# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22−cv−02119−DLF

GARCIA v. RUBIN GROUP LLC et al
Assigned to: Judge Dabney L. Friedrich
Demand: $6,106,000
 Case in other court:  Virginia Eastern, 1:22−cv−00698
Cause: 28:1452 R&R re motions to remand (non−core)

Date Filed: 07/14/2022
Jury Demand: None
Nature of Suit: 370 Other Fraud
Jurisdiction: Federal Question

**Plaintiff**

**KARL GARCIA**                    represented by    **Tracey M. Ohm**
STINSON LEONARD STREET, LLP
1775 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
(202) 728−3008
Fax: (202) 572−9948
Email: tracey.ohm@stinson.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RUBIN GROUP LLC**                represented by    **Laurin H. Mills**
SAMEK WERTHER & MILLS LLC
2000 Tower Oaks Boulevard
Suite 200
Rockville, MD 20852
(703) 547−4693
Fax: 240−912−3030
Email: laurin@samek−law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**819D LLC**                       represented by    **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark David Crawford**
LAW OFFICES OF MARK D.
CRAWFORD, PLLC
1005 North Glebe Road
Suite 210
Arlington, VA 22201
202−256−1244

Email: mcrawford@mdc−law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**819 CAPITAL LLC**                     represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**K STREET HOLDINGS LLC**               represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TR HOLDINGS LLC**                     represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**2233−40TH PARTNERS LLC**              represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SOUTH GLEBE LLC**                     represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**WOODMORE PARTNERS LLC**               represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TRG DEVELOPMENT LLC**                 represented by  **Laurin H. Mills**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**638 NEWTON PARTNERS LLC**             represented by  **Laurin H. Mills**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREW RUBIN**                          represented by  **Christopher Allan Glaser**
                                          JACKSON & CAMPBELL, P.C.
                                          2300 N Street, NW
                                          Suite 300
                                          DC, DC 20037
                                          202−457−1600
                                          Email: cglaser@jackscamp.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**MICHELLE A. TYGIER**                    represented by  **Laurin H. Mills**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT RUBIN**                          represented by  **Laurin H. Mills**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**CANAL VIEW HOLDINGS LLC**               represented by  **Christopher Allan Glaser**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**GREGORY AUGER II**                      represented by  **Alexander McDonald Laughlin**
                                          ODIN, FELDMAN & PITTLEMAN, P.C.
                                          1775 Wiehle Avenue
                                          Suite 400
                                          Reston, VA 20190
                                          (703) 218−2134
                                          Fax: (703) 218−2160
                                          Email: alex.laughlin@ofplaw.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**GREGORY AUGER III**                     represented by  **Alexander McDonald Laughlin**
                                          (See above for address)
                                          *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRISTOS ECONOMAKIS**          represented by   **CHRISTOS ECONOMAKIS**
5058 Joewood Drive
Sanibel, FL 33957
PRO SE

**Defendant**

**LILIANA ECONOMAKIS**          represented by   **LILIANA ECONOMAKIS**
5058 Joewood Drive
Sanibel, FL 33957
PRO SE

**Defendant**

**THOMAS D. MADISON**          represented by   **Douglas E. McKinley**
P O BOX 7395
Alexandria, VA 22307
703−249−2873
Fax: 202−591−1564
Email: doug1803@verizon.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFREY HOULE**          represented by   **William B. Porter**
BLANKINGSHIP & KEITH P.C.
4020 University Drive
Suite 300
Fairfax, VA 22030
(703) 293−7236
Fax: (703) 691−3913
Email: wporter@bklawva.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 06/22/2022 | 1 | | Notice of Removal ( Filing fee $ 402, receipt number AVAEDC−8441607.), filed by 819D LLC. (Attachments: # 1 Exhibit A−1 − Fairfax Circuit Court Pleadings, # 2 Exhibit A−2 − Fairfax Circuit Court Pleadings, # 3 Civil Cover Sheet)(Burgers, Kristen) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/22/2022) |
| 06/22/2022 | | | Initial Case Assignment to District Judge Leonie M. Brinkema and Magistrate Judge John F. Anderson. (kgall) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/22/2022) |
| 06/29/2022 | 2 | | MOTION to Dismiss for Failure to State a Claim by 2233−40th Partners LLC, 638 Newton Partners LLC, 819 Capital LLC, K Street Holdings LLC, Robert Rubin, South Glebe LLC, TR Holdings LLC, TRG Development LLC, The |

| | | |
|---|---|---|
| | | Rubin Group LLC, Michelle A. Tygier, Woodmore Partners LLC. (Attachments: # 1 Proposed Order)(Mills, Laurin) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 3 | Memorandum in Support re 2 MOTION to Dismiss for Failure to State a Claim filed by 2233−40th Partners LLC, 638 Newton Partners LLC, 819 Capital LLC, K Street Holdings LLC, Robert Rubin, South Glebe LLC, TR Holdings LLC, TRG Development LLC, The Rubin Group LLC, Michelle A. Tygier, Woodmore Partners LLC. (Attachments: # 1 Exhibit A − 2020.07.29 ORDER re MTD)(Mills, Laurin) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 4 | Waiver of re 2 MOTION to Dismiss for Failure to State a Claim , 3 Memorandum in Support, by 2233−40th Partners LLC, 638 Newton Partners LLC, 819 Capital LLC, K Street Holdings LLC, Robert Rubin, South Glebe LLC, TR Holdings LLC, TRG Development LLC, The Rubin Group LLC, Michelle A. Tygier, Woodmore Partners LLC (Mills, Laurin) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 5 | MOTION to Dismiss by Canal View Holdings LLC, Andrew Rubin. (Attachments: # 1 Proposed Order)(Glaser, Christopher) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 6 | NOTICE by Canal View Holdings LLC, Andrew Rubin *Rule 7.1 Disclosure* (Glaser, Christopher) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 7 | MOTION to Dismiss for Failure to State a Claim by Jeffrey Houle. (Attachments: # 1 Proposed Order)(Keith, John) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 8 | Memorandum in Support re 7 MOTION to Dismiss for Failure to State a Claim filed by Jeffrey Houle. (Keith, John) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 9 | MOTION to Change Venue */ Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia* by 819D LLC. (Burgers, Kristen) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 10 | Memorandum in Support re 9 MOTION to Change Venue */ Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia* filed by 819D LLC. (Attachments: # 1 Exhibit A, Part 1 − Amended Complaint (DC Superior Court), # 2 Exhibit A, Part 2 − Amended Complaint (DC Superior Court), # 3 Exhibit B − Arbitration Order, # 4 Exhibit C − Third Amended Complaint (Fairfax County Circuit Court), # 5 Exhibit D − Excerpt, Complaint (Fairfax County Circuit Court), paragraph 1, # 6 Exhibit E − Excerpt, Amended Complaint (Fairfax County Circuit Court), paragraph 1 −, # 7 Exhibit F − Excerpt, Second Amended Complaint (Fairfax County Circuit Court), paragraph 1, # 8 Exhibit G − Motion to Stay Case)(Burgers, Kristen) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | 11 | Notice of Hearing Date set for 10:00 a.m. on July 22, 2022 re 9 MOTION to Change Venue */ Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia*, 10 Memorandum in Support,,, |

| | | | |
|---|---|---|---|
| | | | (Burgers, Kristen) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/29/2022) |
| 06/29/2022 | | | Set Deadlines as to 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia*. Motion Hearing set for 7/22/2022 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (clar, ) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 06/30/2022) |
| 07/01/2022 | 12 | | RESPONSE in Support re 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia The 11 Defendants' Consent to Removal of State Court Action and to Transfer of Venue* filed by 2233−40th Partners LLC, 638 Newton Partners LLC, 819 Capital LLC, Robert Rubin, South Glebe LLC, TR Holdings LLC, TRG Development LLC, The Rubin Group LLC, Michelle A. Tygier, Woodmore Partners LLC. (Mills, Laurin) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/01/2022) |
| 07/01/2022 | 13 | | NOTICE of Appearance by Ian Joseph McElhaney on behalf of Jeffrey Houle (McElhaney, Ian) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/01/2022) |
| 07/01/2022 | 14 | | RESPONSE in Support re 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia and Consent to Notice of Removal* filed by Jeffrey Houle. (McElhaney, Ian) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/01/2022) |
| 07/02/2022 | 15 | | NOTICE by Thomas D. Madison (McKinley, Douglas) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/02/2022) |
| 07/05/2022 | 16 | | Response to 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia* filed by Canal View Holdings LLC, Andrew Rubin. (Glaser, Christopher) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/05/2022) |
| 07/06/2022 | 17 | | RESPONSE in Support re 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia* filed by Gregory Auger II. (Laughlin, Alexander) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/06/2022) |
| 07/06/2022 | 18 | | RESPONSE in Support re 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia* filed by Gregory Auger III. (Laughlin, Alexander) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/06/2022) |
| 07/06/2022 | 19 | | NOTICE by Karl Garcia re 1 Notice of Removal, *Fed. R. Bankr. P. 9027(e)(3) Statement* (Ohm, Tracey) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/06/2022) |
| 07/08/2022 | 20 | | NOTICE of Appearance by Tracey Michelle Ohm on behalf of Karl Garcia (Ohm, Tracey) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/08/2022) |
| 07/08/2022 | 21 | | NOTICE of Appearance by Marc Elliott Albert on behalf of Karl Garcia (Albert, Marc) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: |

| | | | |
|---|---|---|---|
| | | | 07/08/2022) |
| 07/13/2022 | 22 | | RESPONSE to Motion re 9 MOTION to Change Venue / *Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia* filed by Karl Garcia. (Ohm, Tracey) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/13/2022) |
| 07/13/2022 | 23 | | Opposition to 7 MOTION to Dismiss for Failure to State a Claim , 2 MOTION to Dismiss for Failure to State a Claim , 3 Memorandum in Support, 5 MOTION to Dismiss , 8 Memorandum in Support filed by Karl Garcia. (Benes, Bethany) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/13/2022) |
| 07/13/2022 | 24 | | MOTION to Strike 7 MOTION to Dismiss for Failure to State a Claim , 2 MOTION to Dismiss for Failure to State a Claim , 3 Memorandum in Support, 5 MOTION to Dismiss , 8 Memorandum in Support by Karl Garcia. (Ohm, Tracey) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/13/2022) |
| 07/13/2022 | 25 | | Memorandum in Support re 24 MOTION to Strike 7 MOTION to Dismiss for Failure to State a Claim , 2 MOTION to Dismiss for Failure to State a Claim , 3 Memorandum in Support, 5 MOTION to Dismiss , 8 Memorandum in Support filed by Karl Garcia. (Ohm, Tracey) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/13/2022) |
| 07/13/2022 | 26 | | ORDERED that this civil action be and is TRANSFERRED to the United States District Court for the District of Columbia; and it is further ORDERED that the hearing currently scheduled for July 22, 2022, be and is CANCELLED. Signed by District Judge Leonie M. Brinkema on 07/13/2022. (nlop, c/m to pro se defendants) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/14/2022) |
| 07/13/2022 | | | Case transferred to District of District of Columbia. (nlop, ) [Transferred from Virginia Eastern on 7/20/2022.] (Entered: 07/14/2022) |
| 07/20/2022 | 27 | | Case transferred in from District of Virginia Eastern; Case Number 1:22−cv−00698. Original file ,transfer order and docket sheet received. (Entered: 07/20/2022) |
| 07/22/2022 | 28 | | MOTION to Remand to State Court *and/or* MOTION to Abstain by KARL GARCIA. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Text of Proposed Order)(Ohm, Tracey). Added MOTION on 7/25/2022 (zed). (Entered: 07/22/2022) |
| 07/26/2022 | 29 | | REPLY to opposition to motion *Eleven Defendants' Reply to Plaintiff's Opposition to Their Motion to Dismiss* RE 7 MOTION to Dismiss for Failure to State a Claim filed by 2233−40TH PARTNERS LLC, 638 NEWTON PARTNERS LLC, 819D LLC, K STREET HOLDINGS LLC, ROBERT RUBIN, RUBIN GROUP LLC, SOUTH GLEBE LLC, TR HOLDINGS LLC, TRG DEVELOPMENT LLC, MICHELLE A. TYGIER, WOODMORE PARTNERS LLC. (Mills, Laurin) Modified on 7/27/2022 to add docket relationship (zed). (Entered: 07/26/2022) |
| 07/27/2022 | 30 | | |

| | | | |
|---|---|---|---|
| | | | Memorandum in opposition to re <u>24</u> MOTION to Strike <u>7</u> MOTION to Dismiss for Failure to State a Claim , <u>2</u> MOTION to Dismiss for Failure to State a Claim , <u>3</u> Memorandum in Support, <u>5</u> MOTION to Dismiss , <u>8</u> Memorandum in Support filed by CANAL VIEW HOLDINGS LLC, ANDREW RUBIN. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Text of Proposed Order)(Glaser, Christopher) (Entered: 07/27/2022) |
| 07/27/2022 | <u>31</u> | | Memorandum in opposition to re <u>24</u> MOTION to Strike <u>7</u> MOTION to Dismiss for Failure to State a Claim , <u>2</u> MOTION to Dismiss for Failure to State a Claim , <u>3</u> Memorandum in Support, <u>5</u> MOTION to Dismiss , <u>8</u> Memorandum in Support filed by JEFFREY HOULE. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B)(Porter, William) (Entered: 07/27/2022) |
| 07/27/2022 | <u>32</u> | | RESPONSE re <u>24</u> MOTION to Strike <u>7</u> MOTION to Dismiss for Failure to State a Claim , <u>2</u> MOTION to Dismiss for Failure to State a Claim , <u>3</u> Memorandum in Support, <u>5</u> MOTION to Dismiss , <u>8</u> Memorandum in Support filed by 2233−40TH PARTNERS LLC, 638 NEWTON PARTNERS LLC, 819 CAPITAL LLC, K STREET HOLDINGS LLC, ROBERT RUBIN, RUBIN GROUP LLC, SOUTH GLEBE LLC, TR HOLDINGS LLC, TRG DEVELOPMENT LLC, MICHELLE A. TYGIER, WOODMORE PARTNERS LLC. (Attachments: # <u>1</u> Exhibit 1 − Def's Opposition to Pltf's Motion to Strike Plea in Bar)(Mills, Laurin) (Entered: 07/27/2022) |
| 07/28/2022 | | | MINUTE ORDER. Defendant 819D LLC is a debtor in a bankruptcy case in this District, No. 22−00101−ELG. Plaintiff's claims are related to that bankruptcy case, and thus this action should be referred to the bankruptcy judge of this District pursuant to DCt.LBR 5011−1 and 28 U.S.C. § 157(a). Accordingly, it is hereby ORDERED that the Clerk of Court shall refer this civil action to the bankruptcy court. So Ordered by Judge Dabney L. Friedrich on July 28, 2022. (lcdfl2) (Entered: 07/28/2022) |
| 07/28/2022 | 33 | | Case referred to the U.S. Bankruptcy Court of the District of Columbia pursuant to Minute Order. (zed) (Entered: 07/28/2022) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **KARL GARCIA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. _____** |
| ) | |
| ) | |
| **THE RUBIN GROUP LLC** ) | |
| **819D LLC** ) | |
| **819 CAPITAL LLC** ) | |
| **K STREET HOLDINGS LLC** ) | |
| **TR HOLDINGS LLC** ) | **Removed from the Circuit Court for** |
| **2233-40ᵀᴴ PARTNERS LLC** ) | **Fairfax County, Virginia, Civil Case** |
| **SOUTH GLEBE LLC** ) | **No. CL-2020-17040** |
| **WOODMORE PARTNERS LLC** ) | |
| **a/k/a WOODMORE LLC** ) | |
| **TRG DEVELOPMENT LLC** ) | |
| **638 NEWTON PARTNERS LLC** ) | |
| **ANDREW RUBIN** ) | |
| **MICHELLE A. TYGIER** ) | |
| **ROBERT RUBIN** ) | |
| **CANAL VIEW HOLDINGS LLC** ) | |
| **GREGORY AUGER II** ) | |
| **GREGORY AUGER III** ) | |
| **CHRISTOS ECONOMAKIS** ) | |
| **LILIANA ECONOMAKIS** ) | |
| **THOMAS D. MADISON** ) | |
| **JEFFREY HOULE,** ) | |
| ) | |
| **Defendants.** ) | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1452, defendant 819D LLC, hereby gives notice and removes this case to the United States District Court for the Eastern District of Virginia, Alexandria Division.

819D LLC respectfully submits the following grounds for removal:

## I.    Nature of the Action and Prior Proceedings

1.     819D LLC is named as one of 20 defendants (collectively, the "**Defendants**") in the civil action captioned *Karl Garcia v. The Rubin Group, et al.,* brought by plaintiff Karl Garcia ("**Garcia**") in the Circuit Court for Fairfax County, Virginia (the "**Circuit Court**"), assigned Case No. CL-2020-17040 (the "**Action**").

2.     Upon information and belief, Garcia commenced the Action by filing an initial Complaint against certain of the Defendants on October 30, 2020. Thereafter, Garcia filed several amended complaints, that, among other things, dropped certain alleged causes of action and added certain Defendants. Garcia's Third Amended Complaint ("**TAC**") is currently his operative pleading in the Action

3.     In the Action, Garcia asserts that in or around April 2017, he purchased a residential condominium unit (the "**Unit**") at 819 D Street NE, Washington DC, from 819D LLC for the purchase price of $1,525,000. TAC ¶¶ 27-28. Garcia further asserts that the Unit suffered from serious defects, giving rise to various legal claims against 819D LLC and certain of the other Defendants. TAC ¶ 29. Garcia then alleges that following his purchase of the Unit, 819D made initial fraudulent transfers totaling $6,106,544.60 (the "**Transferred Funds**") to certain Defendants who then made subsequent fraudulent transfers of portions of the Transferred Funds to other of the Defendants. TAC ¶¶ 231-33. While the TAC identifies a multitude of alleged fraudulent transfers by and among the Defendants, 819D LLC was the  transferor of the $6,106,544.60 in Transferred Funds, such that all other Defendants are either initial transferees or immediate or mediate transferees of the initial transferees. As a result of the foregoing, Garcia asserts two types of fraudulent conveyance claims (the "**Fraudulent Transfer Claims**") against

819D LLC and the other Defendants: (a) Count I – Fraudulent Conveyance Pursuant to Va. Code § 55.1-400 (TAC ¶¶ 235-242); and (b) Count II – Voluntary Conveyance Pursuant to Va. Code § 55.1-401 (TAC ¶¶ 243-249).

4.      819D LLC filed a voluntary petition for relief  (the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code on June 19, 2020 in the United States Bankruptcy Court for the District of Columbia, assigned Bankruptcy Case No. 22-00101. Pursuant to 11 U.S.C. § 301(b),  commencement of the Bankruptcy Case constituted an order for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

5.      Pursuant to 11 U.S.C. §§ 541, 544(b), 548, and 550, the fraudulent transfer claims asserted in the TAC against Defendants comprise assets of 819D LLC's bankruptcy estate, are subject to 819D LLC's control as a debtor in possession under 11 U.S.C. §§ 1107(a) and 1108, and are subject to, and protected from creditor interference by, the automatic stay of 11 U.S.C. § 362(a).

## II.      Basis for Removal – 28 U.S.C. §§ 1452 and 1334(b)

6.      819D LLC removes the Action to this Court under 28 U.S.C. § 1452 because the Action both arises under the Bankruptcy Code and relates to a case under the Bankruptcy Code as contemplated by 28 U.S.C. § 1334(b).

7.      Removal of the Action is proper pursuant to 28 U.S.C. § 1452 because the Action is "related to" the Bankruptcy Case.  The Fraudulent Transfer Claims, which purportedly arise from 819D LLC's initial transfer of the Transferred Funds to certain Defendants and subsequent transfers of the Transferred Funds by the initial transferees, are all property of 819D LLC's bankruptcy estate.  Indeed, if the Fraudulent Transfer Claims are valid and recoverable, they will constitute the bankruptcy estate's primary asset and will be instrumental in funding distributions

3

to creditors under a plan of reorganization. Further, the Fraudulent Transfer Claims are statutorily "core" in that the claims are part of a "proceeding to determine, avoid, or recover fraudulent conveyances," 28 U.S.C. § 157(b)(2)(H). Thus, section 1334(b)'s "related to" standard for original jurisdiction is satisfied.

8.　　Removal of the Action is also proper pursuant to 28 U.S.C. § 1452 because the Action "arises under" the Bankruptcy Code, and therefore this Court has original jurisdiction over the Fraudulent Transfer Claims under 28 U.S.C. § 1334(b).

9.　　Garcia purports to bring the Fraudulent Transfer Claims under state fraudulent conveyance law: Va. Code Ann. §§ 55.1-400 and 401. TAC, Counts I & II. State fraudulent conveyance law is "applicable" only by function of federal law, specifically section 544(b) of the Bankruptcy Code, 11 U.S.C. §544(b). Section 544(b) allows a representative of the bankruptcy estate to invoke state fraudulent conveyance law to "avoid" transfers of property of a bankruptcy debtor such as 819D LLC that could have been avoided outside bankruptcy by (and only by) an unsecured creditor of the debtor. 11 U.S.C. § 544(b). Without section 544(b), neither the debtor nor a representative of the bankruptcy estate would have standing to pursue the Fraudulent Transfer Claims.

10.　　Accordingly, section 1334(b)'s "arising under" jurisdiction extends to the Fraudulent Transfer Claims brought pursuant to section 544(b) of the Bankruptcy Code.

## III.　**Procedural Compliance and Reservation of Rights**

11.　　Pursuant to Fed. R. Bankr. P. 9027(a)(1) and 28 U.S.C. § 1446(a), this Notice is properly filed in this Court, the United States District Court for the Eastern District of Virginia, Alexandria Division, as the district and division within which Garcia filed the Action.

4

12.     819D LLC consents to this Court's entry of final orders or judgment in this matter.

13.     Pursuant to Fed. R. Bankr. P. 9027(b), copies of the process and pleadings filed with the Circuit Court in the Action accompany this Notice of Removal.  *See* **Exhibit A** attached hereto.

14.     This Notice is filed within 90 days following the order for relief in the Bankruptcy Case and thus this Notice is timely pursuant to Fed. R. Bankr. P. 9027(a)(2).

15.     A copy of this Notice will be promptly served upon Garcia's counsel and counsel for all Defendants and filed with the clerk of the Circuit Court, pursuant to Fed. R. Bankr. P. 9027(b) and (c).

16.     819D LLC reserves the right to take any and all positions regarding the validity of the Fraudulent Transfer Claims, Garcia's claim to have suffered damages or injury, and any and all other claims asserted by Garcia in any forum or proceeding.  819D LLC does not waive, and specifically reserves, any and all defenses to any claims asserted against it in the Action or in any other lawsuit or civil or administrative proceeding brought by Garcia. No statement herein or omission herefrom shall be deemed to constitute an admission by 819D LLC of any of the allegations of, or damages sought, in the TAC.

Dated:  June 22, 2022                  Respectfully submitted,

                                   /s/ *Kristen E. Burgers*
                                   Stephen E. Leach (Va. Bar No. 20601)
                                   Kristen E. Burgers (Va. Bar No. 67997)
                                   HIRSCHLER FLEISCHER, PC
                                   8270 Greensboro Drive, Suite 700
                                   Tysons, Virginia 22102
                                   Phone:  (703) 584-8902
                                   Facsimile:  (703) 584-8901
                                   Email:  sleach@hirschlerlaw.com
                                            kburgers@hirschlerlaw.com
                                   *Attorneys for 819D LLC*

6

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2022, the foregoing Notice of Removal was electronically filed with the United States District Court for the Eastern District of Virginia, Alexandria Division, using the Court's CM/ECF system. Additionally, I certify that the foregoing was served upon counsel of record and unrepresented parties in the Action via email where indicated below and by first-class mail, postage prepaid, upon the following:

Bethany Benes, Esq.
Bethune Benes, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax, VA 22030
Email: bbenes@bethunebenes.com

Christopher A. Glaser, Esq.
Jackson & Campbell
2300 N Street NW, Suite 300
Washington, DC 20037
Email: cglaser@jackscamp.com

Laurin H. Mills, Esq.
Samek Werther Mills, LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
Email: laurin@samek-law.com

John A.C. Keith, Esq.
Blankingship & Keith
4020 University Drive, Suite 300
Fairfax, VA 22030
Email: jkeith@bklawva.com

Alexander M. Laughlin, Esq.
Odin Feldman Pittleman, PC
1775 Wiehle Avenue, Suite 400
Reston, VA 20190
Email: alex.laughlin@ofplaw.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria, VA 22307
Email: demckinley@verizon.net

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 N. Glebe Road, Suite 210
Arlington, VA 22201
Email: mcrawford@mdc-law.com

Liliana Ekonomakis
5058 Joewood Drive
Sanibel, FL 33957

Christos Ekonomakis
5058 Joewood Drive
Sanibel, FL 33957

_Kristen E. Burgers_____
Kristen E. Burgers

# EXHIBIT A

**VIRGINIA**

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

FILED
CIVIL PROCESSING

2022 MAR 23 ⊃ 1: 30

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| **KARL GARCIA**<br>c/o Bethune Benes, PLLC<br>4290 Chain Bridge Road, Suite 302<br>Fairfax, Virginia 22030<br><br>*Plaintiff,*<br><br>v.<br><br>**THE RUBIN GROUP LLC**<br>c/o Laurin Mills, Esq.<br>*Counsel*<br><br>*and*<br><br>**819D LLC**<br>c/o Mark Crawford, Esq.<br>*Counsel*<br><br>*and*<br><br>**819 Capital LLC**<br>c/o Laurin Mills, Esq.<br>*Counsel*<br><br>*and*<br><br>**K STREET HOLDINGS LLC**<br>c/o Laurin Mills, Esq.<br>*Counsel*<br><br>*and*<br><br>**TR HOLDINGS LLC**<br>c/o Laurin Mills, Esq.<br>*Counsel*<br><br>*and*<br><br>**2233-40th PARTNERS LLC**<br>c/o Laurin Mills, Esq.<br>*Counsel* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. CL-2020-17040 |

1

*and*                                                )
                                                     )
**SOUTH GLEBE LLC**                                  )
c/o Laurin Mills, Esq.                               )
*Counsel*                                            )
                                                     )
*and*                                                )
                                                     )
**WOODMORE PARTNERS LLC**                            )
**a/k/a WOODMORE LLC**                               )
c/o Laurin Mills, Esq.                               )
*Counsel*                                            )
                                                     )
*and*                                                )
                                                     )
**TRG DEVELOPMENT LLC**                              )
c/o Laurin Mills, Esq.                               )
*Counsel*                                            )
                                                     )
*and*                                                )
                                                     )
**638 NEWTON PARTNERS LLC**                          )
c/o Laurin Mills, Esq.                               )
*Counsel*                                            )
                                                     )
*and*                                                )
                                                     )
**ANDREW RUBIN**                                     )
c/o Christopher Glaser, Esq.                         )
*Counsel*                                            )
                                                     )
*and*                                                )
                                                     )
**MICHELLE A. TYGIER**                               )
c/o Laurin Mills, Esq.                               )
*Counsel*                                            )
                                                     )
and                                                  )
                                                     )
**ROBERT RUBIN**                                     )
c/o Laurin Mills, Esq.                               )
*Counsel*                                            )
                                                     )
*and*                                                )
                                                     )

2

**CANAL VIEW HOLDINGS LLC**                    )
<u>Serve</u>: **Corporation Service Company,**    )
**Registered Agent**                            )
**1090 Vermont Ave., NW**                       )
**Washington, DC 20005**                        )
                                                )
*and*                                           )
                                                )
**GREGORY AUGER II**                            )
**c/o Alex Laughlin, Esq.**                     )
*Counsel*                                       )
                                                )
*and*                                           )
                                                )
**GREGORY AUGER III**                           )
**c/o Alex Laughlin, Esq.**                     )
*Counsel*                                       )
                                                )
*and*                                           )
                                                )
**CHRISTOS ECONOMAKIS**                         )
**5058 Joewood Drive**                          )
**Sanibel, FL 33957**                           )
                                                )
*and*                                           )
                                                )
**LILIANA ECONOMAKIS**                          )
**5058 Joewood Drive**                          )
**Sanibel, FL 33957**                           )
                                                )
*and*                                           )
                                                )
**THOMAS D. MADISON**                           )
**c/o Douglas McKinley, Esq.**                  )
*Counsel*                                       )
                                                )
*and*                                           )
                                                )
**JEFFREY HOULE**                               )
**c/o John Keith, Esq.**                        )
*Counsel*                                       )
                                                )
    *Defendants.*           )

## THIRD AMENDED COMPLAINT

COMES NOW, Karl Garcia, by counsel, and hereby files this Amended Complaint against

Defendants The Rubin Group, LLC ("**The Rubin Group**"), 819D LLC ("**819D**"), 819 Capital

3

LLC ("**819 Capital**"), K Street Holdings LLC ("**K Street**"), TR Holdings LLC ("**TR Holdings**"), 2233-40ᵗʰ Partners LLC ("**2233**"), South Glebe LLC ("**South Glebe**"), Woodmore Partners LLC a/k/a Woodmore LLC ("**Woodmore**"), TRG Development LLC ("**TRG Development**"), 638 Newton Partners LLC ("**638 Newton**"), Canal View Holdings LLC ("**Canal View**"), Andrew Rubin ("**A. Rubin**") Michelle A. Tygier ("**Tygier**"), Robert Rubin ("**R. Rubin**"), Gregory Auger II ("**Auger II**"), Gregory Auger III ("**Auger III**"), Christos Economakis ("**Christos**"), Liliana Economakis ("**Liliana**" ), Thomas D. Madison ("**Madison**"), and Jeffrey Houle ("**Houle**") (each a "**Defendant**" and collectively, the "**Defendants**") relating to the Defendants' fraudulent scheme to convey assets to keep them out of the purvey of Mr. Garcia's right to collection in satisfy a judgment. In support thereof, Mr. Garcia states as follows:

## PARTIES

1. Karl Garcia ("**Mr. Garcia**") is a resident of the State of Florida and the purchaser of the real property located at 819 D Street, Northeast, Unit 34, Washington, DC 20002 (the "**Unit**").

2. The Rubin Group is a limited liability company registered with the Commonwealth of Virginia and is managed by. Tygier and A. Rubin. As will be further discussed below, The Rubin Group is the alter ego or business conduit of A. Rubin and Tygier and their various entities, including 819D and 819 Capital, conducting business under its name. As will be further discussed below, The Rubin Group has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

3. 819D is a limited liability company registered in the District of Columbia. 819D is managed by TRG Development, through its managing member The Rubin Group. 819D regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, 819D has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for

4

which Mr. Garcia is entitled to as a result of his status as a creditor. As will be discussed in further detail below, 819D is the alter ego or business conduit of The Rubin Group and 819 Capital.

4. 819 Capital is a limited liability company registered in the District of Columbia and is managed by The Rubin Group. 819 Capital is the alter ego and business conduit of 819D and regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, 819 Capital has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor. As will be discussed in further detail below, 819 Capital is the alter ego or business conduit of The Rubin Group and 819D.

5. K Street is a limited liability company registered in the District of Columbia and is managed by Tygier and A. Rubin. The Rubin Group owns 100% of Class B and 91% of the intra-class interests in K Street. K Street regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, K Street has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

6. TR Holdings is a limited liability company registered in the District of Columbia and is managed by Tygier. TR Holdings regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, TR Holdings has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor. As will be discussed in further detail below, TR Holdings is the alter ego or business conduit of Tygier and R. Rubin.

5

7.  2233 is a limited liability company registered in the District of Columbia and is managed by The Rubin Group. 2233 regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, 2233 has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

8.  South Glebe is a limited liability company registered with the Commonwealth of Virginia and is managed by The Rubin Group. South Glebe regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, South Glebe has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

9.  Woodmore is a limited liability company registered in the District of Columbia and is managed by The Rubin Group. Woodmore regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, Woodmore has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

10. TRG Development is a limited liability company registered in the District of Columbia and is managed by The Rubin Group. TRG Development regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, TRG Development has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.   As will be discussed in further detail below, TRG Development is the alter ego or business conduit of The Rubin Group.

6

11. 638 Newton is a limited liability company registered in the District of Columbia and is managed by Tygier and A. Rubin, with R. Rubin having certain decision-making rights. 638 Newton regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group and A. Rubin. As will be further discussed below, 638 Newton has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

12. A. Rubin is the son of Defendants Tygier and R. Rubin and is a resident of the state of Maryland, residing at 1423 Sharps Point Road, Annapolis, Maryland 21409. A. Rubin is an officer and/or Member of each Canal View, The Rubin Group, 819D, K Street, 2230, 638 Newton, South Glebe, Woodmore, and TRG Development. A. Rubin regularly conducts business in the Commonwealth of Virginia through his business transactions with The Rubin Group. As will be further discussed below, A. Rubin has caused tortious injury in this Commonwealth through his participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

13. Tygier is the mother of Defendant A. Rubin and the wife of Defendant R. Rubin. Tygier is a resident of the District of Columbia, residing at 3704 Military Road Northwest, Washington, DC 20015. Tygier is an officer and/or Member of each The Rubin Group, 819D, K Street, TR Holdings, 2230, South Glebe, Woodmore, 638 Newton, and TRG Development. Tygier regularly conducts business in the Commonwealth of Virginia through her business transactions with The Rubin Group. As will be further discussed below, Tygier has caused tortious injury in this Commonwealth through her participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

14. R. Rubin is the father of Defendant A. Rubin and the husband of Defendant Tygier. R. Rubin is a resident of the District of Columbia, residing at 3704 Military Road Northwest,

7

Washington, DC 20015. R. Rubin is an officer and/or Member of Defendant TR Holdings. R. Rubin regularly conducts business in the Commonwealth of Virginia through his business transactions with The Rubin Group and TR Holdings. As will be further discussed below, R. Rubin has caused tortious injury in this Commonwealth through his participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

15. Canal View is a limited liability company registered in the District of Columbia. Canal View regularly conducts business in the Commonwealth of Virginia through its business transactions with The Rubin Group. As will be further discussed below, Canal View has caused tortious injury in this Commonwealth through its participation in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.  As will be discussed in further detail below, Canal View is the alter ego or business conduit of A. Rubin.

16. Tygier, R. Rubin, and A. Rubin own and operate Defendants The Rubin Group, 819D, 819 Capital LLC, K Street, TR Holdings, 2233, South Glebe, Woodmore, TRG Development, 638 Newton, and Canal View (collectively referred to as the "**Entity Defendants**"), maintaining complete domination and unity of ownership.  While Operating Agreements were entered into for each of the Entity Defendants, the corporate formalities and requirements set forth in the Operating Agreements were disregarded.  The Entity Defendants have been and continue to be operated as and advertised by each Tygier, R. Rubin, and A. Rubin as the single entity of "The Rubin Group".  The operations and funds of each Entity Defendant have been co-mingled, including use of funds to pay for expenses of a separate Entity Defendant, including payroll and development costs. The Entity Defendants utilize the residential addresses of Tygier and R. Rubin or A. Rubin as the business address of each entity and all share the same equipment to conduct

8

24

business. Additionally, the Entity Defendants operate using the same phone numbers, computers, email addresses, and websites as those maintained by The Rubin Group.

17. Tygier, R. Rubin, and A. Rubin, as controlling members and/or managers, have siphoned away funds of the Entity Defendants. Tygier, A. Rubin, and R. Rubin generally treat the assets and funds of the Entity Defendants as their personal piggy banks, including regularly transferring funds from bank accounts held in the name of an Entity Defendant to personal accounts to cover overdraft of such personal account as well as pay for personal expenses not related to the Entity Defendant. As admitted in the Complaint filed by A. Rubin on behalf of Canal View against TR Holdings and The Rubin Group in this Court as Case No. CL-19-9270, "Tygier and [R. Rubin] misappropriated funds belonging to [The Rubin Group] for their own benefit including, by way of example, to satisfy their personal car payments and repairs to their personal home."

18. Auger II is a resident of the District of Columbia, residing at 2320 Wisconsin Ave., NW, Unit 312, Washington, DC 20007. Auger II is a member of 819D. Auger II regularly conducts business in the Commonwealth of Virginia through his business transactions with 819D and its alter-ego The Rubin Group, including receiving improperly conveyed funds through Eagle Bank, which operates in Virginia. As will be further discussed below, Auger II has caused tortious injury in this Commonwealth through his participation as a grantee in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

19. Auger III is a resident of the District of Columbia, residing at 2320 Wisconsin Ave., NW, Unit 312, Washington, DC 20007. Auger II is a member of 819D. Auger III regularly conducts business in the Commonwealth of Virginia through his business transactions with 819D and its alter-ego The Rubin Group, including receiving improperly conveyed funds through Eagle Bank, which operates in Virginia. As will be further discussed below, Auger III has caused tortious injury in this Commonwealth through his participation as a grantee in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

9

20. Christos is a resident of the State of Florida and is a member of 819D. Christos regularly conducts business in the Commonwealth of Virginia through his business transactions with 819D and its alter-ego The Rubin Group, including receiving improperly conveyed funds through Eagle Bank, which operates in Virginia. As will be further discussed below, Christos has caused tortious injury in this Commonwealth through his participation as a grantee in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

21. Liliana is a resident of the State of Florida and is a member of 819D. Liliana regularly conducts business in the Commonwealth of Virginia through her business transactions with 819D and its alter-ego The Rubin Group, including receiving improperly conveyed funds through Eagle Bank, which operates in Virginia. As will be further discussed below, Liliana has caused tortious injury in this Commonwealth through her participation as a grantee in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

22. Madison is a resident of the Commonwealth of Virginia and regularly conducts business in the Commonwealth of Virginia through his business transactions with 819D and its alter-egos The Rubin Group and 819 Capital, including receiving improperly conveyed funds through Sandy Spring Bank, which operates in Virginia. As will be further discussed below, Madison has caused tortious injury in this Commonwealth through his participation as a grantee in fraudulent and/or voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

23. Houle is a resident of the Commonwealth of Virginia and regularly conducts business in the Commonwealth of Virginia through his business transactions with 819D and its alter-egos The Rubin Group and 819 Capital, including receiving improperly conveyed funds through Sandy Spring Bank, which operates in Virginia. As will be further discussed below, Houle has caused tortious injury in this Commonwealth through his participation as a grantee in fraudulent and/or

10

26

voluntary conveyances of assets for which Mr. Garcia is entitled to as a result of his status as a creditor.

## JURISDICTION

24. This Court has jurisdiction over the claims asserted in this Complaint pursuant to Va. Code § 17.1-513.

25. This Court has personal jurisdiction over each of the Defendants pursuant to Va. Code 8.01-328.1(A), as each Defendant has transacted business in the Commonwealth and has engaged in causing a tortious injury upon Mr. Garcia through various transfers of funds from at least one Virginia entity.

26. Venue is proper in this judicial circuit pursuant to Va. Code § 8.01-261(11). With regards to Defendants The Rubin Group and TRG Development, venue is proper in this judicial circuit pursuant to Va. Code § 8.01-262(2). As to all Defendants, venue is proper in this judicial circuit pursuant to Va. Code §§ 8.01-262(3) and (4).

## FACTUAL ALLEGATIONS

27. In or around April 2017, Mr. Garcia purchased Unit 34, located within the building known as "The Sanctuary", with an address of 819 D Street NE, Washington, DC (the "**Property**") from Defendant 819D for a total purchase price of One Million Five Hundred and Twenty-Five Thousand Dollars ($1,525,000.00). As an owner of a unit within the Property, Mr. Garcia is also a member of homeowners' association known as The Sanctuary Condominium Unit Owners Association (the "**Association**") and has certain rights with regards to the Property's Common Area Elements, as defined by the Association's governing documents.

28. While the legal title of Unit 34 transferred from 819D to Mr. Garcia, A. Rubin, Tygier, and The Rubin Group were intricately involved during the purchase process between 819D and Mr. Garcia. In fact, the Property bears a plaque, believed to have been installed by A. Rubin, Tygier, and The Rubin Group, indicating that the Property was "RESTORED BY: The Rubin Group" in

11

2016. A. Rubin similarly posted a picture on his personal Instagram account showing Tygier, R. Rubin, and A. Rubin sitting in Unit 34 and advertised that the "developer" of the Property was The Rubin Group, including "#therubingroup" in his post.

29. Unbeknownst to Mr. Garcia at the time, A. Rubin, Tygier, 819D, and The Rubin Group were aware that the Property suffered from serious defects prior to the transfer of Unit 34 to Mr. Garcia.

30. On April 22, 2017, a pre-closing inspection was conducted at which a number of defects were identified within Unit 34 ("**Punch List Items**"). The Punch List Items were not limited to necessary cosmetic repairs; the Punch List Items included serious defects within the Unit categorized as "major problem(s)" by a certified inspector, including evidence of window leaks, visible decay, and numerous safety issues resulting from improperly constructed stairs. A. Rubin, Tygier, 819D, and The Rubin Group were notified of the defects listed and promised to make all necessary repairs. As a result of their promises, the purchase of the Unit proceeded to settlement on April 28, 2017.

31. On May 1, 2017, a follow-up inspection was conducted with Tygier and 819D (the "**Pre-Move-In Inspection**"). During the Pre-Move-In Inspection, Tygier and 819D represented that the Punch List items would be resolved prior to Mr. Garcia's move in. Ultimately, however, the Punch List items were not resolved.

32. Upon moving into Unit 34, Mr. Garcia began to personally notice further structural deficiencies and other flaws with Unit 34 and the Property, including substantial leaks in the Unit's windows and walls and severe humidity issues. Mr. Garcia notified Defendants The Rubin Group, 819D, and Tygier of the issues on multiple occasions beginning on May 4, 2017.

33. On June 1, 2017, Tygier participated in a meeting of the Property's Association. At the meeting, a number of residents voiced their outrage over the Property's defects and lack of repair by Tygier, A. Rubin, 819D, and The Rubin Group. Claims made by the residents at the meeting

12

included that Tygier, A. Rubin, 819D, and The Rubin Group were required pursuant to D.C. Code to repair and resolve the defects.

34. Mr. Garcia began further investigating the issues with the Property as a whole. On or about August 6, 2017, Mr. Garcia created a "**Common Area Punch List**," itemizing various issues with the Property's Common Areas. The Common Area Punch List included images and captions, detailing everything from a broken attic window in the Property Mr. Garcia noticed walking down the street, to eroding mortar on the façade's exterior, to missing portions of the Property's brick chimney stack. Three days later, on August 9, 2017, Mr. Garcia submitted the document to Defendant 819D, A. Rubin, and Tygier via the email address warranty@rubingroupdc.com, for which A. Rubin and Tygier both had access to, maintained, and utilized for Property issues.

35. On August 21, 2017, Mr. Garcia met with 819D and Tygier, to perform a walk-through of the Property to address the Common Area Punch List.

36. Since moving into Unit 34, Mr. Garcia has uncovered multiple defects within Unit 34 and the Property through professional inspections and analysis, including but not limited to:

        a.  extremely high humidity and moisture levels;

        b.  a large, gaping hole in Unit 34's HVAC closet exposing the Unit to the outside elements;

        c.  missing mortar on the façade's exterior;

        d.  missing portions of the Property's brick chimney stack;

        e.  a pigeon infestation in the Property's attic, causing significant health risks to the residents and guests of the Property; and

        f.  a significant and reoccurring water leak in the Property's bell tower, resulting in downpours of water infiltrating Unit 34.

13

37. On March 24, 2018, through a detailed letter addressed to 819D and A. Rubin, Mr. Garcia notified the Defendants of the existential issues with Unit 34 and the Property. Mr. Garcia included the findings of the hired professionals and their reports with his correspondence.

38. On April 17, 2018, 819D, through A. Rubin, confirmed receipt of Mr. Garcia's March 24, 2018 letter.

39. On or about July 13, 2018, after the issues within Unit 34 and the Property still remained, undersigned counsel sent official notice to Defendants The Rubin Group, 819D, A. Rubin, and Tygier that Mr. Garcia had hired legal representation relating to his claims for structural defects and health hazards affecting Unit 34 and the Property (the "**Litigation Hold Letter**"). The Litigation Hold Letter expressly cautioned against the transfer, dissipation, or otherwise disposal of any assets to avoid enforcement in Mr. Garcia's anticipated judgment.

40. The delivery of the Litigation Hold Letter, and the acceptance of the same by each The Rubin Group, 819D, A. Rubin, and Tygier, was confirmed via certified mail, return receipt requested, signature required.

41. On or about July 27, 2018, 819D through counsel, responded to and confirmed receipt of the Litigation Hold Letter. The July 27, 2018 letter conceded that 819D (and accordingly A. Rubin and Tygier) had notice of the "outstanding issues" as early as February 2018 as a result of emails between Mr. Garcia, 819D, and a contractor known as Potomac Construction Group.

42. On August 10, 2018, undersigned counsel sent official notice to Defendants Auger II, Auger III, and Christos that Mr. Garcia had hired legal representation relating to his claims for structural defects and health hazards affecting Unit 34 and the Property (the "**2nd Round Litigation Hold Letter**"). The 2nd Round Litigation Hold Letter expressly cautioned against the transfer, dissipation, or otherwise disposal of any assets to avoid enforcement in Mr. Garcia's anticipated judgment.

14

43. On or about December 11, 2018, Mr. Garcia filed a formal structural defect warranty claim relating to Unit 34 with the Department of Housing and Community Development in the District of Columbia.

44. On or about August 23, 2019, 819D was served with a Notice of Warranty Claim regarding Mr. Garcia's complaints. 819D, through counsel, confirmed receipt of the Notice of Warranty Claim in correspondence with the District of Columbia dated September 16, 2019.

45. On or about May 18, 2020, Mr. Garcia filed an action in the Superior Court of the District of Columbia asserting claims relating to Defendants 819D, The Rubin Group, A. Rubin, and Tygier (the "**DC Action**"). Mr. Garcia's DC Action asserts damages totaling no less than Four - Million, Five Hundred and Seventy-Five Thousand Dollars ($4,575,000.00), plus interest, punitive damages, and attorneys' fees.

46. As a result of the communications from Mr. Garcia and the interactions of Mr. Garcia and 819D, A. Rubin, and Tygier between April 2017 and May 2020, Defendants The Rubin Group, 819D, A. Rubin, Tygier, and any entity controlled by and/or in which A. Rubin and/or Tygier were agents, had adequate and actual notice of Mr. Garcia's claims. Accordingly, Mr. Garcia is, and has been a "creditor" of each under Virginia law since April 2017.

47. Notwithstanding Mr. Garcia's status as a creditor, and that litigation was anticipated, Defendants The Rubin Group, 819D, A. Rubin, and Tygier made transfers of assets from The Rubin Group and 819D after April 2017.

48. On or about April 27, 2017, Defendant 819D transferred funds in the amount of $1,200,000 to 819 Capital as a member distribution.

49. Following the receipt of the money from 819D, Defendant 819 Capital subsequently transferred the $1,200,000 on or about April 27, 2017 as follows:

    a. Funds in the amount of $206,250 to TR Holdings as a member distribution;

    b. Funds in the amount of $206,250 to Canal View as a member distribution;

15

    c.  Funds in the amount of $37,500 to Pelican Resource as a member distribution;

    d.  Funds in the amount of $250,000 to Madison as a member distribution;

    e.  Funds in the amount of $50,000 to Moore as a member distribution;

    f.  Funds in the amount of $50,000 to Mark and Lynette Russell as a member distribution;

    g.  Funds in the amount of $125,000 to Zohlman as a member distribution;

    h.  Funds in the amount of $50,000 to McFarland as a member distribution;

    i.  Funds in the amount of $50,000 to Houle as a member distribution;

    j.  Funds in the amount of $50,000 to Ivor and Lexy Kessler as a member distribution;

    k.  Funds in the amount of $50,000 to Haminger as a member distribution;

    l.  Funds in the amount of $25,000 to Gray as a member distribution;

    m.  Funds in the amount of $50,000 to Kagen-Waghelstein as a member distribution;

50. On or about May 1, 2017, Defendant 819D transferred funds in the amount of $1,400,000 to 819 Capital as a member distribution.

51. Following the receipt of the money from 819D, Defendant 819 Capital subsequently transferred the $1,400,000 on or about May 1, 2017 as follows:

    a.  Funds in the amount of $97,086.68 to TR Holdings as a member distribution;

    b.  Funds in the amount of $97,086.68 to Canal View as a member distribution;

    c.  Funds in the amount of $16,435.68 to Pelican Resource as a member distribution;

    d.  Funds in the amount of $108,168.49 to Madison as a member distribution;

    e.  Funds in the amount of $21,914.25 to Moore as a member distribution;

    f.  Funds in the amount of $21,892.33 to Mark and Lynette Russell as a member distribution;

    g.  Funds in the amount of $54,292.47 to Zohlman as a member distribution;

    h.  Funds in the amount of $21,695.07 to McFarland as a member distribution;

16

> > i.  Funds in the amount of $21,432.05 to Houle as a member distribution;
> >
> > j.  Funds in the amount of $21,629.32 to Ivor and Lexy Kessler as a member distribution;
> >
> > k.  Funds in the amount of $21,388.22 to Haminger as a member distribution;
> >
> > l.  Funds in the amount of $10,540.68 to Gray as a member distribution;
> >
> > m.  Funds in the amount of $20,774.54 to Kagen-Waghelstein as a member distribution;

52. On or about May 2, 2017, Defendant A. Rubin transferred funds in the amount of $40,000 to South Glebe.

53. On or about May 4, 2017, Defendant TR Holdings transferred funds in the amount of $40,000 to South Glebe.

54. On or about June 26, 2017, Defendant A. Rubin transferred funds in the amount of $40,000 to South Glebe.

55. On or about June 27, 2017, Defendant South Glebe transferred funds in the amount of $10,000 to Canal View.

56. On or about July 13, 2017, Defendant TR Holdings transferred funds in the amount of $3,000 to 2233.

57. On or about July 18, 2017, Defendant 819 Capital transferred funds in the amount of $835,783.54 to The Rubin Group.

58. Following the receipt of the money from 819 Capital, Defendant The Rubin Group subsequently transferred the $835,783.54 on or about July 18, 2017 as follows:

> > a.  Funds in the amount of $417,891.77 to Canal View for the benefit of A. Rubin;
> >
> > b.  Funds in the amount of $417,891.77 to Tygier and R. Rubin;

59. On or about July 21, 2017, Defendant 819D transferred funds in the amount of $417,892 to The Rubin Group for distribution to Tygier.

17

60. On or about July 21, 2017, Defendant 819D transferred funds in the amount of $417,892 to The Rubin Group for distribution to A. Rubin.

61. On or about July 21, 2017, Defendant 819D transferred funds in the amount of $365,500 to The Rubin Group.

62. On or about July 21, 2017, Defendant 819D transferred funds in the amount of $55,250 to The Rubin Group.

63. On or about July 21, 2017, Defendant 819D transferred funds in the amount of $97,300 to The Rubin Group.

64. On or about July 26, 2017, Defendant 819 Capital transferred funds in the amount of $82,750 to 819D.

65. On or about August 1, 2017, Defendant 819D transferred funds in the amount of $82,750 to 819 Capital.

66. On or about August 1, 2017, Defendant 819D made a second transfer of funds in the amount of $82,750 to 819 Capital.

67. On or about August 1, 2017, Defendant 819D made a third transfer of funds in the amount of $240,000 to 819 Capital.

68. Following the receipt of the money from 819D, Defendant 819 Capital subsequently transferred the funds on or about August 1, 2017 as follows:

       a. Funds in the amount of $2,773.63 to TR Holdings as a member distribution;

       b. Funds in the amount of $2,773.63 to Canal View as a member distribution;

       c. Funds in the amount of $504.30 to Pelican Resource as a member distribution;

       d. Funds in the amount of $3,361.98 to Madison as a member distribution;

       e. Funds in the amount of $672.40 to Moore as a member distribution;

       f. Funds in the amount of $672.40 to Mark and Lynette as a member distribution;

       g. Funds in the amount of $1,680.99 to Zohlman as a member distribution;

18

    h.   Funds in the amount of $672.40 to McFarland as a member distribution;

    i.    Funds in the amount of $672.40 to Houle as a member distribution;

    j.    Funds in the amount of $672.40 to Ivor and Lexy as a member distribution;

    k.   Funds in the amount of $672.40 to Haminger as a member distribution;

    l.    Funds in the amount of $336.20 to Gray as a member distribution;

    m.  Funds in the amount of $672.40 to Kagen-Waghelstein as a member distribution;

69. On or about August 23, 2017, Defendant A. Rubin transferred funds in the amount of $5,000.00 to South Glebe.

70. Following the receipt of the money from A. Rubin, Defendant South Glebe transferred $5,000 to Canal View on or about August 23, 2017.

71. On or about August 24, 2017, Defendant A. Rubin transferred funds in the amount of $5,000.00 to South Glebe.

72. Following the receipt of the money from A. Rubin, Defendant South Glebe transferred $5,000 to Canal View on or about August 24, 2017.

73. On or about September 14, 2017, Defendant A. Rubin transferred funds in the amount of $25,000.00 to Woodmore.

74. Following the receipt of the money from A. Rubin, Defendant Woodmore transferred $25,000 to Canal View on or about September 14, 2017.

75. On or about September 29, 2017, Defendant A. Rubin transferred funds in the amount of $18,000.00 to 638 Newton.

76. On or about October 18, 2017, Defendant 819D transferred funds in the amount of $151,197.31 to Christos and Liliana.

77. On or about October 18, 2017, Defendant 819D transferred funds in the amount of $750,156.04 to Auger II.

19

78. On or about October 18, 2017, Defendant 819D transferred funds in the amount of $196,667.18 to Auger III.

79. On or about November 7, 2017, Defendant Canal View transferred funds in the amount of $50,000 to A. Rubin.

80. On or about November 27, 2017, Defendant 819 Capital transferred funds in the amount of $82,750 to Canal View.

81. On or about November 27, 2017, Defendant The Rubin Group transferred funds in the amount of $50,000 to 2233.

82. On or about November 27, 2017, Defendant The Rubin Group transferred a second set of funds in the amount of $500.00 to 2233.

83. On or about November 28, 2017, Defendant The Rubin Group transferred funds in the amount of $100,000.00 to 2233.

84. On or about November 28, 2017, Defendant The Rubin Group transferred a second set of funds in the amount of $1,000.00 to 2233.

85. On or about November 30, 2017, Defendant A. Rubin transferred funds in the amount of $35,000.00 to South Glebe.

86. Following the receipt of the money from A. Rubin, Defendant South Glebe transferred $35,000 to Canal View on or about November 30, 2017.

87. On or about December 1, 2017, Defendant 819 Capital transferred funds conveyed from 819D as follows:

       a. Funds in the amount of $1,293.56 to TR Holdings as a member distribution;

       b. Funds in the amount of $1,293.56 to Canal View as a member distribution;

       c. Funds in the amount of $347.11 to Pelican Resource as a member distribution;

       d. Funds in the amount of $2,443.09 to Madison as a member distribution;

       e. Funds in the amount of $462.81 to Moore as a member distribution;

20

    f.   Funds in the amount of $464.82 to Mark and Lynette Russell as a member distribution;

    g.   Funds in the amount of $1,202.39 to Zohlman as a member distribution;

    h.   Funds in the amount of $482.97 to McFarland as a member distribution;

    i.   Funds in the amount of $489.02 to Ivor and Lexy Kessler as a member distribution;

    j.   Funds in the amount of $511.20 to Haminger as a member distribution;

    k.   Funds in the amount of $269.72 to Gray as a member distribution;

    l.   Funds in the amount of $567.66 to Kagen-Waghelstein as a member distribution;

88. On or about December 7, 2017, Defendant 819D transferred funds in the amount of $605,152.28 to 819 Capital.

89. On or about December 13, 2017, Defendant 819 Capital transferred funds in the amount of $859,725.67 to The Rubin Group.

90. On or about December 15, 2017, Defendant The Rubin Group transferred funds in the amount of $150,000 to South Glebe.

91. On or about December 18, 2017, Defendant TR Holdings transferred funds in the amount of $25,000 to Tygier and R. Rubin.

92. On or about December 27, 2017, Defendant TR Holdings transferred funds in the amount of $15,000 to Tygier and R. Rubin.

93. On or about December 29, 2017, Defendant The Rubin Group transferred funds in the amount of $7,200 to TRG Development.

94. On or about January 17, 2018, Defendant Canal View transferred funds in the amount of $60,000 to A. Rubin.

95. On or about January 17, 2018, Defendant 819 Capital transferred funds in the amount of $1,293.56 to The Rubin Group.

21

96. On or about January 26, 2018, Defendant A. Rubin transferred funds in the amount of $5,000.00 to Woodmore.

97. Following the receipt of the money from A. Rubin, Defendant Woodmore transferred $5,000 to Canal View on or about January 26, 2018.

98. On or about January 30, 2018, Defendant The Rubin Group transferred funds in the amount of $7,000 to TRG Development.

99. On or about January 30, 2018, Defendant The Rubin Group transferred a second set of funds in the amount of $1,000 to TRG Development.

100.     On or about February 7, 2018, Defendant TR Holdings transferred funds in the amount of $20,000 to Tygier and R. Rubin.

101.     On or about February 13, 2018, Defendant TR Holdings transferred funds in the amount of $25,000 to Tygier and R. Rubin.

102.     On or about February 28, 2018, Defendant The Rubin Group transferred funds in the amount of $7,000 to TRG Development.

103.     On or about February 28, 2018, Defendant The Rubin Group transferred a second set of funds in the amount of $1,000 to TRG Development.

104.     On or about March 1, 2018, Defendant The Rubin Group transferred funds in the amount of $30,000 to South Glebe.

105.     On or about March 2, 2018, Defendant A. Rubin transferred funds in the amount of $4,200.00 to Woodmore.

106.     Following the receipt of the money from A. Rubin, Defendant Woodmore transferred $4,200 to Canal View on or about March 2, 2018.

107.     On or about March 2, 2018, Defendant TR Holdings transferred funds in the amount of $25,000 to Tygier and R. Rubin.

22

108. On or about March 2, 2018, Defendants Tygier and R. Rubin transferred $6,105 to Jonathan Rubin.

109. On or about March 23, 2018, Defendant A. Rubin transferred funds in the amount of $8,000.00 to Woodmore.

110. Following the receipt of the money from A. Rubin, Defendant Woodmore transferred $8,000 to Canal View on or about March 23, 2018.

111. On or about March 29, 2018, Defendant The Rubin Group transferred funds in the amount of $7,000 to TRG Development.

112. On or about March 29, 2018, Defendant TR Holdings transferred funds in the amount of $25,000 to Tygier and R. Rubin.

113. On or about April 4, 2018, Defendant Canal View transferred funds in the amount of $40,000 to A. Rubin.

114. On or about April 18, 2018, Defendant TR Holdings transferred funds in the amount of $20,000 to Tygier and R. Rubin.

115. On or about April 26, 2018, Defendant The Rubin Group transferred funds in the amount of $7,000 to TRG Development.

116. On or about May 10, 2018, Defendant Canal View transferred funds in the amount of $10,000 to A. Rubin.

117. On or about May 16, 2018, Defendant The Rubin Group transferred funds in the amount of $9,000 to Woodmore.

118. On or about May 18, 2018, Defendant The Rubin Group transferred funds in the amount of $30,000 to South Glebe.

119. On or about May 23, 2018, Defendant TR Holdings transferred funds in the amount of $20,000 to Tygier and R. Rubin.

23

120. On or about May 30, 2018, Defendant The Rubin Group transferred funds in the amount of $7,100 to TRG Development.

121. On or about June 6, 2018, Defendant Canal View transferred funds in the amount of $4,000 to A. Rubin.

122. On or about June 15, 2018, Defendant The Rubin Group transferred funds in the amount of $55,000 to South Glebe.

123. On or about June 15, 2018, Defendant South Glebe transferred funds in the amount of $16,769.85 to Canal View.

124. On or about June 25, 2018, Defendant TR Holdings transferred funds in the amount of $10,000 to Tygier and R. Rubin.

125. On or about June 26, 2018, Defendant Canal View transferred funds in the amount of $7,000 to A. Rubin.

126. On or about June 27, 2018, Defendant The Rubin Group transferred funds in the amount of $8,000 to TRG Development.

127. On or about July 9, 2018, Defendant Canal View transferred funds in the amount of $2,500 to A. Rubin.

128. On or about July 11, 2018, Defendant TR Holdings transferred funds in the amount of $10,000 to R. Rubin and Tygier.

129. On or about July 25, 2018, Defendant The Rubin Group transferred funds in the amount of $50,000 to South Glebe.

130. On or about July 25, 2018, Defendant The Rubin Group transferred funds in the amount of $10,000 to Woodmore.

131. On or about July 26, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

24

132.     On or about July 31, 2018, Defendant The Rubin Group transferred funds in the amount of $7,000 to TRG Development.

133.     On or about July 31, 2018, Defendant TR Holdings transferred funds in the amount of $10,000 to Tygier and R. Rubin.

134.     On or about August 8, 2018, Defendant Canal View transferred funds in the amount of $20,000 to A. Rubin.

135.     On or about August 16, 2018, Defendant 638 Newton transferred funds in the amount of $2,506 to Canal View.

136.     On or about August 17, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

137.     On or about August 27, 2018, Defendant The Rubin Group transferred funds in the amount of $9,000 to TRG Development.

138.     On or about August 31, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

139.     On or about September 13, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

140.     On or about September 25, 2018, Defendant The Rubin Group transferred funds in the amount of $7,000 to TRG Development.

141.     On or about September 26, 2018, Defendant The Rubin Group transferred funds in the amount of $27,250 to Woodmore.

142.     On or about September 28, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

143.     On or about October 1, 2018, Defendant The Rubin Group transferred funds in the amount of $10,000 to South Glebe.

25

144.    On or about October 3, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

145.    On or about October 5, 2018, Defendant The Rubin Group transferred funds in the amount of $500 to South Glebe.

146.    On or about October 11, 2018, Defendant TR Holdings transferred funds in the amount of $7,500 to Tygier and R. Rubin.

147.    On or about October 19, 2018, Defendant The Rubin Group transferred funds in the amount of $40,000 to South Glebe.

148.    On or about October 19, 2018, Defendant The Rubin Group transferred funds in the amount of $9,000 to Woodmore.

149.    On or about October 19, 2018, Defendant The Rubin Group transferred funds in the amount of $22,000 to TRG Development.

150.    On or about November 5, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

151.    On or about November 14, 2018, Defendant A. Rubin transferred funds in the amount of $101,000 to Canal View.

152.    On or about November 16, 2018, Defendant TR Holdings transferred funds in the amount of $7,500 to Tygier and R. Rubin.

153.    On or about December 5, 2018, Defendant TR Holdings transferred funds in the amount of $10,000 to Tygier and R. Rubin.

154.    On or about December 14, 2018, Defendant TR Holdings transferred funds in the amount of $7,500 to Tygier and R. Rubin.

155.    On or about December 21, 2018, Defendant TR Holdings transferred funds in the amount of $5,000 to Tygier and R. Rubin.

26

156. On or about December 27, 2018, Defendant Canal View transferred funds in the amount of $60,000 to A. Rubin.

157. On or about January 4, 2019, Defendant A. Rubin transferred funds in the amount of $55,000 to Canal View.

158. On or about January 4, 2019, Defendant A. Rubin transferred a second set of funds in the amount of $120,000 to Canal View.

159. On or about January 7, 2019, Defendant TR Holdings transferred funds in the amount of $15,000 to Tygier and R. Rubin.

160. On or about January 14, 2019, Defendant The Rubin Group transferred funds in the amount of $7,300 to TRG Development.

161. On or about February 6, 2019, Defendant TR Holdings transferred funds in the amount of $9,000 to Tygier and R. Rubin.

162. On or about February 19, 2019, Defendant Canal View transferred funds in the amount of $2,500 to A. Rubin.

163. On or about February 20, 2019, Defendant Canal View transferred funds in the amount of $1,000 to A. Rubin.

164. On or about February 27, 2019, Defendant The Rubin Group transferred funds in the amount of $7,300 to TRG Development.

165. On or about March 15, 2019, Defendant 638 Newton transferred funds in the amount of $3,219.46 to Tygier.

166. On or about March 25, 2019, Defendant Tygier transferred funds in the amount of $15,000 to The Rubin Group.

167. On or about March 25, 2019, Defendant The Rubin Group transferred funds in the amount of $15,000 to Woodmore.

27

168.     On or about March 26, 2019, Defendant The Rubin Group transferred funds in the amount of $7,107.15 to TRG Development.

169.     On or about March 26, 2019, Defendant The Rubin Group transferred funds in the amount of $12,652.36 to South Glebe.

170.     On or about May 1, 2019, Defendants Tygier and R. Rubin transferred funds in the amount of $3,000 to Woodmore.

171.     On or about May 14, 2019, Defendant Canal View transferred funds in the amount of $15,000 to A. Rubin.

172.     On or about May 15, 2019, Defendant 638 Newton transferred funds in the amount of $3,219.46 to R. Rubin and Tygier.

173.     On or about May 17, 2019, Defendants Tygier and R. Rubin transferred funds in the amount of $1,250 to Woodmore.

174.     On or about May 30, 2019, Defendants Tygier and R. Rubin transferred funds in the amount of $5,093.66 to Woodmore.

175.     On or about June 3, 2019, Defendants Tygier and R. Rubin transferred funds in the amount of $3,710.71 to South Glebe.

176.     On or about June 3, 2019, Defendants Tygier and R. Rubin transferred funds in the amount of $12,182.22 to South Glebe.

177.     On or about June 11, 2019, Defendant Canal View transferred funds in the amount of $15,000 to A. Rubin.

178.     On or about June 14, 2019, Defendant 819D transferred funds in the amount of $44,038.32 to The Rubin Group.

179.     As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against Tygier, on or about June 14, 2019, Defendant Tygier caused Defendant The Rubin Group to transfer assets totaling $44,038.32 to Tygier in repayment of a purported "loan" owed to Tygier

28

from A. Rubin. Tygier caused the transfer of the assets from The Rubin to K Street to A. Rubin to

819 Capital and then ultimately to Tygier as a result of Tygier's allegation that such funds were

owed to her from Defendant 819 Capital.

180.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against

Tygier, on or about June 14, 2019, Defendant Tygier caused Defendant The Rubin Group to

transfer funds totaling $34,734.03 to K Street. Defendant Tygier then caused a series of

transactions to transfer those funds from K Street to A. Rubin and then ultimately to 2233 on

behalf of A. Rubin.

181.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against

Tygier, Defendant Tygier caused Defendant The Rubin Group to transfer $42,548.65 to Defendant

K Street. Defendant Tygier then directed a series of transactions to transfer those funds from K

Street to Defendant A. Rubin, and then from Defendant A. Rubin to TRG Development.

182.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against

Tygier, Defendant Tygier caused Defendant 638 Newton to transfer $186,000.62 to Defendant A.

Rubin. Defendant A. Rubin then consented to the transfer of $186,500.62 to his father, R. Rubin

for an alleged repayment of a personal note.

183.    As admitted in the Complaint filed by A. Rubin on behalf of Canal View against

TR Holdings and The Rubin Group in this Court as Case No. CL-19-9270, on or about June 14,

2019, Tygier caused 638 Newton to retain funds in the amount of $25,748.94 owed to A. Rubin

for member distributions.

184.    On or about June 30, 2019, Defendant The Rubin Group transferred funds in the

amount of $4,926.16 to Woodmore.

185.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against

Tygier, on or about July 1, 2019, Defendant Tygier caused Defendant The Rubin Group to initiate

a series of no less than five (5) transactions that shifted funds between the various Defendants.

29

186.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against Tygier, on or about July 1, 2019, Defendant Tygier caused a series of transactions that shifted $30,681.54 from The Rubin Group to Defendant K Street, then from Defendant K Street to Defendant TRG Development, then from Defendant TRG Development to A. Rubin, and then ultimately from A. Rubin to Defendant Tygier for an alleged repayment of a partial distribution from Defendant 819 Capital.

187.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against Tygier, on or about July 1, 2019, Defendant Tygier caused a second series of transactions that shifted $34,734.03 from Defendant The Rubin Group to K Street, then from K Street to TRG Development, then from TRG Development to A. Rubin, and then ultimately from A. Rubin to Tygier for an alleged reimbursement of Tygier's 2/3 share of a Letter of Credit and Warranty Bond associated with Defendant 2233.

188.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against Tygier, on or about July 1, 2019, Defendant Tygier caused a third series of transactions that moved $28,333.33 from Defendant The Rubin Group to K Street Holdings, then from K Street Holdings to TRG Development, then from TRG Development to A. Rubin, and ultimately from A. Rubin to Tygier for an alleged reimbursement of Tygier's capital contributions on behalf of A. Rubin to Defendant TRG Development.

189.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against Tygier, on or about July 1, 2019, Defendant Tygier caused a fourth series of transactions that moved $7,438.93 from Defendant The Rubin Group to K Street Holdings, then from K Street Holdings to TRG Development, then from TRG Development to A. Rubin, and ultimately from A. Rubin to South Glebe.

190.    As admitted in the Complaint filed by A. Rubin in the D.C. Superior Court against Tygier, on or about July 1, 2019, Defendant Tygier caused a fifth series of transactions that moved

30

$1,971.50 from Defendant The Rubin Group to K Street Holdings, then from K Street Holdings to TRG Development, then from TRG Development to A. Rubin, and ultimately from A. Rubin to Woodmore.

191. On or about July 8, 2019, Defendant K Street transferred funds in the amount of $2,058.17 to Tygier and R. Rubin.

192. On or about July 8, 2019, Defendant The Rubin Group transferred funds in the amount of $15,000 to Tygier and R. Rubin.

193. On or about July 9, 2019, Defendant Canal View transferred funds in the amount of $5,000 to A. Rubin.

194. On or about July 12, 2019, Defendant Canal View transferred funds in the amount of $4,000 to A. Rubin.

195. On or about August 6, 2019, Defendant The Rubin Group transferred funds in the amount of $15,000 to Woodmore.

196. On or about August 6, 2019, Defendant The Rubin Group transferred funds in the amount of $45,000 to South Glebe.

197. On or about August 7, 2019, Defendant Canal View transferred funds in the amount of $4,000 to A. Rubin.

198. On or about August 15, 2019, Defendant A. Rubin transferred funds in the amount of $2,500 to Canal View.

199. On or about August 21, 2019, Defendant Canal View transferred funds in the amount of $20,000 to A. Rubin.

200. On or about August 23, 2019, Defendant K Street transferred funds in the amount of $651.48 to Tygier and R. Rubin.

201. On or about October 18, 2019, Defendant Canal View transferred funds in the amount of $117,868 to A. Rubin.

31

202.     On or about October 28, 2019, Defendant K Street transferred funds in the amount of $7,500 to Tygier and R. Rubin.

203.     On or about November 4, 2019, Defendant The Rubin Group transferred funds in the amount of $45,000 to South Glebe.

204.     On or about November 4, 2019, Defendant The Rubin Group transferred funds in the amount of $15,000 to Woodmore.

205.     On or about November 4, 2019, Defendant The Rubin Group transferred funds in the amount of $4,651.38 to Tygier and R. Rubin.

206.     On or about December 2, 2019, Defendant The Rubin Group transferred funds in the amount of $19,049.01 to Tygier and R. Rubin.

207.     On or about December 30, 2019, Defendant TR Holdings transferred funds in the amount of $2,142.89 to R. Rubin.

208.     On or about February 6, 2020, Defendant The Rubin Group transferred funds in the amount of $1,500 to South Glebe.

209.     On or about February 13, 2020, Defendant The Rubin Group transferred funds in the amount of $39,905.76 to Woodmore.

210.     On or about February 24, 2020, Defendant The Rubin Group transferred funds in the amount of $45,000 to South Glebe.

211.     On or about March 11, 2020, Defendant Canal View transferred funds in the amount of $10,000 to A. Rubin.

212.     On or about March 16, 2020, Defendant The Rubin Group transferred funds in the amount of $10,000 to South Glebe.

213.     On or about April 13, 2020, Defendant K Street transferred funds in the amount of $900 to Tygier and R. Rubin.

32

214.     On or about April 16, 2020, Defendant Canal View transferred funds in the amount of $10,000 to A. Rubin.

215.     On or about May 7, 2020, Defendant TR Holdings transferred funds in the amount of $694.79 to R. Rubin.

216.     On or about May 11, 2020, Defendant K Street transferred funds in the amount of $1,250 to Tygier and R. Rubin.

217.     On or about June 9, 2020, Defendant The Rubin Group transferred funds in the amount of $15,000 to South Glebe.

218.     On or about June 15, 2020, Defendant The Rubin Group transferred funds in the amount of $700 to Tygier and R. Rubin.

219.     On or about June 22, 2020, Defendant The Rubin Group transferred funds in the amount of $15,000 to South Glebe.

220.     On or about July 1, 2020, Defendant South Glebe transferred funds in the amount of $600 to R. Rubin.

221.     On or about July 3, 2020, Defendant South Glebe transferred funds in the amount of $600 to R. Rubin and Tygier.

222.     On or about July 9, 2020, Defendant Canal View transferred funds in the amount of $14,000 to A. Rubin.

223.     On or about August 6, 2020, Defendant Canal View transferred funds in the amount of $15,000 to A. Rubin.

224.     On or about August 19, 2020, Defendant The Rubin Group transferred funds in the amount of $10,000 to South Glebe.

225.     On or about September 23, 2020, Defendant The Rubin Group transferred funds in the amount of $15,000 to Woodmore.

226. On or about September 29, 2020, Defendant The Rubin Group transferred funds in the amount of $105,000 to South Glebe.

227. On or about October 6, 2020, Defendant The Rubin Group transferred funds in the amount of $20,000 to Woodmore.

228. On or about November 13, 2020, Defendant A. Rubin transferred funds in the amount of $162,675.88 to Canal View.

229. On or about January 28, 2021, Defendant The Rubin Group transferred funds in the amount of $20,000 to Woodmore.

230. On or about February 4, 2021, Defendant A. Rubin transferred funds in the amount of $15,000 to Canal View.

231. The transactions referenced above from 819D totaled no less than $6,106,544.60 of funds improperly conveyed between the various Defendants, including no less than $3,610,652.28 directly to alter-ego 819 Capital and no less than $1,397,872.32 directly to alter-ego The Rubin Group, with no less than $3,570,417.73 eventually flowing to Tygier, R. Rubin, A. Rubin, and alter-egos TR Holdings and Canal View.

232. The transfers referenced above left Defendant 819D, and alter-egos 819 Capital and The Rubin Group, insolvent. The transactions were conducted to remove the funds from potential collection and to hinder, delay, and/or defraud the creditors of 819D, 819 Capital, The Rubin Group, A. Rubin, and/or Tygier.

233. As a result of the transactions Mr. Garcia has been damaged in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60).

234. Upon information and belief, the transactions set forth herein were not the only transfers made by the Defendants after April 2017. The ultimate extent of damage to Mr. Garcia is unknown at this time, as it is unknown what other transfers, in what amounts, and to whom the

34

transactions were made by the Defendants. Mr. Garcia reserves the right to amend his Complaint upon the discovery of new information.

### COUNT I- FRAUDULENT CONVEYANCE PURSUANT TO VA. CODE § 55.1-400
### (against all Defendants)

235.     The allegations contained in Paragraphs 1-234 above are incorporated herein by reference.

236.     As early as April 2017, Defendants had adequate and actual notice of Mr. Garcia's claims against Defendants The Rubin Group, 819D, A. Rubin, and Tygier.

237.     As a result of the Defendants' notice of Mr. Garcia's claims, Mr. Garcia was and is a creditor as early as April 2017 pursuant to Virginia law.

238.     Notwithstanding the Defendants' knowledge of Mr. Garcia's claims and status as a creditor, the Defendants engaged in a series of transactions the transferred funds totaling no less than of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60) from 819D to themselves, family members, and/or entities controlled by Defendants A. Rubin and/or Tygier.

239.     The Defendants' transfers were for inadequate or no consideration for the conveyance under the threat of litigation by creditor Mr. Garcia, including but not limited to distributions to members.

240.     At all relevant times, Defendants The Rubin Group, LLC, 819D LLC, 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore LLC, TRG Development LLC, and 638 Newton Partners LLC were the stooges and instruments of A. Rubin and Tygier used for the purpose of fraudulently avoiding each's obligation to creditors, including Mr. Garcia.

241.     The Defendants' transfers from April 2017 to the present were meant to hinder, delay, and/or defraud Defendants' creditors, including Mr. Garcia.

35

51

242.     As a result of the fraudulent conveyances between Defendants after April 2017, Mr. Garcia has suffered known damages in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60).

WHEREFORE, Plaintiff Karl Garcia hereby demands judgment against each Defendant and in favor of Karl Garcia (i) voiding the conveyances above, (ii) ordering the conveyed funds to be returned, and (iii) entering *in personam* judgments as set forth below:

    i.    against The Rubin Group LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

    ii.    against 819D LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

    iii.    against 819 Capital LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

    iv.    against K Street Holdings LLC in the amount of Two Hundred and Fifteen Thousand, One Hundred and Seventy-Six Dollars and Four Cents ($215,176.04), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

    v.    against TR Holdings LLC in the amount of Three Hundred and Seven Thousand, Four Hundred and Three Dollars and Eighty-Seven Cents ($307,403.87), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

    vi.    against 2233-40th Partners LLC in the amount of One Hundred and Eighty-Nine Thousand, Two Hundred and Thirty-Four Dollars and Three Cents ($189,234.03), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

36

vii.    against South Glebe LLC in the amount of Eight Hundred and Seventeen Thousand, Nine Hundred and Eighty-Four Dollars and Twenty-Two Cents ($817,984.22), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

viii.    against Woodmore Partners LLC a/k/a Woodmore LLC in the amount of Two Hundred and Fifty-Three Thousand, Five Hundred and Ninety-Seven Dollars and Eight Cents ($253,597.08), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

ix.    against TRG Development LLC in the amount of One Hundred and Fifty-Four Thousand, Five Hundred and Fifty-Five Dollars and Eighty Cents ($154,555.80), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

x.    against 638 Newton Partners LLC in the amount of Eighteen Thousand Dollars and Zero Cents ($18,000.00), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xi.    against Canal View Holdings LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xii.    against Andrew Rubin in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xiii.    against Michelle A. Tygier in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

37

xiv. against Robert Rubin in the amount of One Million, Two Hundred and Forty-Seven Thousand, Three Hundred and Thirteen Dollars and Forty-Four Cents ($1,247,313.44), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xv. against Gregory Auger II in the amount of Seven Hundred and Fifty Thousand, One hundred and Fifty-Six Dollars and Zero Cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xvi. against Gregory Auger III in the amount of One Hundred and Ninety-Six Thousand, Six Hundred and Sixty-Seven Dollars and Zero Cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xvii. against Christos Economakis in the amount of One Hundred and Fifty-One Thousand, One Hundred and Ninety-Seven Dollars and Zero cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xviii. against Liliana Economakis in the amount of One Hundred and Fifty-One Thousand, One Hundred and Ninety-Seven Dollars and Zero cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xix. against Thomas D. Madison in the amount of Three Hundred and Sixty-Three Thousand, Nine Hundred and Seventy-Three Dollars and Fifty-Six Cents ($363,973.56), plus prejudgment interest, punitive damages, attorneys' fees, and costs; and

xx. against Jeffrey Houle in the amount of Seventy-Two Thousand, One Hundred and Four Dollars and Forty-Five Cents ($72,104.45), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

Karl Garcia further requests this Court enter a lien from the date of the filing of this action against all the estate, real and personal, of each Defendant, pursuant to Va. Code § 55.1-402.

38

## COUNT II – VOLUNTARY CONVEYANCE PURSUANT TO VA. CODE § 55.1-401
### (In the alternative, against all Defendants)

243.    The allegations contained in Paragraphs 1-234 above are incorporated herein by reference.

244.    As early as April 2017, Defendants had adequate and actual notice of Mr. Garcia's claims against Defendants The Rubin Group, 819D, A. Rubin, and Tygier.

245.    As a result of the Defendants' notice of Mr. Garcia's claims, Mr. Garcia was, and is, a creditor as early as April 2017 pursuant to Virginia law.

246.    Notwithstanding the Defendants' knowledge of Mr. Garcia's claims and status as a creditor, the Defendants engaged in a series of transactions totaling no less than Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60) from 819D to themselves, family members, and/or entities controlled by Defendants A. Rubin and/or Tygier.

247.    The Defendants' transfers were for inadequate or no consideration for the conveyance.

248.    The Defendants' transfers from April 2017 to the present resulted in the insolvency of each of the Defendants. More specifically, Defendants 819D, The Rubin Group, A. Rubin, Tygier, and 819 Capital are each without adequate funds and/or assets to satisfy the anticipated judgment(s) of Mr. Garcia.

249.    As a result of the conveyances between Defendants after April 2017, Mr. Garcia has been damaged through the impairment of his claim as a creditor. Mr. Garcia has suffered known damages in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60).

WHEREFORE, Plaintiff Karl Garcia hereby demands judgment against each Defendant and in favor of Karl Garcia (i) voiding the conveyances above, (ii) ordering the conveyed funds to be returned, and (iii) entering *in personam* judgments as set forth below:

     i.     against The Rubin Group LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

     ii.    against 819D LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

     iii.   against 819 Capital LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

     iv.   against K Street Holdings LLC in the amount of Two Hundred and Fifteen Thousand, One Hundred and Seventy-Six Dollars and Four Cents ($215,176.04), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

     v.    against TR Holdings LLC in the amount of Three Hundred and Seven Thousand, Four Hundred and Three Dollars and Eighty-Seven Cents ($307,403.87), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

     vi.   against 2233-40th Partners LLC in the amount of One Hundred and Eighty-Nine Thousand, Two Hundred and Thirty-Four Dollars and Three Cents ($189,234.03), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

     vii.  against South Glebe LLC in the amount of Eight Hundred and Seventeen Thousand, Nine Hundred and Eighty-Four Dollars and Twenty-Two Cents ($817,984.22), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

40

viii.    against Woodmore Partners LLC a/k/a Woodmore LLC in the amount of Two Hundred and Fifty-Three Thousand, Five Hundred and Ninety-Seven Dollars and Eight Cents ($253,597.08), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

ix.    against TRG Development LLC in the amount of One Hundred and Fifty-Four Thousand, Five Hundred and Fifty-Five Dollars and Eighty Cents ($154,555.80), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

x.    against 638 Newton Partners LLC in the amount of Eighteen Thousand Dollars and Zero Cents ($18,000.00), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xi.    against Canal View Holdings LLC in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xii.    against Andrew Rubin in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xiii.    against Michelle A. Tygier in the amount of Six Million, One Hundred and Six Thousand, Five Hundred and Forty-Four Dollar and Sixty Cents ($6,106,544.60), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xiv.    against Robert Rubin in the amount of One Million, Two Hundred and Forty-Seven Thousand, Three Hundred and Thirteen Dollars and Forty-Four Cents ($1,247,313.44), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

41

xv. against Gregory Auger II in the amount of Seven Hundred and Fifty Thousand, One hundred and Fifty-Six Dollars and Zero Cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xvi. against Gregory Auger III in the amount of One Hundred and Ninety-Six Thousand, Six Hundred and Sixty-Seven Dollars and Zero Cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xvii. against Christos Economakis in the amount of One Hundred and Fifty-One Thousand, One Hundred and Ninety-Seven Dollars and Zero cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xviii. against Liliana Economakis in the amount of One Hundred and Fifty-One Thousand, One Hundred and Ninety-Seven Dollars and Zero cents, plus prejudgment interest, punitive damages, attorneys' fees, and costs;

xix. against Thomas D. Madison in the amount of Three Hundred and Sixty-Three Thousand, Nine Hundred and Seventy-Three Dollars and Fifty-Six Cents ($363,973.56), plus prejudgment interest, punitive damages, attorneys' fees, and costs; and

xx. against Jeffrey Houle in the amount of Seventy-Two Thousand, One Hundred and Four Dollars and Forty-Five Cents ($72,104.45), plus prejudgment interest, punitive damages, attorneys' fees, and costs;

Karl Garcia further requests this Court enter a lien from the date of the filing of this action against all the estate, real and personal, of each Defendant, pursuant to Va. Code § 55.1-402.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**A TRIAL BY JURY IS DEMANDED.**

42

**RESPECTFULLY SUBMITTED,**

**KARL GARCIA,**
By counsel

_[signature]_

Bethany R. Benes (Va. Bar No. 85408)
**Bethune Benes, PLLC**
4290 Chain Bridge Road, Suite 302
Fairfax, Virginia 22030
Tel.: (703) 260-9322
bbenes@bethunebenes.com
*Counsel for Plaintiff Karl Garcia*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent a follows on this **11th** day of **March** 2022 to the following:

by email (by agreement of counsel):

Laurin H. Mills, Esq.
Samek Werther Mills LLC
laurin@samek-law.com
*Counsel for 11 Defendants*

Mark Crawford, Esq.
Law Offices of
Mark D. Crawford, PLLC
mcrawford@mdc-law.com
*Counsel for 819D LLC*

Douglas E. McKinley, Esq.
demckinley@verizon.net
*Counsel for Thomas Madison*

Christopher A. Glaser, Esq.
Jackson & Campbell, PC
cglaser@jackscamp.com
*Counsel for Canal View Holdings LLC
and Andrew Rubin*

John Keith, Esq.
jkeith@bklawva.com
*Counsel for Jeffrey Houle*

Alex Laughlin, Esq.
Alex.laughlin@ofplaw.com
*Counsel for Gregory Auger II and
Gregory Auger III*

by mail to the following at the last known address of each:

Christos Economakis
5058 Joewood Drive
Sanibel, FL 33957

Liliana Economakis
5058 Joewood Drive
Sanibel, FL 33957

_[signature]_

Bethany Benes

43

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

FILED
CIVIL PROCESSING

2022 APR 22 P 3: 15

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| KARL GARCIA<br><br>        Plaintiff,<br><br>v.<br><br>THE RUBIN GROUP LLC, et al.,<br><br>        Defendants. | Case No. CL-2020-17040 |

**ANSWER OF DEFENDANT GREGORY AUGER II
TO THIRD AMENDED COMPLAINT**

Defendant Gregory Auger II ("**Auger II**") answers the Third Amended Complaint ("**TAC**") of Plaintiff Karl Garcia ("**Plaintiff**" or "**Mr. Garcia**") as follows:

By way of response to the first unnumbered paragraph of the TAC, Auger II admits Plaintiff filed this action against the defendants identified therein. Auger II denies engaging in or any liability for any purported "fraudulent scheme to convey assets to keep them out of the purvey [sic] of Mr. Garcia's right to collection in satisfy [sic] a judgment." Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in the first unnumbered paragraph of the TAC and therefore denies the same.

1.      Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

2.      Auger II admits The Rubin Group has been identified previously as a Virginia limited liability company managed by A. Rubin. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

1

and therefore denies the same.

3.    Auger II admits that 819D is a District of Columbia limited liability company, that TRG Development has been identified previously as its manager, and that The Rubin Group has been identified previously as the managing member of TRG Development.   Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

4.    Auger II admits that 819 Capital has been identified previously as a District of Columbia limited liability company.  Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

5.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

6.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

7.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

8.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

9.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

10.    Auger II admits that TRG Development has been identified previously as a District of Columbia limited liability company managed by The Rubin Group.  Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



2

this paragraph and therefore denies the same.

11. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

12. Auger II admits that A. Rubin has been identified previously as the son of Tygier and R. Rubin and also as an officer of 819D. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

13. Auger II admits that Tygier has been identified previously as the mother of A. Rubin and as an officer of 819D. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

14. Auger II admits that R. Rubin has been identified previously as the father of A. Rubin. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

15. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

16. Auger II admits that 819D has an operating agreement. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

17. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

18. Auger II admits that he is a member of 819D. The remaining allegations contained in this paragraph are denied.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

3

19.     Auger II admits that he is a member of 819D.  The remaining allegations contained in this paragraph are denied.

20.     Auger II admits that Christos has been identified previously as a member of 819D. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

21.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

22.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

23.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

24.     This paragraph states legal conclusions to which no response is required; however, Auger II does not, at this time, contest the subject matter jurisdiction of this Court.  To the extent a further response is required, the remaining allegations contained in this paragraph are denied.

25.     This paragraph contains legal conclusions to which no response is required; however, Auger II does not contest personal jurisdiction in this Court.  To the extent a further response is required, the remaining allegations contained in this paragraph are denied.

26.     This paragraph contains legal conclusions to which no response is required; however, Auger II does not contest venue in this Court.  To the extent a further response is required, the remaining allegations contained in this paragraph are denied.

27.     Auger II admits there is a Unit 34 located within the building known as The Sanctuary having the address contained in this paragraph.  Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Udin
Feldman
Pittleman PC

4

paragraph and therefore denies the same.

28.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

29.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

30.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

31.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

32.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

33.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

34.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

35.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

36.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

37.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

38.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

5

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



39.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

40.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

41.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

42.     Auger II admits that he received a letter in August 2018 alleging structural defects and health hazards affecting Unit 34 and the Property and cautioning Auger II and Auger III. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

43.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

44.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

45.     Auger II admits that Mr. Garcia filed an action in the Superior Court of the District of the Columbia asserting claims against the defendants identified in this paragraph. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

46.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

47.     Auger II admits 819D made one transfer of funds to him after April 2017. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

6


Odin
Feldman
Pittleman PC

48.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

49.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

50.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

51.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

52.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

53.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

54.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

55.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

56.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

57.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

58.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

59.     Auger II lacks knowledge or information sufficient to form a belief about the truth

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

7

of the allegations contained in this paragraph and therefore denies the same.

60. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

61. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

62. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

63. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

64. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

65. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

66. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

67. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

68. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

69. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

70. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Udin
Feldman
Pittleman PC

71.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

72.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

73.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

74.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

75.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

76.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

77.     Admitted.

78.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

79.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

80.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

81.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

82.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

9

83.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

84.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

85.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

86.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

87.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

88.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

89.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

90.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

91.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

92.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

93.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

94.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Udin
Feldman
Pittleman PC

10

95. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

96. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

97. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

98. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

99. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

100. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

101. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

102. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

103. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

104. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

105. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

106. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

11

107.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

108.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

109.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

110.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

111.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

112.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

113.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

114.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

115.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

116.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

117.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

118.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

12

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

119.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

120.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

121.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

122.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

123.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

124.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

125.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

126.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

127.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

128.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

129.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

130.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

13

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

131. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

132. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

133. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

134. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

135. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

136. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

137. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

138. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

139. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

140. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

141. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

142. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

143.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

144.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

145.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

146.      Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

147.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

148.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

149.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

150.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

151.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

152.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

153.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

154.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

15

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

155.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

156.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

157.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

158.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

159.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

160.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

161.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

162.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

163.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

164.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

165.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

166.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

16



Odin
Feldman
Pittleman PC

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

179.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

180.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

181.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

182.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

183.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

184.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

185.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

186.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

187.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

188.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

189.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

190.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

18

191.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

192.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

193.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

194.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

195.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

196.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

197.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

198.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

199.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

200.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

201.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

202.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

19

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

203.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

204.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

205.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

206.      Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

207.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

208.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

209.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

210.      Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

211.      Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

212.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

213.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

214.     Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

20

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

215.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

216.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

217.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

218.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

219.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

220.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

221.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

222.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

223.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

224.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

225.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

226.    Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

21

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman pc

227. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

228. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

229. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

230. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

231. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

232. Auger II lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

233. Denied.

234. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

235. Auger II incorporates by reference his responses to the foregoing paragraphs.

236. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

237. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

238. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

239. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

22



Odin
Feldman
Pittleman PC

240.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

241.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

242.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

WHEREFORE, Auger II denies that Plaintiff is entitled to any of the relief requested in Count I as to Auger II. The remaining relief requested in Count I pertains to other defendants and, as such, no response is required. To the extent a response is required, the prayer for relief in Count I is denied in its entirety.

243.    Auger II incorporates by reference his responses to the foregoing paragraphs.

244.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

245.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

246.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

247.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

248.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

249.    This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



WHEREFORE, Auger II denies that Plaintiff is entitled to any of the relief requested in Count II as to Auger II. The remaining relief requested in Count II pertains to other defendants and, as such, no response is required. To the extent a response is required, the prayer for relief in Count II is denied in its entirety.

## GROUNDS OF DEFENSE

1. The TAC fails to state a claim on which relief can be granted.

Auger II reserves the right to assert any and all other grounds of defense and affirmative defenses that become available through discovery or during the pendency of this action.

WHEREFORE, having answered the TAC, Auger II respectfully requests this Court to dismiss the TAC, with prejudice, enter judgment in his favor and against Plaintiff, and award Auger II all other proper relief.

Respectfully submitted,

Alexander M. Laughlin, Esq. (VSB No. 25237)
James P. Miller, Esq. (VSB No. 89409)
ODIN, FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
(703) 218-2134 (Mr. Laughlin)
(703) 218-2154 (Mr. Miller)
(703) 218-2160 (facsimile)
Alex.Laughlin@ofplaw.com
Jim.Miller@ofplaw.com
*Counsel for Defendant Gregory Auger II and Defendant Gregory Auger III*



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

24

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served via email, this 22nd

day of April 2022 upon:

Laurin H. Mills, Esq.
Samek Werther Mills LLC
laurin@samek-law.com
*Counsel for 11 Defendants*

Mark Crawford, Esq.
Law Offices of Mark D. Crawford
PLLC
mcrawford@mdc-law.com
*Counsel for 819D LLC*

Douglas E. McKinley, Esq.
demckinley@verizon.net
*Counsel for Thomas Madison*

John A.C. Keith, Esq.
Blankingship & Keith, P.C.
jkeith@bklawva.com
*Counsel for Jeffrey Houle*

Christopher A. Glaser, Esq.
Jackson & Campbell, PC
cglaser@jackscamp.com
*Counsel for Canal View Holdings LLC and Andrew Rubin*

Bethany R. Benes, PLLC
Bethune Benes, PLLC
bbenes@bethunebenes.com
*Counsel for Plaintiff*

By mail to the following at the last known address of each:

Christos Economakis
5058 Joewood Drive
Sanibel, FL 33957

Liliana Economakis
5058 Joewood Drive
Sanibel, FL 33957

James P. Miller



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

FILED
CIVIL PROCESSING
2022 APR 22 P 3: 14

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

KARL GARCIA

      Plaintiff,

v.

THE RUBIN GROUP LLC, et al.,

      Defendants.

Case No. CL-2020-17040

## ANSWER OF DEFENDANT GREGORY AUGER III
## TO THIRD AMENDED COMPLAINT

Defendant Gregory Auger III ("**Auger III**") answers the Third Amended Complaint ("**TAC**") of Plaintiff Karl Garcia ("**Plaintiff**" or "**Mr. Garcia**") as follows:

By way of response to the first unnumbered paragraph of the TAC, Auger III admits Plaintiff filed this action against the defendants identified therein. Auger III denies engaging in or any liability for any purported "fraudulent scheme to convey assets to keep them out of the purvey [sic] of Mr. Garcia's right to collection in satisfy [sic] a judgment." Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in the first unnumbered paragraph of the TAC and therefore denies the same.

1.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

2.    Auger III admits The Rubin Group has been identified previously as a Virginia limited liability company managed by A. Rubin. Auger III lacks knowledge or information

1



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

84

sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

3.      Auger III admits that 819D is a District of Columbia limited liability company, that TRG Development has been identified previously as its manager, and that The Rubin Group has been identified previously as the managing member of TRG Development. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

4.      Auger III admits that 819 Capital has been identified previously as a District of Columbia limited liability company. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

5.      Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

6.      Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

7.      Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

8.      Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

9.      Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

10.     Auger III admits that TRG Development has been identified previously as a District of Columbia limited liability company managed by The Rubin Group. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

2

this paragraph and therefore denies the same.

11.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

12.     Auger III admits that A. Rubin has been identified previously as the son of Tygier and R. Rubin and also as an officer of 819D. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

13.     Auger III admits that Tygier has been identified previously as the mother of A. Rubin and as an officer of 819D. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

14.     Auger III admits that R. Rubin has been identified previously as the father of A. Rubin. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

15.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

16.     Auger III admits that 819D has an operating agreement. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

17.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

18.     Auger III admits that Auger II is a member of 819D. The remaining allegations contained in this paragraph are denied.

19.     Auger III admits that Auger II is a member of 819D. By way of further response,

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

3

Auger III avers that he is also a member of 819D. The remaining allegations contained in this paragraph are denied.

20. Auger III admits that Christos has been identified previously as a member of 819D. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

21. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

22. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

23. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

24. This paragraph states legal conclusions to which no response is required; however, Auger III does not, at this time, contest the subject matter jurisdiction of this Court. To the extent a further response is required, the remaining allegations contained in this paragraph are denied.

25. This paragraph contains legal conclusions to which no response is required; however, Auger III does not contest personal jurisdiction in this Court. To the extent a further response is required, the remaining allegations contained in this paragraph are denied.

26. This paragraph contains legal conclusions to which no response is required; however, Auger III does not contest venue in this Court. To the extent a further response is required, the remaining allegations contained in this paragraph are denied.

27. Auger III admits there is a Unit 34 located within the building known as The Sanctuary having the address contained in this paragraph. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

4

28.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

29.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

30.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

31.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

32.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

33.      Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

34.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

35.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

36.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

37.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

38.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Udin
Feldman
Pittleman PC

39. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

40. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

41. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

42. Auger III admits that he received a letter in August 2018 alleging structural defects and health hazards affecting Unit 34 and the Property and cautioning Auger II and Auger III. Auger II lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

43. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

44. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

45. Admitted.

46. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

47. Auger III admits 819D made one transfer of funds to him after April 2017. Auger III lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph and therefore denies the same.

48. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

49.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

50.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

51.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

52.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

53.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

54.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

55.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

56.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

57.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

58.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

59.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

60.     Auger III lacks knowledge or information sufficient to form a belief about the truth

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

7

of the allegations contained in this paragraph and therefore denies the same.

61.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

62.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

63.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

64.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

65.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

66.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

67.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

68.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

69.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

70.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

71.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

72.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

73.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

74.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

75.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

76.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

77.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

78.     Admitted.

79.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

80.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

81.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

82.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

83.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

9

84.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

85.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

86.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

87.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and its subparts and therefore denies the same.

88.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

89.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

90.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

91.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

92.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

93.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

94.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

95.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

10

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

96.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

97.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

98.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

99.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

100.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

101.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

102.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

103.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

104.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

105.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

106.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

107.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

11



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

108. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

109. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

110. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

111. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

112. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

113. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

114. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

115. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

116. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

117. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

118. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

119. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Udin
Feldman
Pittleman PC

12

120.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

121.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

122.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

123.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

124.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

125.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

126.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

127.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

128.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

129.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

130.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

131.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

13



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

132.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

133.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

134.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

135.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

136.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

137.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

138.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

139.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

140.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

141.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

142.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

143.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

14

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman pc

144.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

145.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

146.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

147.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

148.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

149.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

150.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

151.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

152.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

153.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

154.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

155.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

15

156.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

157.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

158.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

159.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

160.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

161.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

162.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

163.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

164.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

165.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

166.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

167.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

16

168.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

169.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

170.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

171.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

172.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

173.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

174.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

175.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

176.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

177.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

178.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

179.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

17

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

180. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

181. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

182. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

183. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

184. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

185. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

186. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

187. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

188. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

189. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

190. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

191. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

18

192.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

193.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

194.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

195.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

196.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

197.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

198.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

199.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

200.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

201.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

202.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

203.     Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

19

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

204. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

205. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

206. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

207. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

208. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

209. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

210. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

211. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

212. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

213. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

214. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

215. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



Odin
Feldman
Pittleman PC

20

216.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

217.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

218.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

219.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

220.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

221.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

222.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

223.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

224.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

225.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

226.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

227.    Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100



21

228. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

229. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

230. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

231. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

232. Auger III lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph and therefore denies the same.

233. Denied.

234. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

235. Auger III incorporates by reference his responses to the foregoing paragraphs.

236. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

237. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

238. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

239. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

240. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

22

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

241. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

242. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

WHEREFORE, Auger III denies that Plaintiff is entitled to any of the relief requested in Count I as to Auger III. The remaining relief requested in Count I pertains to other defendants and, as such, no response is required. To the extent a response is required, the prayer for relief in Count I is denied in its entirety.

243. Auger III incorporates by reference his responses to the foregoing paragraphs.

244. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

245. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

246. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

247. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

248. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

249. This paragraph states legal conclusions to which no response is required. To the extent a response is required, the allegations contained in this paragraph are denied.

WHEREFORE, Auger III denies that Plaintiff is entitled to any of the relief requested in Count II as to Auger III. The remaining relief requested in Count II pertains to other defendants

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100


Odin
Feldman
Pittleman PC

23

and, as such, no response is required. To the extent a response is required, the prayer for relief in Count II is denied in its entirety.

## GROUNDS OF DEFENSE

1.　　The TAC fails to state a claim on which relief can be granted.

Auger III reserves the right to assert any and all other grounds of defense and affirmative defenses that become available through discovery or during the pendency of this action.

WHEREFORE, having answered the TAC, Auger III respectfully requests this Court to dismiss the TAC, with prejudice, enter judgment in his favor and against Plaintiff, and award Auger III all other proper relief.

Respectfully submitted,

Alexander M. Laughlin, Esq. (VSB No. 25237)
James P. Miller, Esq. (VSB No. 89409)
ODIN, FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
(703) 218-2134 (Mr. Laughlin)
(703) 218-2154 (Mr. Miller)
(703) 218-2160 (facsimile)
Alex.Laughlin@ofplaw.com
Jim.Miller@ofplaw.com
*Counsel for Defendant Gregory Auger II and
Defendant Gregory Auger III*



1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

24

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via email, this 22nd day of April 2022 upon:

Laurin H. Mills, Esq.
Samek Werther Mills LLC
laurin@samek-law.com
*Counsel for 11 Defendants*

Mark Crawford, Esq.
Law Offices of Mark D. Crawford PLLC
mcrawford@mdc-law.com
*Counsel for 819D LLC*

Douglas E. McKinley, Esq.
demckinley@verizon.net
*Counsel for Thomas Madison*

John A.C. Keith, Esq.
Blankingship & Keith, P.C.
jkeith@bklawva.com
*Counsel for Jeffrey Houle*

Christopher A. Glaser, Esq.
Jackson & Campbell, PC
cglaser@jackscamp.com
*Counsel for Canal View Holdings LLC and Andrew Rubin*

Bethany R. Benes, PLLC
Bethune Benes, PLLC
bbenes@bethunebenes.com
*Counsel for Plaintiff*

By mail to the following at the last known address of each:

Christos Economakis
5058 Joewood Drive
Sanibel, FL 33957

Liliana Economakis
5058 Joewood Drive
Sanibel, FL 33957

James P. Miller

1775 Wiehle Avenue, Suite 400, Reston, VA 20190
703-218-2100

Odin
Feldman
Pittleman PC

25

**V I R G I N I A:**

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

FILED
CIVIL PROCESSING
2021 MAY 20 P 12: 59
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

|  |  |
|---|---|
| **KARL GARCIA,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2020-17040** |
| | ) |
| **THE RUBIN GROUP, LLC, *et al.*,** | ) **JURY TRIAL DEMANDED** |
| | ) |
| **Defendants.** | ) |

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendants, The Rubin Group LLC, 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners, LLC, TRG Development LLC, 638 Newton Partners LLC, Michelle Tygier and Robert Rubin (collectively "Defendants") submit this Answer, Affirmative Defenses, and Counterclaim. In response to Plaintiff's Amended Complaint, Defendants state as follows:

### PARTIES

1. Admitted.

2. Defendants admit that The Rubin Group is a limited liability company registered in the Commonwealth of Virginia and that Tygier is a managing member. Defendants deny the remainder of the allegations in Paragraph 2.

3. Defendants admit that 819D is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 3.

4. Defendants admit that 819 Capital is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 4.

5. Defendants admit that K Street is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 5.

6. Defendants admit that TR Holdings is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 6.

7. Defendants admit that 2233 is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 7.

8. Defendants admit that South Glebe is a limited liability company registered in the Commonwealth of Virginia. Defendants deny the remainder of the allegations in Paragraph 8.

9. Defendants admit that Woodmore Partners, LLC is a limited liability company, but deny the remainder of the allegations in Paragraph 9.

10. Defendants admit that TRG Development is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 10.

11. Defendants admit that 638 Newton is a limited liability company registered in the District of Columbia. Defendants deny the remainder of the allegations in Paragraph 11.

12. Defendants admit that A. Rubin is the son of Defendants Tygier and R. Rubin and that he is a resident of Annapolis, Maryland. Defendants deny the remaining allegations in Paragraph 12.

13. Defendants admit the allegations in the first three sentences of Paragraph 13. Defendants deny the remaining allegations in Paragraph 13.

14. Defendants admit the allegations in the first three sentences of Paragraph 14. Defendants deny the remaining allegations in Paragraph 14.

2

## JURISDICTION

15. Denied.

16. Denied.

17. Denied.

## FACTUAL ALLEGATIONS

18. Admitted.

19. Defendants deny the allegations in the first sentence of Paragraph 19. Defendants lack knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 19.

20. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 and, therefore, deny the allegations.

21. Tygier denies the allegations in Paragraph 21. The other Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 and, therefore, deny the allegations.

22. Tygier and The Rubin Group lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 22 and, therefore deny the allegations. Tygier and The Rubin Group also deny the allegations in the last sentence of Paragraph 22. The remaining Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 22 and, therefore, deny the allegations.

23. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 23 and, therefore, deny the allegations.

24. Tygier admits that she met with Garcia on or about August 21, 2017.

3

25. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 25 and, therefore, deny the allegations.

26. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 26 and, therefore, deny the allegations.

27. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 27 and, therefore, deny the allegations.

28. Defendants admit that Ms. Tygier, supposedly in her capacity as "Director," received a "Litigation Hold" letter dated July 13, 2018 relating to alleged claims against 819D LLC and that the letter stated that the assets of 819D LLC should not be transferred, dissipated, or otherwise disposed of in an effort to avoid enforcement of any judgment. Defendants deny the remaining allegations in Paragraph to the extent they are inconsistent with the content of the letter, which speaks for itself.

29. Tygier admits that her receipt of the letter was confirmed via certified mail, return receipt requested, signature required. The remaining Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 29 and, therefore, deny the allegations.

30. Tygier denies the allegations in Paragraph 30 as they relate to her. The remaining Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 30 and, therefore, deny the allegations.

31. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 31 and, therefore, deny the allegations.

32. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 32 and, therefore, deny the allegations.

4

33. Defendants deny that The Rubin Group was named as a defendant in the DC Action and also deny that the DC Action alleged damages "totaling no less than Four-Million, Five Hundred and Seventy-Five Thousand Dollars." Defendants admit the remaining allegations in Paragraph 33.

34. Denied.

35. Denied as phrased.

36. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 36 and, therefore, deny the allegations.

37. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 37 and, therefore, deny the allegations.

38. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 38 and, therefore, deny the allegations.

39. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 39 and, therefore, deny the allegations.

40. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 40 and, therefore, deny the allegations.

41. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 41 and, therefore, deny the allegations.

42. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 42 and, therefore, deny the allegations.

43. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 43 and, therefore, deny the allegations.

5

44. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 44 and, therefore, deny the allegations.

45. Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 45 and, therefore, deny the allegations.

46. Denied.

47. Denied as phrased.

48. Denied as phrased.

49. Denied as phrased.

50. Denied as phrased.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

## COUNT I

60. Defendants incorporate their responses to Paragraphs 1 – 59 as if set forth herein.

61. Denied.

62. Denied.

63. Denied.

6

64. Denied.

65. Denied.

66. Denied.

67. Denied.

Defendants deny that Plaintiff is entitled to the relief he seeks.

## COUNT II

68. Defendants incorporate their responses to Paragraphs 1 – 59 as if set forth herein.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

Defendants deny that Plaintiff is entitled to the relief he seeks.

## COUNT III

Dismissed pursuant to Court Order.

## COUNT IV

Dismissed pursuant to Court Order.

## DEMAND FOR JURY TRIAL

Defendants demand trial by jury for all the issues so triable.

## AFFIRMATIVE DEFENSES

As for their affirmative defenses, Defendants state as follows:

### First Affirmative Defense

7

Plaintiff fails to state a claim for relief.

### Second Affirmative Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Third Affirmative Defense

Plaintiff's claims are barred because Plaintiff failed to provide adequate notice of his

claims.

### Fourth Affirmative Defense

Plaintiff's claims are barred because Plaintiff is not a creditor of defendants.

### Fifth Affirmative Defense

Plaintiff lacks standing to assert many of his claims.

### Sixth Affirmative Defense

This Court lacks jurisdiction to rule on Plaintiff's claims because they are all subject to a

mandatory arbitration provision.


### COUNTERCLAIM AGAINST KARL GARCIA

Defendants/Counterclaim-Plaintiffs, The Rubin Group LLC, 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners LLC, TRG Development LLC, 638 Newton Partners LLC, Michelle Tygier and Robert Rubin (collectively "CC Plaintiffs") file this counterclaim against Plaintiff/Counterclaim-Defendant Karl Garcia ("Garcia") for abuse of process. In furtherance of these claims, the CC Plaintiffs allege as follows:

8

## PARTIES

1.      The Rubin Group ("TRG") is a limited liability company formed under the laws of the Commonwealth of Virginia. TRG holds an ownership interest in several of the entities named as CC Plaintiffs.

2.      819 Capital LLC, K Street Holdings LLC, 2233-40th Partners LLC, and 638 Newton Partners LLC are entities formed under the laws of the District of Columbia. South Glebe LLC is an entity formed under the laws of the Commonwealth of Virginia. Woodmore Partners, LLC is an entity formed under the laws of the State of Maryland. They are single purpose business entities created to own and manage real estate investments.

3.      TR Holdings LLC and 819 Capital LLC are limited liability companies formed under the laws of the District of Columbia.

4.      Michelle Tygier is a resident of the District of Columbia. She is a member of TRG and, through TRG, she has an indirect ownership interest in various other entities, including the entities named as CC Plaintiffs.

5.      Robert Rubin is a resident of the District of Columbia. He is the husband of Michelle Tygier. Mr. Rubin has a membership interest in TR Holdings LLC.

6.      Karl Garcia is a resident of the District of Columbia.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this counterclaim pursuant to Va. Code § 17.1-513.

8.      This Court has personal jurisdiction over Garcia pursuant to Va. Code § 8.01-328.1(A) because Garcia has caused tortious injury in the Commonwealth and has engaged in a persistent course of conduct in the Commonwealth relating to the claims at issue in this Counterclaim.

9

9.     Venue is proper pursuant to Va. Code § 8.01-262.

## **FACTUAL BACKGROUND**

### *Garcia Files a Lawsuit in the District of Columbia*

10.     In or around April 2017, Garcia purchased a condominium unit ("Unit 34") located within a building known as "The Sanctuary," with an address of 819 D Street, NE, Washington, DC from 819D LLC for a total purchase price of One Million Five Hundred and Twenty-Five Thousand Dollars ($1,525,000.00).

11.     Garcia entered into a purchase agreement with 819D LLC to purchase Unit 34. The purchase agreement includes an arbitration clause, pursuant to which "Any controversy or claim, arising out of or relating tin any way to this Agreement . . . or the Condominium . . . shall be settled by arbitration."

12.     Garcia claims that, since moving into Unit 34, he discovered various structural defects with the property.

13.     On May 15, 2020, Garcia filed a lawsuit in the Superior Court for the District of Columbia arising out of the alleged structural defects (the "DC Action"). Notwithstanding the arbitration provision in the purchase agreement, Garcia sued 819D LLC for breach of warranty, breach of contract, unfair or deceptive trade practices, fraud and recission of the purchase agreement.

14.     In the DC Action, Garcia also named Michelle Tygier and Andrew Rubin as defendants on the basis that they were individually liable or alter egos of 819D LLC. Garcia also sued four other entities that were involved in the marketing and sale of the condominium units or the management of the condominiums.

10

15.     On June 29, 2020, Michelle Tygier filed a motion to dismiss the claims against her in the DC Action.

16.     Garcia opposed Tygier's motion to dismiss.

17.     On July 29, 2020, the DC Superior Court entered an Order granting Tygier's motion to dismiss. The Court ruled that Tygier was not a "declarant" under D.C. Code § 42.1901.02(11) and "therefore, [is] relieved of tort liability with respect to the Unit development at issue in this case." The court also concluded that Garcia's complaint "does not include sufficient factual allegations satisfying Rule 8(a) to support an alter ego or veil piercing theory of liability."

18.     On more than one occasion since the Court's July 29, 2020 ruling, Garcia has amended the complaint in the DC Action. However, Garcia has not amended the complaint to assert any claims against Tygier or any of the other CC Plaintiffs.

19.     On August 17, 2020, Garcia served a subpoena duces tecum on Tygier in the DC Action. Tygier objected to the subpoena and, without conferring with Tygier's counsel, Garcia filed a motion to compel compliance with the subpoena.

20.     Tygier moved to strike the motion to compel and also opposed the motion to compel.

21.     On October 16, 2020, the Court denied Garcia's motion to compel and stated:

"The Court finds that Plaintiff failed to comply with Rule 37(a)(1)(A) – (C) and the motion shall be denied as such. Indeed, it does not appear that Plaintiff made any effort to resolve the discovery dispute at issue before seeking court intervention. Moreover, the Court finds that Plaintiff failed to take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena in accordance with Rule 45. Indeed, Plaintiff served the subpoena on the non-parties before a scheduling order in this case has entered and before Defendant 819D LLC, a Defendant in this matter, entered an appearance at all."

11

22.     On November 17, 2020, the DC Superior Court issued an Order denying Garcia's motion to compel discovery responses from another defendant in the DC Action. The court noted the "flurry of motions" filed by Garcia and stated,

> "If Plaintiff continues to file premature motions with the court without first meeting and conferring *in good faith* with Defendants, the Court will consider awarding Defendants' attorneys' fees, as appropriate, for the time spent responding to Plaintiff's motions."

23.     November 12, 2020, Garcia filed a renewed motion to compel compliance with the subpoena. Tygier opposed the motion. On December 8, 2020, the court once again denied Garcia's motion.

24.     The Superior Court has since ruled that Garcia's claims against 819D LLC in the DC Action are subject to arbitration. Garcia appealed that ruling and the entire DC Action is now stayed pending resolution of Garcia's appeal.

25.     The Federal Arbitration Act controls Garcia's appeal rights and preempts any state law to the contrary. The appeal is a frivolous delay tactic because the Federal Arbitration Act only authorizes appeals from orders denying arbitration, not compelling arbitration. This tactic demonstrates that Garcia has no interest in having the merits of his underlying lawsuit decided and is doing everything he can to delay that action while he pursues vexatious litigation in this Court.

### *Garcia Commences a Separate Action in Fairfax Circuit Court*

26.     Unhappy with how the DC Action was proceeding, Garcia came up with an alternative mechanism to pressure 819D LLC to settle the DC Action.

27.     On October 30, 2020, Garcia filed this action in Fairfax County Circuit Court (the "Fairfax Action"). Garcia named 819D LLC as a defendant and also sued 12 other defendants for fraudulent conveyance and improper transfer.

12

28. All but one of the defendants that Garcia named in the Fairfax Action are located *outside* the Commonwealth of Virginia.

29. Garcia could have amended the DC Action to include the claims he filed in the Fairfax Action.

30. However, Garcia's purpose in filing the Fairfax Action was to initiate multiple lawsuits, create vexatious litigation and harass Tygier and Rubin to force their hand in resolving the DC Action.

31. At the time that Garcia filed the Fairfax Action, he had no other claims pending against the CC Plaintiffs.

32. In particular, before filing the Fairfax Action, Garcia had never provided any notice that he had a claim of any sort against 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners, LLC, TRG Development LLC, 638 Newton Partners LLC or Robert Rubin.

33. Upon information and belief, Garcia learned about the existence of the entities listed in Paragraph 27 by reviewing the docket and/or pleadings in another action pending in DC Superior Court involving disputes between Michelle Tygier and Andrew Rubin.

34. In the Fairfax Action, Garcia alleged that he was a creditor of all the CC Plaintiffs.

35. On November 3, 2021, before Garcia served CC Plaintiffs with process or otherwise notified them of the existence of the Fairfax Action, Garcia issued subpoenas *duces tecum* to at least three banking institutions.

36. Each subpoena requested "All Documents and Communications . . . . related to the financial account(s) held in the name" of each defendant in the Fairfax Action, "including but not

13

limited to account opening documents, signature cards, bank statements, withdrawal receipts, wire transfers, deposits, ATM transactions, emails, and account closing documents."

37. By way of the subpoenas, Garcia sought all financial information relating to the CC Plaintiffs in the custody, possession, or control of the banking institutions.

38. At the time Garcia issued the subpoenas *duces tecum* he knew, at a minimum, that Michelle Tygier and Andrew Rubin had retained counsel in connection with the DC Action.

39. In fact, on the same day that Garcia filed the Fairfax Action (October 30th), his counsel emailed Ms. Tygier's counsel regarding her responses to a subpoena in the DC Action. During the next several days, through at least November 5th, Garcia's counsel continued to communicate with Ms. Tygier's counsel regarding the production of documents in the DC Action. However, throughout the course of those email exchanges, Garcia's counsel never once mentioned the Fairfax Action or the subpoenas *duces tecum* that Garcia simultaneously issued in the Fairfax Action.

40. In fact, Garcia did not serve a copy of the subpoenas *duces tecum* on counsel for defendants as required by Rule 1:12. Nor did Garcia take any steps to notify CC Plaintiffs of the existence of the Fairfax Action or the subpoenas duces tecum "on or before the day of filing" the subpoenas *duces tecum*, as required by the rules.

41. The CC Plaintiffs first learned about the Fairfax several days later.

42. Garcia served the banks with copies of the subpoenas *duces tecum* before he served the CC Plaintiffs with a summons or a copy of the subpoenas duces tecum.

43. For example, on November 6, 2020, Tygier received notice from Sandy Spring Bank that it had been served with a subpoena *duces tecum* in the Fairfax Action and it planned to produce the requested documents.

14

44.     Much later, the CC Plaintiffs learned that, at or around the same time that Garcia issued subpoenas to the banking institutions, Garcia also issued a subpoena *duces tecum* intended for CC Plaintiffs' accountant. Again, Garcia sought all financial information relating to the CC Plaintiffs.

45.     In keeping with Garcia's practices in the DC Action, before undertaking any good faith efforts to confer with counsel for the accountant, Garcia filed a motion to compel compliance with the subpoena against the CC Plaintiff's accountant.

46.     This caused the accountant to incur significant legal expenses. Garcia also knew or should have known that the information sought from the accountant went far beyond information relevant to this litigation and that producing this information was both burdensome to the accountant and another means of harassing the CC Plaintiffs by attempting to uncover their private, financial information that has nothing to do with Garcia's claims against 819D LLC.

47.     There was no legitimate basis for Garcia to seek all financial records for all CC Plaintiffs.

48.     Garcia knew that requesting all financial information relating to all CC Plaintiffs would be an invasion of CC Plaintiffs' privacy and confidential business information.

49.     After undersigned counsel filed a motion for a protective order, this Court limited the scope of the records that Garcia was entitled to receive from the financial institutions pursuant to the subpoenas.

50.     In Garcia's April 9, 2021 Opposition to a Demurrer, Garcia finally acknowledged that he is not a creditor of all CC Plaintiffs. Specifically, Garcia stated, "the Amended Complaint alleges that Mr. Garcia is a creditor of two of the Moving Defendants: The Rubin Group LLC and

15

Tygier." Garcia claimed that the remaining CC Plaintiffs "either transferred and/or received improperly conveyed funds."

51. However, when Garcia issued the subpoenas *duces tecum* on November 3, 2021, he did not limit the information requested in accordance with his April 9th description of his claims.

52. Upon information and belief, Garcia proceeded in this way – issuing subpoenas *duces tecum* on or about the day he filed the Fairfax Action that seek all financial information for all CC Plaintiffs and serving copies of the subpoenas *duces tecum* on the banks before serving the CC Plaintiffs – because he sought to annoy and harass CC Plaintiffs and attempt to extort money from them by engaging in vexatious litigation and obtaining confidential, sensitive financial information relating to their private personal and business affairs.

53. Upon information and belief, Garcia hoped that by applying this sort of pressure and by harassing CC Plaintiffs, he could force them to pay him some amount of undeserved money to go away.

54. Garcia had an ulterior purpose in filing this action, issuing subpoenas *duces tecum* to the banks and accountant and pursuing claims against CC Plaintiffs in the Fairfax Action.

55. Specifically, Garcia hoped that he could not only force settlement, but also embarrass and harass CC Plaintiffs in the process and obtain sensitive information regarding the CC Plaintiff's finances and operations.

## COUNT I – ABUSE OF PROCESS

56. CC Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

57. When Garcia commenced this litigation, he issued subpoenas *duces tecum* to the banks and financial institutions that requested all financial information for all CC Plaintiffs and

16

delayed service of the summons and subpoenas on CC Plaintiffs, in violation of the Rules. Garcia had an improper and ulterior purpose, i.e., to use vexatious litigation and issue overbroad and baseless subpoenas requesting confidential information to force CC Plaintiffs to pay Garcia some amount of money to end the continued intrusions into their personal and business affairs.

58.    Although Garcia later claimed that he was not a "creditor" of all CC Plaintiffs, he nonetheless issued subpoenas *duces tecum* that sought all financial information for all the CC Plaintiffs.

59.    Garcia did not limit the subpoenas or the scope of documents requested to transactions from entities of which he claims he is a creditor.

60.    Nor did he limit the subpoenas to transfers that he believed to be an improper conveyance.

61.    Upon information and belief, Garcia hoped that the banks would receive the subpoenas and respond before the CC Plaintiffs were served with a summons or copy of the Fairfax Action and, as such, Garcia would obtain a wealth of confidential and sensitive information relating to CC Plaintiffs.

62.    Garcia's conduct is not proper in the regular prosecution of proceedings and constitutes an abuse of process.

63.    The CC Plaintiffs have incurred substantial fees and expended significant resources as a result of Garcia's abuse of process.

64.    The CC Plaintiff's damages are ongoing and continue to accrue.

WHEREFORE, the CC Plaintiffs demand a judgment in their favor and against Karl Garcia to include the following relief:

17

A. Awarding the CC Plaintiffs compensatory damages in an amount to be proven at trial, but not less than $25,000;

B. Award the CC Plaintiffs their reasonable attorneys' fees and costs; and

C. Award all such other relief as the Court determines is just and proper.

## DEMAND FOR JURY TRIAL

Counterclaim Plaintiffs hereby demand a trial by jury on all issues and claims triable by a jury.

Dated: May 20, 2021                                  Respectfully submitted,

/s/ Kimberly Jandrain
Laurin H. Mills (VSB No. 79848)
Kimberly Jandrain (VSB No. 72727)
Samek, Werther & Mills LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
(703) 547-4693
Fax (703) 547-4694
Laurin@samek-law.com
kim@samek-law.com

*Attorneys for The Rubin Group LLC, 819
Capital LLC, K Street Holdings LLC, TR
Holdings LLC, 2233-40th Partners LLC,
South Glebe LLC, Woodmore Partners LLC,
TRG Development LLC, 638 Newton
Partners LLC, Michelle Tygier, and Robert
Rubin*

18

## CERTIFICATE OF SERVICE

I certify that on May 20, 2021, I caused to be served, via electronic mail a copy of the

foregoing on:

Bethany R. Benes
Bethune Benes, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax, VA 22030
bbenes@bethunebenes.com
*Attorney for Karl Garcia*

Christopher A. Glaser
Jackson & Campbell, P.C.
2300 N Street, N.W., Suite 300
Washington, D.C. 20037-1194
(202) 457-1612
CGlaser@JacksCamp.com
*Attorney for Andrew Rubin*

Mark Crawford
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com
*Attorney for 819D LLC*

/s/ Kimberly Jandrain
Kimberly Jandrain

19

Clear All Data

## ACCEPTANCE/WAIVER OF SERVICE OF PROCESS AND
## WAIVER OF FUTURE SERVICE OF PROCESS
## AND NOTICE

Case No. ........CL-2020-17040........

COMMONWEALTH OF VIRGINIA    VA. CODE §§ 8.01-327; 20-99.1:1; Rules 3:5, 3:8

........................................................ Fairfax County ........................................................ Circuit Court

........Karl Garcia........    v.    ........The Rubin Group, et al.........
PLAINTIFF                                              DEFENDANT

I, the undersigned party named below, swear under oath/affirm the following:

1.  I am a party [ ] plaintiff [X] defendant in the above-styled suit.

2.  I have received a copy of the following documents on this date:

    [X] Complaint

        [X] filed on ........................... November 30, 2021 ..........................., attached
                                  DATE

        [ ] pre-filing copy pursuant to Va. Code § 20-99.1:1(A), attached

    [ ] Summons with copy of Complaint filed on ..................................................., attached
                                                  DATE

    [ ] Other – Describe: ................................................ filed on ...........................
                                                                 DATE

I understand that my receipt of these copies and my signature below constitute

        [ ] the acceptance of service of process of these copies, or

        [X] a waiver of service of process and notice which may be prescribed by law.

3.  I agree to voluntarily and freely waive any future service of process and notice as checked below in this case:

    [ ] a.  the 21-day time period for filing a responsive pleading.

    [ ] b.  any further service of process.

    [ ] c.  notice of the appointment of a commissioner in chancery and hearings held by such commissioner in chancery, if a commissioner in chancery is appointed.

    [ ] d.  notice of the taking of depositions.

    [ ] e.  notice of the filing of any reports by a commissioner in chancery of the filing of depositions.

    [ ] f.  notice of testimony to be given orally in open court.

    [ ] g.  notice of entry of any order, judgment or decree, including the final decree of divorce.

I understand that, by waiving service of process and notice, I am giving up my right to be notified of the events where indicated above.

........03/15/22........                                    ........................................................
DATE                                              [x] DEFENDANT    [ ] PLAINTIFF

**TO DEFENDANT:** Notify the Court in writing of any changes of your address while this case is pending.

State/Commonwealth of _District of Columbia_ [X] City [ ] County of ...........................

Subscribed and sworn to/affirmed before me this ...15... day of ...March..., 20 _22_

by ........Gregory Ulysses Auger III........
PRINT NAME OF AFFIANT

........3/15/2022........                                    ........Pamela J. Durbin........
DATE                                              [ ] CLERK    [ ] DEPUTY CLERK
                                 [ ] NOTARY PUBLIC (My commission expires ...........................)

                                 Registration No. ...........................

                                        PAMELA J. DURBIN
                                  NOTARY PUBLIC DISTRICT OF COLUMBIA
                                  My Commission Expires April 14, 2022

FORM CC-1406 MASTER 07/19

**ACCEPTANCE/WAIVER OF SERVICE OF PROCESS AND
WAIVER OF FUTURE SERVICE OF PROCESS
AND NOTICE**

Case No. ........ CL-2020-17040

COMMONWEALTH OF VIRGINIA    VA. CODE §§ 8.01-327; 20-99.1:1; Rules 3:5, 3:8

........................... Fairfax County ........................... Circuit Court

........... Karl Garcia ........... v. ........... The Rubin Group, et al. ...........
PLAINTIFF                                              DEFENDANT

I, the undersigned party named below, swear under oath/affirm the following:

1. I am a party [ ] plaintiff [X] defendant in the above-styled suit.

2. I have received a copy of the following documents on this date:

    [X] Complaint

        [X] filed on ........................... November 30, 2021 ..........................., attached
                                                            DATE

        [ ] pre-filing copy pursuant to Va. Code § 20-99.1:1(A), attached

    [ ] Summons with copy of Complaint filed on ..........................., attached
                                                            DATE

    [ ] Other – Describe: ........................... filed on ...........................
                                                                                    DATE

    I understand that my receipt of these copies and my signature below constitute

        [ ] the acceptance of service of process of these copies, or

        [X] a waiver of service of process and notice which may be prescribed by law.

3. I agree to voluntarily and freely waive any future service of process and notice as checked below in this case:

    [ ] a.    the 21-day time period for filing a responsive pleading.

    [ ] b.    any further service of process.

    [ ] c.    notice of the appointment of a commissioner in chancery and hearings held by such commissioner in chancery, if a commissioner in chancery is appointed.

    [ ] d.    notice of the taking of depositions.

    [ ] e.    notice of the filing of any reports by a commissioner in chancery of the filing of depositions.

    [ ] f.    notice of testimony to be given orally in open court.

    [ ] g.    notice of entry of any order, judgment or decree, including the final decree of divorce.

    I understand that, by waiving service of process and notice, I am giving up my right to be notified of the events where indicated above.

....... 3/9/22 .......                    ....... (signature) .......
DATE                                         [•] DEFENDANT    [ ] PLAINTIFF

**TO DEFENDANT:** Notify the Court in writing of any changes of your address while this case is pending.

State/Commonwealth of ... VIRGINIA ..., [ ] City [X] County of ... FAIRFAX ...

Subscribed and sworn to/affirmed before me this ... 9th ... day of ... MARCH ..., 20 22.

by ... Gregory W. Anger. ...
                                PRINT NAME OF AFFIANT

....... 3/9/22 .......                    ....... Marse Ann Hammond .......
DATE                    [ ] CLERK    [ ] DEPUTY CLERK    [X] NOTARY PUBLIC (My commission expires ...........................)

Registration No. ... 121691 ...

MARSE ANN HAMMOND
NOTARY PUBLIC
REGISTRATION # 121691
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES 06/30/2024

FORM CC-1406 MASTER 07...

 **CT Corporation**

**Service of Process Transmittal**
11/11/2020
CT Log Number 538575280

**TO:** Registered Agent Department
Business Filings Incorporated (Recipient Account Only)
8020 Excelsior Dr Ste 200
Madison, WI 53717-1998

**RE:** **Process Served in District of Columbia**

**FOR:** 819D LLC  (Domestic State: DC)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | KARL GARCIA, PLTF. vs. THE RUBIN GROUP LLC, ET AL., DFTS. // TO: 819D LLC |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # CL20200017040 |
| **ON WHOM PROCESS WAS SERVED:** | Business Filings Incorporated, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/11/2020 at 15:22 |
| **JURISDICTION SERVED :** | District of Columbia |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/12/2020, Expected Purge Date: 11/17/2020 |
| | Image SOP |
| | Email Notification,  Registered Agent Department  ctsop@bizfilings.com |
| **SIGNED:**<br>**ADDRESS:** | Business Filings Incorporated<br>208 S La Salle St Ste 814<br>Chicago, IL 60604-1101 |
| **For Questions:** | 866-203-1500<br>DealTeam@wolterskluwer.com |

Page 1 of  1 / NK

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Karl Garcia vs. Rubin Group LLC, The et al.**

CL-2020-0017040

TO:    **819D LLC**
       **Serve: Business Filings Inc. of Delaware, R/A**
       **1015 15th Street NW Ste 100**
       **Washington DC 20005**

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on November 5, 2020.

JOHN T. FREY, CLERK

By: _____
                    **Deputy Clerk**

Plaintiff's Attorney:  Bethany R. Benes

SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Karl Garcia vs. Rubin Group LLC, The et al.**

CL-2020-0017040

TO:     **819D LLC**
        **Serve: Business Filings Inc. of Delaware, R/A**
        **1015 15th Street NW Ste 100**
        **Washington DC 20005**

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on November 5, 2020.

**JOHN T. FREY, CLERK**

By: _____
**Deputy Clerk**

**Plaintiff's Attorney:  Bethany R. Benes**

SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Karl Garcia vs. Rubin Group LLC, The et al.**

**CL-2020-0017040**

TO:    **819D LLC**
       **Serve: Business Filings Inc. of Delaware, R/A**
       **1015 15th Street NW Ste 100**
       **Washington DC 20005**

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on November 5, 2020.

JOHN T. FREY, CLERK

By: _____
                    **Deputy Clerk**

**Plaintiff's Attorney:  Bethany R. Benes**

133

SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Karl Garcia vs. Rubin Group LLC, The et al.**

**CL-2020-0017040**

TO: **819D LLC**
**Serve: Business Filings Inc. of Delaware, R/A**
**1015 15th Street NW Ste 100**
**Washington DC 20005**

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on November 5, 2020.

JOHN T. FREY, CLERK

By: _____
Deputy Clerk

Plaintiff's Attorney:  Bethany R. Benes

**SPS**

**V I R G I N I A :**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

## PROOF OF SERVICE

**Karl Garcia**
      **Plaintiff**
**VS**

**Rubin Group LLC, The et al.**
      **Defendant**

**CL-2020-0017040**
**Subtype:  Summons/Complaint**
**Serve: 819D LLC**


STATE OF_____

CITY/COUNTY OF_____, to wit:

     This day _____

personally appeared before the undersigned Notary Public in and for the City/County and State

aforesaid, and, having been first duly sworn according to law, deposes and states as follows:  that

he/she is not a party to, or otherwise interested in, the subject matter in controversy in the within

cause, that he/she is over the age of 18 years; that on the _____ day of _____, 20___, at

_____ o'clock _____.m. he/she served the within Complaint,  in person, on the Defendant

_____ at_____

_____

_____ and the Defendant  is / is not  a

resident of the State of Virginia.

                   _____
                     AFFIANT               TITLE

     Subscribed and sworn to before me in my City/County and State aforesaid, this

_____ day of _____, 20_____.

                    Notary ID #: _____

_____
        NOTARY PUBLIC          My Commission expires:_____

# AFFIDAVIT OF PROCESS SERVER

### Circuit Court of Fairfax County, Commonwealth of Virginia

**Karl Garcia**

        Plaintiff(s),

VS.

**The Rubin Group, LLC, et al**

        Defendant(s).

Attorney: Bethany Benes

Bethune Benes, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax VA 22030



*259573*

**Case Number: CL-2020-0017040**

Legal documents received by Same Day Process Service, Inc. on **11/06/2020** at **2:51 PM** to be served upon **Andrew Rubin** at **1423 Sharps Point Road, Annapolis, MD 21409**

I, **Rene Rivas**, swear and affirm that on **November 10, 2020** at **1:00 PM**, I did the following:

**POSTED** the **Summons - Civil Action; Civil Case Coversheet; Complaint; Subpoena Duces Tecum (Civil) - Attorney Issued and Exhibit A to Subpoena Duces Tecum to Monument Financial Corporation d/b/a Monument Bank c/o CT Corporation System, Registered Agent; Subpoena Duces Tecum (Civil) - Attorney Issued and Exhibit A to Subpoena Duces Tecum to Sandy Spring Bank f/k/a Revere Bank c/o CT Corporation System, Registered Agent; Subpoena Duces Tecum (Civil) - Attorney Issued and Exhibit A to EagleBank, Inc, c/o CT Corporation System, Registered Agent; Plaintiff's First Set of interrogatories to Defendant 2233-40th Partners LLC; Plaintiff's First Set of Interrogatories to Defendant 638 Newton Partners LLC; Plaintiff's First Set of Interrogatories to Defendant 819 Capital LLC; Plaintiff's First Set of Interrogatories to Defendant 819D LLC; Plaintiff's First Set of Interrogatories to Defendant Andrew Rubin; Plaintiff's First Set of Interrogatories to Defendant k Street Holdings LLC; Plaintiff's First Set of Interrogatories to Defendant Robert Rubin; Plaintiff's First Set of Interrogatories to Defendant South Glebe LLC; Plaintiff's First Set of Interrogatories to Defendant the Rubin Group LLC; Plaintiff's First Set of Interrogatories to Defendant TR Holdings; Plaintiffs First Set of Interrogatories to Defendant TRG Development LLC; Plainitiff's First Set of Interrogatories to Defendant Michell Tygier; Plaintiff's First Set of Interrogatories to Defendant Woodmore LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant 2233-40th Partners LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant 819 Captial LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant 819D LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant Andrew Rubin; Plaintiff's First Set of Requests for Production of Documents to Defendant K Street Holdings LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant Robin Rubin; Plaintiff's First Set of Requests for Production of Documents to Defendant South Glebe LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant The Rubin Group LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant TR Holdings LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant TRG Development LLC; Plaintiff's First Set of Requests for Production of Documents to Defendant Michelle Tygier; Plaintiff's First Set of Requests for Production of Documents to Defendant Woodmore LLC;** by attaching a copy to the front door located at **1423 Sharps Point Road Annapolis MD 21409**. The attempt of service occurred:

| Date/Time | Address | Remarks |
|---|---|---|
| 11/10/2020-1:00 PM | 1423 Sharps Point Road Annapolis, MD 21409 | Upon my arrival. I spotted two vehicles parked in the driveway. A Grey Range Rover and a white Honda with DC tags GC-3501. I proceeded to the front door and rang the doorbell. I heard a Caucasian female inside the house walking toward the door. She was on the phone. I heard her lock the door and walked towards the back of the house. I waited for about 5 minutes and yelled the subject name, but I wasn't acknowledged. I proceeded to post the legal documents to the red with glass front door at the property. |

On **11/10/2020**, a copy of the legal documents were mailed to the defendant, via first class mail.

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.



**Rene Rivas**
Process Server

**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
**(202)-398-4200**
**info@samedayprocess.com**

Internal Job ID:259573

District of Columbia: SS
Subscribed and Sworn to before me
this 12 day of NILENAR 2·20

Michael Molash, Notary Public, D.C.
My commission expires July 14, 2022



The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Karl Garcia

**DEFENDANTS**

The Rubin Group, LLC, et al. (see attached List)

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Bethany R. Benes, Bethune Benes, PLLC, 4290 Chain Bridge Road, Suite 302, Fairfax, VA 22030

Attorneys *(If Known)*

See attached List.

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | (15 USC 1681 or 1692) |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1452

Brief description of cause:
Action to recover alleged fraudulent conveyances.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ $6,106,544.60

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE
June 22, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Kristen E. Burgers (Va. Bar No. 67997)

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## DEFENDANTS & DEFENDANTS COUNSEL

| Defendant | Counsel |
|---|---|
| 819D LLC | Stephen E. Leach, Esq.<br>Kristen E. Burgers, Esq.<br>Hirschler Fleischer, PC<br>8270 Greensboro Drive, Suite 700<br>Tysons, VA 22102<br>*Bankruptcy Counsel*<br><br>Mark Crawford, Esq.<br>Law Offices of Mark D. Crawford, PLLC<br>1005 N. Glebe Road, Suite 210<br>Arlington, VA 22201<br>*Litigation Counsel* |
| Canal View Holdings<br>Andrew Rubin | Christopher A. Glaser, Esq.<br>Jackson & Campbell<br>2300 N Street NW, Suite 300<br>Washington, DC 20037 |
| Jeffrey Houle | John A.C. Keith, Esq.<br>Blankingship & Keith<br>4020 University Drive, Suite 300<br>Fairfax, VA 22030 |
| Gregory Auger II<br>Gregory Auger III | Alexander M. Laughlin, Esq.<br>Odin Feldman Pittleman, PC<br>1775 Wiehle Avenue, Suite 400<br>Reston, VA 20190 |
| Thomas Madison | Douglas E. McKinley, Esq.<br>P.O. Box 7395<br>Alexandria, VA 22307 |

The Rubin Group LLC  
819 Capital LLC  
K Street Holdings LLC  
TR Holdings LLC  
2233-40th Partners LLC  
South Glebe LLC  
Woodmore Partners LLC  
TRG Development LLC  
638 Newton Partners LLC  
Michelle A. Tygier  
Robert Rubin  

Laurin H. Mills, Esq.  
Samek Werther Mills, LLC  
2000 Duke Street, Suite 300  
Alexandria, VA 22314  

Christos Ekonomakis  
5058 Joewood Drive  
Sanibel, FL 33957  

Pro Se  

Liliana Ekonomakis  
5058 Joewood Drive  
Sanibel, FL 33957  

Pro Se  

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| v. | |
| **THE RUBIN GROUP, LLC, *et al.*** | Case No. 1:22-cv-00698-LMB-JFA |
| Defendants. | |

## THE 11 DEFENDANTS' MOTION TO DISMISS

Defendants, The Rubin Group LLC ("TRG"), 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners, LLC, TRG Development LLC, 638 Newton Partners LLC, Michelle Tygier, and Robert Rubin (collectively the "11 Defendants") submit this Motion to Dismiss the Third Amended Complaint ("TAC") filed by Karl Garcia ("Mr. Garcia") pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth in the Memorandum in Support of this Motion to Dismiss, which is filed contemporaneously herewith, this Motion should be granted.

Respectfully submitted,

Dated: June 29, 2022

_____/s/ Laurin H. Mills_____
Laurin H. Mills (VSB No. 79848)
Mansitan Sow (VSB No. 94590)
Brian C. Clarry (VSB No. 92160)
Samek, Werther & Mills LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
(703) 547-4693
Fax (240) 912-3030
Laurin@samek-law.com
Mansitan@samek-law.com
Brian@samek-law.com

*Attorneys for 11 Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of June, 2022, a true and accurate copy of the foregoing was served via the Court's CM/ECF system and/or electronic mail to:

Christopher A. Glaser
Jackson & Campbell, P.C.
2300 N Street, N.W., Suite 300
Washington, D.C. 20037-1194
(202) 457-1612
CGlaser@JacksCamp.com
*Attorney for Andrew Rubin*

Bethany Benes, Esq.
Bethune Benes, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax, Virginia 22030
bbenes@bethunebenes.com
*Attorney for Karl Garcia*

John A. C. Keith, Esq.
Blankingship & Keith, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
jkeith@bklawva.com
*Counsel for Jeffrey Houle*

Alex Laughlin, Esq. Jim Miller, Esq.
Alex.laughlin@ofplaw.com
Jim.miller@ofplaw.com
*Counsel for Gregory Auger II and Gregory Auger III*

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com
*Attorney for 819D LLC*

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net
*Counsel for Thomas Madison*

James P. Miller, Esq.
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Jim.Miller@ofplaw.com

Milt N. Theologou, Esq.
Silverman Theologou LLP
11200 Rockville Pike, Ste. 520
North Bethesda, MD 20852
mtheologou@silvermanlegal.com

_____/s/ Laurin H. Mills_____
Laurin H. Mills

142

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| v. | |
| **THE RUBIN GROUP, LLC, *et al.*** | Case No. 1:22-cv-00698-LMB-JFA |
| Defendants. | |

## <u>ORDER GRANTING THE 11 DEFENDANTS' MOTION TO DISMISS</u>

The Court, having considered the Motion to Dismiss filed by Defendants, The Rubin Group LLC, 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners, LLC, TRG Development LLC, 638 Newton Partners LLC, Michelle Tygier, and Robert Rubin (collectively the "11 Defendants"), any opposition thereto, and the entire record herein, is of the opinion that said motion is well taken and should be and is GRANTED.

The Third Amended Complaint filed by Plaintiff Karl Garcia is hereby dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

SO ORDERED this _____ day of _____, 2022.

_____
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| | Case No. 1:22-cv-00698-LMB-JFA |
| v. | |
| **THE RUBIN GROUP, LLC, *et al.*** | |
| Defendants. | |

**THE 11 DEFENDANTS'**
**MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Defendants, The Rubin Group LLC ("TRG"), 819 Capital LLC, K Street Holdings LLC,

TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners, LLC, TRG

Development LLC, 638 Newton Partners LLC, Michelle Tygier, and Robert Rubin (collectively

the "11 Defendants") submit this Memorandum in Support of their Motion to Dismiss the Third

Amended Complaint ("TAC") filed by Karl Garcia ("Mr. Garcia").

**BACKGROUND**

This case arises from the sale of a District of Columbia condominium developed by

defendant 819D LLC ("819D") and sold to Mr. Garcia in 2017. In the action before this Court,

Mr. Garcia alleges two causes of action against the 11 Defendants:

(1)      Fraudulent Conveyance pursuant to Va. Code § 55.1-400 (Count I); and

(2)      Voluntary Conveyance pursuant to Va. Code § 55.1-401 (Count II)

Both counts concern monetary transfers that purportedly originated from 819D following

Mr. Garcia's purchase. For the reasons set forth herein, this action should be dismissed.

## ARGUMENT

### I.    Standard.

This is a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6).  A motion to dismiss tests the sufficiency of a complaint, but it does "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  In considering a motion to dismiss, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth" or are not plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### II.    Garcia Lacks Standing to Assert Many of His Claims.

Mr. Garcia lacks standing to pursue claims that relate to common elements and/or limited common elements of the condominium.  In both the District of Columbia and Virginia, only condominium associations have standing to assert claims relating to the common elements or the limited common elements of a condominium.  Va. Code § 55.1-1915; D.C. Code § 42-1902.09.  "[S]tanding to institute claims or actions concerning common elements, including limited common elements, is restricted to condominium unit owners' associations."  *Kuznicki v. Mason*, 273 Va. 166, 176, 639 S.E.2d 308, 312–13 (2007) (individual unit owner lacks standing to assert claim regarding limited common element); *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 726 n.1 (D.C. 2000) (Unit owner's "claim is for injuries sustained to the cooperative, and

2

such a claim can only be brought in the form of an indirect derivative suit on behalf on the cooperative.")

Mr. Garcia has no standing to assert claims relating to either common elements or limited common elements of the condominium. Any purported notification of claims made by Mr. Garcia must be considered only to the extent that same relates to claims which may be asserted by Garcia. Each claim by Mr. Garcia relating to conditions outside the condominium unit that he purchased should be dismissed. E.g., TAC ¶ 33. "On June 1, 2017, Tygier participated in a meeting of the Property's Association. At the meeting, a number of residents voiced their outrage over the Property's defects and lack of repair by Tygier, A. Rubin, 819D, and the Rubin Group."); TAC ¶ 34 ("Mr. Garcia began further investigating the issues with the Property as a whole. On or about August 6, 2017, Mr. Garcia created a "**Common Area Punch List,**" itemizing various issues with the Property's Common Areas. The Common Area Punch List included images and captions, detailing everything from a broken attic window in the Property Mr. Garcia noticed walking down the street, to eroding mortar on the façade's exterior, to missing portions of the Property's brick chimney stack. Three days later, on August 9, 2017, Mr. Garcia submitted the document to Defendant 819D, A. Rubin, and Tygier…").

### III. Count II Should Be Dismissed Because Garcia Did Not Allege that Any of the 11 Defendants Were Insolvent or Rendered Insolvent at the Time of the Transfers.

To be liable for a voluntary conveyance, the transfer must be made without valuable consideration and the transferor must either be "insolvent" at the time of the transfer or rendered insolvent when the transfer is made. *In re Meyer*, 244 F.3d 352, 353 (4th Cir. 2001).[1] A debtor

---

[1] Paragraph 240 of the TAC alleges that the transfers were without valuable consideration. That is a conclusion, not an allegation of fact. The TAC, which was filed after a year of discovery, contains no facts supporting the contention that any of the transfers were made without valuable

is insolvent, pursuant to Va. Code § 55.1-401, when it has insufficient property to pay all its debts. *Hudson v. Hudson*, 249 Va. 335, 340 (1995). "Debt" is defined as "liability on a claim." *Commonwealth ex rel. Von Moll v. HKS, Inc.*, 103 Va. Cir. 1, 3, 2019 WL 11866747 (Richmond Apr. 23, 2019); 11 U.S.C. § 101(12). To "prove insolvency, both the value of the debtor's assets and the amount of his liabilities must be established." *Hudson*, 249 Va. at 340. Insolvency is measured on the date of the alleged transfer. *In re Meyer*, 244 F.3d at 353.[2]

An alleged debt must exist on the date of the alleged transfer. *Id.* Garcia's potential judgment resulting from his claim is **not a debt** for purposes of measuring the 11 Defendants' insolvency. *Cobb v. Overman,* 109 F. 65, 67 (4th Cir. 1901) (discussing payments falling due after the filing of petition, "such claims not being debts absolutely owning at the time of filing."); *Lewis v. Roberts*, 267 U.S. 467, 471 (1925) ("unliquidated claims arising in tort, not previously reduced to judgment" are merely claims, "not being included in the enumeration of provable debts."). The only references to insolvency in his 249-paragraph TAC are as follows:

> "The transfers referenced above left 819D and alter-egos 819 Capital and the Rubin Group insolvent." TAC ¶ 232 (which is a conclusion, not an allegation of fact).

> "The [] transfers [] resulted in the insolvency of each of the Defendants. More specifically, Defendants 819 D, The Rubin Group, A. Rubin, Tygier and 819 Capital are each without adequate funds and/or assets to satisfy the anticipated judgment(s) of Mr. Garcia." TAC ¶ 248.

---

consideration. The motion to dismiss as to Count II should be granted for the additional reason that Garcia has not pleaded an essential factual element of the claim.

[2] Insolvency is a term with two meanings. "Balance sheet" insolvency occurs when a company's liabilities exceed its assets; "cash flow" insolvency occurs when a company is unable to meet maturing debts as they come due. *Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 590 (8th Cir. 2007). Virginia courts appear to focus exclusively on cash flow insolvency. Garcia has alleged no facts showing that any of the 11 Defendants were insolvent under either definition on the dates of the alleged transfers.

Garcia does not get to define insolvency for the purposes of Va. Code § 55.1-401.

Insolvency is the inability to pay debts as they come due or a situation where an entity's

liabilities exceed its assets. The Court has no authority to void the alleged transfers because of

Mr. Garcia's bare allegation that his "anticipated judgment" – which is a "claim" and not a

"debt" – may not be satisfied. That is not the test for insolvency.

## IV. The TAC Fails to State a Claim for Fraudulent Conveyance.

Plaintiff sued the 11 Defendants for fraudulent conveyance only under Virginia law. The

issue raised in this motion to dismiss is whether Plaintiff states a claim for fraudulent

conveyance under Virginia law. To answer that question, the Court must first conduct a choice-

of-law analysis.

"[A] claim for fraudulent conveyance under Virginia law sounds in tort." *Roanoke*

*Cement Co., LLC v. Chesapeake Prods., Inc.*, 2007 WL 2071731 (July 13, 2007) (E.D. Va.

2007); *Terry v. June*, 420 F. Supp. 2d 493, 503 (W.D. Va. 2006) (holding that fraudulent

conveyance is a tort for choice-of-law purposes); 37 C.J.S. *FRAUDULENT CONVEYANCES* §

213 ("A cause of action for fraudulent conveyance is a species of tort").

In Virginia, actions sounding in tort are governed by the law of the place of the wrong,

which is a principle known as *lex loci delicti*. *McMillan v. McMillan*, 219 Va. 1127, 1128

(1979); *see also Cockrum v. Donald J. Trump for Pres., Inc.*, 365 F. Supp. 3d 652, 666 (E.D. Va.

2019). The place of the wrong is where "the last event necessary to make an [actor] liable for an

alleged tort takes place." *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir.

1986); *Terry*, 420 F. Supp. 2d at 503.

> [T]he last act necessary to complete the tort of fraudulent conveyance is the
> irrevocable delivery or acceptance of funds by the transferee, not the transferor's
> order to pay out investor funds. Without a transferee to accept a transfer of funds,
> in other words, there can be no conveyance and therefore no liability created.

5

*Terry*, 420 F. Supp. 2d at 503. For a fraudulent conveyance by wire transfer, the *lex loci delicti* would be the receiver's bank location. *Id.* With checks, the last clear act occurs at the location of the bank that honors the check. *Id.* at 505; Va. Code § 8.4A-104(a).

To state a claim for fraudulent conveyance under Virginia law, Garcia must allege, *for each challenged transfer*, that the funds received by each transferee were received in Virginia. Virginia's fraudulent conveyance law does not apply to transfers received in other jurisdictions and "a claim for fraudulent conveyance is not a predicate unlawful act from which liability can be spread to others on a theory of civil conspiracy." *La Bella Dona*, 294 Va. at 257.

The fraudulent transfer allegations are at ¶¶ 48-231 of the TAC. Each allegation is that a transfer of a given amount was made by one defendant to another defendant on a given date. The TAC, however, is devoid of allegations establishing the last clear act to complete the alleged tort for any of the transfers. For example, the TAC does not allege how any of the transfers were made (i.e., cash, check, wire). Nor does it allege where any wire transfer or check was received. It is noteworthy that Ms. Tygier and Robert Rubin are D.C. residents. TAC ¶¶ 13-14. Andrew Rubin lives in Maryland. TAC ¶ 12. Defendants 819D, 819D Capital, K Street, TR Holdings, 2233, Woodmore, TRG Development, Canal View and 638 Newton are all companies registered in the District of Columbia and managed by LLC members who live in either D.C. or Maryland. TAC ¶¶ 2-15. In short, there is no allegation supporting even an inference that any transfers were received in Virginia.

Vague and conclusory allegations do not state a claim for fraud. *Ogunde v. Prison Health Services*, 274 Va. 55, 66 (2007). Plaintiff has sued the 11 Defendants under Virginia's fraudulent conveyance statute and has the burden to allege facts sufficient to establish that Virginia law applies – which means pleading facts sufficient to establish the place of the wrong.

6

*Dreher v. Budget Rent-A-Car System, Inc.*, 272 Va. 390 (2006) (conducting choice-of-law analysis at demurrer stage and applying New York law). This he has not done. The motion to dismiss the fraudulent conveyance count must be granted for failing to allege facts sufficient to state a claim under Virginia law.

### V. Garcia Did Not Provide Adequate Notice of His Claim Before July 2018.

"The entitlement of one alleging a fraudulent conveyance need not be judicially established or reduced to judgment at the time of the challenged conveyance." *Buchanan v. Buchanan*, 266 Va. 207, 212 (2003). Thus, obtaining a judgment against a party is not a prerequisite to establishing creditor status in Virginia (although it is in the District of Columbia). *Bruce v. Dean*, 149 Va. 39, 46 (1927). Rather, "[t]he key consideration in establishing creditor status is whether there was actual notice of a specific potential claim." *Luria v. Bd. of Dir. of Westbriar Condo. Unit Ass'n,* 277 Va. 359, 366 (2009). A plaintiff cannot demonstrate creditor status of either class before providing actual notice of a specific potential claim to a defendant. *Id.; see also Bennett v. Garner*, 913 F.3d 436, 442 (4th Cir. 2019); *McCarthy v. Giron*, 2014 WL 2696660, at *13 (E.D. Va. June 6, 2014).

Garcia alleges that he obtained creditor status as of April 22, 2017, when he identified "Punch List Items within his unit in the condominium." TAC ¶ 30. Knowledge of punch list items (which are normal in new construction and typically minor) is not actual notice of a specific potential claim of structural defects, the existence of which was not discovered until much later. *Luria,* 277 Va. at 366-67. Garcia, like the trial court in *Luria*, is implicitly applying a "should have known" standard erroneously to support his argument that the 11 Defendants had "notice" since April 2017. *Id.*

7

Garcia alleges he sent "official notice" via a "litigation hold letter" he sent to on or about July 13, 2018 (the "July Letter").  Assuming *arguendo*, the July Letter constitutes legally sufficient notice of Garcia's potential claims, then July 13, 2018, is the earliest date Garcia obtained creditor status, and against the recipient Defendants only.  Alternatively, absent the legal sufficiency of the July Letter to notify the 11 Defendants of a potential claim, Garcia's May 18, 2020, filing of the D.C. Action is the earliest date Garcia provided actual notice as to the recipient Defendants only.   Accordingly, Garcia fails to state a cause of action regarding the 132 transfers he alleges occurred before July 13, 2018.

Furthermore, the underlying dispute arises from a contract between Garcia and Defendant 819D *only.*  Garcia alleges only one transfer was made after the July Letter, by Defendant 819D in the amount of $44,038.32, on June 14, 2019. TAC ¶ 178.  That transfer is the only transfer for which Garcia could potentially state a claim.  *Luria,* 277 Va. at 366-67.

## VI.     The Alter-Ego Allegations Against Tygier Are Barred by *Res Judicata* and Collateral Estoppel.

*Res judicata* involves both issue and claim preclusion.  *Lee v. Spoden*, 290 Va. 235, 245–46 (2015).  Issue preclusion bars re-litigation of common factual issues between the same or related parties.  *Funny Guy, LLC v. Lecego, LLC*, 293 Va. 135, 142 (2017).  Claim preclusion bars the assertion of legal or equitable rights even if they were not resolved in the earlier litigation.  The doctrine requires litigants to "make the most of their day in court."  *Id.* at 143.

Garcia brought an action in the District of Columbia against 819D, Andrew Rubin, Ms. Tygier, and others, regarding alleged defects in his unit.  D.C. Superior Court Judge Puig-Lugo granted Ms. Tygier's motion to dismiss all claims against her, holding that Garcia did not plead facts to support an alter ego or veil piercing theory of liability.  Exh. A.  Therefore, all alter ego and veil piercing allegations in the TAC against Ms. Tygier, including, but not limited to those

8

contained in paragraphs 2, 6, 231-32, and 240, are barred by *res judicata* and collateral estoppel. *Glasco v. Ballard*, 249 Va. 61, 64 (1995) ("The doctrine applies even when the subsequent proceeding involves a different claim for relief").

## VII.   An *In Personam* Judgment Is Not Available Unless and Until Garcia Prevails in the Underlying Arbitration.

Both conveyance statutes contain the same remedy:  A judicial decree declaring the conveyance void as to the transferor's creditors.  *Grayson*, 300 Va. at 49.  "This remedy returns the fraudulently conveyed assets to the transferor, but, as a general rule, it does not authorize 'a court to award an *in personam* judgment when the transaction is set aside.'"  *La Bella Donna*, 294 Va. at 256.  These statutes are subject to a narrow exception that allows a court to enter an *in personam* judgment against the transferee of a fraudulent *cash* transfer.  *Grayson*, 300 Va. at 50-51.  "The exception "unw[inds] the transfer of the cash in the grantee's pockets; it [does] not impose liability upon the grantee by virtue of his participation in the transaction."  *La Bella Dona*, 294 Va. at 257. *In personam* judgment is not available here because Garcia has yet to prevail in his underlying arbitration.

However, "[a] creditor availing himself of [VA Code Ann. § 55.1-402] shall have a ***lien*** from the time of bringing his action on all the estate, real and personal, and a petitioning creditor shall also be entitled to a lien from the time of filing his petition in the court in which the action is brought." The Court may only set aside a fraudulent or voluntary transfer in an action brought by a creditor to execute on a judgment.  Va. Code § 55.1-404 ("The court may set aside a fraudulent conveyance or voluntary transfer pursuant to §§ 55.1-400 or 55.1-401 during an action brought by a creditor to *execute on a judgment*.").

9

152

Garcia is not a judgment creditor. Thus, the motion to dismiss must be granted to the extent he seeks *in personam* judgments against any Defendant.

Even if the Court had the power to grant *in personam* judgments, "the limit of the transferee's *in personam* liability is limited to the amount of cash allegedly received by the transferee." *La Bella Dona*, 294 Va. at 256-57. Mr. Garcia requests *in personam* judgments against certain of the Defendants in specific amounts, but for The Rubin Group, 819D LLC, 819 Capital LLC, Mr. Rubin, and Ms. Tygier, Mr. Garcia seeks over $6 million each. TAC at p. 36-37. Garcia's potential recovery, however, is limited to the amounts received by these alleged transferees after he provided actual notice of his specific claims. *Davis v. Bonney*, 89 Va. 755, 761 (1893) ("The statute . . . gives a creditor . . . a lien on the property fraudulently transferred but does not extend the lien to any other estate of the debtor. . . . [W]hen . . . the property has been brought under the control of the court for the benefit of creditors, all the relief has been obtained which is contemplated by the statute.").

## VIII. To the Extent that Virginia's Fraudulent or Voluntary Conveyance Statutes Permit a Claimant Who Has Not Obtained a Judgment Establishing the Debt to Maintain an Action, Those Statutes Are Unconstitutional as Applied.[3]

Garcia has a breach of warranty claim against 819D based on alleged defects in a $1.5 million condominium he purchased on April 28, 2017. Almost five years later, he has not reduced his claim to a judgment. But, for the past 18 months, he has relentlessly pursued the 11 Defendants (and now nine additional defendants) for over $6 million even though no one knows whether or how much Garcia will recover in the underlying action.

---

[3] "[W]here constitutional rights are invaded they may be set up by general demurrer or otherwise, at any time." *Hagood v. Commonwealth*, 157 Va. 918, 922 (1932).

Before the advent of modern fraudulent and voluntary conveyance statutes, unsecured and non-judgment creditors were not permitted to bring a fraudulent conveyance action because such a law would have been repugnant to traditional notions of fairness:

> This principle is elementary. A rule of procedure which allowed any **prowling creditor**, before his claim was definitively established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with the business affairs of the alleged debtor, **would manifestly be susceptible to the grossest abuse. A more powerful weapon could not be placed at the disposal of unscrupulous litigants**.

1 Frederick Scott Wait, *A Treatise on Fraudulent Conveyances and Creditors' Bills* § 73 (1884) (emphasis added). The abuse referenced in the quote above is precisely what has happened in this case during the past year.

Such a rule of procedure is equally repugnant to constitutional notions of fundamental fairness. In *Grupo Mexicano de Desarrolla S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) (Scalia, J.), the Supreme Court addressed the issue of whether the equity powers of federal courts, prior to the entry of a money judgment, allowed a federal court to enjoin the defendant from transferring assets to the benefit of preferred creditors. The Court held, citing the Wait *Treatise*, that the equity jurisdiction of federal courts did not permit such an injunction and was incompatible with basic notions of both procedural and substantive fairness. *Id.* at 330. The Court observed that several states had enacted statutes conferring a right on non-judgment creditors to bring a fraudulent conveyance claim. The Court declined to opine on the constitutional viability of those statutes. *Id.* at 324 n.7. This case makes the issue ripe.

While state legislatures enjoy broad latitude to craft laws, that latitude is constrained by the "due process" clauses of the 5th and 14th Amendments. *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276 (1856) ("It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as

11

well as on the executive and judicial powers of the government and cannot be so construed as to leave Congress free to make any process 'due process of law' by its mere will.").

While due process clauses are mainly about procedural protections, it has long been the law that those clauses also have a substantive aspect that concerns the "fundamental fairness" of government activity. *North Carolina Dep't of Revenue v. The Kimberly Rice Kaestner 1992 Family Trust*, 139 S. Ct. 2213, 2219 (2019).

Virginia is one of a small minority of states whose fraudulent conveyance statutes were not derived from the Uniform Fraudulent Transfer Act ("UFTA"). Virginia's fraudulent conveyance statute, as originally enacted, did not permit a "creditor" with a naked claim that had not been reduced to a judgment to maintain a fraudulent conveyance action. To the extent that Virginia's existing fraudulent conveyance statute can be construed to provide a "prowling creditor," such as Garcia, the ability to file suit before obtaining a judgment in his underlying case, that statute is unconstitutional because it is abhorrent to constitutional notions of fairness that predate the founding of this country.

WHEREFORE, the 11 Defendants respectfully request this Honorable Court grant their Motion to Dismiss and to dismiss this present action as to them, together with any further relief deemed just and proper.

Dated: June 29, 2022

Respectfully submitted,

    */s/ Laurin H. Mills*
Laurin H. Mills (VSB No. 79848)
Mansitan Sow (VSB No. 94590)
Brian C. Clarry (VSB No. 92160)
Samek, Werther & Mills LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
(703) 547-4693
Fax (240) 912-3030
Laurin@samek-law.com

12

Mansitan@samek-law.com
Brian@samek-law.com

*Attorneys for 11 Defendants*

13

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of June, 2022, a true and accurate copy of the

foregoing was served via the Court's CM/ECF system and/or electronic mail to:

Christopher A. Glaser
Jackson & Campbell, P.C.
2300 N Street, N.W., Suite 300
Washington, D.C. 20037-1194
(202) 457-1612
CGlaser@JacksCamp.com
*Attorney for Andrew Rubin*

Bethany Benes, Esq.
Bethune Benes, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax, Virginia 22030
bbenes@bethunebenes.com
*Attorney for Karl Garcia*

John A. C. Keith, Esq.
Blankingship & Keith, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
jkeith@bklawva.com
*Counsel for Jeffrey Houle*

Alex Laughlin, Esq. Jim Miller, Esq.
Alex.laughlin@ofplaw.com
Jim.miller@ofplaw.com
*Counsel for Gregory Auger II and Gregory
Auger III*

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com
*Attorney for 819D LLC*

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net
*Counsel for Thomas Madison*

James P. Miller, Esq.
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Jim.Miller@ofplaw.com

Milt N. Theologou, Esq.
Silverman Theologou LLP
11200 Rockville Pike, Ste. 520
North Bethesda, MD 20852
mtheologou@silvermanlegal.com

_____*/s/ Laurin H. Mills*_____
Laurin H. Mills

# EXHIBIT A

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| GARCIA, KARL, | Civil Action No. 2020 CA 002540 B |
| Plaintiffs, | Civil II - Calendar 11 |
| v. | Judge Hiram E. Puig-Lugo |
| 819D, LLC et al, | |
| Defendant. | |

### ORDER

This matter is before the Court on Defendant Michelle Tygier's Motion to Dismiss, filed on June 29, 2020 and Defendant Andrew Rubin's Motion to Dismiss, filed on June 30, 2020. On June 13, 2020, Plaintiff filed an opposition to Defendant Rubin's motion and on July 14, 2020, Plaintiff filed an opposition to Defendant Tygier's motion. On July 21, 2020, Defendant Tygier filed her reply.

### Background

On May 18, 2020, Plaintiff filed his Complaint against 819D, LLC, Andrew Rubin, Michelle Tygier, Regua, Urban Pace, Potomac Construction Group, and the Sanctuary Condominium Unit Owners Association. Plaintiff's Complaint asserts that Andrew Rubin was a board member of the homeowner's association governing the Property at issue and also the President of 819D, LLC. Plaintiff's Complaint asserts that Michelle Tygier was also a board member of the homeowner's association governing the Property at issue and an officer or director of 819D, LLC. Plaintiff alleges, in relevant part, that he identified defects on the Property and Defendants Tygier and Rubin represented that the defects would be fixed prior to Plaintiff's move-in on the Property. Plaintiff asserts, in relevant part, that Defendants Rubin and

Tygier had a duty to repair and/or replace any defects in the Unit and failed to do so. Based on the allegations in Plaintiff's Complaint, Plaintiff asserts, in relevant part, that Defendants Rubin and Tygier engaged in a breach of warranty, violation of the Consumer Protection Procedures Act ("CPPA"), and fraud.

### DISCUSSION

To survive a Motion to Dismiss, a Complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *See Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543-44 (D.C. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Dismissal of a Complaint for failure to state a claim upon which relief can be granted should only be awarded if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See* Super. Ct. Civ. R. 12(b)(6); *Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C. 1999).

When considering a Motion to Dismiss, a Court must "construe the facts on the face of the Complaint in the light most favorable to the non-moving party, and accept as true the allegations in the Complaint." *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 174 (D.C. 1996). A Court should not dismiss a Complaint merely because it "doubts that a Plaintiff will prevail on a claim." *See Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 210 (D.C. 1997). However, the Court need not accept inferences if such inferences are unsupported by the facts set out in the Complaint. *See Kowal v. MCI Comm. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor must the Court accept legal conclusions cast in the form of factual allegations. *Id.*

A pleading must contain a "short and plain statement of the claim showing that the pleading is entitled to relief." *See* Super. Ct. Civ. R. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-

78 (2009). To survive a Motion to Dismiss under Super. Ct. Civ. R. 12(b)(6), a Plaintiff must

provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the Plaintiff pleads

factual content that allows the Court to draw the reasonable inference that the Defendant is liable

for the misconduct alleged." *Id.*

## I. Plaintiff's Breach of Warranty Claim against Defendants Tygier and Rubin

Under D.C. Code § 42.1903.16, "[a] declarant shall warrant against structural defects in

each of the units for 2 years from the date each unit is first conveyed to a bona fide purchaser,

and all of the common elements for 2 years." The term "declarant" shall mean any person or

group of persons acting in concert who: (A) Offers to dispose of the person's or group's interest

in a condominium unit not previously disposed of; (B) Reserves or succeeds to any special

declarant right; or (C) Applies for registration of the condominium." D.C. Code § 42-

1901.02(11).

It is well established that one seeking to pierce the corporate veil on an alter ego theory

must prove by affirmative evidence the existence of a "unity of ownership and interest" and the

"use of the corporate form to perpetuate fraud or wrong." *Meshel v. Ohev Sholom Talmud Torah*,

869 A.2d 343, 355 (D.C. 2005) (citation omitted). In determining if these elements are met,

Courts "consider a range of factors, including whether corporate formalities have been observed;

whether there has been any commingling of corporate and shareholder funds, staff, and property;

whether a single shareholder dominates the corporation; whether the corporation is adequately

capitalized; and, especially, whether the corporate form has been used to effectuate a fraud." *Id.*

Piercing the corporate veil is a doctrine of equity and the "factor which predominates will vary in

each case…." *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984). Moreover, determining whether to

pierce the corporate veil is a practical test, "based largely on a reading of particular factual circumstances." *Id.* at 816 (quoting *Valley Finance, Inc. v. United States*, 629 F.2d 162, 172 ( D.C. Cir. 1980)). While a plaintiff need not plead "[that which] he needs to show to prevail at trial, the plaintiff must still allege sufficient facts regarding an alter ego relationship to 'satisfy Rule 8(a) and [*Ashcroft v. Iqbal* (citation omitted)].'" *Kelleher v. Dream Catcher, LLC*, 221 F. Supp. 3d 157, 158-59 (D.D.C. 2016).

Defendant Tygier asserts that Plaintiff's claim must fail because Plaintiff failed to allege or show that Tygier is a "declarant" and therefore, Tygier owed no duty to provide a warranty nor is she alleged to have provided a personal warranty. Defendant Tygier asserts that instead, Plaintiff entered into a Purchase Agreement with 819D, LLC, the developer and owner of the Unit and the Purchase Agreement included 819D, LLC's warranty against structural defects, as well as defects in workmanship and improper materials. Similarly, Defendant Rubin asserts that he is also not a declarant and did not owe a duty to Plaintiff to provide a warranty on the property. Defendant Rubin asserts that Rubin did not hold title to the Property, did not hold any interest in the Property, nor did he offer to dispose of any interest in the Property. Defendant Rubin asserts that he had no obligation to provide any warranty and in fact, did not provide a warranty.

In opposition, Plaintiff asserts that while Rubin and Tygier are not parties to the Purchase Agreement, and while 819D, LLC is the seller, 819D, LLC was established to serve the purpose of the alter ego of Rubin and Tygier. Plaintiff asserts that the Complaint sets forth facts that allege and allow the Court to infer that Rubin and Tygier may be liable as the alter ego of 819D, LLC and cannot shield themselves from personal liability.

Here, the Court finds that Plaintiff's Complaint does not include sufficient factual allegations satisfying Rule 8(a) to support an alter ego or veil piercing theory of liability. Plaintiff's Complaint contains one sentence that states "upon information and belief, 819D was established to serve the purpose of, and is, the alter ego or business conduit of Andrew Rubin and Michelle Tygier conducting business under its name." The aforementioned allegation is a legal conclusion and Plaintiff's Complaint is devoid of any sufficient factual allegations regarding an alter ego relationship between Rubin, Tygier and 819D, LLC. Therefore, even viewing the Complaint in a light most favorable to Plaintiff, Plaintiff's Complaint fails to state a claim for breach of warranty against Tygier and Rubin in their individual capacities, as they are not "declarants" under D.C. Code § 42-1901.02(11) and did not owe a duty to Plaintiff to warranty the Unit at issue. Accordingly, Count I breach of warranty claim against Rubin and Tygier is dismissed.

## II. Plaintiff's CPPA Claim against Defendants Tygier and Rubin

Under D.C. Code § 28-3904, it is a violation of the D.C. Consumer Protection Procedures Act ("CPPA") for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby. The CPPA only supplies consumers with cause of action against merchants selling them goods or services, and therefore there must be consumer-merchant relationship in consumer transaction involving sale of goods or services for act to apply. *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015). A "merchant" under the Act "means a person, whether organized or operating for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary

course of business does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901.

Defendant Tygier asserts that Plaintiff failed to make any allegations specific to Tygier to show that Tygier is a "merchant" and does not explain, for example, the legal basis for Plaintiff's assertion that Tygier had a duty to disclose any information to Plaintiff. Tygier also asserts that Plaintiff failed to explain how Tygier can be held personally liable for the acts of 819D, LLC or the homeowner's association. Similarly, Defendant Rubin asserts that the CPPA does not apply because Rubin is not a "merchant" for purposes of the CPPA. Rubin asserts that he did not sell the property, the deed identifies 819D, LLC as the seller, and Rubin has not acted in the capacity of a merchant selling any item to Plaintiff.

In opposition, Plaintiff again reiterates that Rubin was the President of 819D, LLC and therefore, can be held personally liable under the CPPA as a "merchant" because he was "involved" in the sale and 819D, LLC was an alter ego for Rubin. Plaintiff asserts that Rubin made representations in the course of marketing the sale of the Unit to Plaintiff which violates the CPPA. Similarly, Plaintiff asserts that Tygier, as an officer of 819D, LLC, can be held personally liable under the CPPA as a "merchant" because she made representations in the course of marketing the sale of the Unit to Plaintiff which violates the CPPA.

In reply, Tygier asserts that Plaintiff's citations to a line of cases are not analogous to the instant case. Further, Tygier asserts that Plaintiff waived his claims against Tygier. To support this assertion, Defendant Tygier includes the Purchase Agreement, referenced in Plaintiff's Complaint and the document upon which Plaintiff forms much of his Complaint. The Purchase Agreement, between Plaintiff and 819D, LLC, contains a provision which waives Plaintiff's right to assert any and all claims arising out of or relating in any way to any oral or other

representations not contained in the Purchase Agreement. Specifically, the Purchase Agreement states, in relevant part:

> This is the complete agreement between the parties…there are no other oral or other written agreements, representations, conditions, promises, or understandings directly or indirectly connected with this Agreement. Purchaser hereby waives and releases seller, its partners, affiliates, agents, employees, contractors and each of their respective successors and assigns, including, without limitation, any condominium association or other governing body formed in connection with the condominium, from any and all claims, losses, damages, expenses, costs, cause of action or other liabilities whether known or unknown, matured or unmatured, absolute or contingent, arising out of or relating in any way whatsoever to any such oral or other written agreement, representations, conditions, promises, or understandings.

Here, the Court finds that Plaintiff failed to allege facts sufficient to show that Rubin and Tygier are "merchants" subject to the CPPA. Plaintiff's Complaint is void of facts showing that Rubin, Tygier, and Plaintiff had a consumer-merchant relationship in a consumer transaction. Indeed, the seller of the Property was 819D, LLC and the purchaser was Plaintiff. As explained above, Plaintiff failed to show facts sufficient to pierce the corporate veil and does not allege facts of any consumer-merchant relationship or consumer transaction between Rubin and Tygier with Plaintiff. Plaintiff's CPPA claim merely states that Rubin and Tygier had an "obligation" to fully and accurately disclose to the public the characteristics and condition of the Property being offered for sale and they violated their duty by misrepresenting material facts about the Property which misled Plaintiff to purchase the Property. However, as stated in the Purchase Agreement signed by Plaintiff, the Purchase Agreement constituted the entire agreement and any pre-signing representations are not connected to the Purchase Agreement and/or binding. Indeed, the Purchase Agreement states: "there are no other oral or other written agreements, representations, conditions, promises, or understandings directly or indirectly connected with this Agreement" and the Purchase Agreement does not include any obligations on the part of Rubin and Tygier who are not parties to the contract. Therefore, Plaintiff's CPPA claims against Rubin and

Tygier shall be dismissed, as Rubin and Tygier are not "merchants" subject to the CPPA and Plaintiff waived his claims against them when he signed the Purchase Agreement to which Rubin and Tygier are not parties.

## III.    Plaintiff's Fraud Claim against Defendants Tygier and Rubin

In order to make out a claim for Fraud the Plaintiff must show: (1) a false representation in reference to material fact, (2) made with knowledge of its falsity, (3) with the intent to deceive, and (4) action taken in reliance upon the representation. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013). It is well-established that allegations of fraud must be pled with particularity.  *See* Super. Ct. Civ. R. 9(b) (all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (pleader must state the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud). Moreover, where a complaint is filed against multiple defendants, the heightened pleading standard requires that the identity and role of individual defendants alleged to have made false representations be specified in the complaint.  *Phone Recovery Servs., LLC v. Verizon Wash., DC, Inc.*, 191 A.3d 309, 322 (D.C. 2018).

"A corporate officer's tortious conduct, though committed in behalf of the corporation, also creates personal and individual liability on his part." *Bethesda Salvage Co. v. Fireman's Fund Ins. Co.*, 111 A.2d 472 (D.C. 1955).  However, the D.C. Condominium Act specifically relieves condominium developers' agents of tort liability with respect to condominium developments. *Barimany v. Urban Pace LLC*, 73 A.3d 964 (D.C. 2013).  Indeed, under D.C. Code § 42-1903.09, "[a]n action for tort alleging a wrong done: (1) by any agent or employee of the declarant or of the unit owners' association; or (2) in connection with the condition of any

portion of the condominium which the declarant or the association has the responsibility to maintain, **shall be brought against the declarant** or the association, as the case may be."

Defendant Tygier asserts that under D.C. Code § 42-1903, she is shielded from any potential personal liability arising out of statements she allegedly made as an agent or officer of 819D, LLC.  Tygier asserts that Plaintiff's Complaint makes clear that the one alleged statement she made to Plaintiff was in the course of her duties as an agent for 819D, LLC.  Accordingly, Tygier asserts that to the extend her statements give rise to a tort claim, the proper Defendant is 819D, LLC.  Similarly, Defendant Rubin asserts that Plaintiff failed to allege facts to pierce the corporate veil and he cannot be held liable for his statements made as the agent for 819D, LLC.  Defendant Rubin asserts that Plaintiff's Complaint makes clear that Plaintiff was aware that his dealings were with the principal 819D, LLC and not Rubin as an individual or agent.  Further, Defendant Rubin asserts that even assuming he could be held personally liable, Plaintiff's fraud claim was not pled with the requisite particularity.

In opposition, Plaintiff asserts that Tygier and Rubin are "declarants" under the D.C. Condominium Act and therefore, can be held liable despite the D.C. Condominium Act relieving condominium developers' agents of tort liability with respect to condominium developments.  Further, Plaintiff asserts that he alleged with particularity that Rubin and Tygier made several false representations and references paragraphs 11, 14, and 15 in his Complaint to support his assertion.

The Court finds that, as stated and found above, Tygier and Rubin are not "declarants" under D.C. Code § 42-1901.02(11) and therefore, are relieved of tort liability with respect to the Unit development at issue in this case.  Further, the Court finds that Plaintiff's fraud claim was not pled with the requisite particularity.  Indeed, Paragraph 11 of Plaintiff's Complaint names

five defendants and does not specify the role of the individual defendants alleged to have made the false representations. Instead, Plaintiff's Complaint states the Unit was advertised with false representations and attributes liability to five defendants for the contents of the advertisement with no particularity or specificity. Plaintiff's fraud allegations fail to state the time, place and content of the false misrepresentations, and the fact(s) misrepresented as it pertains to each respective Defendant against whom Plaintiff is asserting a claim of fraud. Therefore, Plaintiff has failed to state a claim of fraud against Rubin and Tygier because as agents of 819D, LLC, they are relieved from liability under the D.C. Condominium Act and Plaintiff failed to plead his fraud claim with the requisite particularity.

## CONCLUSION

Based on the above findings, the relevant law, and the entire record herein, it is this 29th day of July 2020, hereby:

**ORDERED** that Defendant Tygier's Motion to Dismiss is **GRANTED**; it is further

**ORDERED** that Defendant Rubin's Motion to Dismiss is **GRANTED**; it is further

**ORDERED** that Plaintiff's claims against Defendant Tygier and Defendant Rubin are **DISMISSED**.

**IT IS SO ORDERED**.

Judge Hiram Puig-Lugo
*Signed in Chambers*

Copies via CaseFileXpress to all counsel of record.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| v. | |
| **THE RUBIN GROUP, LLC,** *et al.* | Case No. 1:22-cv-00698-LMB-JFA |
| Defendants. | |

### THE 11 DEFENDANTS' NOTICE OF WAIVER OF ORAL ARGUMENT

Defendants, The Rubin Group LLC ("TRG"), 819 Capital LLC, K Street Holdings LLC, TR Holdings LLC, 2233-40th Partners LLC, South Glebe LLC, Woodmore Partners, LLC, TRG Development LLC, 638 Newton Partners LLC, Michelle Tygier, and Robert Rubin (collectively the "11 Defendants") submit this provisional waiver of oral argument of their Motion to Dismiss the Third Amended Complaint ("TAC") filed by Karl Garcia ("Mr. Garcia") pursuant to Fed. R. Civ. P. 12(b)(6). The 11 Defendants understand that defendant 819D, LLC is going to file a motion to transfer this matter to the District of Columbia where it filed for Chapter 11 bankruptcy protection. Because that motion is likely to be granted, the 11 Defendants waive oral argument so as not to clog the Court's calendar unnecessarily. If for some reason the motion to transfer is not granted, the 11 Defendants reserve their right to make a request for oral argument.

Dated:  June 29, 2022

Respectfully submitted,

_____*/s/ Laurin H. Mills*_____
Laurin H. Mills (VSB No. 79848)
Mansitan Sow (VSB No. 94590)
Brian C. Clarry (VSB No. 92160)
Samek, Werther & Mills LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
(703) 547-4693
Fax (240) 912-3030
Laurin@samek-law.com
Mansitan@samek-law.com
Brian@samek-law.com

*Attorneys for 11 Defendants*

2

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of June, 2022, a true and accurate copy of the

foregoing was served via the Court's CM/ECF system and/or electronic mail to:

Christopher A. Glaser
Jackson & Campbell, P.C.
2300 N Street, N.W., Suite 300
Washington, D.C. 20037-1194
(202) 457-1612
CGlaser@JacksCamp.com
*Attorney for Andrew Rubin*

Bethany Benes, Esq.
Bethune Benes, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax, Virginia 22030
bbenes@bethunebenes.com
*Attorney for Karl Garcia*

John A. C. Keith, Esq.
Blankingship & Keith, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
jkeith@bklawva.com
*Counsel for Jeffrey Houle*

Alex Laughlin, Esq. Jim Miller, Esq.
Alex.laughlin@ofplaw.com
Jim.miller@ofplaw.com
*Counsel for Gregory Auger II and Gregory Auger III*

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com
*Attorney for 819D LLC*

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net
*Counsel for Thomas Madison*

James P. Miller, Esq.
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Jim.Miller@ofplaw.com

Milt N. Theologou, Esq.
Silverman Theologou LLP
11200 Rockville Pike, Ste. 520
North Bethesda, MD 20852
mtheologou@silvermanlegal.com

_____/s/ Laurin H. Mills_____
Laurin H. Mills

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00698-LMB-JFA |
| **THE RUBIN GROUP, LLC, *et al.*** | |
| Defendants. | |

**ANDREW RUBIN'S AND CANAL VIEW HOLDINGS LLC'S
MOTION TO DISMISS**

COME NOW Defendants Andrew Rubin ("**Andrew Rubin**") and Canal View Holdings LLC ("**CVH**"), by counsel, and present this Motion to Dismiss the Third Amended Complaint filed by Karl Garcia ("**Mr. Garcia**") and, for the reasons more fully set forth in the accompanying Memorandum in Support of Motion to Dismiss, respectfully request that this Court dismiss the Third Amended Complaint.

As more fully set forth in the accompanying Memorandum, the Third Amended Complaint should be dismissed as to Andrew Rubin and CVH as: (1) the Third Amended Complaint only asserts Virginia-based statutory causes of action but the wrong alleged—purported financial transfers—are not alleged to have occurred in Virginia and, as a result, the two statutes are not triggered; (2) the purported notification of any claims by Mr. Garcia is deficient as a matter of law; (3) Mr. Garcia fails to allege that 819D was insolvent on any relevant date; (4) even if Mr. Garcia has alleged a cause of action pursuant to the Virginia Voluntary Conveyance and Fraudulent Conveyance statutes, to the extent that the statutes permit a judgment against a transferee prior to a finding of any wrongdoing by the transferor, such statutes are unconstitutional; (5) Mr. Garcia lacks standing for much of his claims as same relate to common elements and limited common

1

elements of a condominium; and, (6) any claims against CVH and Andrew Rubin, as transferees of funds originating with 819D, must be limited to the amount of funds actually received, and not returned, by them.

WHEREFORE, Andrew Rubin and Canal View Holdings LLC respectfully requests this Honorable Court grant their Motion to Dismiss and to dismiss this present action as to it, together with any further relief deemed just and proper.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

Christopher A. Glaser (VSB No. 43491)
2300 N Street, N.W.
Suite 300
Washington, DC 20037
Telephone: (202) 457-1600
Facsimile:  (202) 457-1678
Email: cglaser@jackscamp.com

2

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of June, 2021, a true and accurate copy of the foregoing was served via the Court's CM/ECF system, to:

Laurin H. Mills, Esq.
Samek Werther Mills LLC
2000 Duke St., Suite 300
Alexandria, VA 22314
laurin@samek-law.com

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com

Bethany Benes, Esq.
Bethune Benes, PLLC
3975 Fair Ridge Drive
South Terrace, Suite 25C
Fairfax, Virginia 22033
bbenes@bethunebenes.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net

James P. Miller, Esq.
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Jim.Miller@ofplaw.com

John A. C. Keith, Esq.
Blankingship & Keith, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
jkeith@bklawva.com

Milt N. Theologou, Esq.
Silverman Theologou LLP
11200 Rockville Pike, Ste. 520
North Bethesda, MD 20852
mtheologou@silvermanlegal.com

_____
Christopher A. Glaser

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00698-LMB-JFA |
| **THE RUBIN GROUP, LLC,** *et al.* | |
| Defendants. | |

**ANDREW RUBIN'S AND CANAL VIEW HOLDINGS LLC'S**
**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

COME NOW Defendants Andrew Rubin ("**Andrew Rubin**") and Canal View Holdings LLC ("**CVH**"), by counsel, and present this Memorandum in Support of the Motion to Dismiss the Third Amended Complaint filed by Karl Garcia ("**Mr. Garcia**") and state as follows:

**Introduction**

This case arises from the sale of a District of Columbia condominium developed by defendant 819D LLC ("**819D**") and sold to Mr. Garcia. Following the sale—and prior to notification of defects, the repairs of which would exceed the amount of any construction bond—819D distributed profits to its members. In the action before this Court, Mr. Garcia alleges two causes of action against Mr. Rubin and CVH: (1) Fraudulent Conveyance pursuant to Va. Code § 55.1-400 (Count I); and, (2) Voluntary Conveyance pursuant to Va. Code § 55.1-401, each purportedly in regard to transfers which purportedly originated from 819D following Mr. Garcia's purchase. For the reasons set forth herein, these claims cannot stand against Andrew Rubin or CVH and this action should be dismissed.

1

**I.     The Claims against Andrew Rubin and CVH, if any, do Not Arise out of Virginia Law and any Virginia Law-Based Claims Should be Dismissed.**

Mr. Garcia's claims arise, it at all, by virtue of the sale and purchase of a condominium in the District of Columbia, which is governed by the law of the District of Columbia. Mr. Garcia's tort-based claims alleged in the present action—both Counts I and II—are governed by the law of the place where the tort occurred pursuant to Virginia's *lex loci delicti* choice-of-law rules. The Third Amended Complaint fails to state a claim against Andrew Rubin or CVH in that it does not allege that any of the purportedly tortious transfers directly to, or in the line of transfers leading to, Andrew Rubin or CVH were committed in the Commonwealth of Virginia. The torts of fraudulent transfer and voluntary transfer occurred, if at all, outside of the Commonwealth of Virginia. Absent sufficient and proper allegations by Mr. Garcia that the two Virginia statutes are triggered, there is no basis for a suit under Virginia's fraudulent conveyance or voluntary conveyance statutes against Andrew Rubin. The Third Amended Complaint, as to Andrew Rubin and CVH, should be dismissed.

**II.    Mr. Garcia's Purported "Notification" is Inadequate as a Matter of Law.**

Mr. Garcia has no claim against Andrew Rubin or CVH relating to any transfers from 819D, or subsequent transferees, as Mr. Garcia failed to give proper notice prior to the purported transfers from 819D. *Luria v. Board of Directors of Westbriar Condominium Unit Owners Ass'n*., 277 Va. 359, 366, 672 S.E.2d 837, 841 (2009)(As punch list items did not provide sufficient notice to condominium developer of later-claimed structural defects, "[w]e hold that the notice required to create creditor status is actual notice of a specific potential statutory warranty claim.").

In the fraudulent transfer context, the "key consideration in establishing creditor status is whether there was actual notice of a specific potential claim." *Luria*, 277 Va. at 366, 672 S.E.2d

2

at 840. In *Luria*, the Supreme Court held that notification of a non-structural claim is insufficient to establish creditor status for purposes of demonstrating a fraudulent transfer as the,

> documents do not establish that [transferee] had actual notice of a specific potential statutory warranty claim because the problems noted were not characterized as structural defects 'which reduced the stability or safety of the structure below accepted standards or restricted the normal intended use of all or part of the structure.'

*Luria*, 277 Va. at 367, 672 S.E.2d at 841, citing Va. Code § 55–79.79.[1]

The purported notifications prior to the alleged transfers from 819D are not structural in nature and fail to provide notice as they "did not notify [defendant] of any defect that reduced 'stability' or 'safety' of the [condominium]." *Luria*, 277 Va. at 367, 672 S.E.2d at 841.

Mr. Garcia was not a creditor at the time of any purported transfer from 819D to Andrew Rubin or CVH. It is insufficient to contend, as Mr. Garcia does, that notification to 819D of minor punch list items somehow acts to prevent any future transfers by 819D. Undersigned counsel has located no case law which would elevate punch list items to such heights and subject future transfers to being unwound. The Supreme Court of Virginia has held that actual notice of claims beyond punch list items is required to accomplish the goals asserted by Mr. Garcia.

As Mr. Garcia failed to provide notice of his claims prior to any purported transfer, the Third Amended Complaint should be dismissed as against Andrew Rubin and CVH.

---

[1] Importantly, Va. Code § 55-79.79, now codified as Va. Code § 55.1-1955, is substantially similar to the District of Columbia warranty bond statute, D.C. Code § 42-1903.16, regarding structural defects. *See*, D.C. Code § 42-1903.16 ("the term "structural defect" means a defect in a component that constitutes any unit or portion of the common elements that reduces the stability or safety of the structure below standards commonly accepted in the real estate market, or restricts the normally intended use of all or part of the structure and which requires repair, renovation, restoration, or replacement."); *and see*, Va. Code § 55.1-1955 ("For the purposes of this subsection, structural defects shall be those defects in components constituting any unit or common element that reduce the stability or safety of the structure below accepted standards or restrict the normal intended use of all or part of the structure and that require repair, renovation, restoration, or replacement.").

3

### III. Mr. Garcia Fails to Allege that 819D LLC was Insolvent on any Relevant Date.

Mr. Garcia alleges insolvency of 819D LLC—the only entity against which Mr. Garcia has an underlying claim arising from the purported condominium defects—and others in only two paragraphs. In Paragraph 232 of the Third Amended Complaint, Mr. Garcia alleges,

> 232. The transfers referenced above left Defendant 819D, and alter-egos 819 Capital and The Rubin Group, insolvent. The transactions were conducted to remove the funds from potential collection and to hinder, delay, and/or defraud the creditors of 819D, 819 Capital, The Rubin Group, A. Rubin, and/or Tygier.

In Paragraph 249 of the Third Amended Complaint, Mr. Garcia alleges,

> 248. The Defendants' transfers from April 2017 to the present resulted in the insolvency of each of the Defendants. More specifically, Defendants 819D, The Rubin Group, A. Rubin, Tygier, and 819 Capital are each without adequate funds and/or assets to satisfy the anticipated judgment(s) of Mr. Garcia.

Contrary to Mr. Garcia's allegations, the relevant test for insolvency is not whether the entities presently have funds to satisfy an anticipated judgement but, instead, Mr. Garcia is required to allege, and then establish, that the amount of the entities' liabilities on the date of the purported transfers exceeded the amount of its assets on the same date. *Hudson v. Hudson*, 249 Va. 335, 341, 455 S.E.2d 14, 17 (1995). Mr. Garcia alleges the incorrect standard and fails to allege that any entity which transferred funds to Andrew Rubin or CVH, was insolvent on any relevant date. Mr. Garcia's claim of a violation of Va. Code § 55.1-401 alleging insolvency should be dismissed.

### IV. In the Event that Mr. Garcia has Alleged a Claim Against Andrew Rubin or CVH Pursuant to the Virginia Voluntary Conveyance and Fraudulent Conveyance Statutes, Which He Has Not, Such Statutes are Unconstitutional.

In the event that Mr. Garcia has alleged a claim against Andrew Rubin or CVH which is permitted to proceed notwithstanding that no underlying judgment has been obtained which could give rise to Mr. Garcia's present claims, Andrew Rubin and CVH are being deprived of their due process rights under the Fifth and Fourteenth Amendments to the United States

4

Constitution and Article I, Section 11 the Constitution of Virginia. *Grupo Mexicano de Desarrolla S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 330 (1999)("The requirement that the creditor obtain a prior judgment is a fundamental protection in debtor-creditor law….")

> A rule of procedure which allowed any prowling creditor, before his claim was definitely established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with the business affairs of the alleged debtor, would manifestly be susceptible of the grossest abuse. A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants.

*Id.*

The Claims against Andrew Rubin and CVH should be dismissed.

## V.     Mr. Garcia Lacks Standing for Much of his Alleged Claims.

Mr. Garcia lacks standing to pursue much of his alleged claims as same relate to common elements and/or limited common elements of the condominium. In both the District of Columbia and the Commonwealth of Virginia, only condominium associations have standing to assert claims relating to the common elements or the limited common elements of a condominium. Va. Code § 55.1-1915; D.C. Code § 42-1902.09; "[S]tanding to institute claims or actions concerning common elements, including limited common elements, is restricted to condominium unit owners' associations." *Kuznicki v. Mason*, 273 Va. 166, 176, 639 S.E.2d 308, 312–13 (2007) (individual unit owner lacks standing to assert claim regarding limited common element); *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 726 n.1 (D.C. 2000) (Unit owner's "claim is for injuries sustained to the cooperative, and such a claim can only be brought in the form of an indirect derivative suit on behalf on the cooperative.")

Mr. Garcia has no standing to assert claims relating to either common elements or limited common elements of the condominium. Any purported notification of claims made by Mr. Garcia must be considered only to the extent that same relates to claims which may be asserted

5

by Garcia. Each claim by Mr. Garcia relating to common elements and/or limited common elements of the condominium should be dismissed.

**VI.    The Claims against CVH and Andrew Rubin, if any, Must be Limited to the Funds Actually Received.**

Mr. Garcia demands an *in personam* judgment against Andrew Rubin and CVH in the amount of $6,106,544.60 but fails to allege this amount was ever transferred to either entity or that his underlying claim rises to this amount. In the event that this Court permits an *in personam* judgment to be taken against Andrew Rubin or CVH as the transferee of funds originating from 819D LLC, pursuant to Va. Code § 55.1-400 and § 55.1-401 such judgment merely "unwinds the transfer of the cash in the grantee's pockets; it does not impose liability upon the grantee by virtue of his participation in the transaction." *Grayson v. Westwood Buildings L.P.*, 300 Va. 25, 859 S.E.2d 651, 666 (2021). No judgment, designed to unwind a transaction, can be issued in excess of the amounts actually transferred in such transaction. Mr. Garcia's claims in excess of the amounts actually received by Andrew Rubin should be dismissed.

WHEREFORE, Andrew Rubin and Canal View Holdings LLC respectfully requests this Honorable Court grant their Motion to Dismiss and to dismiss this present action as to it, together with any further relief deemed just and proper.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

_____
Christopher A. Glaser (VSB No. 43491)
2300 N Street, N.W.
Suite 300
Washington, DC 20037
Telephone: (202) 457-1600
Facsimile: (202) 457-1678
Email: cglaser@jackscamp.com

6

5281682v.1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of June, 2021, a true and accurate copy of the foregoing was served via the Court's CM/ECF system, to:

Laurin H. Mills, Esq.
Samek Werther Mills LLC
2000 Duke St., Suite 300
Alexandria, VA 22314
laurin@samek-law.com

Bethany Benes, Esq.
Bethune Benes, PLLC
3975 Fair Ridge Drive
South Terrace, Suite 25C
Fairfax, Virginia 22033
bbenes@bethunebenes.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net

John A. C. Keith, Esq.
Blankingship & Keith, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
jkeith@bklawva.com

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net

James P. Miller, Esq.
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Jim.Miller@ofplaw.com

Milt N. Theologou, Esq.
Silverman Theologou LLP
11200 Rockville Pike, Ste. 520
North Bethesda, MD 20852
mtheologou@silvermanlegal.com

Christopher A. Glaser

7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-00698-LMB-JFA |
| **THE RUBIN GROUP, LLC,** *et al.* | |
| Defendants. | |

### ORDER GRANTING DEFENDANTS ANDREW RUBIN AND
### CANAL VIEW HOLDINIGS LLC'S MOTION TO DISMISS

The Court, having considered the Motion to Dismiss filed by Defendants, Andrew

Rubin and Canal View Holdings LLC any opposition thereto, and the entire record herein, is

of the opinion that said motion is well taken and should be and is GRANTED.

The Third Amended Complaint filed by Plaintiff Karl Garcia is hereby dismissed,

with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

SO ORDERED this_____day of_____, 2022.

_____
UNITED STATES DISTRICT JUDGE

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **KARL GARCIA,** | |
| Plaintiff, | |
| | Case No. 1:22-cv-00698-LMB-JFA |
| v. | |
| **THE RUBIN GROUP, LLC,** *et al.* | |
| Defendants. | |

## STATEMENT OF FINANCIAL DISCLOSURE

COMES NOW Defendant Canal View Holdings LLC, and pursuant to Local Rule 7.1, to enable the Judges and Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel certifies that Canal View Holdings LLC, is not publicly traded and has nothing further to report under Local Civil Rule 7.1(A)(1)(a) and (b).

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

Christopher A. Glaser (VSB No. 43491)
2300 N Street, N.W.
Suite 300
Washington, DC 20037
Telephone: (202) 457-1600
Facsimile: (202) 457-1678
Email: cglaser@jackscamp.com

1

5282675v.1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of June, 2021, a true and accurate copy of the foregoing was served via the Court's CM/ECF system, to:

Laurin H. Mills, Esq.
Samek Werther Mills LLC
2000 Duke St., Suite 300
Alexandria, VA 22314
laurin@samek-law.com

Bethany Benes, Esq.
Bethune Benes, PLLC
3975 Fair Ridge Drive
South Terrace, Suite 25C
Fairfax, Virginia 22033
bbenes@bethunebenes.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net

John A. C. Keith, Esq.
Blankingship & Keith, PC
4020 University Drive, Suite 300
Fairfax, VA 22030
jkeith@bklawva.com

Mark Crawford, Esq.
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Rd, Suite 210
Arlington, VA 22201
mcrawford@mdc-law.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria VA 22307
demckinley@verizon.net

James P. Miller, Esq.
Odin, Feldman & Pittleman, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
Jim.Miller@ofplaw.com

Milt N. Theologou, Esq.
Silverman Theologou LLP
11200 Rockville Pike, Ste. 520
North Bethesda, MD 20852
mtheologou@silvermanlegal.com

Christopher A. Glaser

2

5282675v.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| KARL GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00698 |
| | ) | (LMB/JFA) |
| THE RUBIN GROUP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## JEFFREY HOULE'S MOTION TO DISMISS

COMES NOW Defendant Jeffrey Houle ("Mr. Houle"), by counsel, and, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, moves this Court to dismiss the Third Amended Complaint ("TAC") filed against him by Karl Garcia on the ground that the entire Third Amended Complaint fails to state any claims upon which relief may be granted. In support of his motion, Mr. Houle incorporates by reference his Memorandum in Support of Motion to Dismiss.

WHEREFORE, Mr. Houle respectfully requests that this Court dismiss the Third Amended Complaint filed against him with prejudice, and award him any such further relief as this Court deems appropriate.

Respectfully submitted,

JEFFREY HOULE
By Counsel

Date: June 29, 2022

BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)


By:    /s/ John A. C. Keith
       John A. C. Keith, VSB No. 14116
         jkeith@bklawva.com
       Ian J. McElhaney, VSB No. 94888
         imcelhaney@bklawva.com
       *Counsel for Defendant Jeffrey Houle*


## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Bethany R. Benes, Esquire
BETHUNE BENES, PLC
3975 Fair Ridge Drive
South Terrace Suite 25C
Fairfax, Virginia 22033
  bbenes@bethunebenes.com
*Counsel for Plaintiff Karl Garcia*

Mark D. Crawford, Esquire
LAW OFFICES OF MARK D. CRAWFORD, PLLC
1005 North Glebe Road, Suite 210
Arlington, Virginia 22201
  mcrawford@mdc-law.com
*Counsel for Defendant 819D LLC*

Christopher A. Glaser, Esquire
JACKSON & CAMPBELL, PC
2300 N Street, N.W., Suite 300
Washington, D.C. 20037
  cglaser@jackscamp.com
*Counsel for Defendants Andrew Rubin and
Canal View Holdings, LLC*

Laurin H. Mills, Esquire
Mansitan M. Sow, Esquire
SAMEK WERTHER MILLS LLC
2000 Duke Street, Suite 300
Alexandria, Virginia 22314
  laurin@samek-law.com
  mansitan@samek-law.com
*Counsel for Defendants Michelle Tygier,
The Rubin Group, LLC, 819 Capital LLC,
K Street Holdings LLC, TR Holdings LLC,
2233-40th Partners LLC, South Glebe LLC,
Woodmore LLC, TRG Development LLC,
638 Newton Partners LLC and Robert Rubin*

Douglas E. McKinley, Esquire
LAW OFFICE OF DOUGLAS E. MCKINLEY
Post Office Box 7395
Alexandria, Virginia 22307
  demckinley@verizon.net
*Counsel for Defendant Thomas D. Madison*

Alexander M. Laughlin, Esquire
James P. Miller, Esquire
ODIN FELDMAN PITTLEMAN PC
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
  Alex.Laughlin@ofplaw.com
  Jim.Miller@ofplaw.com
*Counsel for Defendants Gregory Auger, II and
Gregory Auger, III*

     And I hereby certify that I will mail the document by U.S. mail to the following non-

filing users:

Milt N. Theologou, Esquire
SILVERMAN THEOLOGOU, LLP
11200 Rockville Pike, Suite 520
N. Bethesda, Maryland 20852
  mtheologou@silvermanlegal.com
*Counsel for Defendant Liliana Economakis*

Christos Economakis
5058 Joewood Drive
Sanibel, Florida 33957
*Defendant*

     /s/ John A. C. Keith
     John A. C. Keith, Esq.
     Virginia State Bar No. 14116
     BLANKINGSHIP & KEITH, P.C.
     4020 University Drive, Suite 300
     Fairfax, Virginia 22030
     Phone: 703-691-1235
     Fax: 703-691-3913
     jkeith@bklawva.com
     *Counsel for Defendant Jeffrey Houle*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

KARL GARCIA,               )

       Plaintiff,         )

v.                      )       Case No. 1:22-cv-00698
                       )       (LMB/JFA)

THE RUBIN GROUP, *et al.*,    )

       Defendants.     )

### ORDER GRANTING JEFFREY HOULE'S MOTION TO DISMISS

THE COURT, having considered the Motion to Dismiss filed by Defendant Jeffrey

Houle and any opposition thereto and the entire record herein, is of the opinion that said motion

is well taken and should be and is GRANTED.

The Third Amended Complaint filed by Plaintiff Karl Garcia is hereby dismissed, with

prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

SO ORDERED this _____ day of _____, 2022.

 

                               _____

                               UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

KARL GARCIA,                          )
                                      )
    Plaintiff,    )
                                      )
v.                                    )    Case No. 1:22-cv-00698
                                      )    (LMB/JFA)
THE RUBIN GROUP, *et al.*,            )
                                      )
    Defendants.   )

### JEFFREY HOULE'S
### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

COMES NOW Defendant Jeffrey Houle ("**Houle**"), by counsel, and presents this memorandum in Support of his Motion to Dismiss Karl Garcia's ("**Mr. Garcia**") Third Amended Complaint ("TAC") filed herewith:

### Introduction

This case arises from the sale of a District of Columbia condominium developed by defendant 819D LLC ("**819D**") and sold to Mr. Garcia. In the action before this Court, Mr. Garcia alleges two causes of action against all defendants (who are lumped together in the TAC as if they are all similarly situated – they are not): (1) Fraudulent Conveyance pursuant to Va. Code § 55.1-400 (Count I); and, (2) Voluntary Conveyance pursuant to Va. Code § 55.1-401, each purportedly in regard to transfers which purportedly originated from the developer, 819D, following Mr. Garcia's purchase of a condo unit. Unlike most of the other defendants, Houle was a passive investor who was paid out by defendant 819 Capital according to the investment instrument. For the reasons set forth herein, these claims cannot stand against Houle and this action should be dismissed.

1

## I.  Mr. Garcia has Failed to Adequately Plead Notice of his Alleged Claims to Houle

Nowhere in the TAC has Garcia specifically pleaded that Houle was given notice of Garcia's alleged claims. Instead, in Count I, the conclusory allegation is that "[a]s early as April, 2017, Defendants had adequate and actual notice of Mr. Garcia's claims against Defendants The Rubin Group, 819D, A. Rubin, and Tygier." TAC, ¶237. Likewise, in Count II, the exact same allegation is made in paragraph 245. Scanning the preceding 235 paragraphs, nowhere is there any hint, much less any specific allegation that *Houle* had notice, or let alone even knew who Karl Garcia was. In fact, the logical inference from the four (4) times that Houle's name appears in the 235 paragraphs of factual background is that he had no way of knowing about Garcia. He is mentioned only in connection with jurisdiction (he is a Virginia resident) and with the 3 payments he is alleged to have received from 819 Capital after April of 2017. (ECF Doc. 1-1, TAC ¶¶ 23, 49(i), 51(i), 68(i).)

Counts I and II clearly qualify as "shotgun pleadings" and as such they fail to notify each defendant of the actions that led to their joinder in the litigation. *Home Design Servs., Inc. v. David Weekley Homes, LLC*, No. 2:06-CV-350FTM29DNF, 2007 WL 1080001, at *3 (M.D. Fla. Apr. 9, 2007) ("The First Amended Complaint makes no distinction between the conduct of the thirteen defendants."); FRCP 8(a). In addition, in that Count I alleges a fraud claim, it must be pleaded with specificity to comply with FRCP 9(b). *See All. Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12CV701-HEH, 2013 WL 143500, at *3 (E.D. Va. Jan. 11, 2013); *Dolan v. PHL Variable Ins. Co.*, No. CV 3:15-CV-01987, 2016 WL 6879622, at *6 (M.D. Pa. Nov. 22, 2016) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.").

2

Counts I and II are not pleaded in such a way as to show *Houle* that Mr. Garcia is entitled to relief and thus both counts violate Rule 8(a)(2) and should be dismissed. Count I furthermore sounds in fraud and the circumstances constituting fraud must be pleaded with particularity. FRCP 9(b). There is a complete lack of particularity in the sparse allegations concerning Houle and thus Count I must be dismissed.

## II.     Mr. Garcia Lacks Standing for Much of his Alleged Claims.

Mr. Garcia lacks standing to pursue much of his alleged claims as they relate to common elements and/or limited common elements of the condominium. In both the District of Columbia and the Commonwealth of Virginia, only condominium associations have standing to assert claims relating to the common elements or the limited common elements of a condominium. Va. Code § 55.1-1915; D.C. Code § 42-1902.09. "[S]tanding to institute claims or actions concerning common elements, including limited common elements, is restricted to condominium unit owners' associations." *Kuznicki v. Mason*, 273 Va. 166, 176 (2007) (individual unit owner lacks standing to assert claim regarding limited common element); *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 726 n.1 (D.C. 2000) (Unit owner's "claim is for injuries sustained to the cooperative, and such a claim can only be brought in the form of an indirect derivative suit on behalf on the cooperative.").

Mr. Garcia has no standing to assert claims relating to either common elements or limited common elements of the condominium. Any purported notification of claims made by Mr. Garcia must be considered only to the extent that they relate to claims which may be asserted by Garcia. Each claim by Mr. Garcia relating to common elements and/or limited common elements of the condominium should be dismissed.

### III.     Mr. Garcia Fails to Allege that 819D LLC was Insolvent on any Relevant Date.

Mr. Garcia alleges insolvency of 819D LLC—the only entity against which Mr. Garcia has an underlying claim arising from the purported condominium defects—and others in only two paragraphs.  In Paragraph 232 of the Third Amended Complaint, Mr. Garcia alleges,

> 232. The transfers referenced above left Defendant 819D, and alter-egos 819 Capital and The Rubin Group, insolvent. The transactions were conducted to remove the funds from potential collection and to hinder, delay, and/or defraud the creditors of 819D, 819 Capital, The Rubin Group, A. Rubin, and/or Tygier.

In Paragraph 248 of the Third Amended Complaint, Mr. Garcia alleges,

> 248. The Defendants' transfers from April 2017 to the present resulted in the insolvency of each of the Defendants. More specifically, Defendants 819D, The Rubin Group, A. Rubin, Tygier, and 819 Capital are each without adequate funds and/or assets to satisfy the anticipated judgment(s) of Mr. Garcia.

Contrary to Mr. Garcia's allegations, the relevant test for insolvency is not whether the entities presently have funds to satisfy an anticipated judgement but, instead, Mr. Garcia is required to allege, and then establish, that the amount of the entities' liabilities on the date of the purported transfers exceeded the amount of its assets on the same date.  *Hudson v. Hudson*, 249 Va. 335, 341 (1995).  Mr. Garcia alleges the incorrect standard and fails to allege that any entity which transferred funds to  Houle, was insolvent on any relevant date.  Mr. Garcia's claim of a violation of Va. Code § 55.1-401 alleging insolvency should be dismissed.

### IV.     Mr. Garcia's Purported "Notification" to Houle is Inadequate as a Matter of Law.

The facts alleged in the TAC make it clear that all notices went to the developer, not to any passive investor like Houle.  Punch lists, warranty claims and litigation hold letters were certainly communications directed to the developer, not to an investor, who is not alleged to ever have had any notice whatsoever of Garcia's beef.

4

It is also significant that the alleged payments to Houle were made on April 27 (TAC ¶ 49i); May 1 (TAC ¶ 51i) and August 1 (TAC ¶ 68i) of 2017.  Garcia did not settle on his condo unit until April 28, 2017, as alleged in paragraph 30 of the TAC and the earliest possible alleged notice to anyone other than punch list items was on March 24, 2018, months after Houle had received his last payment. TAC ¶37. Reading the allegations of the TAC in the light most favorable to plaintiff, there is simply no allegation of any notice to Houle before  he was served with this action.

Furthermore, Mr. Garcia has no claim against Houle relating to any transfers from 819D, or subsequent transferees, as Mr. Garcia failed to give proper notice prior to the purported transfers from 819D.  *Luria v. Board of Directors of Westbriar Condominium Unit Owners Ass'n.*, 277 Va. 359, 366 (2009) (As punch list items did not provide sufficient notice to condominium developer of later-claimed structural defects, "[w]e hold that the notice required to create creditor status is actual notice of a specific potential statutory warranty claim").

In the fraudulent transfer context, the "key consideration in establishing creditor status is whether there was actual notice of a specific potential claim."  *Luria*, 277 Va. at 366.  In *Luria*, the Supreme Court held that notification of a non-structural claim is insufficient to establish creditor status for purposes of demonstrating a fraudulent transfer as the,

> documents do not establish that [transferee] had actual notice of a specific potential statutory warranty claim because the problems noted were not characterized as structural defects 'which reduced the stability or safety of the structure below accepted standards or restricted the normal intended use of all or part of the structure.'

*Luria*, 277 Va. at 367 (quoting Va. Code § 55–79.79).

The purported notifications prior to the alleged transfers from 819D are not structural in nature and fail to provide notice as they "did not notify [defendant] of any defect that reduced 'stability' or 'safety' of the [condominium]." *Luria*, 277 Va. at 367.

5

Mr. Garcia was not a creditor at the time of any purported transfer from 819D. It is insufficient to contend, as Mr. Garcia does, that notification to 819D of minor punch list items somehow acts to prevent any future transfers by 819D or 819 Capital. The Supreme Court of Virginia has held that actual notice of claims beyond punch list items is required to accomplish the goals asserted by Mr. Garcia.

As Mr. Garcia failed to provide notice of his claims prior to any purported transfer, the Third Amended Complaint should be dismissed as against Houle.

WHEREFORE, Jeffrey Houle respectfully requests this Honorable Court grant his Motion to Dismiss and to dismiss this present action as to him, together with any further relief deemed just and proper.

Respectfully submitted,

JEFFREY HOULE
By Counsel

Date: June 29, 2022

BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)


By:     /s/ John A. C. Keith            
       John A. C. Keith, VSB No. 14116
         jkeith@bklawva.com
       Ian J. McElhaney, VSB No. 94888
         imcelhaney@bklawva.com
       *Counsel for Defendant Jeffrey Houle*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of June 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Bethany R. Benes, Esquire
BETHUNE BENES, PLC
3975 Fair Ridge Drive
South Terrace Suite 25C
Fairfax, Virginia 22033
  bbenes@bethunebenes.com
*Counsel for Plaintiff Karl Garcia*

Christopher A. Glaser, Esquire
JACKSON & CAMPBELL, PC
2300 N Street, N.W., Suite 300
Washington, D.C. 20037
  cglaser@jackscamp.com
*Counsel for Defendants Andrew Rubin and*
*Canal View Holdings, LLC*

Mark D. Crawford, Esquire
LAW OFFICES OF MARK D. CRAWFORD, PLLC
1005 North Glebe Road, Suite 210
Arlington, Virginia 22201
  mcrawford@mdc-law.com
*Counsel for Defendant 819D LLC*

Laurin H. Mills, Esquire
Mansitan M. Sow, Esquire
SAMEK WERTHER MILLS LLC
2000 Duke Street, Suite 300
Alexandria, Virginia 22314
  laurin@samek-law.com
  mansitan@samek-law.com
*Counsel for Defendants Michelle Tygier,*
*The Rubin Group, LLC, 819 Capital LLC,*
*K Street Holdings LLC, TR Holdings LLC,*
*2233-40th Partners LLC, South Glebe LLC,*
*Woodmore LLC, TRG Development LLC,*
*638 Newton Partners LLC and Robert Rubin*

Douglas E. McKinley, Esquire
LAW OFFICE OF DOUGLAS E. MCKINLEY
Post Office Box 7395
Alexandria, Virginia 22307
  demckinley@verizon.net
*Counsel for Defendant Thomas D. Madison*

Alexander M. Laughlin, Esquire
James P. Miller, Esquire
ODIN FELDMAN PITTLEMAN PC
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
  Alex.Laughlin@ofplaw.com
  Jim.Miller@ofplaw.com
*Counsel for Defendants Gregory Auger, II and*
*Gregory Auger, III*

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Milt N. Theologou, Esquire
SILVERMAN THEOLOGOU, LLP
11200 Rockville Pike, Suite 520
N. Bethesda, Maryland 20852
  mtheologou@silvermanlegal.com
*Counsel for Defendant Liliana Economakis*

Christos Economakis
5058 Joewood Drive
Sanibel, Florida 33957
*Defendant*

   /s/ John A. C. Keith
John A. C. Keith, Esq.
Virginia State Bar No. 14116
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
Phone: 703-691-1235
Fax: 703-691-3913
jkeith@bklawva.com
*Counsel for Defendant Jeffrey Houle*

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| KARL GARCIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| THE RUBIN GROUP LLC | ) |
| 819D LLC | ) |
| 819 CAPITAL LLC | ) |
| K STREET HOLDINGS LLC | ) |
| TR HOLDINGS LLC | ) |
| 2233-40TH PARTNERS LLC | ) |
| SOUTH GLEBE LLC | ) |
| WOODMORE PARTNERS LLC | ) |
| a/k/a WOODMORE LLC | ) |
| TRG DEVELOPMENT LLC | ) |
| 638 NEWTON PARTNERS LLC | ) |
| ANDREW RUBIN | ) |
| MICHELLE A. TYGIER | ) |
| ROBERT RUBIN | ) |
| CANAL VIEW HOLDINGS LLC | ) |
| GREGORY AUGER II | ) |
| GREGORY AUGER III | ) |
| CHRISTOS ECONOMAKIS | ) |
| LILIANA ECONOMAKIS | ) |
| THOMAS D. MADISON | ) |
| JEFFREY HOULE, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 1:22-cv-00698-LMB-JFA

Removed from the Circuit Court for
Fairfax County, Virginia, Civil Case
No. CL-2020-17040

## MOTION OF DEFENDANT 819D LLC TO TRANSFER VENUE
## TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Defendant (and chapter 11 debtor in possession) 819D LLC ("**819D**") respectfully moves

this Court, pursuant to 28 U.S.C. § 1412, for an order transferring venue of this entire civil action

to the U.S. District Court for the District of Columbia, where that district's bankruptcy court is

administering 819D's bankruptcy case, *In re 819D LLC*, Case No. 22-00101-ELG (Chapter 11). This motion is supplemented and supported by a separate memorandum of law. A proposed order is being submitted herewith.

Dated: June 29, 2022             Respectfully submitted,

                         */s/ Kristen E. Burgers*
                         Stephen E. Leach (Va. Bar No. 20601)
                         Kristen E. Burgers (Va. Bar No. 67997)
                         HIRSCHLER FLEISCHER, PC
                         8270 Greensboro Drive, Suite 700
                         Tysons, Virginia 22102
                         Phone: (703) 584-8900
                         Facsimile: (703) 584-8901
                         Email: sleach@hirschlerlaw.com
                                  kburgers@hirschlerlaw.com

                         *Attorneys for 819D LLC*

## CERTIFICATE OF CONFERENCE

I hereby certify, pursuant to Local Civil Rule 7(E), that a telephone conference was held between myself and plaintiff's attorney, Bethany Benes, on June 29, 2022, in an effort to narrow the areas of disagreement as to the merits of this motion and that no agreement could be reached regarding same.

                         *Kristen E. Burgers*
                         Kristen E. Burgers

# CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2022, a true and correct copy of the foregoing Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia was electronically filed with the Clerk of the Court using the CM/ECF system which will then send a notification of such filing to all parties registered with the system. Additionally, I certify that the foregoing was served upon counsel of record and unrepresented parties in this action via electronic mail and first-class mail, postage prepaid, as follows:

Bethany Benes, Esq.
Bethune Benes, PLLC
3975 Fair Ridge Drive
South Terrace, Suite 25C
Fairfax, VA 22033
Email: bbenes@bethunebenes.com

Christopher A. Glaser, Esq.
Jackson & Campbell
2300 N Street NW, Suite 300
Washington, DC 20037
Email: cglaser@jackscamp.com

Laurin H. Mills, Esq.
Samek Werther Mills, LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
Email: laurin@samek-law.com

John A.C. Keith, Esq.
Blankingship & Keith
4020 University Drive, Suite 300
Fairfax, VA 22030
Email: jkeith@bklawva.com

Alexander M. Laughlin, Esq.
Odin Feldman Pittleman, PC
1775 Wiehle Avenue, Suite 400
Reston, VA 20190
Email: alex.laughlin@ofplaw.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria, VA 22307
Email: demckinley@verizon.net

Mark D. Crawford, Esq.
Law Offices of Mark D. Crawford PLLC
2111 Wilson Boulevard, Suite 700
Arlington, VA 22201
Email: mcrawford@mdc-law.com

Milt Theologou, Esq.
Silverman Theologou, LLP
11200 Rockville Pike, Suite 520
North Bethesda, MD 20852
Email: mtheologou@silvermanlegal.com

Christos Economakis
5058 Joewood Drive
Sanibel, FL 33957

Liliana Economakis
5058 Joewood Drive
Sanibel, FL 33957

Marc Albert
Tracey Ohm
Stinson LLP
1775 Pennsylvania Avenue NW
Suite 800
Washington, DC 20006-4605
Email: marc.albert@stinson.com
       tracey.ohm@stinson.com

*Kristen E. Burgers*
Kristen E. Burgers

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| **KARL GARCIA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **THE RUBIN GROUP LLC** | ) | **Civil Action No. 1:22-cv-00698-LMB-JFA** |
| **819D LLC** | ) | |
| **819 CAPITAL LLC** | ) | |
| **K STREET HOLDINGS LLC** | ) | |
| **TR HOLDINGS LLC** | ) | **Removed from the Circuit Court for** |
| **2233-40TH PARTNERS LLC** | ) | **Fairfax County, Virginia, Civil Case** |
| **SOUTH GLEBE LLC** | ) | **No. CL-2020-17040** |
| **WOODMORE PARTNERS LLC** | ) | |
| **a/k/a WOODMORE LLC** | ) | |
| **TRG DEVELOPMENT LLC** | ) | |
| **638 NEWTON PARTNERS LLC** | ) | |
| **ANDREW RUBIN** | ) | |
| **MICHELLE A. TYGIER** | ) | |
| **ROBERT RUBIN** | ) | |
| **CANAL VIEW HOLDINGS LLC** | ) | |
| **GREGORY AUGER II** | ) | |
| **GREGORY AUGER III** | ) | |
| **CHRISTOS ECONOMAKIS** | ) | |
| **LILIANA ECONOMAKIS** | ) | |
| **THOMAS D. MADISON** | ) | |
| **JEFFREY HOULE,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**819D LLC'S  MOTION TO TRANSFER VENUE TO THE U.S. DISTRICT**
**COURT FOR THE DISTRICT OF COLUMBIA**

Defendant (and chapter 11 debtor in possession) 819D LLC ("**819D**") respectfully

submits this memorandum of law in support of its motion (the "**Motion**" ECF No. 9) to transfer

venue of this action (the "**Action**"), pursuant to 28 U.S.C. § 1412, to the U.S. District Court for

the District of Columbia (the "**DC District Court**"), where that district's bankruptcy court (the "**Bankruptcy Court**") is administering 819D's bankruptcy case (the "**Bankruptcy Case**"), *In re 819D LLC*, Case No. 22-00101-ELG (Chapter 11).

819D respectfully requests that this Court enter an order transferring the Action, which is a core proceeding under 28 U.S.C. 157(b)(2)(B) & (H), and is both "related to" the Bankruptcy Case and "arises under" section 544(b) of title 11 of the U.S. Code (the "**Bankruptcy Code**") to the DC District Court where that court will presumably refer the Action to the Bankruptcy Court. As shown below, transfer of venue under 28 U.S.C. § 1412 will promote both the interests of justice and the convenience of the parties.

### BACKGROUND

This is a state law, prepetition, fraudulent conveyance case in which the plaintiff Karl Garcia ("**Garcia**") asserts that 819D made fraudulent transfers, totaling not less than $6,106,544.60, to certain of the other defendants who fraudulently re-transferred the funds to the remaining defendants. Garcia asserts that 819D's initial transfers and all of the subsequent transfers are avoidable because they were done with the actual intent to hinder, delay, or defraud him under Va. Code Ann. § 55.1-400. Alternatively, he contends that the transfers were constructively fraudulent under Va. Code Ann. § 55.1-401 because they were made for inadequate consideration, either when 819D and the other transferors were insolvent or which rendered them insolvent. Garcia contends that the transfers will thwart Garcia's ability to collect a judgment which does not yet exist, but which he anticipates obtaining against 819D and others in the future.

The Action is related to an earlier, and pending, lawsuit (the "**DC Action**") which Garcia commenced against 819D and other defendants in the Superior Court for the District of

2

Columbia (the "**Superior Court**") on May 18, 2020, Case No. 2020 CA 002540. See *Amended Complaint* ("**DC Amended Complaint**") attached hereto as **Exhibit A**. The DC Action emanates from 819D's prior ownership of a former church building at 819 D Street, Northeast, Washington DC, which 819D converted into a residential condominium project marketed as "The Sanctuary" (the "**Project**"). DC Amended Complaint ¶¶ 1-2, 9.

Per the DC Amended Complaint, on or about April 18, 2017, Garcia entered into a Purchase Agreement with 819D for his purchase of Unit 34 (the "**Unit**") at the Project for the price of $1,525,000. DC Amended Complaint ¶¶ 17, 85. Garcia alleges that after signing the Purchase Agreement he discovered construction flaws and deficiencies in both his Unit and in the common areas of the Project including, among other things, a severe pigeon infestation in part of the common area. DC Amended Complaint ¶¶ 20-26, 32-35.

Identifying himself as a resident of the District of Columbia ("**DC**") (DC Amended Complaint ¶ 1), Garcia filed the DC Action on May 18, 2020, against 819D and other entities involved with the development, marketing, and subsequent operation of the Project. Through the DC Action, Garcia seeks base damages against 819D in the amount of the $1,525,000 Unit purchase price for breach of warranty, breach of contract, fraud, and negligence, plus trebled damages of $4,575,000 for unfair or deceptive trade practices under DC law. In the alternative, Garcia seeks rescission of the Purchase Agreement.[1]

On February 3, 2021, the Superior Court ruled (the "**Arbitration Order**") that Garcia's claims against 819D and others were subject to arbitration pursuant to an arbitration clause in the Purchase Agreement. Arbitration Order attached hereto as **Exhibit B**. Garcia filed an appeal of

---

[1] Garcia has also sued the condominium owners' association in the DC Action for $500,000 for breach of fiduciary duty.

the Arbitration Order, which is currently pending (although the appeal is stayed by virtue of 819D's Bankruptcy Case) in the District of Columbia Court of Appeals, Appeal No. 21-CV-104.

On October 30, 2020, approximately five months after commencing the DC Action, Garcia initiated this Action in the Circuit Court for Fairfax County, Virginia, Case No. CL-2020-17040, asserting the $6,106,544.60 in fraudulent conveyances referred to above.  *See Third Amended Complaint* (the "**TAC**") ¶¶ 231-234.  A copy of the TAC in the Action is attached hereto as **Exhibit C**.

As he did in the DC Action, Garcia initially identified himself in the Action as a resident of DC ("Karl Garcia ('Mr. Garcia') is a resident of the District of Columbia and the purchaser of the real property located at 819 D Street, Northeast, Unit 34, Washington DC 20002 ('Unit 34')). *Complaint* ¶ 1 (paragraph 1 attached hereto as **Exhibit D**).   Garcia again identified himself as a resident of DC in his *Amended Complaint* filed with the Circuit Court on February 26, 2021. *Amended Complaint* ¶ 1 (paragraph 1 attached hereto as **Exhibit E**).   Garcia appears subsequently to have left DC:  He identified himself as a resident of the State of Florida in the first paragraph of both his *Second Amended Complaint* filed November 30, 2021 and in the TAC filed March 23, 2022.  Paragraph 1 from the *Second Amended Complaint*  attached hereto as **Exhibit F**.

The Action hinges entirely on Garcia's ability to establish that he holds an enforceable claim against 819D arising from his purchase of the Unit – if he has no claim against 819D he has no right to avoid and recover for his benefit any of the allegedly fraudulent conveyances identified in the Action.  Notwithstanding his contentions in the DC Action and the Action, Garcia has not yet established, and may never establish, that 819D is indebted to him for anything based upon the Purchase Agreement or 819D's conduct related to the Project.  The

4

findings and determinations in the DC Action will play a material part in 819D's defenses in this Action. Indeed, if 819D prevails in the DC Action, Garcia's claims in this Action collapse. Garcia's claims in both this Action and the DC Action are prepetition claims against the bankruptcy estate which are subject to the Bankruptcy Court's core jurisdiction in connection with the allowance or disallowance of claims. 28 U.S.C. § 157(b)(2)(B). Thus the Bankruptcy Court is the proper court to undertake an analysis of the validity of Garcia's claims in the event Garcia timely files a proof of claim against 819D, which he necessarily will do to preserve his eligibility to receive distributions in the Bankruptcy Case.

Faced, among other issues, with the mounting financial burden of defending the Action and the DC Action, 819D filed its chapter 11 petition in the Bankruptcy Court on June 19, 2022, Case No. 22-00101-ELG. The Bankruptcy Case triggered the automatic stay of section 362(a) of the Bankruptcy Code, which bars Garcia from pursuit of the Action and the DC Action without Bankruptcy Court approval.

On June 22, 2022, having been advised of the Bankruptcy Case, Garcia filed a *Motion to Stay Case* (the "**Stay Motion**") in the Fairfax Circuit Court. Stay Motion attached hereto as **Exhibit G**. Garcia correctly asserted in the Stay Motion that "[b]ecause all claims [in the Action] are directly tied to 819D" it is impossible for Garcia to proceed without litigating his claims against 819D and that 819D is thus a "necessary and indispensable party." Stay Motion ¶ 6. The "related" nature of the Action to the Bankruptcy Case could hardly be clearer.

In its list of the holders of the 20 largest non-insider unsecured claims, 819D identified Garcia as the holder of a disputed, contingent, unliquidated claim in the amount of $4,575,000. Bankruptcy Case ECF Docket No. 1-2, page 1 of 4. 819D identified the next largest claim as held by the Sanctuary Condominium Owners' Association in the amount of $745,575 and the

5

third largest claim as held by the Law Office of Mark D. Crawford PLLC in the amount of $167,292.26. Garcia's claim is not only the largest claim against the 819D, it is several times larger than all other known claims against 819D combined. Given both the absolute and relative size of Garcia's claim, it is not only "related to" the Bankruptcy Case, its determination is essential to how that case will be resolved and how bankruptcy estate assets will be distributed.

The Bankruptcy Court has set October 24, 2022, as the deadline for non-government creditors to file proofs of claim in the Bankruptcy Case. Because 819D has already identified Garcia's claim as disputed, contingent, and unliquidated (and will do so again in its schedules of assets and liabilities), Garcia will necessarily have to file a proof of claim to participate in distributions in the Bankruptcy Case. 819D will object to Garcia's proof of claim and the resolution of that objection by the Bankruptcy Court will be a "core proceeding" under 28 U.S.C. § 157(b)(2)(B), further reflecting that Garcia's claim in the Action is necessarily "related to" the Bankruptcy Case.

## ARGUMENT

### I.     ONLY 819D, AND NOT GARCIA, HAS STANDING TO PURSUE THE ACTION

The Action is a proceeding by which Garcia seeks, as a creditor of 819D and for his sole benefit, to avoid and recover purported fraudulent transfers by 819D to other defendants. Because the Action is a proceeding to recover fraudulent transfers made by 819D, only 819D, acting as the debtor in possession, rather than Garcia, has standing to pursue the Action for the benefit of the bankruptcy estate and all of its creditors:

> [C]reditors have no ability or standing to prosecute [a prepetition fraudulent transfer action] in their own right and for their own benefit, even if they would have had standing to do so outside of bankruptcy.

5 *Collier on Bankruptcy* (16th Ed.) ¶ 548.02[5] (citing *Haskell v. PWS Holding Corp. (In re PWS Holding Corp.),* 303 F.3d 308, 314 (3d Cir. 2002), *cert. denied*, 538 U.S. 924 (2003) ("In other

6

words, §544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate."); *St. Francis County Farmers Ass'n v. Wright (In re Wright)*, 353 B.R. 627, 653 (Bankr. E.D. Ark. 2006)).

> *Collier* elaborates as follows:

> > Any attempt by the creditor to pursue the action is barred by the automatic stay of section 362(a), either under the theory that the action is property of the estate, or constitutes a power and benefit vested initially and primarily in the estate representative. As a result, a creditor pursuing a debtor's transferee in a state court avoidance action is stayed from further prosecution upon commencement of the debtor's case….Their [the creditors] remedy is to file a proof of claim in the debtor's case.

Id. (citations omitted). *Collier* is addressing precisely the situation before this Court: Garcia, as a prepetition creditor, is subject to the automatic stay and the Action is an asset of the bankruptcy estate or, at a minimum, a power and benefit under the sole control of 819D as debtor in possession. Given that the Action represents what would be, by far, the largest asset of 819D's bankruptcy estate, and only 819D has standing to pursue it, transfer of the Action to the Bankruptcy Court, where the Action can be administered and resolved as an integral element of the Bankruptcy Case, would promote the economic and efficient administration of the estate, thus satisfying the "in the interest of justice" prong of 28 U.S.C. § 1412.

## II. BECAUSE THE ACTION CAN PROCEED ONLY UNDER 11 U.S.C. § 544(b) IT IS A PROCEEDING UNDER TITLE 11 AND CHANGE OF VENUE SHOULD BE DETERMINED UNDER 28 U.S.C. § 1412

Once 819D entered bankruptcy, Garcia's prepetition avoidance Action vested in 819D as the debtor in possession with the powers of a bankruptcy trustee. See 5 *Collier on Bankruptcy* (16th Ed.) ¶548.02[2], [5]; *Deutsche Bank Trust Co. Ams. V. Large Private Ben. Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 83 (2d Cir. 2019). Further, "[a] constructive fraudulent conveyance action brought by a trustee <u>et al.</u> under section 544 is a claim

7

arising under federal law.  *Tribune Co. Fraudulent Conveyance Litig.*, Id. (citations omitted).  As the Second Circuit noted, even though such a fraudulent conveyance action borrows applicable state law standards regarding avoidance of the subject transfers, an action pursued under section 544(b) has its own statute of limitations, measure of damages, and standards for distribution. *Id*. (citations omitted).  Disposition of a state fraudulent conveyance action under section 544(b) extinguishes the right of creditors to pursue that action under state law.  *Id*. (citations omitted).

The bankruptcy change of venue provision, 28 U.S.C. § 1412, provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  Because the Action must now proceed only under section 544(b) of the Bankruptcy Code, it is a "proceeding under title 11" and the Motion should be determined under the standards of section 1412.

III.    **BECAUSE THE ACTION IS ALSO "RELATED TO" THE BANKRUPTCY CASE, THE MOTION TO TRANSFER SHOULD BE DETERMINED UNDER 28 U.S.C. § 1412**

Even if the Action were not a "proceeding under [section 544(b)] of title 11" it is "related to" the Bankruptcy Case and thus the Motion should be analyzed under 28 U.S.C. § 1412.

A.    **The DC District Court would have subject matter jurisdiction over the Action.**

As this Court has previously noted, the initial step in assessing whether transfer is appropriate under section 1412 is to determine whether the transferee district would have subject matter jurisdiction over the Action if this Court orders transfer.  *Hilton Worldwide, Inc. v. Caesars Entm't Corp.*, 532 B.R. 259, 270 (E.D. Va. 2015) (Ellis, J.).  This question is easily satisfied because the DC Court would have subject matter jurisdiction under 28 U.S.C. § 1334(b), which provides that "district courts shall have original but not exclusive jurisdiction of all proceedings *arising under title 11*, or arising in *or related to cases* under title 11." (emphasis

8

added).   Thus the District of Columbia would have subject matter jurisdiction so long as the

Action either arises under section 544(b) of the Bankruptcy Code (as discussed above), or the

Action is "related to" the Bankruptcy Case.  *See Hilton*, 532 B.R. at 270.

### B.    The Action is "related to" the Bankruptcy Case.

Once subject matter jurisdiction is established, transfer of venue under section 1412 is

permissible if the Action is "related to" the Bankruptcy Case even if it does not also arise under

title 11.  See *Gibbs v. Rees*, 2018 U.S. Dist. LEXIS 48680 at *17-25 (E.D. Va. Mar. 23, 2018)

(Lauck, District Judge.).

A civil case is "related to" a bankruptcy case "if the outcome of the civil case 'could

conceivably have any effect on the estate being administered in bankruptcy … if the outcome

could alter the debtor's rights, liabilities, option, or freedom of action … and which in any way

impacts upon the handling and administration of the bankruptcy estate.'"  *New Horizon of N.Y.,*

*LLC v. Jacobs*, 231 F.3d 143, 151 (4th Cir. 2000) (quoting *Celotex Corp. v. Edwards*, 514 U.S.

300, 308 n.6 (1995)); *Hilton*, 532 B.R. at 270-71.  Congress adopted this broad standard "to grant

comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and

expeditiously with all matters connected with the bankruptcy estate.   *Hilton*, 532 B.R. 270

(quoting *Celotex*, 514 U.S. at 308).[2]  "This test does not require with any certainty or likelihood

---

[2]  In *Fitzgibbon v. Radack*, 597 B.R. 836 (E.D. Va. 2019), Judge Robert E. Payne of this Court ruled, contrary to *Hilton* and *Gibbs*, that 28 U.S.C. 1412 is not applicable to proceedings that are related to a bankruptcy case but do not arise under title 11.  Here *Fitzgibbon* is distinguishable because it was a malicious prosecution/defamation case rather than an action to avoid prepetition debtor transfers under section 544(b) of the Bankruptcy Code.  Approximately seven months after *Fitzgibbon* was decided (February 6, 2019), this Court in *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 282 n.30 (decided September 30, 2019) reaffirmed that "the language of § 1412, properly considered in the context of the statute as a whole, makes clear that § 1412 must apply to all cases 'related to' bankruptcy proceedings." (quoting *Gibbs v. Rees*, 2018 U.S. Dist. LEXIS 48680 at *23-24); see also *Schniper v. Servisfirst Bancshares, Inc.*, 2022 U.S. Dist. LEXIS 21615 at *16-17 (W.D.N.C. Feb. 7, 2022) (rejecting *Fitzgibbon* and alluding to the decision as an "outlier" among decisions from courts of the Fourth Circuit).

9

that the proceeding could conceivably have an effect on the bankruptcy estate, the possibility itself is sufficient." *In re Bestwall LLC*, 2022 U.S. Dist. LEXIS 2981 at *15 (W.D.N.C. Jan. 6, 2022) (internal citation omitted); *Gibbs v. Rees*, 2018 U.S. Dist. LEXIS 48680 at *24-25 ("The possibility of such alteration or impact [on the debtor's rights, liabilities, options, or freedom of action] is sufficient for a case to be 'related to' a bankruptcy case.").

The Action easily satisfies the foregoing standard – there is not just a "conceivable" effect on the Bankruptcy Case, but a direct and fundamental effect. First, the Action is based upon the largest claim against 819D (as noted, the claim asserted in the Action is a number of multiples greater than the aggregate of all other known claims against 819D). The validity and size of Garcia's claim will bear directly on any plan of reorganization or liquidation that 819D might hereafter propose, and thus the Bankruptcy Court will have to address the Garcia claim. Further, the Action is either *the major asset* of the bankruptcy estate (assuming the validity of Garcia's claim and legal and factual allegations against 819D), or a right and benefit that only 819D, as debtor in possession, has standing to pursue. It is simply inconceivable, given the nature and size of Garcia's claim in the Action, that the Action will not have a major impact on the administration of the Bankruptcy Case (including 819D's ability to confirm a plan of reorganization) and the distribution of bankruptcy estate property to Garcia and other creditors. As such, the Action is certainly, even inextricably, related to the Bankruptcy Case.

## IV. TRANSFER OF THE ACTION WOULD BE IN THE INTERESTS OF JUSTICE AND PROMOTE THE CONVENIENCE OF THE PARTIES

Because this Court and the DC District Court have "related to" bankruptcy jurisdiction over the Action, its transfer under section 1412 is appropriate *either* in the interests of justice *or* for the convenience of the parties. *Hilton*, 532 B.R. at 274 (noting that section 1412 "is a disjunctive provision"). Both prongs are satisfied here.

**A.    Transfer of the Action is in the interests of justice.**

Courts of this district have described the "interests of justice" component of section 1412 as a "broad and flexible standard which must be applied on a case-by-case basis." *Gibbs v. Rees*, 2018 U.S. District Lexis 48680 at *33 (*citing Hilton*, 532 B.R. at 274 which quotes *In re Manville Forest Prods., Corp.* , 896 F.2d 1384, 1391 (2d Cir. 1990)).  In evaluating whether the interest of justice supports transfer, courts in this district have considered multiple factors:

> (1)    The economic and efficient administration of the bankruptcy estate; (2) the so-called 'home court' rule – the presumption that the district hearing the bankruptcy case is the proper venue for related actions; (3) judicial efficiency; (4) the ability to receive a fair trial; (5) the state's interest in having the controversy decided within its borders; (6) the enforceability of any judgment; and (7) the plaintiff's original choice of forum.

*Gibbs v. Rees*, 2018 U.S. Dist. LEXIS 48680 at *34; *Hilton*, 532 B.R. 274.  "All factors do not receive equal weight, however, and the most important factor is 'the economic and efficient administration of the estate." *Gibbs v. Rees*. Id. (citing *Dunlap v. Friedman's Inc.*, 331 B.R. 674, 680 (S.D.W. Va. 2005)).

Here, the first and most important factor, the economic and efficient administration of the bankruptcy estate, will be served by transfer of the Action to the Bankruptcy Case forum where all issues between Garcia and 819D can be addressed together by a single judge *with* a complete picture of the issues that affect the Bankruptcy Case.  819D will challenge Garcia's claim in the bankruptcy case – the same damages claim which Garcia would have to establish in the Action to maintain his fraudulent conveyance theories.  Thus resolving the Action will involve many of the legal and factual determinations that will be necessary to determine Garcia's status as a creditor of the bankruptcy estate.  It would be inefficient and needlessly costly to the bankruptcy estate to have two different courts make many of the same determinations.  And such a duplicative process would, of course, create the risk of inconsistent and irreconcilable rulings, greatly

complicating the administration of the bankruptcy estate. Accordingly, transferring the Action so that it may be resolved together with the claim allowance and disallowance process will promote the economic and efficient administration of the bankruptcy estate.

The second factor – the presumption that related matters should be resolved in the same court where the Bankruptcy *Case* is proceeding – favors transferring the Action to DC. The home court presumption is one of the most important factors in deciding a motion to transfer venue. *Dunlap v. Friedman's, Inc. (In re Dunlap)*, 331 B.R. 674, 678 (S.D. W. Va. 2005). This factor alone is arguably dispositive here given that the Action is a form of estate asset, 819D is a named party, 819D alone has standing to pursue the Action, and the Action is based on issues that will be key to 819D's efforts to reorganize (including the validity and amount of Garcia's claim against the estate which will determine his right to vote on any chapter 11 plan).

The third factor – judicial efficiency – also weighs in favor of transfer. The Bankruptcy Court will almost certainly gain an intimate familiarity with the claims in the Action through the claims' allowance *and* plan confirmation process. It would make little sense to have two courts wrestle with the Garcia-related issues when they can be consolidated in a single court that has responsibility for 819D's reorganization.

With respect to the fourth, "fair trial" factor, there is no reason to believe that Garcia, who brought the DC Action in *the* Superior Court and was until recently a resident of DC, will not receive a fair trial of the issues in the Action in DC. Garcia can hardly contend otherwise given that he voluntarily brought the DC Action against 819D in DC.

As to the fifth, "local controversy" factor, no strong "local" interest requires that the Action be maintained in this Court rather than in DC. Indeed it is DC, not Virginia, that has a strong local interest in this matter because it arises out Garcia's purchase of the Unit in DC and

12

Garcia's ensuing DC Action, which is based upon causes of action that all occurred in DC, including 819D's alleged unfair and deceptive trade practices under DC law (giving rise to a claim for $4,575,000). And there is no reason to believe that the DC courts cannot properly apply the Virginia fraudulent conveyance statutes assuming they are even applicable to the transfers alleged in the Action.

The sixth factor – enforceability of *any* judgment – weighs in favor of transfer because Garcia will only be able to resolve his claim against 819D through the Bankruptcy Case in DC. Further, there is no reason to conclude that any resolution of the Action will be more or less enforceable in Virginia than it would be in DC.

Finally, the seventh factor – Garcia's choice of Virginia as a forum – has little weight in this instance. All of the actions and events that gave rise to Garcia's claims against 819D arose from Garcia's purchase of the Unit in DC. Garcia was until recently a resident of DC and is now a resident of Florida. He has not identified any connection with Virginia. 819D is organized under DC law and the Project has been the focus of all of its operations and activities, all of which were in DC. While certain of the 20 defendants are either organized under Virginia law or reside in Virginia, their relationship to Virginia has little or nothing to do with the events upon which Garcia bases his claims and legal theories.

Because the interest of justice factors weigh in favor of transfer, this Court should exercise its authority under section 1412 *and* transfer this case to the DC District Court.

**B.    DC is the most convenient forum.**

Here, the most convenient forum to litigate the Action is DC. 819D of course chose to file its bankruptcy case in DC *because* it is organized under DC law and all of its activities and operations have occurred in DC. Garcia chose to file his DC Action in the DC Superior Court, so if that case were to proceed, Garcia would be litigating in DC with his already-present DC

13

counsel. Garcia was until recently a DC resident and has no apparent relationship to Virginia. On the other hand, like 819D, many of the 20 defendants are organized under DC law or reside in DC. Only a few of the defendants have any relationship to Virginia. Consolidating Garcia's claims in a single forum would avoid duplicative litigation and potentially inconsistent results, making DC the most convenient forum for resolution of the Action.

**CONCLUSION**

For the foregoing reasons, *819D* respectfully requests that this Court transfer the Action, pursuant to 28 U.S.C. § 1412, to the DC District Court.


Dated:  June 29, 2022 Respectfully submitted,

*/s/ Kristen E. Burgers*
Stephen E. Leach (Va. Bar No. 20601)
Kristen E. Burgers (Va. Bar No. 67997)
HIRSCHLER FLEISCHER, PC
8270 Greensboro Drive, Suite 700
Tysons, Virginia 22102
Phone:  (703) 584-8900
Facsimile:  (703) 584-8901
Email:  sleach@hirschlerlaw.com
           kburgers@hirschlerlaw.com

*Attorneys for 819D LLC*

14

## **CERTIFICATE OF SERVICE**

   I hereby certify that on June 29, 2022, a true and correct copy of the foregoing Motion of Defendant 819D LLC to Transfer Venue to the U.S. District Court for the District of Columbia was electronically filed with the Clerk of the Court using the CM/ECF system which will then send a notification of such filing to all parties registered with the system. Additionally, I certify that the foregoing was served upon counsel of record and unrepresented parties in this action via electronic mail and first-class mail, postage prepaid, as follows:

Bethany Benes, Esq.
Bethune Benes, PLLC
3975 Fair Ridge Drive
South Terrace, Suite 25C
Fairfax, VA 22033
Email: bbenes@bethunebenes.com

Laurin H. Mills, Esq.
Samek Werther Mills, LLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
Email: laurin@samek-law.com

Alexander M. Laughlin, Esq.
Odin Feldman Pittleman, PC
1775 Wiehle Avenue, Suite 400
Reston, VA 20190
Email: alex.laughlin@ofplaw.com

Mark D. Crawford, Esq.
Law Offices of Mark D. Crawford PLLC
2111 Wilson Boulevard, Suite 700
Arlington, VA 22201
Email: mcrawford@mdc-law.com

Marc E. Albert, Esq.
Tracey M. Ohm, Esq.
Stinson LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Email: marc.albert@stinson.com
   Tracey.ohm@stinson.com

Christopher A. Glaser, Esq.
Jackson & Campbell
2300 N Street NW, Suite 300
Washington, DC 20037
Email: cglaser@jackscamp.com

John A.C. Keith, Esq.
Blankingship & Keith
4020 University Drive, Suite 300
Fairfax, VA 22030
Email: jkeith@bklawva.com

Douglas E. McKinley, Esq.
P.O. Box 7395
Alexandria, VA 22307
Email: demckinley@verizon.net

Milt Theologou, Esq.
Silverman Theologou, LLP
11200 Rockville Pike, Suite 520
North Bethesda, MD 20852
Email: mtheologou@silvermanlegal.com

Liliana Economakis
5058 Joewood Drive
Sanibel, FL 33957

Christos Economakis
5058 Joewood Drive
Sanibel, FL 33957

       *Kristen E. Burgers*
       Kristen E. Burgers

# EXHIBIT A - Part 1

D.C. Superior Court
11/30/2020 11:15AM
Clerk of the Court

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KARL GARCIA | ) |
| *Plaintiff,* | ) ) |
| v. | ) ) Case No. 2020 CA 002540 |
| **819D LLC d/b/a THE RUBIN GROUP** | ) ) |
| And | ) ) |
| REGUA LLC | ) ) |
| And | ) ) |
| **LONG & FOSTER REAL ESTATE, INC.** **d/b/a URBAN PACE** | ) ) ) |
| And | ) ) |
| POTOMAC CONSTRUCTION GROUP, LLC | ) ) |
| And | ) ) |
| THE SANCTUARY CONDOMINIUM UNIT OWNERS ASSOCIATION | ) ) ) |
| *Defendants.* | ) ) |

## AMENDED COMPLAINT

COMES NOW, Karl Garcia, by counsel, and hereby files this Amended Complaint against (i) 819D LLC, (ii) Regua LLC, (iii) Long & Foster Real Estate, Inc. d/b/a Urban Pace, (iv) Potomac Construction Group, LLC (collectively, the "**Project Defendants**"), and (v) The Sanctuary Condominium Unit Owners Association, and in support thereof, states as follows:

### PARTIES

1. Karl Garcia ("**Mr. Garcia**") is a resident of the District of Columbia and the purchaser of the real property located at 819 D Street, Northeast, Unit 34, Washington, DC 20002 ("**Unit 34**" and/or the "**Unit**").

2. 819D LLC ("**819D**") is a limited liability company registered to do business in the District of Columbia, with its previous principal place of business located at the residence of its owner, Mr. Andrew Rubin ("**Rubin**"), 1928 37th Street, Northwest, Washington, DC 20007, and its current principal place of business located at 1401 Church Street NW, Suite 129, Washington, DC 20005. 819D advertises itself as a residential developer and was listed as the developer and seller of the building located at 819 D Street, Northeast, Washington, DC 20002 (the "**Property**"), which includes Unit 34. Upon information and belief, 819D's only members are Rubin and his mother, Michelle A. Tygier ("**Tygier**"), and the company was established for the improper purpose of serving as the alter ego or business conduit of Rubin and Tygier conducting business under its name and the name of The Rubin Group, LLC, a Virginia limited liability company. Through Rubin and Tygier, 819D was created to siphon funds from 819D to Rubin and Tygier personally, as well as other entities owned and controlled by them and Robert Rubin ("**Robert**"), Tygier's husband and Rubin's father, including The Rubin Group, LLC.

3. Upon information and belief, Regua LLC ("**Regua**") is a limited liability company registered to do business in the District of Columbia, with its principal place of business located at the residential address of Greg Auger located at 2320 Wisconsin Avenue, Northwest, #312, Washington, DC 20007. Regua is a real estate investment firm specializing in the acquisition and development of commercial properties in the District of Columbia. Regua advertised itself as a developer of the Property and was intimately involved in the acquisition, conversion, and sale of the Property beginning in or around 2014. Upon information and belief, Regua was the "silent partner" of 819D and indirectly assisted in the transfer of the units within the Property, including Unit 34 to Mr. Garcia.

4. Long & Foster Real Estate, Inc. d/b/a Urban Pace ("**Urban Pace**") is a real estate company providing marketing, sales, and advisory services to real estate developers in the District of

2

Columbia. Together with 819D d/b/a The Rubin Group and Regua, Urban Pace was involved in the marketing and sale of the units within the Property, including the marketing and sale of Unit 34 to Mr. Garcia.

5. Potomac Construction Group, LLC ("**Potomac**") is a limited liability company registered to do business in the District of Columbia, with its principal place of business located at 7960 Old Georgetown Road, Suite 1-C, Bethesda, Maryland 20184. Upon information and belief, Potomac was the general contractor hired to assist in the redevelopment of the Property.

6. The Sanctuary Condominium Unit Owners Association (the "**Association**") is the homeowner's association that governs the Property, including Unit 34.

JURISDICTION

7. This Court has jurisdiction over the claims asserted in this Complaint pursuant to §11-921 of the Code of the District of Columbia.

8. This Court has personal jurisdiction over each of the Defendants pursuant to §13-423 of the Code of the District of Columbia, as the claims asserted in this Complaint relate to the business transaction for the sale and maintenance of the real property located at Unit 34 in the District of Columbia.

FACTUAL ALLEGATIONS

9. Upon information and belief, the Property was purchased by Defendant 819D in or around 2014 in collaboration with Regua. The Property, known as "The Sanctuary", was listed and marketed to the public as "Developed By" Defendants 819D d/b/a The Rubin Group & Regua, including the eventual purchaser of Unit 34, Mr. Garcia. Defendants 819D d/b/a The Rubin Group & Regua held themselves out to the public as developers and sellers of the Property, utilizing their company logos as sellers of the Property on advertisements to the public, including Mr. Garcia.

3

10. Unit 34 is a three-story condominium unit located within the Property.

11. During its marketing and sale of the units within the Property, Urban Pace, through its agents, obtained knowledge as to the condition of the Property and publicly advertised the Property as having certain conditions and features to potential buyers, including Mr. Garcia. For example, Urban Pace created and continuously published the "MRIS" listing for Unit 34 beginning on or around March 27, 2016, including the representation that Unit 34 was the "highest point on Capitol Hill". It was unknown by Mr. Garcia at the time that this information was false.

12. Through its Application for Condo Registration submitted to the District of Columbia on May 7, 2016, as well as through other marketing materials, Defendants 819D and Regua falsely represented that the bricks making up the building were only 80 years old and would last another 70 years.

13. On June 21, 2016, Urban Pace published an article on its website, entitled "The Sanctuary Condos Nearing Completion in 119-Year-Old Capitol Hill Church Building." In the article, Urban Pace represented that the Property was being developed by The Rubin Group (now known to be 819D) and Regua. Defendants 819D d/b/a The Rubin Group & Regua made the specific decision to represent their involvement as developers of the Property to the public, including Mr. Garcia.

14. As early as June 23, 2016, and continuing to date, the Property was advertised by 819D, Regua, and Urban Pace as the 2016 "conversion of an iconic 119-year-old Capitol Hill church into one-of-a kind residential condominiums", which included "meticulous" and "careful" restoration. The Property was advertised by 819D, Regua, and Urban Pace as having "New" roofing, with an estimated useful life of 25 years. The Unit was also advertised as being well-managed by a Unit Owners' Association, who was to provide oversight of the building and its residents' needs and operations. Unbeknownst to Mr. Garcia at the time, these representations were false and misleading.

4

15. As early as August 7, 2016, Defendants 819D, Regua, and Urban Pace further represented on at least one internet website marketing the Property that, "The hallmark of this effort is the careful restoration of the beautiful stained and leaded glass windows, one of the building's defining features. Craftsmen have toiled for countless hours, lovingly restoring every single historic window of the building. Each window has been carefully disassembled, its pattern meticulously documented, cleaned and repaired and painstakingly reassembled by hand, using the original colored glass or, where allowed by the Historic Review Board, new clear glass." Through the website, Defendants 819D, Regua, and Urban Pace made the aforementioned representations to Mr. Garcia when he viewed the representations on a website created by 819D d/b/a The Rubin Group located at www.rubingroupdc.com on or around March 24, 2017.

16. The representations referred to in paragraphs 9-15 above were reinforced by Potomac, by and through their agent, Otis Schell ("**Mr. Schell**"). On March 24, 2017, during one of Mr. Garcia's visits to the Unit, Mr. Schell repeated the representations that had been made to Mr. Garcia regarding the "meticulous" and "careful" restoration that had been undertaken for the Property. Mr. Schell asserted that the Property had been "gutted" with "new interiors" and that the Project Defendants were providing a "quality product". Mr. Schell represented to Mr. Garcia that construction on the Property began immediately after the church congregation that previously occupied the Property moved to Maryland, even though, in actuality and unbeknownst to Mr. Garcia, the Property lay abandoned for several years after the church left, further deteriorating from a lack of maintenance.

17. Based on the Project Defendants' representations as to the condition and restoration of the Property, not known by Mr. Garcia at the time to be false, as well as the services and representations provided by the Association, Mr. Garcia entered into a Purchase Agreement with 819D for the purchase of Unit 34 on or about April 18, 2017. The Purchase Agreement included

5

819D's warranty against structural defects, as well as defects in workmanship and improper materials.

18. Upon information and belief, Defendants 819D d/b/a The Rubin Group and Regua profited from the sale of Unit 34 to Mr. Garcia.

19. Pursuant to DC law, Mr. Garcia was entitled to a fifteen (15) day right to rescind the Purchase Agreement.

20. On April 20 and April 28, 2017, within the 15 day "right to rescind" period, a pre-settlement walk-through of the Unit was conducted (together, the "**Walk-Through**"). At the Walk-Thru, 819D and Urban Pace represented that certain agreements, including the installation of wooden closet systems and a glass sliding door, would be fulfilled. It was also agreed that Mr. Schell, as an agent of Potomac Construction, would assist with the pre-closing inspection scheduled for April 22, 2017, from unlocking the Unit itself or any other restricted Common Area to directing the inspector throughout the building.

21. On April 22, 2017, Mr. Schell assisted with the pre-closing inspection. However, Mr. Schell failed to provide Mr. Garcia's inspector with access to the attic to complete his inspection. Mr. Schell conveniently explained to Mr. Garcia and the inspector that he "must've forgotten the key,", although it is now clear that Mr. Schell was assisting in the intentional concealment of the condition of the Property's attic, which is discussed in further detail below.

22. Outside of the attic area, a number of defects were identified by Sentry Home Inspections, the contractor hired by Mr. Garcia to perform the pre-closing inspection and included on the pre-closing inspection report / "Punch List." Per the terms of the Purchase Agreement, the Punch List document was provided to 819D, Rubin, and Urban Pace prior to closing. 819D and Urban Pace represented that the defects would be fixed prior to Mr. Garcia's move in.

6

23. On May 1, 2017, an inspection was conducted with Tygier (the "**Pre-Move-In Inspection**"). During the Pre-Move-In Inspection, Tygier, on behalf of 819D, represented that the Punch List items would be resolved by prior to Mr. Garcia's move in, and that certain features of the Unit were in accordance with the required building code, including but not limited to the use of unanchored glass railings along the catwalk in the Unit. In response to an accusation that the Unit's HVAC was used without a filter during construction, Tygier represented that such accusation was false.

24. 819D and Regua, as developers of the Property, had a duty to remedy any incomplete items as soon thereafter as reasonably practical prior to transferring the Property to Mr. Garcia, or if unable to remedy prior to Settlement, as soon as reasonably possible after Settlement.

25. 819D and Regua, as developers of the Property, had an obligation to repair and/or replace any defects in the Unit in a manner which meets or exceeds performance standards.

26. Upon moving into Unit 34, Mr. Garcia began to notice structural deficiencies and flaws with the Unit, including extremely high humidity and moisture levels.

27. The Property's Homeowner's Manual, which was distributed to Mr. Garcia by 819D, Regua, and Urban Pace, established a "Warranty Procedure" applicable to Mr. Garcia's Unit. While the Homeowner's Manual named 819D as the "Project Declarant," the Homeowner's Manual represented that the Property was "developed by" 819D and Regua. The Manual's "Warranty Procedure" indicated that that a two-year limited warranty on the Unit would be provided by 819D and Regua. The Homeowner's Manual represented that 819D and Regua would address Warranty issues "in a timely and efficient manner." Mr. Garcia contacted 819D and Regua through the Warranty Procedure set forth in the Homeowner's Manual to notify and seek remediation of the issues pursuant to the Warranty Procedure policy.

7

28. At the time of his purchase, Mr. Garcia was also provided with "Condominium Instruments", including Condominium Plats, Plans, and Bylaws of The Sanctuary Condominiums dated April 29, 2016. The Condominium Instruments established the Association for the governance of the Property, including the Property's General Common Elements.

29. Section 7.1 of the Condominium Declaration defines the General Common Elements as "all Common Elements without limitation", including but not limited to the foundations, roofs, and structural interior walls.

30. The Condominium's Bylaws provide that the powers and responsibilities of the Association are delegated to a Board of Directors. Section 4.1 of the Association's Bylaws mandate certain duties of the Association's Board of Directors, including but not limited to: prepare and adopt an annual budget for the Property, establish and maintain a reasonable reserve fund for capital improvements, replacements, and major repairs, pay the cost of services rendered to the Property for which the Association is liable, maintain, repair, improve, replace and/or modify the Common Elements, and exercise the care required of a fiduciary to the Property unit owners.

31. Each unit owner within the Property is not only the sole owner of the portion of the Property which comprises his/her living quarters, but also one (1) of many mutual owners of common facilities which service his and other living quarters and of common areas which the Unit Owner may use and enjoy along with other Unit Owners. These areas are defined as the Property's "**General Common Elements**".

32. Since moving into his Unit, Mr. Garcia has also experienced damages affecting his Unit as the result of defects and disrepair within the Property's General Common Elements.

33. On or about August 6, 2017, Mr. Garcia created a "Common Area Punch List," itemizing various issues with the building's Common Areas. The Common Area Punch List included images

8

and captions, detailing everything from a broken attic window in the Property that Mr. Garcia had noticed walking down the street, to eroding mortar on the façade's exterior, to missing portions of the Property's brick chimney stack. Three days later, on August 9, Mr. Garcia submitted the document to 819D and the Association, as well as to agents of Potomac Construction.

34. Several weeks later, on August 21, 2017, Mr. Garcia met with the Association, Potomac Construction and 819D, including Tygier, to perform a walk-through of the Property to address the Common Area Punch List. At this meeting, Potomac Construction and 819D represented that various items on the Common Area Punch List had been repaired, but that certain items on the document were out of purview, including that an engineer had already "signed off" on the obvious structural deficiencies of the chimney, which is made of brick and stands approximately twenty feet above the building's roof. Potomac and Tygier also demonstrated from the street that the attic window had been tended to; that it was "fixed, but not sealed." 819D alleged that the remaining repairs were the responsibility of the Association.

35. On October 27, 2017, Mr. Garcia learned from professional inspector Home Energy Medics that the Property's attic was severely contaminated with a pigeon infestation.

36. Mr. Garcia immediately notified the Association of the attic finding the very next day, October 28, 2017. In response, the Association informed Mr. Garcia that it did not have the necessary reserve funds to hire the appropriate professional to inspect and report on the situation, but that it would allow Mr. Garcia to hire the necessary professionals at his own expense.

37. Over the course of the next several months, Mr. Garcia hired one professional after another, as each uncovered yet another serious deficiency that required the hiring of the next.

38. On March 24, 2018, Mr. Garcia notified 819D d/b/a The Rubin Group of all of the Unit's existential issues. In his detailed correspondence, Mr. Garcia included the findings of the hired professionals and their reports.

9

39. On or about March 30, 2018, Mr. Garcia notified 819D and the Association of a potential water leak in the bell tower of his Unit. The Association failed to respond.

40. On April 17, 2018, 819D, through Rubin, confirmed receipt of Mr. Garcia's March 24, 2018 letter.

41. On April 30, 2018, Mr. Garcia provided the remaining members of the Association with inspection and lab reports from HP Environmental, as well as various quotes he had compiled, so that the Association could remediate the attic and remove the health hazard from the Property. The reports provided by Mr. Garcia informed the Association that the Property's General Common Elements were in urgent need of repair.

42. At the end of May 2018, Mr. Garcia notified the Association that indeed a water leak existed in the bell tower of his Unit.

43. As a result of the numerous issues with the Property, the Association hired Engineering and Technical Consultants, Inc. ("**ETC**"), to conduct an inspection and analysis of the Property.

44. On July 18, 2018, Mr. Garcia submitted the survey requested and provided by ETC to the Association. Mr. Garcia itemized the issues with the Property's Common Areas, as well as those issues within his Unit, specifically highlighting the tower leak. In his transmittal email to the Association, Mr. Garcia attached the multitude of reports he had compiled throughout the year that outlined the issues with the Property.

45. On August 9 and 29, 2018, Mr. Garcia met with an engineer from ETC, to perform an inspection of his Unit. During the inspection, Mr. Garcia showed the engineer the issues affecting his Unit, including the water leak, as well as the various deficiencies around the Property's Common Areas.

46. During the Fall of 2018, Mr. Garcia approached the Association *again* after no action had been taken to resolve the issues.

10

47. In November 2018, the Association was provided with ETC's findings in a transition study report (the "**ETC Report**"). The ETC Report included pictures of the tower leak affecting Mr. Garcia's Unit on page 14. Again, no action was taken by the Association to repair the issue.

48. On or about December 16, 2018, a strong weather storm hit the DC Metropolitan area, including the Unit. The stormwater cascaded down the tower of Mr. Garcia's Unit, flooding the Unit. Mr. Garcia once again notified the Association of the leak, recruiting members of the board to watch over the leak while he was away for the holidays, even providing them with a key for access.

49. On January 22, 2019, Mr. Garcia attended the Association's Board Meeting to again inform the Association that no action had been taken to resolve the Common Element issues causing severe damage to his Unit. Mr. Garcia provided the Association with a quote from a licensed professional to temporarily fix the tower leak issue. Mr. Garcia also offered to extend a line of credit to the Association so that it could proceed with the repairs necessary throughout the Property, including the tower water leak issue. Mr. Garcia's credit offer included a no-interest loan to fix the tower water leak, and a significantly below-market interest rate for the remaining repairs throughout the Property, including the costs for a full remediation and reinstallation of the attic. The Association declined to accept Mr. Garcia's offer, or take any action to repair and/or remedy the issues.

50. On January 28, 2019, Mr. Garcia followed up with the Association by emailing the written proposal and quote to fix the tower leak issue. The Association responded by indicating it would turn the information over to its insurance company.

51. More than one month later, the Association arranged for a meeting between Mr. Garcia and its insurance adjuster. On March 12, 2019, Mr. Garcia met with the insurance adjuster to inspect the tower water leak. The adjuster explained that he wanted one of his engineers to inspect the

11

leak. Accordingly, on April 2, 2019, Mr. Garcia met with the insurance engineer. The insurance adjuster failed to attend the meeting.

52. By May 2019, no action had been taken by the Association (or its insurance) to repair the tower leak issue. On May 2, 2019, Mr. Garcia contacted the insurance adjuster to inquire as to the status of the repair. Unbeknownst to Mr. Garcia, the adjuster explained that the insurance company had "closed the file" on April 3 and the claim was denied.

53. As of June 3, 2019, the Association had still failed to make the necessary repairs to the Common Elements. Accordingly, Mr. Garcia hired a contractor to perform a water test to determine the source of the water leak. During the course of the contractor's testing, a Board Member of the Association began yelling at the contractor, demanding that the contractor cease all testing and threatening police intervention. On June 6, 2019, the Association sent Mr. Garcia a letter reiterating the Board Member's cease and desist demands and threats. The Association failed to provide any kind of resolution, action plan, or proposal to fix the Common Element issues

54. On August 9, 2019, the Association informed Mr. Garcia that it was "working to compile bids to address the ongoing issues in the attic…and the 'tower leak'."

55. On August 30, 2019, the Association admitted it was "aware that further efforts are needed" to resolve the Common Element issues, including the attic remediation and the tower water leak. The Association admitted, "The prompt and effective remediation and restoration of the attic is a top priority of the Board." The Association further admitted, "the Board is not satisfied that the current property manager is capable of managing projects of this magnitude to the Board's (or to Mr. Garcia's) satisfaction nor of achieving the prompt and effective remediation and restoration that all those involved desire….The outgoing management company has been a significant hinderance to addressing Mr. Garcia's concerns, and they are now being removed from

12

the picture...*the inaction of the prior board and unresponsive management have combined to put the current board in an unenviable position* (emphasis added)."

56. On September 18, 2019, the Association informed Mr. Garcia that it had hired a new project manager to perform the attic remediation. The Association promised "The remediation will begin as soon as practicably possible and will be a full remediation of the attic from the effects of the infestation...The Board intends to have the construction completed no later than December 31, 2019."

57. Notwithstanding, the Association failed to perform any repairs or remediations to resolve the issues alerted to the Association by Mr. Garcia and the Reports.

58. To date, the Property's Association failed to perform the duties it is required to perform in accordance with its fiduciary obligations created under the Bylaws, including but not limited to:

     a. The Association failed to collect required dues on unsold units within the Property;

     b. The Association failed to verify all documents were properly filed with the District of Columbia, including the posting of a warranty bond (as required by law);

     c. The Association failed to supervise and properly manage the management company hired by the Association to oversee and maintain the Property;

     d. The Association failed to maintain and repair Common Area elements of the Property;

     e. The Association failed to establish and maintain a reasonable reserve fund for capital improvements, replacements, and major repairs as required by Article IV of the Association Bylaws;

     f. The Association failed to prepare and adopt an annual budget;

     g. The Association failed to make and collect sufficient assessments against the Unit Owners to defray the Common Expenses; and

13

h. The Association failed to exercise the care required of a fiduciary of the Unit Owners for the necessary and proper governance and operation of the Association;

i. Upon information and belief, The Association also improperly paid for builder costs associated with the construction of the Property.

59. To date, the Association has failed to resolve the Common Element issues, and Mr. Garcia's Unit continues to experience significant water infiltration, health hazards, and damages. As a result of the Association's breaches of its fiduciary duties to Mr. Garcia, Mr. Garcia has incurred, and continues to incur, substantial damage to his Unit.

60. As a result of all of the issues and damages Mr. Garcia was experiencing affecting his Unit, Mr. Garcia became concerned about his health and safety of residing in the Unit. Since moving into his Unit, Mr. Garcia has engaged several licensed professionals to investigate the issues within his Unit and the Property. The licensed professionals indicated their findings in the following reports:

a. a pre-closing home inspection report performed by Sentry Home Inspections, Inc.;

b. an infrared inspection report performed by Capital Infrared;

c. a home energy audit performed by Home Energy Medics, LLC;

d. an HVAC duct report performed by Ductz;

e. an electrical inspection report performed by Meyer Electrical Service, Inc.;

f. an environmental laboratory analysis performed by HP Environmental, Inc.;

g. an indoor environmental assessment of avian droppings report performed by HP Environmental, Inc.;

h. a second home energy audit performed by Home Energy Medics, LLC;

i. a home energy audit performed by Energy Efficiency Experts; and

14

j. a localized building envelope survey and façade inspection performed by Construction Insight, Inc.; (collectively, the "**Reports**", copies of which are attached hereto as **Exhibits A**).

61. The findings of the Reports concluded, *inter alia,* the following:

    a. A large void near the Unit's attic window was cut prior to, or during construction, leaving a large void leading into the Property's attic. For at least a year, the opening was left unattended and exposed the attic to the outside elements. As a result, a pigeon infestation was allowed to thrive in the attic and was described by a professional hygienist as "one of the worst bird infestations" he had ever observed in his over 25 years of experience. The infestation included complete saturation of the attic with pigeon feces, decaying bird eggs, loose feathers, and even a rancid pigeon carcass.

    b. None of the windows in the Unit were properly sealed, with some areas missing required insulation around the windows entirely;

    c. The Unit's envelope suffered from deterioration of the wood trim surrounding the third-floor windows, resulting in moisture damage and damaged framing;

    d. Air leakage in the unit reached 11.4 air changes per hour, exceeding the maximum of five (5) air changes per hour set forth in the 2013 District of Columbia Energy Code § C402. A second, unaffiliated and separate professional also confirmed these results, finding the air leakage in the unit reached 11.5 air changes per hour. The total leakage area is equivalent to opening a standard window 13.4 inches and leaving it open for the *entirety of a year*;

    e. The air leakage allows outside and attic elements and humidity to infiltrate the Unit, resulting in extremely high humidity and moisture levels of no less than 90%,

15

well above the 30% to 50% standard. As a result, Mr. Garcia typically removes nine (9) gallons of water from the Unit *per day* during the summer months. The added humidity results in prime growing conditions for poisonous and toxic molds to grow within the Unit;

f.  The required insulation thickness for the closet containing the Unit's HVAC unit is insufficient; the exposed spray foam on the north side of the space does not fully fill the space between the wood studs and does not comply with the DC building code requirement of R-20 insulation;

g.  A large, gaping hole is present in the exterior wall on the north side of the Unit's HVAC closet, and a separate hole at the bottom of the wood frame. "The wood stud wall is open, without any insulation, sheathing or drywall, revealing a chase within the brick masonry." The holes are "bringing in a significant amount of outside air…creating a harsh environment for the HVAC system. Since the [HVAC] return is located in the HVAC closet, this creates a vacuum effet pulling in air from the chase residing next to the closet and creating a humid environment within [the Unit]". As a result, various pathogens and molds, including E. Coli, were found within the duct system;

h.  All attic windows have gaps and/or holes within the required sealant;

i.  The required insulation is missing in many locations within the Unit's attic, with some areas, including exterior walls, completely devoid of any type of insulation; and/or air sealant. Insulation that was installed was not up to DC Building Code standards, as R-13 insulation was used in between studs in vertical walls in the attic instead of the required R-38 batt insulation;

16

j. The attic in the Unit lacks proper attic ventilation meeting DC Building Code requirements set forth in §1203.2;

k. A large majority of the main trunk of the HVAC system lacks interior lined insulation and exterior insulation. Further, the HVAC ducting is not sealed properly around the connections, and the recessed lighting is not sealed airtight, creating a hole for attic air to flow into the Unit. A bacterial and fungal sample taken from the HVAC evidenced the presence of numerous harmful pathogens;

l. The interior glass railing located on the Unit's second floor does not comply with the DC standard that the glass be able to resist a 200-pound point load or 50 pound per foot continuous load on the system;

m. The roof membrane around the roof drain on the third floor of the Unit is not sealed to a watertight condition, and the pipe perimeter does not contain a high-quality grade silicone sealant that meets the required ASTM C920, Type S, Grade NS, Class 50 requirement. The water leakage is causing significant water damage in the Unit; and

n. The metal tower stair railings within the Unit do not conform to the requirements as set forth in DC Building Code § 1013.4.

o. Contrary to the Project Defendant's representation, the Property's façade was not repaired and repointed as necessary. On all elevations of the building, significant erosion and deterioration of the brick masonry mortar joints exists, causing recess in brick mortar joints and numerous voids in the exterior brick masonry wall;

p. Similar to the brick masonry mortar joints, erosion has occurred at many of the limestone mortar joints. Cracking and spalling of the limestone is also present;

q. Localized sealant failures are present in numerous locations; and

17

    r. A portion of the masonry chimney present on the south side of the Property's roof

     is missing;

62. The findings of the Reports contradict the representations made by the Project Defendants to Mr. Garcia during the marketing and sale of Unit 34. Due to their intimate involvement with conversion, marketing, and sale of the units within the Property, the Project Defendants knew, or should have known, that the conditions that they represented were in fact false.

63. Mr. Garcia also discovered that the construction of the Unit deviates from the plans approved by the District of Columbia, resulting in Mr. Garcia purchasing a Unit different from that to which he agreed to purchase. This includes the Unit being substantially smaller than the 2,315 square feet represented to the District of Columbia and Mr. Garcia to be the size of the Unit.

64. The defects in the Unit reduce the stability and safety of the structure below standards commonly accepted in the real estate market and restrict the normally intended use of all or part of the structure. Due to the defects, the Unit requires repair, restoration, and/or replacement. The defects contained in the Unit pertain to components installed at the direction of the Project Defendants.

65. While Mr. Garcia notified 819D and Regua of the physical defects on multiple occasions, to date, the flaws and physical defects remain.

66. As a result of the Project Defendants' misrepresentations, fraud, and breaches, Mr. Garcia was misled and did not obtain the full benefit of his bargain in the purchase of his Unit.

### COUNT I- BREACH OF WARRANTY
(against 819D and Regua)

67. The allegations contained in Paragraphs 1-66 above are incorporated herein by reference.

68. Defendants 819D and Regua provided an express warranty against certain defects pertaining to the Property and Mr. Garcia's Unit.

18

69. Additionally, pursuant to D.C. Code § 42-1903.16, Defendants 819D and Regua had a duty to warranty the Property against defects, including in workmanship and materials used to restore and develop the Property, as well as the overall condition of the Property.

70. Defendants 819D and Regua breached their obligations, selling Mr. Garcia a Property that suffered from significant defects that reduce the stability or safety of the structure below standards commonly accepted in the real estate market, or restrict the normally intended use of all or part of the structure and which requires repair, renovation, restoration, or replacement.

71. Defendants 819D and Regua breached their express warranty by failing to resolve the warranty issues in a timely and efficient manner.

72. As a result of the aforementioned breaches, Mr. Garcia has suffered damages in an amount no less than One Million Five Hundred and Twenty-Five Thousand Dollars $1,525,000.00.

**COUNT II – BREACH OF CONTRACT**
**(against Defendant 819D, LLC d/b/a The Rubin Group)**

73. The allegations contained in Paragraphs 1-72 above are incorporated herein by reference.

74. Mr. Garcia entered into a valid and enforceable Purchase Agreement with 819D.

75. Pursuant to the Purchase Agreement, 819D was required to turn over possession of the Unit to Mr. Garcia free of any structural defects.

76. 819D breached the Purchase Agreement when it relinquished to Mr. Garcia possession of the Unit containing multiple structural defects and flaws.

77. As a result of 819D's breach, Mr. Garcia has been damaged in an amount no less than One Million Five Hundred and Twenty-Five Thousand Dollars $1,525,000.00.

**COUNT III – VIOLATION OF UNFAIR OR DECEPTIVE TRADE PRACTICES**
**PURSUANT TO D.C. CODE § 28-3904**
**(against 819D, Regua, Urban Pace, and Potomac)**

78. The allegations contained in Paragraphs 1-77 above are incorporated herein by reference.

19

79. As the direct seller of Unit 34 to Mr. Garcia, Defendant 819D, had an obligation to fully and accurately disclose to the public, including Mr. Garcia, the characteristics and condition of the Property being offered for sale, as well as the Association's services. As parties aligned on the seller side of the transaction, indirectly marketing and selling the Unit to Mr. Garcia, Defendants Regua, Urban Pace, and Potomac had similar obligations to accurately advertise the Unit and the Property. While Mr. Garcia did not have direct contact with Defendant Regua during the sale of the Unit, Regua actively participated in the sale through agent Urban Pace and assisted seller 819D in the transaction with Mr. Garcia.

80. Defendants 819D, Regua, Urban Pace, and Potomac violated their duty by mispresenting material facts about the Property, including Unit 34, and misleading Mr. Garcia during his purchase of Unit 34.

81. As a result of the violations by Project Defendants, Mr. Garcia has suffered treble damages in an amount no less than Four Million Five Hundred and Seventy-Five Thousand Dollars $4,575,000.00, plus interest, punitive damages, and attorneys' fees.

### COUNT IV- FRAUD
### (against 819D, Regua, Urban Pace, and Potomac)

82. The allegations contained in Paragraphs 1-81 above are incorporated herein by reference;

83. Defendants 819D, Regua, Urban Pace, and Potomac made representations to Mr. Garcia regarding the Property that were false, including material facts such as the condition of the Property and the manner in which the Property was "restored".

84. Project Defendants made the statements knowing the statements were false and with the intent to mislead, deceive, and induce Mr. Garcia into purchasing the Property.

20

85. Not knowing that the representations made by Project Defendants were false, Mr. Garcia relied on the statements and entered into a Purchase Agreement for the Property in the amount of One Million Five Hundred and Twenty-Five Thousand dollars ($1,525,000.00).

86. As a result of Project Defendants' fraudulent inducement of Mr. Garcia, Mr. Garcia has been damaged in the amount of the purchase of the Property totaling One Million Five Hundred and Twenty-Five Thousand dollars ($1,525,000.00), plus interest, punitive damages, and attorneys' fees.

## COUNT V – NEGLIGENCE
### (In the alternative against 819D and Regua)

87. The allegations contained in Paragraphs 1-86 above are incorporated herein by reference.

88. Defendants 819D and Regua had a duty to construct and ensure that the Property was safe for visitors and inhabitants, including Mr. Garcia.

89. Defendants 819D and Regua breached that duty by constructing the Property and Mr. Garcia's Unit with severe structural defects, including failing to construct the Property in accordance with proper building code requirements.

90. The breaches of Defendants 819D and Regua have caused Mr. Garcia to suffer damage to his Unit;

91. As a result, Mr. Garcia has been damaged in amount no less than One Million Five Hundred and Twenty-Five Thousand dollars ($1,525,000.00), plus interest since the date of his purchase in April 2017.

## COUNT VI- RESCISSION OF THE PURCHASE AGREEMENT
### (In the alternative against 819D)

92. The allegations contained in Paragraphs 1-91 above are incorporated herein by reference.

93. Defendant 819D falsely advertised and represented the Property to attract potential buyers, including Mr. Garcia, to purchase the Property.

21

94. Without the knowledge that the Property was not in the condition and repair represented by Project Defendants, Mr. Garcia entered into a Purchase Agreement for the Property.

95. 819D's representations as to the Property were material errors and go to the substance of the transaction – a purchase of the Property by Mr. Garcia.

96. As a result of 819D's fraud, Mr. Garcia did not obtain the benefit of his bargain and the Purchase Agreement should be voided. As a result of 819D's fraud, Mr. Garcia suffered special damages incidental to the contract and caused directly by the fraud, including professional costs.

### COUNT VII- BREACH OF FIDUCIARY DUTY
### (against the Association)

97. The allegations contained in Paragraphs 1-66 above are incorporated herein by reference.

98. The Condominium Instruments established fiduciary duties owed by Defendant Association to the unit owners of the Property, including Mr. Garcia.

99. Section 42-1903.08(d) of the DC Condominium Act further dictates that, "in performance of duties, an officer or member of the executive board shall exercise the care required of a fiduciary of the unit owners." Defendant Association breached its duties by failing to perform its duties in accordance with the Condominium Instruments and Section 42-1903.07 of the DC Condominium Act.

100.    The Association's failures have exacerbated the damages to Mr. Garcia's Unit, causing further damage to Mr. Garcia's Unit since his purchase of the Unit in April 2017.

101.    As a result of the Association's breaches, Mr. Garcia has suffered damages in an amount no less than Five Hundred Thousand Dollars ($500,000.00).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

22

WHEREFORE, Karl Garcia, by counsel, respectfully requests this Court:

(i)    As to Count I, enter judgment in favor of Karl Garcia and against Defendants 819D LLC d/b/a The Rubin Group, and Regua LLC, jointly and severally, in an amount no less than One Million Five-Hundred and Twenty-Five Thousand Dollars ($1,525,000.00);

(ii)    As to Count II, enter judgment in favor of Karl Garcia and against Defendant 819D LLC d/b/a The Rubin Group, in an amount no less than One Million Five-Hundred and Twenty-Five Thousand Dollars ($1,525,000.00). Or in the alternative, as to Count VI, enter judgment in favor of Karl Garcia and against Defendant 819D LLC d/b/a The Rubin Group, rescinding the Purchase Agreement and resulting transfer of One Million Five-Hundred and Twenty-Five Thousand Dollars ($1,525,000.00) from Karl Garcia to Defendant 819D LLC d/b/a The Rubin Group for the purchase of the Unit, and an award of special damages incidental to the contract and caused directly by the fraud;

(iii)    As to Count III, enter judgment in favor of Karl Garcia and against Defendants 819D LLC d/b/a The Rubin Group, Regua LLC, Long & Foster Real Estate, Inc. d/b/a Urban Pace, and Potomac Construction Group, LLC, jointly and severally, in an amount no less than Four Million Five Hundred and Seventy-Five Thousand Dollars ($4,757,000.00), plus interest, punitive damages, and attorneys' fees;

(iv)    As to Count IV, enter judgment in favor of Karl Garcia and against Defendants 819D LLC d/b/a The Rubin Group, Regua LLC, Long & Foster Real Estate, Inc. d/b/a Urban Pace, and Potomac Construction Group, LLC, jointly and severally, in an amount no less than One Million Five-Hundred and Twenty-Five Thousand Dollars ($1,525,000.00), plus interest, punitive damages, and attorneys' fees;

(v)     As to Count V, enter judgment in favor of Karl Garcia and against Defendant 819D LLC d/b/a The Rubin Group and Regua LLC, jointly and severally, in an amount no less than One Million Five-Hundred and Twenty-Five Thousand Dollars ($1,525,000.00);

(vi)    As to Count VII, enter judgment in favor of Karl Garcia and against Defendant The Sanctuary Unit Owners Association in an amount no less than Five hundred Thousand Dollars ($500,000.00);

(vii)   for any further relief this Court deems just and proper.

A TRIAL BY JURY IS DEMANDED.

RESPECTFULLY SUBMITTED,

KARL GARCIA,
By counsel

/s/
Bethany R. Benes (DC Bar No. 1686123)
**Bethune Benes, PLLC**
4290 Chain Bridge Road, Suite 302
Fairfax, Virginia 22030
Tel.: (703) 260-9322
bbenes@bethunebenes.com

*Counsel for Plaintiff Karl Garcia*

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Amended Complaint was served as set forth below on this 30th day of November 2020 to the following:

Robert M. Gittins (via CaseFileExpress)
Eccelston & Wolf, P.C.
7240 Parkway Drive, 4th Floor
Hanover, MD 21076
*Counsel for Defendant The Sanctuary*
*Condominium Unit Owners Association*

Timothy G. Casey (via CaseFileExpress)
451 Hungerford Drive, Suite 505
Rockville, Maryland 20850
*Counsel for Defendant Urban Pace*

Mark Crawford (via CaseFileExpress)
Law Offices of Mark D. Crawford, PLLC
1005 North Glebe Road, Suite 210
Arlington, Virginia 22201
*Counsel for Defendant 819D, LLC d/b/a The Rubin Group*

Alex Laughlin (via CaseFileExpress)
James Miller
Odin, Feldman, Pittleman, PC
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
*Counsel for Defendant Regua LLC*

Potomac Construction Group, LLC (via mail only)
7960 Old Georgetown Road, Suite 1-C
Bethesda, MD 20814
*Defendant*

/s/
Bethany Benes

25



# Inspection Report

**Karl Garcia**

**Property Address:**
819 D Street NE Unit 34PH
Washington DC 20002



EXHIBIT

A









### Sentry Home Inspections, LLC

Lou Scerbo
6611 1st Street NW
Washington, DC 20012
703-314-2716
ASHI Associate #252420

819 D Street NE Unit 34PH

MD License #29697
VA CHI #3380000661

# Table of Contents

Cover Page ........................................................................... 1

Table of Contents ................................................................. 5

Intro Page ............................................................................ 6

1 PLUMBING ....................................................................... 7

2 ELECTRIC ....................................................................... 11

3(A) ZONE 1 - MAIN ........................................................ 14

3(B) ZONE 2 - TOWER ..................................................... 20

4 INTERIOR ....................................................................... 22

5 KITCHEN ........................................................................ 46

Minor Discovery Summary ............................................... 54

MAJOR Discovery Summary ............................................ 83

General Summary ............................................................ 91

Invoice .............................................................................. 95

Agreement ........................................................................ 96

| Date: 4/22/2017 | Time: 09:00 AM | Report ID: 042217LS3675 |
| --- | --- | --- |
| **Property:** 819 D Street NE Unit 34PH Washington DC 20002 | **Customer:** Karl Garcia | **Real Estate Professional:** Randolph Adams |

Sentry Home Inspections, LLC is pleased to provide you with this home inspection report. This report is intended to provide you with an evaluation of the general condition of the home on the date of the inspection. Please read the entire report. The areas of the home that were inspected include: Structure, Exterior, Plumbing, Electric, HVAC (Heating, Ventilation and Air Conditioning), Interior and Kitchen. For condominiums and cooperatives, common areas are NOT inspected and are not part of a standard report. The structure and exterior are considered common areas in condominiums and cooperatives.

The focus of the inspection was on major problems or concerns. A major problem or concern is a component that is significantly deficient and would potentially cost $500.00 to repair or replace, or posses a threat to life or health. These items, if any, are contained in this report and can be easily identified by locating an "X" in the "MA" (Major) column in each section of this report. Look for the description of the problem or concern in the corresponding explanation below the columns. Major problems or concerns can also be accessed by looking directly at the "MAJOR" Summary in this report.

During the course of identifying major problems or concerns, it is nearly inevitable that minor problems or concerns will be located. A minor problem or concern is a component that is deficient and would more than likely cost less than $500.00 to repair or replace. Minor problems or concerns can be easily identified by locating an "X" in the "m" (minor) column in each section of this report. Look for the description of the problem or concern in the corresponding explanation below the columns. Minor problems or concerns can also be accessed by looking directly at the "MINOR SUMMARY" in this report. It is important to note that this inspection is not an all inclusive inspection and not every minor defect is noted in this report.

It is my sincere hope that you find this report and my services to be beneficial. Thank you for choosing Sentry Home Inspections, LLC for your home inspection needs.

Regards,

Tim Bills

Sentry Home Inspection, LLC President

| **Age Of Home:** | **Occupied:** | **Weather:** |
| --- | --- | --- |
| Original Structure 101 Years. Condo Conversion 2016 | No, vacant | Cloudy |

| **Temperature:** | **Precipitation in last 3 days:** | **Client Is Present:** |
| --- | --- | --- |
| Below 60 | Yes | Yes |

| **Client Attention:** | **Others present:** | **Radon Test:** |
| --- | --- | --- |
| Delayed arrival | Agent | No |

**Air Quality Test:**
No

## P PLUMBING

It is recommended that a licensed plumber perform plumbing repairs noted in this section.

### Styles & Materials

**SYSTEM ACCESS:**
Inaccessible/concealed areas

**BATH WALLS:**
STYLE: Tile - mastic over drywall
COMPONENT: Glass shower door (safety glass?)

**GAS/FUEL SUPPLY:**
SUPPLY: Street
MAIN SHUT-OFF: At gas meter

**LAUNDRY:**
WASHER AGE: 0-1 year
WASHER DISCHARGE: Gray box
DRYER AGE: 0-1 year
DRYER TYPE: Electric
DRYER VENT TYPE: Exterior

**WATER HEATER:**
SIZE: 50 gallon
COMPONENT: Expansion tank

**WASTE DISPOSAL:**
SYSTEM: Public
WASTE LINES: Plastic

**WATER SUPPLY:**
SUPPLY: Public
INTERIOR SERVICE: Plastic (CPVC)

**OTHER FEATURES:**
FEATURE: Bath fan
FEATURE: Fire Sprinklers - not inspected

| | | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|---|
| 1.0 | BATH FAN(S) | X | | | | X | | | |
| 1.1 | DRAIN(S) | X | | | | | | | |
| 1.2 | DRAIN POP-UP | X | | | | | | | |
| 1.3 | DRAIN/WASTE/VENT PIPES (DWV) | X | | | | | | | |
| 1.4 | DRIP PAN(S) | X | | | | | | | |
| 1.5 | DRYER | X | | | | | | | |
| 1.6 | FAUCET(S) | | | | | X | | | |
| 1.7 | FITTINGS | | | | | X | | | |
| 1.8 | FIXTURES | X | | | | | | | |
| 1.9 | GAS LINES | X | | | | | | | |
| 1.10 | GAS METER | | X | | | | | | |
| 1.11 | LOW WATER FLOW | X | | | | | | | |
| 1.12 | PIPES | X | | | | | | | |
| 1.13 | SHOWER DOOR/SURROUND | X | | | | | | | |
| 1.14 | TILE | X | | | | | | | |
| 1.15 | TOILET(S) | X | | | | | | | |
| 1.16 | VALVE(S) | | | | | X | | | |
| 1.17 | WALL PROTECTION | X | | | | X | | | |
| 1.18 | WASHER | X | | | | | | | |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace,
MON= Monitor, FIN= Further Investigation, FYI= For Your Information

IN   NI   MA   m   RR   MON   FIN   FYI

| | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|
| 1.10 WATER HEATER | | | | | | | | |
| 1.20 FOR YOUR INFORMATION | | | | | | | | |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace,
MON= Monitor, FIN= Further Investigation, FYI= For Your Information

| IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|

**Comments:**

**1.0** Bath fan in powder room is not squarely aligned with ceiling lines. Item 1(Picture)



1.0 Picture 1

**1.6** Spray hose is binding at kitchen sink. Does not recoil. Item 1(Picture)



1.6 Picture **1**

**1.7** Restricted water flow at hall bathroom shower head. Item 1(Picture)



1.7 Picture 1

**1.16** Remove masking tape from main water cutoff valve. Item 1(Picture)



1.16 Picture 1

**1.17** Missing caulk - all bathtub/shower faucet fixtures. Item 1(Picture) Item 2(Picture)

 

1.17 Picture 1                    1.17 Picture 2

**1.20** For your information -- recommend cleaning dryer vent and maintain at least twice annually

## 2. ELECTRIC

It is recommended that a licensed electrician perform all electrical repairs noted in this section.

### Styles & Materials

**ACCESS:**
  Inaccessible/concealed areas

**SERVICE ENTRANCE CABLE:**
  TYPE: Aluminum
  SERVICE: Conduit
  AMPERAGE: 150
  VOLTAGE: 120/240
  PHASE: Single

**MAIN DISCONNECT:**
  LOCATION: Main Panel

**PANEL:**
  TYPE: Circuit breakers
  PANEL: Labeled
  EXPANSION ROOM: Available
  SYSTEM: Single
  LOCATION: Foyer wall

**PANEL CAPACITY:**
  AMPERAGE: 150

**GROUNDING:**
  TYPE: Central

**MAJOR CIRCUITS:**
  CABLE TYPE: Armored cable (AC or BX)
  WIRE TYPE: Aluminum
  WIRE TYPE: Copper

**GENERAL CIRCUITS:**
  CABLE TYPE: Armored cable (AC or BX)
  WIRE TYPE: Copper

**RECEPTACLES:**
  DISTRIBUTION: Typical
  TYPE: 3 prong

**GFCI:**
  LOCATION: Bathroom
  LOCATION: Kitchen

**OTHER FEATURES:**
  FIXTURES: Recessed

| | | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|---|
| 2.0 | CIRCUIT BREAKERS | X | | | | | | | |
| 2.1 | CIRCUITS/CABLES | X | | | | X | | | |
| 2.2 | DOOR BELL | | X | | | | | | |
| 2.3 | GROUND | X | | | | | | | |
| 2.4 | INSTALLATION/OPERATION OF AFCI (ARC FAULT CIRCUIT INTERRUPTERS) | X | | | | | | | |
| 2.5 | INSTALLATION/OPERATION OF GFCI (GROUND FAULT CIRCUIT INTERRUPTERS) | X | | | | | | | |
| 2.6 | LIGHT FIXTURES | X | | | | X | | | |
| 2.7 | METER/METER BASE | | X | | | | | | |
| 2.8 | PANEL(S) | X | | | | | | | |
| 2.9 | RECEPTACLES | X | | | | | | | |
| 2.10 | RECESSED LIGHT FIXTURES | X | | | | | | | |
| 2.11 | SERVICE ENTRY CABLE (SEC) | X | | | | | | | |
| 2.12 | SWITCHES/DIMMERS | X | | | | | | | |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace, MON= Monitor, FIN= Further Investigation, FYI= For Your Information

    IN  NI  MA  m  RR  MON  FIN  FYI

**2.1** Overfused appliance circuits - 30 amp breaker servicing Tower heat pump exceeds manufacturer rating of 20 amps. Item 1(Picture) Item 2(Picture)



2.1 Picture 1



2.1 Picture 2

**2.6** Night light at hall bathroom vent fan is out. Item 1(Picture)



2.6 Picture 1

## 3.A) ZONE 1: MAIN

It is recommended that a licensed HVAC technician perform all HVAC repairs noted in this section.

### Styles & Materials

**SYSTEM ACCESS:**
Inaccessible/restricted access
LIMITED BY: Outside temperature restriction: Current temperature is below 60 degrees, AC not tested

**HEATING FUEL TYPE:**
TYPE: Air source heat pump with electric backup

**DUCT SYSTEM:**
TYPE: Metal

**EQUIPMENT LOCATION:**
LOCATION: Closet at living room.

**HEATING CAPACITY:**
9 KW

**HEATING SYSTEM AGE:**
AGE: 2 years

**FORCED AIR HEATING:**
FORCED AIR: Up
FILTER: Disposable

**THERMOSTAT(S):**
TYPE: Electronic set-back
COMPONENT: Single
- Central

**AIR CONDITIONING:**
ORIGINAL: Combined with heating system
TYPE: Heat pump
CAPACITY: 3 tons
FORCED AIR: Up
FILTER: Disposable

**HEAT PUMP CONDENSER AGE:**
AGE: 3 years

| | | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|---|
| 3.0.A | AIR CONDITIONER | ▓ | | | | | | | |
| 3.1.A | CONDENSATE DRAIN LINE | | ▓ | | | | | | |
| 3.2.A | CONDENSATE PAN | | ▓ | | | | | | |
| 3.3.A | DUCTWORK/PLENUM | ▓ | | | | ▓ | | | |
| 3.4.A | FILTER(S) | ▓ | | | | ▓ | | | |
| 3.5.A | FURNACE | ▓ | | | | ▓ | | | |
| 3.6.A | HEAT PUMP | ▓ | | | | | | | |
| 3.7.A | REFRIGERANT LINES | ▓ | | | | | | | |
| 3.8.A | THERMOSTAT(S) | ▓ | | | | | | | |
| 3.9.A | FOR YOUR INFORMATION | ▓ | | | | | | | ▓ |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace, MON= Monitor, FIN= Further Investigation, FYI= For Your Information

IN   NI   MA   m   RR   MON   FIN   FYI

### Comments:

**3.3.A** (1) Floor register does not fit opening at nursery.



3.3.A Picture 1

**3.3.A** (2) Construction dust and sawdust debris in floor register at loft Item 2(Picture)



3.3.A Picture 2

**3.4.A** Missing filter and filter retainer - Item 1(Picture)



3.4.A Picture **1**

**3.5.A** (1) System has been operated during construction. Most manufacturers prohibit use of system during construction as it can damage motor bearings and electronics. Recommend professional cleaning by a licensed HVAC Contractor. Item 1(Picture) Item 2(Picture) Item 3(Picture) Item 4(Picture)



3.5.A Picture 1



3.5.A Picture 2



3.5.A Picture 3

3.5.A Picture 4

**3.5.A** (2) Lower circuit did not energize during test of emergency heat. Further evaluation recommended by a licensed HVAC Contractor to ensure proper operation. Item 5(Picture)



3.5.A Picture 5

**3.9.A** (1) For your information - recommend routine service on both heating and AC systems at least twice annually, once in the spring (AC) and once in the fall (heating)

For your information - replace disposable HVAC filter(s) or clean reusable filter(s) every 30 days of operational use

**3.9.A** (2) System warranties should be extended with terms to begin with ownership transfer.

## 3(E) ZONE 2 - TOWER

It is recommended that a licensed HVAC technician perform all HVAC repairs noted in this section.

### Styles & Materials

**SYSTEM ACCESS:**
Inaccessible/restricted access

**HEATING FUEL TYPE:**
TYPE: Air source heat pump with electric backup

**DUCT SYSTEM:**
TYPE: Metal

**HEAT PUMP CONDENSER AGE:**
AGE: 3 years

**EQUIPMENT LOCATION:**
LOCATION: Ceiling - Tower

**HEATING SYSTEM AGE:**
AGE: 3 years

**THERMOSTAT(S):**
TYPE: Electronic set-back
COMPONENT: Single - Central

**HEATING CAPACITY:**
5 KW

**FORCED AIR HEATING:**
FORCED AIR: Down
FILTER: Disposable

**AIR CONDITIONING:**
CAPACITY: 1.5 tons



| | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|
| 3.0.B AIR CONDITIONER | IN | | | | | | | |
| 3.1.B CONDENSATE DRAIN LINE | | NI | | | | | | |
| 3.2.B CONDENSATE PAN | | NI | | | | | | |
| 3.3.B DUCTWORK/PLENUM | IN | | | | | | | |
| 3.4.B FILTER(S) | IN | | | | RR | | | |
| 3.5.B FURNACE | IN | | | | | MON | | |
| 3.6.B HEAT PUMP | IN | | | | | | | |
| 3.7.B REFRIGERANT LINES | IN | | | | | | | |
| 3.8.B THERMOSTAT(S) | IN | | | | | | | |
| 3.9.B FOR YOUR INFORMATION | IN | | | | | | | FYI |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace,
MON= Monitor, FIN= Further Investigation, FYI= For Your Information

| IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|

### Comments:

**3.4.B** Missing filter - Tower ceiling. Item 1(Picture)



3.4.B Picture 1

**3.5.B** System has been operated during construction. Most manufacturers prohibit use of system during construction as it can damage motor bearings and electronics. Recommend professional cleaning by a licensed HVAC Contractor.

**3.9.B** (1) For your information - recommend routine service on both heating and AC systems at least twice annually, once in the spring (AC) and once in the fall (heating)

For your information - replace disposable HVAC filter(s) or clean reusable filter(s) every 30 days of operational use

**3.9.B** (2) Service access to ceiling HVAC System in Tower is limited as the ceiling height is at least 12 feet. Item 1(Picture)



3.9.B Picture 1

**3.9.B** (3) System warranties should be extended with terms to begin with ownership transfer.

## 4 INTERIOR

It is recommended that a licensed general contractor perform all repairs noted in this section.

### Styles & Materials

**SYSTEM ACCESS:**
  Inaccessible/concealed areas

**WALLS/CEILINGS:**
  TYPE: Gypsum board (drywall/sheetrock)

**FLOORING:**
  TYPE: Ceramic tile
  TYPE: Hardwood

**WINDOWS:**
  AGE: Original – Stained Glass
  AGE: Replacements
  TYPE: Tilt
  MATERIAL: Aluminum
  GLAZING: Double

**DOORS:**
  TYPE: Solid wood

**OTHER SYSTEM INFORMATION:**
  COMPONENT: Smoke alarm(s)

| | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|
| 4.0 CEILINGS | X | | | | X | | | |
| 4.1 COUNTERS, CABINETS AND SHELVES | X | | | | X | | | |
| 4.2 DOORS (REPRESENTATIVE NUMBER) | X | | | | | X | | |
| 4.3 FLOORS | X | | | | | | | |
| 4.4 SMOKE DETECTORS | X | | | | | | | |
| 4.5 STEPS, STAIRWAYS, BALCONIES AND RAILINGS | | | X | | X | | | |
| 4.6 TRIM | X | | | | | | | |
| 4.7 WALLS | X | | | | X | | | |
| 4.8 WINDOWS (REPRESENTATIVE NUMBER) | | | X | | X | | | |
| 4.9 FOR YOUR INFORMATION | X | | | | | | | X |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace,
MON= Monitor, FIN= Further Investigation, FYI= For Your Information

IN    NI    MA    m    RR   MON   FIN   FYI

### Comments:

**4.0** Ceiling blemishes - various, see blue taped areas Item 1(Picture) Item 2(Picture) Item 3(Picture) Item 4(Picture)



4.0 Picture 1



4.0 Picture 2



4.0 Picture 3



4.0 Picture 4

**4.2** (1) Missing hardware - Dead bolt lock at entry door. Item 1(Picture)



4.2 Picture 1

4.2 (2) Door stop trim missing at entry door. Item 2(Picture)



4.2 Picture 2

**4.2** (3) Missing hardware - Door latch at powder room pocket door. Item 3(Picture)



4.2 Picture 3

**4.2** (4) Missing hardware - closet door pulls and sliding door guides at nursery room closet. Item 4(Picture) Item 5(Picture)

 

4.2 Picture 4                    4.2 Picture 5

**4.2** (5) Door does not latch - laundry room. Item 6(Picture)



4.2 Picture 6

**4.2** (6) Missing hardware - doors to Juliet balcony. Item 7(Picture)



4.2 Picture 7

**4.2** (7) Door binds/sticks - hall bathroom door does not close. binds on threshold. Trim to proper fit. Item 8(Picture)



4.2 Picture 8

**4.2** (8) Missing threshold extender and seal at front entry door. Item 9(Picture)



4.2 Picture 9

**4.5** (1) SAFETY CONCERN: Some of the glass partitions at the second floor loft area are braced/bracketed at the ends, where others are not. Need to clarify if the glass partitions require bracing at open ends or are otherwise rated. Item 1(Picture) Item 2(Picture) Item 3(Picture) Item 4(Picture)



4.5 Picture 1



4.5 Picture 2



4.5 Picture 3



4.5 Picture 4

**4.5** (2) SAFETY CONCERN: Some sections of the safety rails leading to the tower do not appear to be in compliance with child safety standards. Item 5(Picture) Item 6(Picture) Item 7(Picture) Item 8(Picture) Item 9(Picture)



4.5 Picture 5



4.5 Picture 6



4.5 Picture 7



4.5 Picture 8



4.5 Picture 9

4.5 (3) Loose fastener safety rail at stairs. Also obstructs shoe moulding trim. Item 10(Picture)



4.5 Picture 10

4.5 **(4)** Loose tread top stair at second floor. Item 11(Picture)



4.5 Picture **11**

**4.6** (1) Damaged stainless steel trim glass partition left side of Juliet balcony at nursery. Item 1(Picture) Other stains on trim. Item 2(Picture) Item 3(Picture)



4.6 Picture 1



4.6 Picture 2



4.6 Picture 3

**4.6** (2) Missing trim upper floor support at Tower. Item 4(Picture)



4.6 Picture 4

4.6 (3) Open gap between refrigerator trim and wall. Item 5(Picture)



4.6 Picture 5

**4.7** Blemished walls - various, see blue taped areas.

4.8 **(1)** Interior water stain on stained glass panel in living room. Item 1(Picture) Item 2(Picture)



4.8 Picture 1



4.8 Picture 2

**4.8** (2) The original wooden window spires at the Tower are heavily weathered with some decay visible. There could be other hidden or latent damage to the wooden spires that is not visible from the inside. Further, they are not properly sealed at the window panes installed at the inside against moisture penetration. The interior window panes installed are simply a single pane of glass or plexiglass material. Water penetration may be damaging to interior finishes and exterior walls. Question who actually owns the responsibility for the current condition and future maintenance of the window spires as they are not easily accessible. Further evaluation of the window spire and window conditions and configuration is recommended at the exterior. Item 3(Picture) Item 4(Picture) Item 5(Picture) Item 6(Picture)



4.8 Picture 3



4.8 Picture 4



4.8 Picture 5



4.8 Picture 6

**4.9** For your information - Closets throughout do not have hanging rods or package shelves. Item 1(Picture) Item 2(Picture) Item 3(Picture)



4.9 Picture 1



4.9 Picture 2



4.9 Picture 3

## 5. KITCHEN

It is recommended that a licensed general contractor perform all repairs noted in this section.

### Styles & Materials

**SYSTEM ACCESS:**
Inaccessible/concealed areas

**COOK TOP:**
FUEL: Gas
AGE: 1-5 yrs
CONDITION: Good
REPLACEMENT PROBABILITY: Low
(average life span = 15-20 yrs)

**DISHWASHER:**
NOT TESTED
AGE: 1-5 yrs
CONDITION: Good
REPLACEMENT PROBABILITY: Low
(average life span = 5-12 yrs)

**DISPOSER:**
AGE: 1-5 yrs
CONDITION: Good
REPLACEMENT PROBABILITY: Low
(average life span = 5-12 yrs)

**REFRIGERATOR:**
NOT TESTED
AGE: 1-5 yrs
CONDITION: Good
REPLACEMENT PROBABILITY: Low
(average life span 15-20 yrs)

**MICROWAVE:**
NOT TESTED

**WALL OVEN:**
AGE: 1-5 yrs
CONDITION: Good
REPLACEMENT PROBABILITY: Low
(average life span = 15-20 yrs $650+)

**OTHER FEATURES:**
FEATURE: Convection oven
FEATURE: Double oven
FEATURE: Fan - external discharge
FEATURE: Self cleaning oven



| | | IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|---|---|
| 5.0 | COOKTOP | ▓ | | | | | | | |
| 5.1 | COUNTERTOPS/CABINETS | ▓ | | | | ▓ | | | |
| 5.2 | DISHWASHER | ▓ | | | | | | | |
| 5.3 | DISPOSER | ▓ | | | | | | | |
| 5.4 | DRAWERS/DOORS | ▓ | | | | ▓ | | | |
| 5.5 | EXHAUST FAN | ▓ | | | | | | | |
| 5.6 | ICE MAKER | ▓ | | | | | | | |
| 5.7 | MICROWAVE | ▓ | | | | ▓ | | | |
| 5.8 | REFRIGERATOR | ▓ | | | | ▓ | | | |
| 5.9 | SINK | ▓ | | | | | | | |
| 5.10 | WALL OVEN | ▓ | | | | ▓ | | | |
| 5.11 | WATER FILTER | | ▓ | | | | | | |
| 5.12 | FOR YOUR INFORMATION | ▓ | | | | | | | ▓ |

IN= Inspected, NI= Not Inspected, MA= Major problem, m= Minor problem, RR= Repair or Replace,
MON= Monitor, FIN= Further Investigation, FYI= For Your Information

| IN | NI | MA | m | RR | MON | FIN | FYI |
|---|---|---|---|---|---|---|---|

### Comments:

5.1 Cracked/missing grout, kitchen backsplash as marked with tape.

5.2 (1) Not tested. Dishwasher installation is not complete. Item 1(Picture) Item 1(Picture) Item 2(Picture)




5.2 Picture 1                                    5.2 Picture 2

**5.2** (2) No dishwasher air gap or vacuum breaker - create a high loop in the dishwasher drain line between the dishwasher and the disposer. The high loop should be attached under the counter top. Item 2(Picture)



5.2 Picture 3

5.4 Misaligned drawer and door right side of wall oven. Item 1(Picture)



5.4 Picture 1

5.7 Not tested. Microwave installation is not complete. Item 1(Picture)



5.7 Picture 1

5.8 Not tested. Refrigerator installation is not complete. Item 1(Picture) Item 2(Picture) Item 3(Picture)

5.8 Picture 1





Right side

5.8 Picture 2



5.8 Picture 3

**5.10** (1) Was not successful in engaging operation of lower wall oven. Review appliance operations with builder or have serviced. Item 1(Picture) Item 2(Picture)

 

5.10 Picture 1

5.10 Picture 2

**5.10** (2) Wall oven is not flush with base cabinet. May not be properly secured. Item 3(Picture) Item 4(Picture)

 

5.10 Picture 3

5.10 Picture 4

**5.12** Appliance warranties should be extended with terms to begin with ownership transfer.

## Minor Discovery Summary



**Sentry Home Inspections, LLC**

**6611 1st Street NW**
**Washington, DC 20012**
**703-314-2716**
**ASHI Associate #252420**
**MD License #29697**
**VA CHI #3380000661**

**Customer**
Karl Garcia

**Address**
819 D Street NE Unit 34PH
Washington DC 20002

The following items or discoveries indicate that these system(s) or component(s) do not function as intended, adversely affect the habitability of the dwelling, appear to warrant further investigation by a specialist, or require subsequent observation. Generally, this summary includes items that constitute "minor" problems or concerns. A minor problem or concern is an item or discovery that is estimated to cost **less than** $500.00 to repair or replace. This Summary is not the entire report. The complete report may include additional information of concern to you. It is recommended that you read the complete report.

## 1. PLUMBING

**1.0      BATH FAN(S)**

**Inspected, Minor problem, Repair or Replace**

Bath fan in powder room is not squarely aligned with ceiling lines. Item 1(Picture)



1.0 Item 1(Picture)

1.6    FAUCET(S)

Inspected, Minor problem, Repair or Replace
Spray hose is binding at kitchen sink. Does not recoil. Item 1(Picture)



1.6 Item 1(Picture)

1.7    FITTINGS

Inspected, Minor problem, Repair or Replace
Restricted water flow at hall bathroom shower head. Item 1(Picture)

**1. PLUMBING**



1.7 Item 1(Picture)

1.16   **VALVE(S)**

**Inspected, Minor problem, Repair or Replace**
Remove masking tape from main water cutoff valve. Item 1(Picture)

## 1. PLUMBING



1.16 Item 1(Picture)

### 1.17 WALL PROTECTION

**Inspected, Minor problem, Repair or Replace**

Missing caulk - all bathtub/shower faucet fixtures. Item 1(Picture) Item 2(Picture)



1.17 Item 1(Picture)



1.17 Item 2(Picture)

## 2. ELECTRIC

### 2.1 CIRCUITS/CABLES

**Inspected, Minor problem, Repair or Replace**

**2 ELECTRIC**

Overfused appliance circuits - 30 amp breaker servicing Tower heat pump exceeds manufacturer rating of 20 amps.
Item 1(Picture) Item 2(Picture)



2.1 Item 1(Picture)



2.1 Item 2(Picture)

2.6 **LIGHT FIXTURES**

**Inspected, Minor problem, Repair or Replace**
Night light at hall bathroom vent fan is out. Item 1(Picture)

## 2. ELECTRIC



2.6 Item 1(Picture)

## 3.3 A ZONE 1 - MAIN

### 3.3.A DUCTWORK/PLENUM

**Inspected, Minor problem, Repair or Replace**

(1) Floor register does not fit opening at nursery.



3.3.A Item 1(Picture)

(2) Construction dust and sawdust debris in floor register at loft Item 2(Picture)



3.3.A Item 2(Picture)

3.4.A **FILTER(S)**

**Inspected, Minor problem, Repair or Replace**

Missing filter and filter retainer - Item 1(Picture)

ZONE 1 - MAIN



3.4.A Item 1(Picture)

3.5.A **FURNACE**

Inspected, Minor problem, Repair or Replace

(1) System has been operated during construction. Most manufacturers prohibit use of system during construction as it can damage motor bearings and electronics. Recommend professional cleaning by a licensed HVAC Contractor. Item 1(Picture) Item 2(Picture) Item 3(Picture) Item 4(Picture)



3.5.A Item 1(Picture)



3.5.A Item 2(Picture)



3.5.A Item 3(Picture)

**3(A) ZONE 1 - MAIN**



3.5.A Item 4(Picture)

(2) Lower circuit did not energize during test of emergency heat. Further evaluation recommended by a licensed HVAC Contractor to ensure proper operation. Item 5(Picture)



3.5.A Item 5(Picture)

**3(B) ZONE 2 - TOWER**

3.4.B   FILTER(S)
Inspected, Minor problem, Repair or Replace
Missing filter - Tower ceiling. Item 1(Picture)

## 3(B) ZONE 3 - TOWER



3.4.B Item 1(Picture)

**3.5.B** **FURNACE**

**Inspected, Minor problem, Repair or Replace**

System has been operated during construction. Most manufacturers prohibit use of system during construction as it can damage motor bearings and electronics. Recommend professional cleaning by a licensed HVAC Contractor.

## 4. INTERIOR

**4.0** **CEILINGS**

**Inspected, Minor problem, Repair or Replace**

Ceiling blemishes - various, see blue taped areas Item 1(Picture) Item 2(Picture) Item 3(Picture) Item 4(Picture)



4.0 Item 1(Picture)



4.0 Item 2(Picture)



4.0 Item 3(Picture)



4.0 Item 4(Picture)

4.2    **DOORS (REPRESENTATIVE NUMBER)**

**Inspected, Minor problem, Repair or Replace**

(1) Missing hardware - Dead bolt lock at entry door. Item 1(Picture)

4. INTERIOR



4.2 Item 1(Picture)

(2) Door stop trim missing at entry door. Item 2(Picture)



4.2 Item 2(Picture)

(3) Missing hardware - Door latch at powder room pocket door. Item 3(Picture)

819 D Street NE Unit 34PH



4.2 Item 3(Picture)

(4) Missing hardware - closet door pulls and sliding door guides at nursery room closet. Item 4(Picture) Item 5(Picture)



4.2 Item 4(Picture)                4.2 Item 5(Picture)

(5) Door does not latch - laundry room. Item 6(Picture)





4.2 Item 6(Picture)

(6) Missing hardware - doors to Juliet balcony. Item 7(Picture)

**4 INTERIOR**



4.2 Item 7(Picture)

(7) Door binds/sticks - hall bathroom door does not close. binds on threshold. Trim to proper fit. Item 8(Picture)



4.2 Item 8(Picture)

(8) Missing threshold extender and seal at front entry door. Item 9(Picture)



4.2 Item 9(Picture)

4.5 STEPS, STAIRWAYS, BALCONIES AND RAILINGS
Inspected, Major problem, Repair or Replace

**819 D Street NE Unit 34PH**

(3) Loose fastener safety rail at stairs. Also obstructs shoe moulding trim. Item 10(Picture)



4.5 Item 10(Picture)

(4) Loose tread top stair at second floor. Item 11(Picture)



4.5 Item 11(Picture)

4.6 **TRIM**

**Inspected, Minor problem, Repair or Replace**

(1) Damaged stainless steel trim glass partition left side of Juliet balcony at nursery. Item 1(Picture) Other stains on trim. Item 2(Picture) Item 3(Picture)



4.6 Item 1(Picture)



4.6 Item 2(Picture)

4. INTERIOR



4.6 Item 3(Picture)

(2) Missing trim upper floor support at Tower. Item 4(Picture)



4.6 Item 4(Picture)

(3) Open gap between refrigerator trim and wall. Item 5(Picture)

**INTERIOR**



4.6 Item 5(Picture)

4.7 **WALLS**

**Inspected, Minor problem, Repair or Replace**
Blemished walls - various, see blue taped areas.

4.8 **WINDOWS (REPRESENTATIVE NUMBER)**

**Inspected, Major problem, Repair or Replace**
(1) Interior water stain on stained glass panel in living room. Item 1(Picture) Item 2(Picture)

**4. INTERIOR**



4.8 Item 1(Picture)

## 4. INTERIOR



4.8 Item 2(Picture)

## 5. KITCHEN

5.1 **COUNTERTOPS/CABINETS**
**Inspected, Minor problem, Repair or Replace**
Cracked/missing grout, kitchen backsplash as marked with tape.

5.2 **DISHWASHER**
**Inspected, Minor problem, Repair or Replace**
(1) Not tested. Dishwasher installation is not complete. Item 1(Picture) Item 1(Picture) Item 2(Picture)

**5. KITCHEN**



5.2 Item 1(Picture)



5.2 Item 2(Picture)

(2) No dishwasher air gap or vacuum breaker - create a high loop in the dishwasher drain line between the dishwasher and the disposer. The high loop should be attached under the counter top. Item 2(Picture)



5.2 Item 3(Picture)

## 5.4 DRAWERS/DOORS

Inspected, Minor problem, Repair or Replace
Misaligned drawer and door right side of wall oven. Item 1(Picture)



5.4 Item 1(Picture)

5.7    **MICROWAVE**

**Inspected, Minor problem, Repair or Replace**
Not tested. Microwave installation is not complete. Item 1(Picture)



5.7 Item 1(Picture)

5.8    REFRIGERATOR

819 D Street NE Unit 34PH

## 9 KITCHEN

**Inspected, Minor problem, Repair or Replace**

Not tested. Refrigerator installation is not complete. Item 1(Picture) Item 2(Picture) Item 3(Picture)

**5. KITCHEN**



5.8 Item 1(Picture)



5.8 Item 2(Picture)

**5 KITCHEN**



Left side

5.8 Item 3(Picture)

5.10 **WALL OVEN**

Inspected, Minor problem, Repair or Replace

(1) Was not successful in engaging operation of lower wall oven. Review appliance operations with builder or have serviced. Item 1(Picture) Item 2(Picture)

## 5. KITCHEN





5.10 Item 1(Picture)

5.10 Item 2(Picture)

(2) Wall oven is not flush with base cabinet. May not be properly secured. Item 3(Picture) Item 4(Picture)





Right side



Left side

5.10 Item 3(Picture)

5.10 Item 4(Picture)

Prepared Using HomeGauge http://www.HomeGauge.com : Licensed To Lou Scerbo

819 D Street NE Unit 34PH



**Sentry Home Inspections, LLC**

**6611 1st Street NW**
**Washington, DC 20012**
**703-314-2716**
**ASHI Associate #252420**
**MD License #29697**
**VA CHI #3380000661**

**Customer**
Karl Garcia

**Address**
819 D Street NE Unit 34PH
Washington DC 20002

The following items or discoveries indicate that these system(s) or component(s) do not function as intended, adversely affect the habitability of the dwelling, appear to warrant further investigation by a specialist, or require subsequent observation. This summary includes those items that constitute "MAJOR" problems or concerns. A major problem or concern is any item or discovery that is estimated to cost **more than $500.00 to repair or replace, or constitutes a safety risk or has the potential to become a significant safety or health issue**. This Summary is not the entire report. The complete report may include additional information of concern to the customer. It is recommended that the customer read the complete report.

### 1. INTERIOR

**4.5** STEPS, STAIRWAYS, BALCONIES AND RAILINGS

Inspected, Major problem, Repair or Replace
(1) SAFETY CONCERN: Some of the glass partitions at the second floor loft area are braced/bracketed at the ends, where others are not. Need to clarify if the glass partitions require bracing at open ends or are otherwise rated. Item 1(Picture) Item 2(Picture) Item 3(Picture) Item 4(Picture)

**4. INTERIOR**



4.5 Item 1(Picture)



4.5 Item 2(Picture)



4.5 Item 3(Picture)



4.5 Item 4(Picture)

(2) SAFETY CONCERN: Some sections of the safety rails leading to the tower do not appear to be in compliance with child safety standards. Item 5(Picture) Item 6(Picture) Item 7(Picture) Item 8(Picture) Item 9(Picture)



4.5 Item 5(Picture)



4.5 Item 6(Picture)



4.5 Item 7(Picture)



4.5 Item 8(Picture)

**4. INTERIOR**



4.5 Item 9(Picture)

4.8    WINDOWS (REPRESENTATIVE NUMBER)

Inspected, Major problem, Repair or Replace

(2) The original wooden window spires at the Tower are heavily weathered with some decay visible. There could be other hidden or latent damage to the wooden spires that is not visible from the inside. Further, they are not properly sealed at the window panes installed at the inside against moisture penetration. The interior window panes installed are simply a single pane of glass or plexiglass material. Water penetration may be damaging to interior finishes and exterior walls. Question who actually owns the responsibility for the current condition and future maintenance of the window spires as they are not easily accessible. Further evaluation of the window spire and window conditions and configuration is recommended at the exterior. Item 3(Picture) Item 4(Picture) Item 5(Picture) Item 6(Picture)



4.8 Item 3(Picture)



4.8 Item 4(Picture)



Appears as though damaged frame section has only been heavily caulked, which is not the solution for wood framing decay

4.8 Item 5(Picture)



4.8 Item 6(Picture)

## General Summary



**Sentry Home Inspections, LLC**

6611 1st Street NW
Washington, DC 20012
703-314-2716
ASHI Associate #252420
MD License #29697
VA CHI #3380000661

**Customer**
Karl Garcia

**Address**
819 D Street NE Unit 34PH
Washington DC 20002

The General Summary is provided for your information. The General Summary contains general observations, additional information, helpful hints and advice on systems in the home.

## 1. PLUMBING

**1.20    FOR YOUR INFORMATION**

Inspected, For Your Information

For your information - recommend cleaning dryer vent and maintain at least twice annually

## 3A. ZONE 1 MAIN

**3.9.A    FOR YOUR INFORMATION**

Inspected, For Your Information

(1) For your information - recommend routine service on both heating and AC systems at least twice annually, once in the spring (AC) and once in the fall (heating)

For your information - replace disposable HVAC filter(s) or clean reusable filter(s) every 30 days of operational use

(2) System warranties should be extended with terms to begin with ownership transfer.

## 3(B) ZONE 2 - TOWER

### 3.9.B FOR YOUR INFORMATION

Inspected, For Your Information

(1) For your information - recommend routine service on both heating and AC systems at least twice annually, once in the spring (AC) and once in the fall (heating)

For your information - replace disposable HVAC filter(s) or clean reusable filter(s) every 30 days of operational use

(2) Service access to ceiling HVAC System in Tower is limited as the ceiling height is at least 12 feet. Item 1(Picture)



3.9.B Item 1(Picture)

(3) System warranties should be extended with terms to begin with ownership transfer.

## 4 INTERIOR

### 4.9 FOR YOUR INFORMATION

Inspected, For Your Information

For your information - Closets throughout do not have hanging rods or package shelves. Item 1(Picture) Item 2(Picture) Item 3(Picture)

**4 INTERIOR**



4.9 Item 1(Picture)



4.9 Item 2(Picture)

**4. INTERIOR**



4.9 Item 3(Picture)

**5. KITCHEN**

5.12 **FOR YOUR INFORMATION**

Inspected, For Your Information
Appliance warranties should be extended with terms to begin with ownership transfer.

---

*Prepared Using HomeGauge http://www.HomeGauge.com* : Licensed To Lou Scerbo



**INVOICE**

**Sentry Home Inspections, LLC**
6611 1st Street NW
Washington, DC 20012
703-314-2716
ASHI Associate #252420
MD License #29697
VA CHI #3380000661
Inspected By: Lou Scerbo

**Inspection Date:** 4/22/2017
**Report ID:** 042217LS3675

| Customer Info: | Inspection Property: |
|---|---|
| Karl Garcia | 819 D Street NE Unit 34PH |
| | Washington DC 20002 |
| Customer's Real Estate Professional: | |
| Randolph Adams | |

Inspection Fee:

| Service | Price | Amount | Sub-Total |
|---|---|---|---|
| Condo (1700+ square feet) | 690.00 | 1 | 690.00 |

Tax $0.00
**Total Price $690.00**

**Payment Method:** Check #1041
**Payment Status:** Paid At Time Of Inspection
**Note:** Thank You!

The Client and Sentry Home Inspections, LLC, of 2020 12th St., NW T03, Washington, DC 20009, agree to the terms and conditions set forth below.

**Scope of Inspection:** The Client authorizes Sentry Home Inspections, LLC to perform a standard home inspection at the following address:

819 D Street NE Unit 34PH
Washington DC 20002

By providing a standard home inspection, Sentry Home Inspections, LLC intends to provide the Client with an evaluation of the general condition of the dwelling. The inspection is a visual inspection of the building including its components and apparent overall condition on the date of the inspection only. The inspection is limited to readily accessible areas of the building and improvements. Data collected for the report as a result of the inspection is not intended to make any representation regarding latent or concealed defects that may be present. No warranty or guarantee is intended, expressed or implied on any system, equipment or component.

**Limits of Inspection:** The inspection is not intended to be an all inclusive and exhaustive search of every minor problem that can exist in a home. The inspection and subsequent report resulting from the inspection can not precisely and completely asses the risk, detect all flaws, predict every occurrence or make any assurances whatsoever. The inspection and subsequent report are not intended to reflect the value of the home and are not intended to provide any advice on whether or not to purchase the property. The Client acknowledges that Sentry Home Inspections, LLC is not insuring against any deficiencies or defects not stated in the inspection report that may be discovered by the Client after the inspection. The inspection and subsequent report cannot identify problems or conditions that are out of view of the visual inspection or that have been hidden or purposely covered.

**Weather Limitations:** Weather conditions limit the extent of the inspection. Snow cover and rain limit roof inspection and access. Snow cover also limits the inspection of landscaping, walks, driveways, grading and drainage. Dry conditions limit the ability to determine moisture, leakage, and seepage in the dwelling. Dry conditions also limit the ability to determine flood conditions in and around the dwelling. Heating systems may not be tested during hot weather conditions. Cooling systems cannot be tested when the external temperature has fallen below 60Â° F within the past twenty-four hours.

**Exclusions from Inspection:** The inspection is a non-intrusive inspection. The inspector will not cause intentional damage by poking holes in walls and ceilings, tear up or move carpeting or rugs. The inspector will not move insulation or vapor barriers, remove ceiling panels, move furniture, appliances, debris, personal belongings, clothing or breakable items. The following items are beyond the scope of the inspection unless otherwise specifically stated: wells, septic tanks and systems, below ground fuel storage tanks, above ground fuel storage tanks, wood stoves, portable heating equipment, window air conditioners, solar heating systems, fire sprinkler or irrigation systems, condition of underground drains, concealed systems, water treatment or softener equipment, underground utilities, playground equipment, security systems, intercom systems, stereo systems, telephone systems, telephone lines, antennas, pools, spas, saunas, leakage from shower pans or stalls, elevators, sheds or other outbuildings, recreational equipment or facilities. The home inspection is not a building code inspection. Additional items beyond the scope of the inspection are: roof not accessible by a twelve foot ladder, slippery, snow covered, brittle (including but not limited to slate or wood shingled roof) or dangerous roof; attics or crawl spaces with limited or no access; thermostat(s) and timer(s) accuracy across a range; chimney interiors; equipment that has been shut off but is still connected to utilities; equipment that has been drained, tagged or otherwise rendered inoperative; intermittently occurring problems including but not limited to leakage or seepage occurring only under unusual weather conditions. This inspection and report does not address nor does Sentry Home Inspections, LLC warrant against the

possible presence or dangers from mold, asbestos, radon gas, lead paint, urea formaldehyde, Chinese drywall, lead and/or other contaminants in drinking water, toxic or flammable chemicals electromagnetic fields, water or airborne diseases or illnesses and any other similar or potentially harmful substances. Sentry Home Inspections, LLC suggests the client contact an appropriate expert and/or government agency concerning these issues.

**Random Samples:** Certain items such as receptacles, switches, fixtures, windows, doors, hardware, screens, cabinets, countertops, mortar, masonry, paint, and caulk condition are randomly sampled for testing and inspection.

**Manufacturer Recalls:** Clients are encouraged to research home appliances, systems and components for manufacturer recalls prior to purchase of home. Sentry Home Inspections, LLC is not responsible for notifying clients of recalled appliances, systems or components.

**Re-inspection:** Re-inspection of any component or area of the dwelling due to weather restrictions, utility shut-off or any other reason is beyond the scope of this inspection. Re-inspection may be scheduled at a later time for an additional fee.

**Participation:** A Client is encouraged to participate in the inspection and do so at his/her own risk. Sentry Home Inspections, LLC assumes no liability for any personal injury, property damage, or any other damages that may result from client participation. The client assumes all responsibility for incomplete or inaccurate information for non-participation.

**Right to Enter:** The Client warrants all necessary arrangements have been made with the selling party for Sentry Home Inspections, LLC to enter and inspect the property described in this contract.

**Pre-Settlement Inspection:** The client understands that this home inspection is not a substitute for a pre-settlement walkthrough. The pre-settlement walkthrough is the responsibility of the client. The client is responsible to follow up with all recommendations as the result of this inspection and to secure the proper course of action and estimates for repairs necessary to correct any problems from specialists. The client realizes that property condition can change between this inspection and the legal acceptance of the premises. Damage may occur, equipment may fail, and signs, symptoms and indications may appear between this inspection and legal acceptance of the premises. The client waives any right to make a claim against Sentry Home Inspections, LLC if the client fails to: diligently follow up on recommendations, secure estimates and proper courses of action, and conduct a pre-settlement walkthrough inspection.

**Third Party Disclosure:** The client acknowledges that this report is for the confidential use of the client. The client consents and authorizes Sentry Home Inspections, LLC to disclose information in the report to any third party relating to the transaction. The client agrees to indemnify and hold Sentry Home Inspections, LLC harmless for any damages and/or expenses, to include attorneys fees, involved in defense of any claim made by a third party as the result of services rendered under this contract.

**Limitation of Liability:** The client agrees that Sentry Home Inspections, LLC's total liability is limited to the cost of the inspection for any mistakes, omissions or errors of any kind.

**Dispute Resolution:** Clients who feel there has been an error, omission or deficiency in the inspection or report preparation must notify Sentry Home Inspections, LLC in writing of the nature and extent of the problem within five business days of discovery and make the property available for re-inspection. Repairs, alterations, or replacement of alleged faulty or defective equipment or components prior to the notification of Sentry Home Inspections, LLC, voids the client's right to file a claim under this contract and relieves the Sentry Home Inspections, LLC of any and all liability for such claim. If either party make a claim against the other relative to this contract, the client and Sentry Home Inspections, LLC both agree to submit the dispute to the American Arbitration Association and use as a gauge of performance, the "Standards of Practice" set forth by the American Society of Home Inspectors. Arbitration will take place at the property by a qualified solicitor or attorney. Client must initiate the proceeding within one year of the date of this contract. If the client initiates and pursues a claim against Sentry Home Inspections, LLC for any alleged error, omission and/or deficiency and fails to prove the claim, the client

agrees to pay all reasonable costs, fees, legal expenses and all other costs associated with the action incurred by Sentry Home Inspections, LLC in defense of the claim.

**Severability:** If any tribunal or other legal entity having jurisdiction over such matters determines that any portion of this contract is void or unenforceable, that tribunal or legal entity shall enforce the remainder of this contract as if the unenforceable portion did not exist. The client requests that the address described above, be inspected in the manner as outlined herein.

**Payment/Credit Card/Returned Check & Late Fees:** Payment is due at time of inspection. A 5% processing fee will be charged on Visa and MasterCard transactions. A $75.00 fee will be charged for any returned check. Accounts 30 days past due will incur a monthly late fee of $35.00.

The client has read, understands and agrees to be bound by the terms of this contract or has re-negotiated them in writing. The client acknowledges that this contract is between the client and Sentry home Inspections, LLC and is limited in liability. The client is signing this contract of his/her own free will and agrees to pay the fee specified below at the conclusion of the inspection.

| Date: 4/22/2017 | Sentry Home Inspections, LLC |
|---|---|
| Inspection Fee: 690.00 | Client Signature: |

© 2011 Sentry Home Inspections, LLC. All rights reserved.

| Service | Price | Amount | Sub-Total |
|---|---|---|---|
| Condo (1700+ square feet) | 690.00 | 1 | 690.00 |

# EXHIBIT A - Part 2



# CONFIDENTIAL INSPECTION REPORT

**CLIENT:**
Karl Garcia

**PROPERTY ADDRESS:**
819 D St NE #34, Washington, DC 20002



**INSPECTOR:**
**Kevin A. Richardson, CPI**
Certified Infraspection Institute Level III Infrared Thermographer®, #7493
NACBI - Board Certified Commercial Building Inspector & Thermographer, #25685647
InterNACHI - Certified Professional Inspector®, #04091175
InterNACHI - Certified Indoor Air Consultant, #IAC2-00-3862
Maryland Licensed Home Inspector, #29727

# Table of Contents

Cover Page ......................................................................................... 1

Table of Contents .............................................................................. 2

Intro Page ........................................................................................... 3

1 General Information .......................................................................... 6

2 Vapor and Air Control Layers ......................................................... 13

3 Fenestrations and Performance ..................................................... 15

4 Heating and Cooling Performance ................................................. 23

5 Infrared Thermal Imaging (ITI) Building Survey ............................. 27

Copyright © Capital Infrared, LLC

| Date: 8/18/2017 | Time: 04:30 PM | Report ID: 20170818-KR1 |
|---|---|---|
| Property: 819 D St NE #34 Washington DC 20002 | Customer: Karl Garcia | Real Estate Professional: Not Applicable |

## Scope of Survey

This Infrared Thermal Imaging (ITI) Building Envelope Survey was performed in accordance with the **Infraspection Institutes Standard for Infrared Inspection of Building Envelopes**. This standard covers procedures for conducting infrared inspections of building envelopes for the purpose of detecting thermal patterns caused by excess energy loss, latent moisture, or structural details. It's a common document for the end user to specify infrared inspections and for the infrared Thermographer to perform them. The standard lists the joint responsibilities of the end user and the infrared Thermographer that, when carried out, will result in the safest and highest-quality inspection for both. The standard also outlines specific content for documenting the results of an infrared inspection and addresses the criteria for infrared imaging equipment, such as spatial resolution and thermal sensitivity. It addresses meteorological conditions under which infrared inspections should be performed and addresses operating procedures and operator qualifications. Lastly, the standard addresses verification of infrared data using invasive test methods.

The purpose of an infrared inspection of a building envelope is to locate and document abnormal patterns of infrared radiation from the building envelope (exceptions) that can be potential problems for the end user.

* Conductive exceptions are usually caused by insufficient, improperly installed, damaged or water-saturated insulation and/or structural components.
* Convective exceptions are usually caused by cracks and holes that permit the uncontrolled movement of air across the building envelope.

Destructive testing is necessary to verify the presence of water in the insulation. Opinions about the causes of these exceptions, the integrity of the building envelope, or recommendations for corrective actions requires skills beyond those of infrared Thermography. Infrared Thermography will be presented as a visual inspection technique to gather and present information about the system at a specific time. Providing destructive testing of any structures for verification of suspected problems is beyond the scope of infrared Thermography.

Data from infrared inspections may be used to assess the condition of a building envelope or for quality assurance inspections of new installations, repairs, or retrofits. The survey does not provide methods to determine the cause of latent moisture within a building envelope or its point of entry. It does not address the suitability of any particular material or system to function satisfactorily as waterproofing or insulation.

### Limitations (Applicability of Constructions)

Applicable constructions include insulated building sidewalls, exterior insulated finish systems (EIFS), and other building finishes which can absorb moisture. Certain construction details can preclude the detection of exceptions. Examples include, but are not limited to, stone or brick facades and walls containing dead air spaces. Some construction materials can preclude the detection of exceptions. Examples include, but are not limited to, high density materials such as brick, block, stone, spandrel glass, and metal. For materials with highly reflective surfaces in the spectral range of the infrared thermal imager, infrared inspections are not practical until the surface is naturally or temporarily dulled. The wetting rates of construction materials vary according to the type of material and environmental exposure. Details with insulations that wet slowly, such as EIFS, usually should not be inspected until they are at least three months old. Infrared inspections are not intended to identify the source of the moisture.

### Data Interpretation

The interpretation of infrared data is a process of pattern recognition for the purpose of differentiating exceptions from those caused by the following:
* Variations in the type, thickness, density, or continuity of insulation.

Copyright © Capital Infrared, LLC

- Variations in wall thickness, moisture content, or continuity.
- Variations in the type or thickness of wall surfacing.
- Variations within the building walls.
- Inconsistencies in walls due to damage, repairs, coatings, or overlays.
- Variations in temperature behind walls.
- Fasteners, flashings, flanges, or projections from walls or discontinuities within them.
- Variations in surface emittance.
- Infrared radiation from nearby sources.
- Hot or cold air from nearby sources.
- Moisture or debris on inspected surfaces.
- Variations in shape or geometry of inspected surfaces.
- Accurate interpretation of infrared data requires verification

### Verification

In order to determine the cause of exceptions, verification of infrared data must be carried out by the following invasive test methods: visual testing or moisture meter probes.

## Terminology

For the purpose of this survey,

**Building envelope**: those portions of the building that separate conditioned from unconditioned spaces.

**End user**: the person requesting infrared Thermographic inspections.

**Exception**: an abnormally warm or cool portion of a building that may be a potential problem for the end user.

**Infrared inspection**: the use of infrared imaging equipment to provide specific thermal information and related documentation about a structure, system, object or process.

**Infrared thermal imager (infrared camera)**: a camera-like device that detects, displays and records the apparent thermal patterns across a given surface.

**Infrared thermographer**: a person who is trained and qualified to use an imaging radiometer.

**Inspection window**: the time period during which infrared inspections of building envelopes can be successfully conducted.

**Moisture meter probe**: an invasive (electrical resistance or galvanometric type) test that entails the insertion of a meter probe(s) into a material to indicate the presence of moisture.

**Qualified assistant**: a person provided and authorized by the end user to perform the tasks required to assist the infrared Thermographer. He/she is knowledgeable of the operation and history of the building to be inspected and is trained in all the safety practices and rules of the end user.

**Qualitative infrared thermography**: the practice of gathering information about a structure, system, object or process by observing images of different patterns of infrared radiation, and recording and presenting that information.

**Quantitative infrared thermography**: the practice of measuring temperatures of the observed patterns of infrared radiation.

**Standard**: a set of specifications that define the purposes, scope and content of a procedure.

**Thermogram**: a recorded visual image that maps the apparent temperature pattern of an object or scene into a corresponding contrast or color pattern.

**Thermographer**: see Infrared thermographer.

Copyright © Capital Infrared, LLC

**Adverse Condition (AC):** A condition determined in accordance with the contractual scope of inspection and which is (1) producing a detrimental effect on Systems or Components and/or (2) impairing the **Normally Intended Function or Operation** of Systems or Components and/or (3) not consistent with **Generally Established Practice(s)**.

**Corrective Action:** This designates **Adverse Conditions** for which evaluation by a **Qualified** individual is recommended as soon as possible for any necessary modifications or corrective measures. If, in the process of evaluating and addressing such conditions, it is determined that there are other **Adverse Conditions** present for which modifications or corrective measures are also deemed necessary, it is recommended that they be addressed at that time. It is further recommended that a copy of the appropriate portion or portions of the inspection report be provided to all **Qualified** individuals retained to evaluate and/or perform modifications or corrective measures to address **Adverse Conditions** documented in the Report.

**Recommended Upgrade (RU):** Information regarding a System or Component which is provided solely as a courtesy to Clients for their consideration as part of any upgrading and maintenance program they may choose to implement. **Recommended Upgrade** conditions are not **Adverse Conditions**. **Recommended Upgrades** should be performed by **Qualified** personnel in accordance with all applicable industry standards and governmental requirements.

**Generally Established Practice(s):** Historically and conventionally applied method(s) and/or means of installation, assembly, operability, maintenance, and/or use.

**Inspected (IN):** The System or Component was examined and no **Adverse Conditions** were observed.

**Normally Intended Function or Operation:** The historic and conventional purpose or use for which a System or Component was installed and/or for which it was designed and intended by its manufacturer.

**Not Applicable (NA):** Indicates that the specific System or Component was not present or that examination of a specific System or Component is outside of the contractual scope of inspection.

**Not Inspected (NI):** Indicates that the specific System or Component was not evaluated because it was not **Readily accessible** or **Safely Accessible** due to weather, landscaping, personal property, pets, factors beyond the inspector's control, and/or factors beyond the contractual scope of inspection. When the Report indicates that a specific System or Component could not be evaluated, the Report will also indicate the specific reason(s).

**Qualified:** Having the training, skills, expertise, and experience necessary to competently address the referenced condition(s) and, where required, holding all applicable licenses, and meeting all applicable governmental requirements.

**Note:** Potential costs which may be associated with additional evaluation of an **Adverse Conditions** or with any modifications or corrective measures which may be deemed necessary to address an **Adverse Condition** are not factors and are not considered by the inspector when recommending a **Corrective Action** designation for any **Adverse Condition**.

## Property Data and Information

| Property Type: | Property Status: | Property Size (Approximate): |
|---|---|---|
| Condominium | Occupied | Under 2000 Square Feet |

| Property Age (Approximate): | Precipitation in Past Three Days: | Ground/Soil Surface Condition: |
|---|---|---|
| 0-5 Years | Yes | Wet |
| Year Built : 2016 (renovated) | | |

Copyright © Capital Infrared, LLC

## 1. General Information

## Property Data and Information

**Standard of Practice:**
Standard for Infrared Inspection of
Building Envelopes

**Lead
Thermographer:**
Kevin Richardson

**Thermographer's Certification
Level:**
Level III Certified Infrared
Thermographer, ID #7493

**Qualified Assistant:**
Not Applicable

**Equipment:**
FLIR SYSTEMS
ThermaCAM T400
Seek Thermal
CompactPRO

**Field of View (FOV):**
40x40 degrees (wide angle)
32 Degrees

**Emissivity:**
1.00 (qualitative)

**Outside Air
Temperature:**
85-90 Deg F

**Indoor Air Temperature:**
70-75 Deg F

**Delta-T:**
15-20 Deg F

**Building
Pressurization:**
Natural Ventilation

**Sky Conditions:**
Cloudy

**Wind Speed:**
10 to 15 MPH

**Relative Humidity:**
65 - 70 %

**Dew Point:**
70 - 75 Deg F

## Items, Systems, and Components

### 1.0 Purpose of Survey

General Comments

Primary purpose of conducting building envelope survey: **Energy Loss and Latent Moisture**

Infrared inspections may be conducted to detect evidence of excess energy loss due to missing, damaged or misapplied insulation or air leakage. Infrared inspections may be conducted from the exterior and/or the interior of a building; however, inspections performed from the interior are generally more helpful in diagnosing performance issues associated with occupant comfort.

Infrared inspections may be conducted to detect evidence of latent moisture within building materials. Infrared inspections may be conducted from the exterior and/or the interior of a building. Vantage point should be selected to provide the greatest probability of detection. Inspection Procedures With help from the end user or the end user's representative, the thermographer will define the areas to be inspected. Latent moisture generally causes a change in the thermal capacitance and/or thermal conductivity of building materials. Moisture evaporating from a surface will generally cause a pronounced cooling in the wet areas.

Infrared inspections to detect latent moisture shall be conducted when conditions are most favorable for gathering accurate data. Inspections conducted from the exterior of the building should be performed post sunset following a sunny day with calm wind conditions. Exceptions associated with latent moisture will generally appear warm. Inspections conducted from the interior of the building may be performed during daytime hours provided that solar loading of exterior walls is not significant. Exceptions associated with latent moisture may appear as warm or cold, depending upon environmental conditions.

The infrared inspection shall be conducted in an organized fashion to ensure complete coverage of all areas of interest. Items to be inspected shall include walls, windows, and doors. For interior inspections, floors and ceilings should be included as well. Detected exceptions should be documented with a thermogram and daylight photograph. These may be substituted by marking the location and size of

Copyright © Capital Infrared, LLC

exceptions on blueprints or drawings. For large structures, recording thermal imagery to videotape can provide a dynamic record of the infrared inspection. Detected exceptions should be verified by independent means. This may include visual confirmation or the use of invasive testing such as moisture meter probes.

## 1.1 Inspection Limitations

General Comments

When this report notes any condition which indicates the past or current presence of moisture, active leaks, or the potential for moisture intrusion including but not limited to any of the conditions listed below, it is important to understand that these conditions may contribute to the creation of environments which have the potential to support bio-organic growth such as mold and mildew. However, the presence of any of such conditions **DOES NOT** necessarily indicate that mold or mildew **IS OR IS NOT** present at the subject property.

* Visible rot, damage, or staining consistent with the presence of moisture on or in any interior or exterior building component
* The presence of moisture (whether in the form of dampness, condensation, or standing water) on interior or exterior building surfaces or components, in soil adjacent to the building, in under building crawlspaces, or in attic spaces
* The presence of staining which is consistent with past or present moisture on any interior or exterior surfaces or components
* Damaged, loose, or missing exterior surface moisture collection and discharge system components
* Flat or negative exterior site grading, planter boxes or other moisture trapping construction or areas adjacent to the foundation perimeter
* Flat or negatively sloped concrete flatwork; pavers, flagstone, or other water-impervious material flatwork; or paving; adjacent to the foundation perimeter
* Leaking, damaged, or improperly assembled potable water piping or fittings
* Damage to or mineral encrustation, rust, or moisture staining on water heaters, boilers or their related components
* Mineral encrustation, rust, or moisture staining on potable water supply or distribution piping, fittings, or related components
* Leaking, damaged, or improperly assembled plumbing drain, waste and venting piping or fittings
* Mineral encrustation, rust, or moisture staining on plumbing drain, waste, and venting piping, fittings, or related components
* Damaged, loose, or improperly installed plumbing fixtures
* Damaged, improper, or missing seals at plumbing fixtures, fixture trim, or fixture enclosures
* Damaged, loose, or missing bathtub enclosure or shower enclosure components
* Improper or missing roof, penetration, exterior wall, opening, deck, foundation, or other flashings
* Rust, staining, or mineral encrustation on air handling system components, air-conditioner condensate collection and discharge system components, or on evaporative cooling system components
* Damaged, missing, or improperly installed or assembled air-conditioning system condensate collection or discharge components or evaporative cooling system cabinet, reservoir, water supply or overflow components
* The presence of central humidification systems which are attached to the conditioned air distribution ductwork, to air handlers, or to central heating plants/furnaces; rust, mineral encrustations, or moisture staining on such systems; or damaged or loose permanently attached central humidifiers
* The presence of evaporative cooling equipment and evaporative cooling system air distribution ductwork
* Damaged, missing or improperly installed or assembled combustion by product venting system components serving natural gas-fired, liquefied petroleum gas-fired, or oil-fired components
* Damaged, obstructed, loose, missing, or improperly assembled or installed clothes dryer venting components
* Damaged, loose, missing, or improperly assembled or installed bathroom, laundry area, or kitchen ventilation fan duct system components
* Damaged, missing, or improperly installed roof covering materials

Copyright © Capital Infrared, LLC

* Improper or missing ventilation or vapor retarders in walls, floors, attic areas or under building crawlspaces
* Standing water in subsurface water collection sump pits.

This information is intended only as a guide. The scope of this inspection and report and the standards in accordance with which this inspection is conducted specifically exclude determining the presence or absence of any hazardous substance. This includes, but is not limited to, determining, testing for, and/or reporting on the presence or absence of any exposed or contained airborne, waterborne or surfaceborne environmental hazards or toxic, harmful, irritating, or dangerous chemicals or substances; mold, mildew or other bio-organic growth or bio-hazards; allergens, irritants, bacteria, viruses, fungi, mycotoxins, or other pathogens; animal excretions, dangerous, damaging, or poisonous animals or insects; toxic flora, gases including radon gas and formaldehyde gas; asbestos, lead in paint or any other products; urea formaldehyde foam insulation, petrochemicals, volatile organic substances or pesticides.

Therefore, if you have any concerns regarding any environmental or wildlife issues and/or desire to obtain information regarding the presence or absence of any environmental hazards or toxic or dangerous substances at the subject property, it is recommended that you retain the services of qualified individuals or companies specializing in the area or areas of your specific concern.

## 1.2 General Information about Infrared Thermal Imaging (ITI)

General Comments

### (1) What is Infrared Thermal Imaging?

Once only the domain of military, science and space programs, Infrared Thermal Imaging (ITI) has made its way into the industrial and commercial sector. Founded on the exact same technologies as used by advanced military aircraft, weather satellites and even the space shuttle, ITI technology for home inspections provide our inspectors with a view of your property like no other. With ITI technology, we can see beyond the spectrum of "natural light" (which is the light that bounces off all objects we can see under the sun or under a light bulb), and measure the temperature variances of any surface to determine where heat, cold, moisture and and possible fungi growth can be occurring in undesirable places.

Because everything has a surface temperature, ITI technology allows us to see the variances in those surface temperatures. The variances are represented by different color tones with the color black representing the coldest temperatures and the color white representing the hottest temperatures. Any color in the red, orange and yellow hues represents warmth while colors in the green, purple and blue hues represents cooler temperatures. However, the Inspector may change the color pallette for any or all of the thermal images in the Report. The color pallette selected does not change the item, system, or component being scanned, but can enhance or sharpen the temperature variances.

### Why is Infrared Thermal Imaging vital to your home inspection?

As human beings, we are limited to seeing light only in the visible spectrum called white light. This is the light that bounces off everyday objects whether that light is being emitted by our Sun or an artificial source such as a light bulb. Without assistance from technology, we are unable to see surface temperature variances, and it is the ability to see these variances that allows us to more-accurately identify potential, and immediate, problems in your home that would have otherwise been missed. The unique aspect of seeing surface temperature variances is that such variances can be caused by issues that may lie below the surface of a floor, behind a wall, or above a ceiling - places that are "out of sight" and are thus out-of-mind. Also, surface temperature variances can be caused by airflow such as cold air seeping under a door or warm air leaking from central air ducts. The air itself changes the surface temperature of objects that come in contact with the air. Surface temperatures can also be changed by living organisms such as fungi growth, mildew and household pests. Because these organisms often thrive in places that cannot be seen by the naked eye (such as behind walls), the use of ITI technology allows us to pinpoint exactly where a "potential" problem area may be occurring without the need for any immediate invasive damage to the structure of your home.

Finally, thermal imaging technology allows us to more-accurately identify damage to your home's

electrical systems. By being able to pinpoint "hot spots" in fuse boxes, electrical panels, and household wiring, we can provide you and your electrician with detailed imagery that will help the electrician to identify defects and make repairs more quickly to save you money. In short, ITI technology is purposefully designed to provide you with a level of service that increases the speed by which many household problems can be identified, reduces the collateral damage required to fix those problems, increases the accuracy rate of correctly identifying problems, and helps you to catch small problems sooner so that they don't become expensive or unmanageable problems that can affect your family's health or your financial well-being.

(2) Once only the domain of military, science and space programs, Infrared Thermal Imaging (ITI) has made its way into the residential and commercial sectors. Founded on the exact same technologies as used by advanced military aircraft, weather satellites and even the space shuttle, ITI technology for building inspections provide our Inspectors with a view of your property like no other. With ITI technology, we can see beyond the spectrum of "natural light" (which is the light that bounces off all objects we can see under the sun or under a light bulb), and see the thermal patterns associated with temperature variances of any surface to determine where heat, cold, and moisture can be occurring in undesirable places.

## Infrared Thermal Imaging (ITI) - Seeing Beyond the Visual™

Infrared Thermal Imaging (ITI) is the technique that uses an infrared imaging radiometer to "see" and "measure" invisible infrared energy being emitted from an object. Thermal, or infrared energy is energy not visible because its wavelength is too long for the sensors in our eyes to detect. It is the part of the electromagnetic spectrum that we perceive as heat. Unlike visible light, in the infrared spectrum, everything with a temperature above absolute zero emits infrared electromagnetic energy. Even cold objects such as ice cubes, emit infrared radiation. The higher the temperature of the object, the greater the infrared radiation emitted. An infrared camera allows us to see what our eyes cannot!

All objects, cold or hot, radiate heat in the form of infrared energy. As an object increases in temperature, it radiates more energy, and the wavelength gets shorter. Infrared radiation, visible light and ultraviolet light are all forms of energy in the electromagnetic spectrum. The only difference is their wavelength or frequency.

The human eye can only see a narrow range of wavelength in the electromagnetic spectrum. These wavelengths range in length from 0.4 to 0.7 microns; a micron is one millionth of a meter. Most of what the eye sees is reflections from objects that high energy from the sun or an incandescent light bulb is striking. If the temperature of an object gets hot enough however, above 525°C, the energy from that object will radiate energy in the visible spectrum and we will see it. This is when we see an object like the burner on an electric stove "glowing" red. In fact, any time an object will emit or reflect energy in the same frequency of our eyes we will see it. Mostly, however we see reflections!

## Infrared Surveys Are Simple, Right?

Taking thermal images and gathering thermal information is quite easy, just push the auto button on an infrared camera and there's an image! However, this may seem simple on the surface, but it's not as easy as it sounds. The real work - and value - is what the Thermographer understands about the object of interest, how it operates, the heat transfer within and to the surface of the object, how to adjust the camera to enhance the thermal details necessary to evaluate the image once it is stored and downloaded onto a computer. Then prepare a report that is accurate, clearly presented and is easy to read by the customer, who generally does not know anything about Infrared Thermal Imaging.

## 1.3 Energy Performance and General Information
### General Comments

During the **ITI Building Envelope Survey** we consider the numerous factors that influence the buildings environment. An area of particular interest is improving the energy efficiency of the building. This involves evaluating the buildings thermal control layer. The thermal control layer consists of both the vapor and air

Copyright © Capital Infrared, LLC

control layers. Both of these elements should occur at the same location to create an effective building envelope. However, the **ITI Building Envelope Survey** is **NOT** a full **Building Energy Performance Audit**. Any comments made by the Thermographer, both during the Inspection and in the written Report, regarding recommendations for energy improvements, energy conservation measures, or recommended upgrades pertaining to energy performance, should be further evaluated or tested by a Qualified Building Energy Performance Contractor. It's recommended that you conduct a full Building Energy Performance Audit **before** making any energy improvements or recommendations in this Report.

IMPORTANT: When fuel burning appliances are present in the building, a Combustion Appliance Safety test must be performed before undergoing measures to Air Seal the building's enclosure. These tests may recommend repairs to combustible appliances.

Buildings with appliances that burn fuel (fireplaces, gas water heaters, furnaces etc.) can easily backdraft and could pose a health and life threatening risk to the occupants in certain common scenarios. Sometimes simply by turning on a whole house fan or the combination of bath exhaust fans, the air handler, clothes dryer, can create negative pressure in the room of these appliances and cause the toxic flue gases to be pulled down the flue pipe and spill into the room. This can pose a life threatening situation and should be taken seriously. Even wood burning fireplaces that back up smoke into a room sometimes is not because of the "design" of the fireplace as many point to, but instead could be from a nearby kitchen range hood creating negative pressure. Or, other appliances that come on in the building that has a fan (exhaust fans, dryer, air handler, leaky ducts that create pressure imbalances etc.).

A CAZ test or "Combustion Appliance Zone" test involves a technical process where a BPI (Building Performance Institute) Certified Building Analyst conducts a "worse case depressurization" test trying to make the combustion appliance venting fail measuring with a manometer, combustion analyzer and standards of testing. This test should be performed on any building with the above conditions for the well being of the occupants, and **MUST** be performed before and after any **Air Sealing**. A preliminary and post-installation safety inspection of all combustion appliances must be completed whenever changes to the Building Enclosure and/or heating system are part of the work scope. This type of survey typically includes all of the following tests: Carbon Monoxide (CO) measurement at each appliance, draft measurement and spillage evaluation for atmospherically vented appliances, and worst-case negative pressure measurement for each combustion appliance zone (CAZ).

Building Performance is the belief that buildings can and should be made safe, comfortable, durable, and energy-efficient. Having a Certified Building Analyst measure, calculate, and analyze a building, allows them to better understand the way your specific structure works and operates in order to recommend the best way to improve it without off-setting the balance of how it effects you. Ask an insulation contractor, a heating tech, and a window salesperson the best way to warm up a cold room, and you may get three different answers. But a building performance contractor takes a whole-building perspective to assess the problem's causes and propose the most effective solution. Understanding the "building as a system" also allows building performance contractors to solve problems like chimney back-drafting that arise from interactions between the building's shell and mechanical systems.

Building Analysts use a diagnostic approach to problem solving. Experience and observation, coupled with pressure diagnostics, infrared imaging, and combustion analysis, allow them to diagnose and correct the most challenging building performance problems. The difference between an average building and a high-performance building often comes down to a contractor's willingness to "sweat the small stuff" that the customer never sees like air sealing, insulation, and ductwork. The core concept is an emphasis on measurable results from performance testing. Performance testing also assures the customer that they have a safe, comfortable, durable, and efficient building when the work is completed. "If you don't test, you don't know."

## 1.4 General Information about Moisture Related Problems

General Comments

Copyright © Capital Infrared, LLC

Moisture intrusion can be the cause of building defects, as well as health ailments for the building's occupants.

Some common moisture-related problems include:

- structural wood decay;
- high indoor humidity and resulting condensation;
- expansive soil, which may crack the foundation through changes in volume, or softened soil, which may lose its ability to support an overlying structure;
- undermined foundations;
- metal corrosion;
- ice dams; and
- mold growth. Mold can only grow in the presence of high levels of moisture. People who suffer from the following conditions can be seriously (even fatally) harmed if exposed to elevated levels of airborne mold spores: asthma; allergies; lung disease; and/or compromised immune systems.

Note: People who do not suffer from these ailments may still be harmed by elevated levels of airborne mold spores.

How does moisture get into the house?

Moisture or water vapor moves into a house in the following ways:

- air infiltration. Air movement accounts for more than 98% of all water vapor movement in building cavities. Air naturally moves from high-pressure areas to lower ones by the easiest path possible, such as a hole or crack in the building envelope. Moisture transfer by air currents is very fast (in the range of several hundred cubic feet of air per minute). Replacement air will infiltrate through the building envelope unless unintended air paths are carefully and permanently sealed;
- by diffusion through building material. Most building materials slow moisture diffusion, to a large degree, although they never stop it completely;
- leaks from roof;
- plumbing leaks;
- flooding, which can be caused by seepage from runoff or rising ground water; it may be seasonal or catastrophic; and
- human activities, including bathing, cooking, dish washing and washing clothes. Indoor plants, too, may be a significant source of high levels of humidity.

Climate Zones

In the northern U.S., moisture vapor problems are driven primarily by high indoor relative humidity levels, combined with low outdoor temperatures during the winter. In the southern U.S. (especially the southeast), the problem is largely driven by high outdoor humidity and low indoor temperatures during summer months. Mixed climates are exposed to both conditions and can experience both types of problems. Humid climates, in general, will be more of a problem than dry climates. Wind-driven rain is the main cause of leaks through the building envelope.

Inspectors can check for moisture intrusion in the following areas:

Roofs

A roof leak may lead to the growth of visible mold colonies in the attic that can grow unnoticed. Roof penetrations increase the likelihood of water leaks due to failed gaskets, sealants and flashing. The number of roof penetrations may be reduced by a variety of technologies and strategies, including:

- consolidation of vent stacks below the roof;
- exhaust fan caps routed through walls instead of the roof;
- high-efficiency combustion appliances, which can be sidewall-vented;
- electrically powered HVAC equipment and hot water heaters that do not require flue; and

Copyright © Capital Infrared, LLC

* adequate flashing. Oftentimes, inspectors discover missing, incorrectly installed or corroded flashing pipes.

### Plumbing

* Distribution pipes and plumbing fixtures can be the source of large amounts of moisture intrusion. If the wall is moist and/or discolored, then moisture damage is already in progress. Most plumbing is hidden in the walls, so serious problems can begin unnoticed.
* One of the most important means of moisture management in the bathroom is the exhaust fan. A non-functioning exhaust fan overloads the bathroom with damp air. If the exhaust fan doesn't turn on automatically when the bathroom is in use, consider recommending switching the wiring or switch. The lack of an exhaust fan should be called out in the inspection report. The fan should vent into the exterior, not into the attic.
* The bathroom sink, in particular, is a common source of moisture intrusion and damage. Although overflow drains can prevent the spillage of water onto the floor, they can become corroded and allow water to enter the cabinet.
* Use a moisture meter to check for elevated moisture levels in the sub-floor around the toilet and tub.
* Bathroom windows need to perform properly in a wide range of humidity and temperature conditions. Check to see if there are any obvious breaks in the weatherstripping and seals. Are there are stains or flaking on the painted surfaces?
* Check showers and bathtubs. Is the caulking is cracked, stiff or loose in spots? Are there cracked tiles or missing grout that may channel water to vulnerable areas? If some water remains in the bathtub after draining, it may be a warning sign of possible structural weakening and settlement in the floor beneath the tub.

### Utility Room

* The water heater tank should be clean and rust-free.
* The area around the water softener tank should be clean and dry.
* Check that all through-the-wall penetrations for fuel lines, ducts, and electrical systems of heating system are well-sealed. All ducts should be clean and dust-free. Inspect the air supply registers in the house for dust accumulation.
* Filters, supply lines, exterior wall penetrations, vents, ductwork and drainage of the cooling system must all be in good working order to avoid moisture problems.

### Attic

* Look for stains or discolorations at all roof penetrations. Chimneys, plumbing vents and skylight wells are common places where moisture may pass through the roof. Any such locations must be inspected for wetness, a musty smell and/or visible signs of mold.
* Are there areas of the insulation that appear unusually thin?
* Rust or corrosion around recessed lights are signs of a potential electrical hazard.

### Foundations

* Model building codes typically require damp-proofing of foundation walls. The damp-proofing shall be applied from the top of the footing to the finished grade. Parging of foundation walls should be damp-proofed in one of the following ways:
* bituminous coating;
* 3 pounds per square yard of acrylic modified cement;
* 1/8-inch coat of surface-bonding cement; or
* any material permitted for water-proofing.

In summary, moisture can enter a building in a number of different ways. High levels of moisture can cause building defects and health ailments.

Copyright © Capital Infrared, LLC

## 2. Vapor and Air Control Layers

**Air Control layer:** The interior ceilings, walls, and floors. These are materials or an assembly of materials that control airflow between a conditioned space and an unconditioned space or between units in multi-family and apartment construction.

**Vapor Control Layer:** The component (or components) that is (or are) designed and installed in an assembly to control the movement of water by vapor diffusion. The Thermographer observes these areas looking for durability issues that may contribute or lead to moisture intrusion or affect energy performance.

## Property Data and Information

**Ceiling Materials:**
Sheetrock

**Wall Material:**
Sheetrock

## Items, Systems, and Components

### 2.0 Ceilings (as an Air Control Layer)

Adverse Condition

See comments under Section 4.

### 2.1 Walls (as an Air Control Layer)

Adverse Condition

(1) A section of the exterior wall assembly adjacent to the air handler is not properly insulated. This not in accordance with **Generally Established Practices**. Thermal insulation in buildings is an important factor to achieving thermal comfort for its occupants. Insulation reduces unwanted heat loss or gain and can decrease the energy demands of heating and cooling systems. Missing or mis-applied insulation inside a wall cavity can also cause convective loops to occur, which in turn, will increase the potential for condensation to form either on the interior wall surface or inside the wall cavity. Convective loop heat losses occur where heat is conducted from the building interior into an enclosed space within the thermal envelope and is then transferred convectively through the thermal envelope. Recommend **Corrective Action** by a **Qualified** Insulation Contractor.

 

Behind return duct

Copyright © Capital Infrared, LLC

(2) A section of the brick wall at the master bedroom shows evidence or previous or current water intrusion (latent moisture). Recommend **Corrective Action** by a **Qualified** Contractor.



Copyright © Capital Infrared, LLC

Page 14 of 31

## 3 Fenestrations and Performance

## Property Data and Information

**Window Type:**
Single Pane
Stained Glass

**Glazing Type:**
N/A

**Frame Material:**
Wood
Metal

## Items, Systems, and Components

### 3.0 Understanding Windows

General Comments

**Benefits of Energy Efficient Windows:**

The purpose for windows is to provide natural light, natural ventilation, and views to the outside. The benefits of high performance windows allows for Energy & Cost Savings, Improved Comfort, Less Condensation, Increased Light & View, Reduced Fading, and Lower HVAC Costs.

**Design Considerations:**

Windows are a complex and interesting element in residential design. New window products and technologies have changed the performance of windows in a radical way. Issues such as climate, orientation, shading, and window area all effect the energy performance, but human factor issues such as access to fresh air, daylight, and natural views impact the comfort of a home.

**Measuring Performance:**

Heat flows through a window assembly in three ways: conduction, convection and radiation. When these basic mechanisms of heat transfer are applied to the performance of windows, they interact in complex ways. Three energy performance characteristics of windows are used to portray how energy is transferred and are the basis for how energy performance is quantified.

Insulating value. When there is a temperature difference between inside and outside, heat is lost or gained through the window frame and glazing by the combined effects of conduction, convection, and radiation. This is indicated in terms of the U-factor of a window assembly.

Heat gain from solar radiation. Regardless of outside temperature, heat can be gained through windows by direct or indirect solar radiation. The ability to control this heat gain through windows is measured in terms of the Solar Heat Gain Coefficient (SHGC) of the window.

Infiltration. Heat loss and gain also occur by Air Leakage through cracks in the window assembly. This effect is measured in terms of the amount of air (cubic feet or cubic meters per minute) that passes through a unit area of window (square foot or square meter) under given pressure conditions. In reality, infiltration varies slightly with wind-driven and temperature-driven pressure changes.

Visible Transmittance is the amount of light in the visible portion of the spectrum that passes through a glazing material. This property does not directly affect heating and cooling loads in a building, but it is an important factor in evaluating energy-efficient windows.

Both the National Fenestration Rating Council (NFRC) and the American Architectural Manufacturers Association (AAMA) have developed systems for rating the condensation resistance of fenestration products. AAMA gives a dimensionless rating, the Condensation Resistance Factor (CRF), ranging from 30

Copyright © Capital Infrared, LLC

to 80 and is based on a physical test. NFRC determines Condensation Resistance (CR) ranging from 1 to 100 and is based on computer simulation. There is no correlation between CRF and CR.

## 3.1 Window Performance Definitions

General Comments

**U-factor (U-value):**

The rate of heat loss is indicated in terms of the U-factor (U-value) of a window assembly. The lower the U-factor, the greater a window's resistance to heat flow and the better its insulating properties. The nationally recognized rating method by the National Fenestration Rating Council (NFRC) is for the whole window, including glazing, frame and spacers. Center-of-glass U-factor is also sometimes referenced, and describes the performance of the glazing alone without the effects of the frame. For most energy efficient windows, the whole window U-factor is higher than the center-of-glass U-factor. High-performance double-pane windows can have U-factors of 0.30 or lower, while some triple-pane windows can achieve U-factors as low as 0.15. Low U-factors are most important in heating dominated climates, although they are also beneficial in cooling dominated climates.

**Solar Heat Gain Coefficient (SHGC):**

The SHGC is the fraction of incident solar radiation admitted through a window, both directly transmitted and absorbed and subsequently released inward. SHGC is expressed as a number between 0 and 1. The lower a window's solar heat gain coefficient, the less solar heat it transmits. The nationally recognized rating method by the National Fenestration Rating Council (NFRC) is for the whole window, including the effects of the frame. Alternately, the center-of-glass SHGC is sometimes referenced, which describes the effect of the glazing alone. Whole window SHGC is lower than glass-only SHGC, and is generally below 0.8.

**Visible Transmittance (VT):**

The visible transmittance (VT) is an optical property that indicates the fraction of visible light transmitted through the window. This is separate from the Solar Heat Gain Coefficient (SHGC), since many modern windows include spectrally selective coatings that can allow different amounts of visible, infrared and ultraviolet light. The NFRC's VT is a whole window rating and includes the impact of the frame area. Since the frame does not transmit any light, the VT may be lower than expected; however, this is done to be consistent with the whole window ratings of U-factor and SHGC. While VT theoretically varies between 0 and 1, most values among double- and triple-pane windows are between 0.30 and 0.70. The higher the VT, the more light is transmitted. A high VT is desirable to maximize daylight.

**Air Leakage (AL):**

Heat loss and gain occur by infiltration through cracks in the window assembly. It is indicated by an air leakage rating (AL) expressed as the equivalent cubic feet of air passing through a square foot of window area. The lower the AL, the less air will pass through cracks in the window assembly. At this time, the AL is optional among NFRC ratings. For code compliance purposes, however, air infiltration is often tested in accordance with the North American Fenestration Standard (NAFS), which produces similar results to the NFRC air leakage rating. Select windows with an AL of 0.30 or less (units are cfm/sq ft).

**Condensation Resistance (CR):**

CR measures how well a window resists the formation of condensation on the inside surface. CR is expressed as a number between 1 and 100. The rating value is based on interior surface temperatures at 30%, 50%, and 70% indoor relative humidity for a given outside air temperature of 0° Fahrenheit under 15 mph wind conditions. The higher the number, the better a product is able to resist condensation. CR is meant to compare products and their potential for condensation formation. CR is an optional rating on the NFRC label.

**National Fenestration Rating Council (NFRC):**

The National Fenestration Rating Council (NFRC) is a nonprofit, public/private organization created by the window, door, and skylight industry. It is composed of manufacturers, suppliers, code officials, researchers, and government agencies. The NFRC has developed a fenestration energy rating system based on certified whole product performance. All major standards and programs for window energy

Copyright © Capital Infrared, LLC

efficiency - including building energy codes, tax credits and utility incentives, ENERGY STAR, and others - base their criteria on certified ratings by the National Fenestration Rating Council (NFRC). To ensure that their products are recognized, manufacturers must therefore participate in the NFRC certification and labeling program.

The NFRC Label:

The NFRC label provides the only reliable way to determine the window energy properties and to compare products. The NFRC label appears on all products certified to the NFRC standards and on all window, door, and skylight products which are part of the ENERGY STAR program. At this time, NFRC labels on window units give ratings for U-factor, Solar Heat Gain Coefficient (SHGC), Visible Light Transmittance (VT), and optionally Air Leakage (AL) and Condensation Resistance (CR) ratings.

ENERGY STAR:

The Department of Energy (DOE) and the Environmental Protection Agency (EPA) have developed an ENERGY STAR designation for products meeting certain energy performance criteria. Windows that have the ENERGY STAR designation will be labeled showing the zones in which it is qualified. Since energy efficient performance of windows, doors, and skylights varies by climate, product recommendations are given for four U.S. climate zones. For making comparisons among ENERGY STAR products, use the NFRC label or the NFRC Certified Products Directory.

## 3.2 Visual Inspection of Windows

Recommended Upgrade, Adverse Condition

(1) Many of the windows throughout the home have periodic condensation forming on the interior glass. The thermal images below depict heat gain from the single lites of glass. Condensation is typically the result of high humidity levels in your home. Air with high humidity holds water vapor until it comes into contact with a surface temperature less than or equal to the dew point (the temperature at which air becomes saturated and produces dew). Because glass surfaces are usually the coldest part of the home, condensation appears on windows first, generally in the form of water droplets or frost on the room side of your window. As interior air becomes drier or as the glass surface becomes warmer, condensation begins to dissipate. However, low temperatures in the edge-of-glass region increases the potential for condensation, which, in turn, can lead to fungi growth and deterioration of window frames, window seals, and wall sections, especially in cold weather. Therefore, it is critical that the indoor humidity levels are controlled and maintained. All of the windows throughout the home a fixed - single pain (one lite of glass). I recommend consulting with a window specialist with respect to either replacing the windows with more modern (double pane) windows or installing interior storm windows. Recommend **Corrective Action** by a **Qualified** Contractor.

### Understanding Condensation

Whenever there is excess humidity in a home, it manifests itself in the form of condensation on the coldest area of a wall, which is normally the windows. The warmer the air, the more moisture it will retain, so when air in your home comes in contact with the colder glass surface, it is subsequently cooled and moisture is released in the form of condensation on the glass.

Condensation often forms at the meeting rail and at the bottom of the lower sash on the interior of the glass. This is because when warm air cools, it falls down across the interior surface of the window at the same time the temperature of the air is falling. The air contacts the horizontal surface of the meeting rail, which acts like a dam, slowing the air's rate of fall and creating the perfect opportunity for the trapped water vapor to escape and form on the meeting rail's surface. The air then rolls over the edge of the meeting rail and again gains speed until it encounters the lower handle of the sash. At this point, the water vapor again makes its exit and lies at the bottom of the sash.

In order to reduce condensation, humidity must be controlled and air movement must be generated. As the exterior temperature drops, the humidity level needs to decrease if condensation is to be controlled. I recommend working with your HVAC Contractor to help with controlling the humidity inside the home. The two main things you can do are to control sources of moisture and increase ventilation. The majority of the condensation that I observed were on the windows inside your bathrooms.

### To decrease or control excess humidity and condensation:

* Use exhaust fans in your kitchen, laundry and bathrooms. Make sure you run the exhaust fans in the bathrooms 15 minutes after each shower.
* Open window coverings and make sure interior doors are left open.
* Create more air circulation on the inside of the windows by opening privacy blinds and window treatments.
* Shut-off furnace humidifiers and other humidifying devices in your home or work with your HVAC Contractor to come up with controlled or optimal usage.
* Air out your house a few minutes each day (if weather permits).

Copyright © Capital Infrared, LLC



Copyright © Capital Infrared, LLC

Copyright © Capital Infrared, LLC



(2) Sections of the single pane window at the living room show evidence or previous or current water intrusion. Recommend **Corrective Action** by a **Qualified** Contractor.



Copyright © Capital Infrared, LLC

Page 22 of 31

## 4. Heating and Cooling Performance

### Property Data and Information

**Heat Type:**
Heat Pump Forced Air (also provides cool air)

**Heat Energy Source:**
Electric

**Number of Heat Systems (excluding wood):**
One

**Cooling Equipment Type:**
Heat Pump Forced Air (also provides warm air)

**Cooling Equipment Energy Source:**
Electricity

**Number of AC Only Units:**
One

### Items, Systems, and Components

#### 4.0 Cooling Performance
Adverse Condition

(1) See comments under Section 4.1 and 4.2.

(2) The front cover for the air handler on the main level (utility closet) is loose and needs to be properly secured. The upper right screw is stripped and needs repair. Recommend **Corrective Action** by a **Qualified** HVAC Contractor.

 

#### 4.1 Filter Effectiveness
Adverse Condition

Copyright © Capital Infrared, LLC

The filter on the return duct on the main level (utility closet) is open and there are sections of the exterior wall (building envelope) that are not properly insulated or air sealed (thermal boundary). This will increase the potential for the blower fan to pull unconditioned and polluted air from building envelope. The warm air from the exterior could be pulled into the supply air stream. This will contribute to dirty or contaminated ducts and reduced energy performance. Also see comments under Section 2.0. Recommend **Corrective Action** by a **Qualified** HVAC Contractor.



### 4.2 Distribution Systems (including fans, pumps, ducts and piping, with supports, insulation, registers, radiators, fan coil units and convectors)

Recommended Upgrade, Adverse Condition

(1) It is suspected that some amount of air stratification is occurring throughout the home. The infrared images below depict air stratification on the main level. Home owners often complain of uneven levels of comfort between the different floors of their homes. Depending on the prevailing winds and outdoor weather conditions, the temperature differential between the lower and upper levels of a building can vary by as much as 20 degrees. When stratification is at its worse, it's not uncommon to have a temperature differential of 10 to 20 degrees in the same room. The primary cause of this condition is a naturally occurring process called "air stratification." While the physics behind this issue can be complex, air stratification is a basic layering effect that allows large air pockets with different core temperatures to remain intact, regardless of whether the building's central HVAC system is running. Recommend **Corrective Action** by a **Qualified** HVAC or Insulation Contractor.

Air stratification results from the influence of buoyancy and the stack effect. Stack effect is the movement of air into and out of buildings, chimneys, flue gas stacks, or other containers, resulting from air buoyancy. Buoyancy occurs due to a difference in indoor-to-outdoor air density resulting from temperature and moisture differences. The result is either a positive or negative buoyancy force. The greater the thermal difference and the height of the structure, the greater the buoyancy force, and thus the stack effect.

Since buildings are not totally sealed, the stack effect will cause air infiltration. During the heating season, the warmer indoor air rises up through the building and escapes at the top either through open windows, ventilation openings, or unintentional holes in ceilings, like ceiling fans and recessed lights. The rising warm air reduces the pressure in the base of the building, drawing cold air in through either open doors, windows, or other openings and leakage. During the cooling season, the stack effect is reversed, but is typically weaker due to lower temperature differences.

#### Air Movement Strategies and Solutions

The airflow issues associated with multi-level homes usually originate with a poor duct design and improper equipment selection. There are a variety of strategies that can be used to counter the effects of air stratification and restore acceptable levels of comfort to every floor in the building.

- *Repair or Replace the Ductwork*: Qualified HVAC contractors should design and install a duct system in accordance with ACCA Manual D standards. These calculations account for the unique

characteristics of the building and each individual room. Proper design accounts for the differences in ambient temperatures of buildings with multiple levels. If this important step is not completed prior to the installation of the equipment, then costly retrofits might be necessary.

* _Return Air Grilles_: Return air grilles play an important role in providing a clear pathway for indoor air to return to the equipment for conditioning. Reducing the size of a central return air grille may save on installation costs, but it can restrict the airflow and also contribute to nuisance air noise. Adding additional return air pathways can be extremely effective in reducing stale air pockets and equalizing the temperature throughout the building.

* _Duct and Envelope Sealing_: Ductwork leaks and loose building envelopes create a negative pressure that intensifies the effects of air stratification. As the unit draws outdoor air into the system, the capacity of the HVAC equipment is compromised. The indoor air temperature will tend to move in the opposite direction of the thermostat setting, and the system will continuously cycle in a futile attempt to meet the indoor load. Duct and perimeter sealing will improve efficiency, promote proper air mixture and help maintain a consistent temperature throughout the building.

* _Zoning_: Dedicated systems can be installed for each level, but this is often a cost prohibitive solution. Mechanical zoning relies on a single HVAC system and a network of motorized dampers, relays, zone controllers and communicating thermostats to address the effects of stratification layers. The dampers are installed in the various locations. When a zone calls for heating or cooling, the damper opens and directs conditioned air into the targeted zone while the other dampers are unaffected. This allows the occupants on different floors to tailor the temperature to their personal preference.

* _Air Balancing_: Cheap supply registers lack a mechanism for controlling air volume and direction. Homeowners with comfort issues are advised to consider purchasing double deflection supply registers with an opposed blade damper for better air movement. Recommend **Corrective Action** by a **Qualified** HVAC Contractor.

 

(2) To help reduce the potential air stratification, I also recommend installing ceiling fans in the bell tower and the mail level (cathedral ceilings). The fan will help de-stratify the supply air.

 

Copyright © Capital Infrared, LLC



Copyright © Capital Infrared, LLC

# 5. Infrared Thermal Imaging (ITI) Building Survey

## Items, Systems, and Components

### 5.0 Interior Thermograms (Exceptions)

Adverse Condition

It's suspected that some amount of air leakage is occurring between the conditioned living space and the unconditioned attic (air bypasses/thermal bridging). I did not gain access to the attic space, but suspect fiberglass batt insulation. The thermal images below show **atypical** thermal patterns consistent with thermal bridging and mis-applied batt insulation (convective energy loss). A thermal bridge, also called a cold bridge, occurs when heat is transferred through a building component at a higher rate than the transfer through the surrounding envelope. Wood is a poor insulator so studs, top-plates, and headers link conditioned interior space and exterior environments. This contributes to significant heat loss in heating months and heat gain in cooling seasons. Thermal bridging accounts for as much as a 37% reduction in a wall or ceilings overall R-Value. The diagnostic testing of the thermal boundary, which involves a blower door test, goes beyond the scope of this inspection. A blower door is a powerful fan that mounts into the frame of an exterior door. The fan pulls air out of the house, lowering the air pressure inside. The higher outside air pressure then flows in through all unsealed cracks and openings of the buildings thermal boundary. The blower door test determines the air infiltration rate of a building. Air sealing the attic space should be considered. This can be achieved by applying two-part expanding spray foam to attic penetrations (gaps, holes, seams) from electrical wiring and boxes, exhaust fans, plumbing vents, duct boots, top-plates, etc. This is called an "Air Sealing and Insulation Energy Package." However, I recommend conducting a full Home Energy Performance Audit to quantify the air leakage before doing any air sealing. A **Qualified** Home Energy Performance Contractor (BPI Certified Building Analyst) should be retained to conduct the work. Recommend **Corrective Action** by a **Qualified** Insulation Contractor.

 



Copyright © Capital Infrared, LLC



Copyright © Capital Infrared, LLC







Copyright © Capital Infrared, LLC

## 5.1 Exterior Thermograms (Exceptions)

Not Applicable

Copyright © Capital Infrared, LLC

# Home Energy Medics, LLC.

Prescriptions for Better Home Comfort, Health, and Efficiency



## HOME ENERGY AUDIT REPORT



**Prepared for:**

Karl Garcia
819 D Street NE Unit 34
Washington DC 20002
310-923-8336
karl.garcia2@yahoo.com

**Inspection Date:**
October 27, 2017

**Inspector:**

Bradley Fleming
"BPI Building Analyst and
Envelope Professional
#5058234"
bfleming@homeenergymedics.com

Home Energy Medics, LLC
817 22nd St. South
Arlington, VA 22202
703-447-5379
www.homeenergymedics.com

Copyright ©, 2017, Home Energy Medics LLC



## Our Process

### 1. Diagnose the problem

The Home Energy Medics' Energy Audit finds the causes of what's making you uncomfortable, wasting your energy, impacting your health and risking your safety. We use state of the art sophisticated diagnostic tools including a blower door and infrared camera.

### 2. Write Your Prescription

This written energy audit report identifies all the major energy and comfort issues in your home or building. It provides a prioritized plan for making the most cost-effective investments to improve comfort and health, save on energy costs, and reduce your environmental impact.

### 3. Implement the Solutions

A detailed, written estimate is provided to achieve the improvements using the best products. Our team of partner professionals completes the work to our very high standards.

### 4. Evaluate the Results

Should you choose us to implement the recommended work outlined in this report, we will re-test to ensure the measured improvements are done to our exacting standards as well as ensure Building Performance Institute quality and combustion safety standards are met.



2

Copyright ©, 2017, Home Energy Medics LLC



## Home Air Leakage Results

According to the 2015 International Energy Conservation Code (IECC) a home is considered energy efficient if a standard blower door test results in less than 3 Air Changes per Hour (ACH). Your home measured **7.8** Air Changes per Hour (ACH) through the blower door. This test shows that your home is leaking **2.60** times the amount of air that it should. In other words, this means you are paying to heat and cool at least **160% more** air than necessary every day. The total of all the equivalent leakage area is equivalent to opening a standard window **9.2** inches and leaving it that way **all year**.



Copyright ©, 2017, Home Energy Medics LLC

3



## ASHRAE Standards for Mechanical Ventilation

The American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) sets national standards for indoor air quality. It is based on the air leakage results from the blower door test as well as building occupancy and the home's existing ventilation equipment (bath fans, kitchen exhaust fans, etc.). According to the ASHRAE 2013 Indoor Air Quality (IAQ) recommendations for residential buildings, your home currently <u>does not</u> require additional ventilation to be considered healthy. However, if the solutions proposed in this report are implemented, minimal mechanical ventilation would be recommended based on the ASHRAE 2013 standard.

During your home energy audit, we discovered there is already mechanical ventilation in place installed on the HVAC system with a mechanized fresh air damper attached to the return.



Copyright ©, 2017, Home Energy Medics LLC

4



## HVAC Supply Register Flows (rooms of interest)



| Master | Nursery | Living | Tower |
|--------|---------|--------|-------|
| 150% | 350% | 182% | 107% |

*These numbers are based on a nominal 1 CFM per 2 square feet of room area and do not account for greater than nominal window area or exterior wall exposure and are designed to assess gross deficiencies indicating sources of problems

## Bath Fan Flow Performance



| Master | Hall | Powder | |
|--------|------|--------|--|
| 153% | 169% | 242% | |

*These numbers are based on a nominal 1 CFM per 1 square foot of room area and do not account for greater than nominal window area or exterior wall exposure and are designed to assess gross deficiencies indicating sources of problems

Copyright ©, 2017, Home Energy Medics LLC

5



# Summary of Problems and Concerns

The primary motivation for the audit is the desire to become better educated and aware of the total energy consumption of the home, obtain prioritized list of improvements to address the issues found during the audit, and improve overall comfort levels. The following table provides a summary of your concerns and motivations plus any unanticipated challenges that we uncovered during your audit. The next few picture tables provide further evidence of identified problem areas as well.

| Homeowner reported problems/concerns |
|---|
| 80-90% humidity in the home |
| High electricity bills |
| Temperature differences throughout the home |
| Large open chase located in the HVAC closet |
| Dust from construction was pulled through unfiltered return |

| Unanticipated problems/concerns found during the audit |
|---|
| Bird feces have contaminated the attic over home |
| Spray foam in the attic is not painted with fire retardant intumescent paint |
| Open chase in the HVAC closet has a high connection to the outside |
| Return vent is located in the HVAC closet acting as a vacuum and pulling outside air into the home |
| High air infiltration and low insulation in the attic |
| Old fiberglass batt insulation |
| Crown molding cracking and warping due to high humidity |
| Improper attic ventilation |

Copyright ©, 2017, Home Energy Medics LLC

6



## HVAC Closet




HVAC closet has a large hole that is bringing in a significant amount of outside air




The high air infiltration is creating a harsh environment for the HVAC system




Since the return is located in the HVAC closet this creates a vacuum effect pulling in air from the chase residing next to the closet and creating a humid environment within the home

Copyright ©, 2017, Home Energy Medics LLC

7



**HVAC closet**




The chase adjacent to the HVAC closet is not insulated and air sealed properly allowing air and outdoor temperatures to infiltrate into the home




The chase runs up into the second floor with areas of air infiltration along the wall connected to it




There is additional air infiltration through the baseboards coming through the chase, the chase needs to be sealed up and insulated properly to stop the uncontrolled temperatures and humidity form entering the home

8

Copyright ©, 2017, Home Energy Medics LLC



## Attic Issues




Bird remains, eggs, and feces located in the attic directly above the client's home, this significantly affects indoor air quality as droppings can harbor numerous human pathogens




The birds had made their way into the attic due to an opening in the window that has been later sealed up




Since the wall cavities, ducts, electrical, and plumbing penetrations are not sealed properly this allows a pathway for the nasty stuff in the attic to infiltrate into the home and affect the indoor air quality

9

Copyright ©, 2017, Home Energy Medics LLC



## 2. Attic Issues




Batting insulation located in the attic is around R-25-R-30 this is lower than our recommended value of R-49 for this region. Also, the insulation is very dirty and not installed properly indicating high air infiltration into the home




Areas around windows were not air sealed




This allows the outdoor air to easily migrate into the home causing high drafty areas

10

Copyright ©, 2017, Home Energy Medics LLC






The large window in the living room has voids where there are areas of insulation missing




These areas of missing insulation and air sealing easily allows air and outdoor temperatures to enter the home




Sealing up these areas with spray foam will stop the air infiltration and create a more comfortable environment within the home

11

Copyright ©, 2017, Home Energy Medics LLC



## ATTIC ISSUES




The tower located in the attic was spray foamed with closed cell foam, we recommend to have this painted with intumescent fire-retardant paint for fire safety




All of these areas that are not sealed properly will add to the air exchange from the outside and increase the humidity levels in the summer




Area of insulation missing in the attic along the slope, attic temperatures will be able to easily radiate into the home

Copyright ©, 2017, Home Energy Medics LLC

12



## 2. Attic Issues



Beams are not air sealed properly allowing cold air from the attic to infiltrate into the home




Dining room ceiling has a large area of insulation missing, this will allow attic temperatures to migrate into the home

13

Copyright ©, 2017, Home Energy Medics LLC







The attic in the tower also has fiberglass batt insulation, fiberglass does a poor job stopping air infiltration. This decreases the insulation value by 50%





The HVAC ducting is not sealed properly around the connections allowing attic temperatures to migrate into the tower and decrease the efficiency of the unit





Recessed lighting is not sealed as well creating a hole for attic air to flow into the home

14

Copyright ©, 2017, Home Energy Medics LLC



## 5. Bell Tower Air Leakage




These penetrations need to be sealed up properly with foam to stop outside air from coming in




The perimeter of the window is not sealed causing a drafty area




Along the baseboards air is getting in causing the floors to get cold and creating drafts

15

Copyright ©, 2017, Home Energy Medics LLC



# Whole Home Solution

The following tables provide a summary of your remedies that need to be implemented. They are sorted by priority order to address your concerns and the unanticipated concerns we found.  Please note that safety related items are always priority one.

### 1. High Humidity and Temperature Differences Throughout Home

Remove and dispose of existing insulation.
After insulation removal, spray disinfectant to mitigate bacterial presence in home.
Install new insulation baffles at the soffit areas.
Apply 5 inches of high quality open cell spray foam to the floor of the attic area.
Spray foam with intumescent paint for fire protection.

### 2. Air Infiltration Through HVAC Closet

Seal attic chase with foam board and spray foam.
Remove wallboard and insulation. When foam is complete, install new wall material and paint.
Apply 5 inches of high quality open cell spray foam to the underside of the roof and gable end walls.
Clean duct system to eliminate dust, debris, and allergens in duct system.

### 3. Bell Tower Air Leakage

Encapsulate skylight with radiant air barrier and seam seal with spray foam
Apply 5 inches of open cell spray foam to the underside of the roof and the gable end walls.
Spray foam with intumescent paint for fire protection.

16

Copyright ©, 2017, Home Energy Medics LLC



## Other Areas

These are areas of concern identified during your audit that are unrelated to the building envelope or mechanical systems in the home. Safety items are recommended to be addressed with the same priority as combustion safety items; however, the rest of the items fall below the priorities of those items addressed in the observations and recommendations table.

### Kitchen Range Hood

**Observations:** The fan flow through the kitchen range hood PASSED measuring at 200CFM.
**Recommendations:** None

### Radon

Radon is a cancer-causing, radioactive gas. The Surgeon General has warned that radon is the second leading cause of lung cancer in the United States today. Conduct radon test to see if radon is entering the home. Contact the Virginia state radon office about obtaining a list of qualified testers www.vdh.virginia.gov/epidemiology/radiologicalhealth/Radon . You can also contact a private radon proficiency program for lists of privately certified radon professionals serving your area. For links and more information, visit www.epa.gov/radon/radontest.html.

### Fire Safety

All required smoke detectors in place and operational.

### Lighting

Americans can save money and protect the environment by installing ENERGY STAR qualified lighting. The easiest way to start saving energy is to change the light bulbs in your current fixtures to compact fluorescent lights (CFLs) or light emitting diodes (LEDs).

### Refrigeration

Refrigerators are the highest electrical consumption appliance on a monthly basis. When a refrigerator has surpassed 12 years of age; it should be replaced with an energy star rated version.

### Home comfort, energy use, and health

Supplemental information describing the following important items is included at the end of this report:

- Importance of treating a house as a system.
- Home Energy Use
- Indoor air quality and air leakage.
- Measuring infiltration (air leakage from outside) with a blower door.

17

Copyright ©, 2017, Home Energy Medics LLC



# Supplemental Information

### Your Energy Audit

The energy audit performed followed to the standards of the Building Performance Institute. The purpose of this energy audit was to identify, quantify, and prioritize measures to improve the home's comfort, health, and energy savings. Observations and recommendations in this report provide the homeowner many excellent opportunities to perform upgrades to improve home comfort and reduce heating and cooling bills.

### Treating a House as a System

It is important to treat a house as an entire system when addressing home performance retrofits (air sealing, insulation, etc.). Home comfort, air quality, moisture, HVAC system operation, and energy consumption are all inter-related. For example, a homeowner that goes through retrofits will likely not need the same size heating and cooling system when the system is replaced. Since the home requires less heating and cooling with air sealing and insulation upgrades, putting in the same size replacement system could cause short cycling, particularly in the summer, resulting in lower HVAC system efficiency and moisture problems in the house.

### Home Energy Use

EPA and DOE studies indicate air leakage in buildings causes up to 40% of heating and cooling costs. Thus, controlling air leakage is one of the most important improvements to make. Typically, consumers look at the first line of defense to improving their home's energy efficiency is window replacement. Unfortunately, leaky or inefficient windows usually contribute a small percentage of the total air leakage in a home, and the typical payback is 15 years or more. The decision to replace windows should be driven more by aesthetics, operability, and comfort rather than energy efficiency. Home performance retrofits are recommended to be done in the following order to achieve the most effective return on the investment:

1. Air sealing- house framing and ductwork
2. Insulation (thermal improvements)
3. HVAC system upgrade
4. Water heater upgrade
5. Energy Star appliances (refrigerator is first priority)
6. Window Replacement

18

Copyright ©, 2017, Home Energy Medics LLC



### *Measuring Infiltration with a Blower Door*

A blower door test measures the aforementioned rate of air leakage that exists in your home. We depressurized your house to the level of (-50) Pascals (Pa) via fan ex-filtration, and the observed infiltration approximated a 20-mph wind blowing through cracks and openings. In most homes, leaks around pipes, electrical penetrations, and structural wall framing account for the most loss of conditioned air than the amount of loss from windows and doors. Can a house be "too tight"? Yes, but this is rare. Home Energy Medics recommendations for air sealing are always based on meeting the 2015 IECC standards in order to maintain acceptable indoor air quality in homes. If blower door tests indicate the need (measured air leakage between this level and the Building Airflow Standard), we will recommend the appropriate supplemental mechanical ventilation in order to ensure healthy indoor air quality. It is much better to seal a house as tight as possible and then install ventilation if needed. This is important to ensure that unfiltered, unconditioned air is not being pulled from the crawl space, attic, or other undesirable location.

### *Home Air Leakage and Indoor Air Quality*

Energy loss and air leakage begins in the attic. Air sealing stops the airflow between a home and the attic and is the key component to preventing energy loss. Proper air sealing helps conditioned air stay inside the home by closing up the holes which will significantly improve the comfort of your home. These air leaks in your home are found around recessed lighting, duct chases, outlets and switches and more. Think of air sealing like going outside on a cold windy day with nothing but a sweater – this will do a poor job to protect you and will easily let cold air in. However, putting on a windbreaker will immediately stop the air to keep you feeling warmer and more comfortable. After properly air sealing such cracks and openings in the home, you can improve home comfort, reduce heating and cooling costs, improve building durability, and improve indoor air quality.



19

Copyright ©, 2017, Home Energy Medics LLC



# House Layout

### Statistics
1921 sq ft
3 Floors
2 Bedrooms 3
Bathrooms

1st Floor



Copyright ©, 2017, Home Energy Medics LLC

20



## 2nd Floor



Copyright ©, 2017, Home Energy Medics LLC

21



3rd Floor



22

Copyright ©, 2017, Home Energy Medics LLC



DUCTZ of Southern Maryland
10383 Southern Maryland Blvd.
Suite 911
Dunkirk MD 20754

March 17, 2018

Inspection

Hello Mr. Garcia,

After my initial inspection of the duct system in your home I found that the cold air return and the open cavity behind the unit are more than likely the cause of your issues with your environmental inspection.

The open cavity beside the HVAC unit is open to the outside wall and should have insulation and drywall to encapsulate the outside wall from the inside wall, this was not the case. I could see the outside brick façade which would allow outside cold & Hot air and outside contaminates to enter the condo and directly into the HVAC unit.

Without blue prints of the mechanical system I cannot see where the they are pulling cold air from. If it comes from the attic environment than I would recommend cleaning the entire duct system. Further information is needed on this aspect.

After inspecting the ductwork in the attic, I found that a large majority of the main trunk system had no interior lined insulation nor exterior insulation. This should be addressed A.S.A.P. This situation not only costs more money to run the heating and cooling systems but also leaves the ductwork susceptible to sweating, which in turn can cause microbial growth within the ductwork.

Recommendations;
- Fix the outside wall beside the air handler to encapsulate the outside wall.
- Insulate all the main ductwork in the attic correctly.
- Find out where the cold air is being pulled from, attic or outside wall?
- Ask your HVAC expert if it is necessary to have a cold air return for your system.

Sincerely,

Dirk Thorne.



# Invoice



Meyer Electrical Service, Inc.
7209 Lenhart Dr
Chevy Chase, MD 20815
Office Phone: 301-941-1400
Mobile Phone: 301-593-0565
waltmeyer@verizon.net

| Invoice Number: | 171216792 |
| Invoice Date: | 12/16/2017 |
| Payment Terms: | COD |
| Invoice Amount: | 135.00 |

**Bill To**
Karl Garcia
819 D Street NE #34
Washington, DC 20002
Office Phone: 310-923-8336
karl.garcia2@yahoo.com

**Job Address**
Karl Garcia
Office Phone: 310-923-8336
karl.garcia2@yahoo.com

| Item Name | Quantity | @ | Taxable | Total |
|-----------|---------|-----|---------|-------|
| Whole House Electrical Inspection<br>Found recessed fixtures installed in attic space non air-tight rated, no gasket or caulking.<br>Old BX cable through out attic space that is abandoned should be removed per NEC 800.25<br>MC cable not supported and secured per NEC 330.30 | 1.00 | 135.00 | | 135.00 |

**Comment:**
We appreciate your business!

| | |
|---|---|
| Subtotal: | $ 135.00 |
| Invoice Amount | $ 135.00 |
| Check #1148 on 12/16/2017. | (135.00) |
| Invoice Balance: | $ 0.00 |

*Herndon, Virginia 20170*

Facsimile: 703 • 471-0020
www.hpenviron.com

Report Number: 183154



HP ENVIRONMENTAL
INCORPORATED

Page 1 of 5

## Certificate of Laboratory Analysis

Karl Garcia
Attn: Karl Garcia
819 D Street, NE
Unit #34
Washington, DC 20002

**Date Received:** 01/29/18
**Date Reported:** 2/6/18
**Project Location:** Residence

---

1. **Client Sample No.: KG-012618-01**      HPE Sample Number: 183154-01
   Sample Matrix: Bulk              Collected: 01/26/18
   Sample Location: Front of residence (outside), ground level, north side: bird droppings (0.5g)

### Bacterial Culture - 35°C - Total Bacterial Plate Count with IDs
Container Tested: Tryp. Soy Blood Agar

Preparation Method: SM 9215     Prepared: 02/06/18     Prepared By: REP
Analysis Method: SM 9215     Analyzed: 02/12/18     Analyzed By: REP

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Bacterial Plate Count | 4.6E+6 | CFU/g | 2000 | ARL |
| Lactobacillus-like | 44 | % | n/a | |
| Staphylococcus epidermidis | 17 | % | n/a | |
| Corynebacterium sp. | 13 | % | n/a | |
| Gram positive rod | 8.6 | % | n/a | |
| Escherichia coli | 4.3 | % | n/a | |
| Gram positive cocci | 4.3 | % | n/a | |
| Pseudomonas aeruginosa | 2.6 | % | n/a | |
| Bacillus sp. | 2.1 | % | n/a | |
| Bacillus licheniformis | 1.3 | % | n/a | |
| Bacillus circulans | 0.80 | % | n/a | |
| Klebsiella sp. | 0.80 | % | n/a | |
| Bacillus cereus | 0.40 | % | n/a | |
| Enterococcus sp. | 0.20 | % | n/a | |
| Actinomyces sp | 0.17 | % | n/a | |

### Fungal Culture - 25°C - Total Fungal Plate Count with IDs
Container Tested: 2% Malt Extract Agar

Preparation Method: ASM: Micro. Proc.     Prepared: 01/26/18     Prepared By: REP
Analysis Method: ASM: Micro. Proc.     Analyzed: 02/02/18     Analyzed By: REP

See footnotes: 1

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Fungal Plate Count | 1.1E+7 | CFU/g | 140000 | ARL |
| Pichia apartinae | 46 | % | n/a | |
| Candida intermedia | 37 | % | n/a | |
| Sporobolomyces salmonicolor | 3.7 | % | n/a | |
| Rhodotorula glutinis | 2.8 | % | n/a | |
| N.S.F. (hyaline) | 2.2 | % | n/a | 2 |
| Exophiala jeanselmei | 1.8 | % | n/a | |
| Aureobasidium pullulans | 1.1 | % | n/a | |
| Clad. cladosporioides complex | 0.90 | % | n/a | |
| Cryptococcus laurentia | 0.90 | % | n/a | |
| Alternaria alternata | 0.70 | % | n/a | |
| Fusarium solani | 0.70 | % | n/a | |
| N.S.F. (pigmented) | 0.70 | % | n/a | 2 |
| Penicillium decumbens * | 0.70 | % | n/a | 3 |
| Mucor pusillus | 0.40 | % | n/a | |
| N.S.F. (mucoid) | 0.40 | % | n/a | 2 |
| Epicoccum purpurascens | 0.20 | % | n/a | |

104 Elden Street
Herndon, Virginia 20170

Report Number: 183154



H P   E N V I R O N M E N T A L
INCORPORATED

Facsimile:   703 • 471-0020
www.hpenviron.com

Page 2 of 5

## Certificate of Laboratory Analysis

Karl Garcia
Attn: Karl Garcia
819 D Street, NE
Unit #34
Washington, DC 20002

**Date Received:**     01/29/18
**Date Reported:**     2/6/18
**Project Location:** Residence

---

2.  Client Sample No.: **KG-012618-02**       HPE Sample Number: 183154-02
    Sample Matrix:     Bulk                   Collected:           01/26/18
    Sample Location:   Front of residence (outside), ground level, north side: in dirt (0.5g)

### Fungal Culture - 25°C - Total Fungal Plate Count with IDs

Container Tested: 2% Malt Extract Agar

Preparation Method:  ASM: Micro. Proc.       Prepared:  01/26/18        Prepared By:  REP
Analysis Method:     ASM: Micro. Proc.       Analyzed: 02/02/18         Analyzed By: REP

| Analyte  *See footnotes: 1* | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Fungal Plate Count | 1.1E+6 | CFU/g | 14000 | ARL |
| Pichia spartinae | 88 | % | n/a | |
| Sporobolomyces salmonicolor | 5.3 | % | n/a | |
| Rhodotorula glutinis | 1.8 | % | n/a | |
| Cryptococcus laurentia | 1.1 | % | n/a | |
| Candida sp. | 0.70 | % | n/a | |
| Exophiala jeanselmei | 0.70 | % | n/a | |
| N.S.F. (hyaline) | 0.50 | % | n/a | 2 |
| N.S.F. (mucoid) | 0.50 | % | n/a | 2 |
| Aureobasidium pullulans | 0.40 | % | n/a | |
| Mucor plumbeus | 0.40 | % | n/a | |
| Alternaria alternata | 0.20 | % | n/a | |
| Fusarium solani | 0.20 | % | n/a | |

---

3.  Client Sample No.: **KG-012618-03**       HPE Sample Number: 183154-03
    Sample Matrix:     Bulk                   Collected:           01/26/18
    Sample Location:   North side, first level: bird droppings (inside attic) (0.5g)

### Fungal Culture - 25°C - Total Fungal Plate Count with IDs

Container Tested: 2% Malt Extract Agar

Preparation Method:  ASM: Micro. Proc.       Prepared:  01/26/18        Prepared By:  REP
Analysis Method:     ASM: Micro. Proc.       Analyzed: 02/02/18         Analyzed By: REP

| Analyte  *See footnotes: 1,4* | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Fungal Plate Count | 73000 | CFU/g | 1400 | ARL |
| Pichia spartinae | 55 | % | n/a | |
| Candida sp. | 14 | % | n/a | |
| Penicillium decumbens * | 7.6 | % | n/a | 3 |
| Clad. cladosporioides complex | 5.4 | % | n/a | |
| Rhodotorula glutinis | 4.1 | % | n/a | |
| Aspergillus niger | 2.7 | % | n/a | |
| Cryptococcus neoformans | 2.7 | % | n/a | |
| Sporobolomyces salmonicolor | 2.2 | % | n/a | |
| Penicillium (monoverticillate) | 1.6 | % | n/a | |
| Penicillium purpurogenum | 1.6 | % | n/a | |
| N.S.F. (mucoid) | 1.4 | % | n/a | 2 |
| Penicillium chrysogenum | 1.1 | % | n/a | |
| Mucor sp. | 0.80 | % | n/a | |

*104 Elden Street*
*Herndon, Virginia 20170*

Facsimile: 703 • 471-0020
www.hpenviron.com

Report Number: 183154



H P  E N V I R O N M E N T A L
INCORPORATED

Page 3 of 5

### Certificate of Laboratory Analysis

Karl Garcia
Attn: Karl Garcia
819 D Street, NE
Unit #34
Washington, DC 20002

**Date Received:** 01/29/18
**Date Reported:** 2/6/18
**Project Location:** Residence

---

Sample Results Continued -----    Client Sample No.: KG-012618-03    Profile: FungalTPC/ID

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Cladosporium sphaerospermum | 0.50 | % | n/a | |

---

4.  Client Sample No.: **KG-012618-04**        HPE Sample Number: 183154-04
    Sample Matrix:    Bulk                    Collected:        01/26/18
    Sample Location:  South side, first level: bird droppings (inside attic) (0.5g)

**Bacterial Culture - 35°C - Total Bacterial Plate Count with IDs**        Container Tested: Tryp. Soy Blood Agar
Preparation Method: SM 9215        Prepared: 02/06/18        Prepared By: REP
Analysis Method:    SM 9215        Analyzed: 02/12/18        Analyzed By: REP

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Bacterial Plate Count | 250000 | CFU/g | 200 | ARL |
| Lactobacillus-like | 47 | % | n/a | |
| Corynebacterium-like | 16 | % | n/a | |
| Staphylococcus epidermidis | 16 | % | n/a | |
| Bacillus sp. | 8.0 | % | n/a | |
| Escherichia coli | 4.7 | % | n/a | |
| Pseudomonas aeruginosa | 2.4 | % | n/a | |
| Bacillus licheniformis | 1.6 | % | n/a | |
| Methylobacterium sp. | 1.6 | % | n/a | |
| Bacillus circulans | 0.80 | % | n/a | |
| Gram positive rod | 0.80 | % | n/a | |
| Enterobacter sp. | 0.40 | % | n/a | |
| Gram positive cocci | 0.40 | % | n/a | |
| Klebsiella sp. | 0.30 | % | n/a | |
| Streptomyces sp. | 0.20 | % | n/a | |
| Enterococcus sp. | 0.10 | % | n/a | |

**Fungal Culture - 25°C - Total Fungal Plate Count with IDs**        Container Tested: 2% Malt Extract Agar
Preparation Method: ASM: Micro. Proc.        Prepared: 01/26/18        Prepared By: REP
Analysis Method:    ASM: Micro. Proc.        Analyzed: 02/02/18        Analyzed By: REP
*See footnotes: 1*

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Fungal Plate Count | 9600 | CFU/g | 1400 | |
| Rhodotorula glutinis | 46 | % | n/a | |
| Pichia spartinae | 13 | % | n/a | |
| Sporobolomyces salmonicolor | 13 | % | n/a | |
| Candida intermedia | 4.2 | % | n/a | |
| Clad. cladosporioides complex | 4.2 | % | n/a | |
| N.S.F. (hyaline) | 4.2 | % | n/a | 2 |
| Penicillium chrysogenum | 4.2 | % | n/a | |
| Penicillium decumbens * | 4.2 | % | n/a | 3 |
| Rhizopus stolonifer | 4.2 | % | n/a | |
| N.S.F. (pigmented) | 2.1 | % | n/a | 2 |

104 Eden Street
Herndon, Virginia 20170

Facsimile: 703 • 471-0020
www.hpenviron.com

Report Number: 183154



H P   E N V I R O N M E N T A L
INCORPORATED

Page 4 of 5

## Certificate of Laboratory Analysis

Karl Garcia
Attn: Karl Garcia
819 D Street, NE
Unit #34
Washington, DC 20002

Date Received: 01/29/18
Date Reported: 2/6/18
Project Location: Residence

---

Sample Results Continued ----- Client Sample No.: KG-012618-04    Profile: FungalTPC/ID

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Penicillium (monoverticillate) | 2.1 | % | n/a | |

5. Client Sample No.: **KG-012618-05**          HPE Sample Number: 183154-05
Sample Matrix:      Wipe/Swipe (1 in2)        Collected:          01/26/18
Sample Location:  HVAC inside Living Room at base below filter

**Bacterial Culture - 35°C - Total Bacterial Plate Count with IDs**          Container Tested: Tryp. Soy Blood Agar
Preparation Method: SM 9215          Prepared: 02/06/18          Prepared By: REP
Analysis Method:      SM 9215          Analyzed: 02/12/18          Analyzed By: REP

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Bacterial Plate Count | 73000 | CFU/in2 | 50 | ARL |
| Lactobacillus sp. | 41 | % | n/a | |
| Corynebacterium-like | 19 | % | n/a | |
| Bacillus (mixed species) | 10 | % | n/a | |
| Staphylococcus epidermidis | 10 | % | n/a | |
| Escherichia coli | 5.5 | % | n/a | |
| Bacillus circulans | 3.4 | % | n/a | |
| Bacillus licheniformis | 3.4 | % | n/a | |
| Gram positive rod | 2.7 | % | n/a | |
| Pseudomonas aeruginosa | 2.0 | % | n/a | |
| Gram positive cocci | 1.4 | % | n/a | |
| Streptococcus sp. | 0.70 | % | n/a | |
| Enterococcus sp. | 0.30 | % | n/a | |
| Klebsiella sp. | 0.10 | % | n/a | |

**Fungal Culture - 25°C - Total Fungal Plate Count with IDs**          Container Tested: Swab/Sterile Single
Preparation Method: ASM: Micro. Proc.          Prepared: 01/26/18          Prepared By: REP
Analysis Method:      ASM: Micro. Proc.          Analyzed: 02/01/18          Analyzed By: REP
                        See footnotes: 1

| Analyte | Result | Units | Reporting Limit | Qualifier |
|---|---|---|---|---|
| Total Fungal Plate Count | 14000 | CFU/in2 | 350 | |
| Penicillium decumbens * | 50 | % | n/a | |
| Yeast (cream) | 36 | % | n/a | |
| Sporobolomyces salmonicolor | 4.3 | % | n/a | |
| Rhodotorula glutinis | 3.6 | % | n/a | |
| Aspergillus niger | 2.1 | % | n/a | |
| Clad. cladosporioides complex | 1.4 | % | n/a | |
| Exophiala jeanselmei | 0.70 | % | n/a | |
| Mucor pusillus | 0.70 | % | n/a | |
| N.S.F. (mucoid) | 0.70 | % | n/a | 2 |
| Chrysonilia sitophila | 0.40 | % | n/a | |
| Rhizopus stolonifer | 0.40 | % | n/a | |

*Herndon, Virginia 20170*

*Facsimile:   703 • 471-0020*
*www.hpenviron.com*

Report Number: **183154**



H P   E N V I R O N M E N T A L
INCORPORATED

Page 5 of 5

## Certificate of Laboratory Analysis

Karl Garcia
Attn: Karl Garcia
819 D Street, NE
Unit #34
Washington, DC 20002

**Date Received:**   01/29/18
**Date Reported:**   2/6/18
**Project Location:**  Residence

---

6.  Client Sample No.: **KG-012618-06**          HPE Sample Number: 183154-06
    Sample Matrix:    Air  (142 L)              Collected:        01/26/18
    Sample Location:   Inside Living Room at center of room at 1' off floor

| **Fungal Culture - 25°C**   - Total Fungal Plate Count with IDs | | | | Container Tested: 2% Malt Extract Agar | |
|---|---|---|---|---|---|
| Preparation Method: ASM: Micro. Proc. | | Prepared: 01/26/18 | | Prepared By: REP | |
| Analysis Method:    ASM: Micro. Proc. | | Analyzed: 02/02/18 | | Analyzed By: REP | |
| Analyte *See footnotes: 1* | Result | Units | Reporting Limit | Qualifier |
| Total Fungal Plate Count | 110 | CFU/m3 | 49 | |
| Penicillium decumbens * | 63 | % | n/a | 3 |
| Rhodotorula glutinis | 13 | % | n/a | |
| Clad. cladosporioides complex | 6.3 | % | n/a | |
| Epicoccum nigrum | 6.3 | % | n/a | |
| N.S.F. (hyaline) | 6.3 | % | n/a | 2 |
| Sporobolomyces salmonicolor | 6.3 | % | n/a | |

(1)   Percentages may not total 100 due to rounding.

(2)   N.S.F = None sporulating fungi

(3)   * = Thermotolerant.

(4)   Cryptococcus neoformans is a presumptive identification.

**Report Notes:**

ARL   The number of organisms/cells observed on the plate or slide exceeds the upper density level for reliable counting.

*Jonathon Hall*
.................................................
Jonathon Hall, MPH, CIH
Director of Environmental Microbiology